UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          3:17CR00024(AWT)

       vs.

PETER J. SANTOS

                       HARTFORD, CONNECTICUT
           Defendant       MAY 30, 2017

- - - - - - - - - - - - - - - x


**JURY TRIAL - VOLUME I**


    BEFORE:

         HON. ALVIN W. THOMPSON, U.S.D.J.

            AND A JURY OF 12



APPEARANCES:


    FOR THE GOVERNMENT:

       OFFICE OF THE UNITED STATES ATTORNEY
       157 Church Street, 23rd Floor
       New Haven, Connecticut 06510
       BY:  JOHN H. DURHAM, AUSA

    FOR THE DEFENDANT:

       LAW OFFICE OF NEAL ROGAN
       315  Post Road West
       Westport, Connecticut  06880
       BY:  NEAL PATRICK ROGAN, ESQ.


                Corinna F. Thompson, RPR
                Official Court Reporter

1                          **TABLE OF CONTENTS**

2        WITNESS              DIRECT     CROSS     REDIRECT     RECROSS

3        JENNIFER AMATO

4          BY MR. DURHAM:      37                    57

5          BY MR. ROGAN:                  50

6        JULIE CASHMAN

7          BY MR. DURHAM:      59                    113

8          BY MR. ROGAN:                  96                       116

9        PATRICIA VILLANO

10         BY MR. DURHAM:      119                   147

11         BY MR. ROGAN:                  128                      151

12         BY MR. DURHAM:                           152

13       DANIEL LEONE

14         BY MR. DURHAM:      153                   215

15         BY MR. ROGAN:                  183                      231

16         BY MR. DURHAM:                           234

17

18

19

20

21

22

23

24

25

1                          <u>9:26 AM</u>

2              THE COURT:  Good morning.  Please be seated,

3       everyone.

4              I guess we have a couple of matters that

5       counsel want to discuss.

6              Mr. Rogan, you had a couple of things, I

7       think.

8              MR. ROGAN:  Yes, Your Honor.  One is not a

9       legal matter, and it may be a moot point now, but on

10      Thursday, when we concluded jury selection, my client

11      had asked to use the facilities.  He was taken out to

12      the restroom here, near the jury room, and unfortunately

13      there was a juror in there, so they ended up seeing him

14      handcuffed and shackled.

15             I would ask if we could do a better job of

16      segregating it, because what's the point of dressing him

17      out if they see that he's actually handcuffed.

18             THE COURT:  Okay.  There are circumstances

19      where the defendant can ask for a limiting instruction,

20      but you can think about that.

21             MR. ROGAN:  I may do that, Your Honor.  I

22      think it's evident to the jury anyway, but if we could

23      just stay focused on that.

24             THE COURT:  Sure.

25             MR. ROGAN:  Your Honor, I did have the

1    opportunity to review the two limiting instructions that

2    you had said you would provide in regards to the two

3    motions in limine that were filed by my client and were

4    denied.

5         I reviewed them with AUSA Durham, and I have

6    no issue with the limiting instruction that says "Re

7    telephone calls."  As I pointed out to Mr. Durham, with

8    the limiting instructions regarding transcripts, I have

9    no problem as it relates to the telephone calls.

10        But the other motion in limine that you ruled

11   on was the actual transcript of the August 31, 2016,

12   sentencing hearing.  You determined that that motion to

13   preclude would be denied, and that there would be a

14   limiting instruction on that as well.

15        This doesn't seem to cover it, because it

16   talks about, at the very end of the transcript,

17   conflicts with what you hear, then you should disregard

18   the transcript and then rely on the recording.

19        MR. DURHAM:  Your Honor, with respect to

20   that --

21        THE COURT:  Let me look at the ruling for a

22   second.

23            (Pause.)

24        THE COURT:  Yes.

25        MR. ROGAN:  It's on the bottom of your page 2.

1            THE COURT:  Yes, Mr. Durham.

2            MR. DURHAM:  I was just going to say, with

3     respect to the August 31st transcript, it may be

4     easiest if Your Honor just add to the limiting

5     instruction, "Re telephone calls," because the Court's

6     instructing the jury that the telephone calls are

7     admitted for purposes of evidence relating to

8     defendant's intent and motive, and submitted for that

9     limited purpose.  The Court could, at that point then,

10    in addition -- I guess it wouldn't be in addition.

11            THE COURT:  I was doing this as a specimen, so

12    I hadn't -- I wasn't sure you were going to want any

13    limiting instructions.  What I would do is take the one

14    for telephone calls and just say -- revise it to cover

15    the court transcript, and then just add motive, intent,

16    as to whether a threat was made.

17            MR. DURHAM:  Yes, Your Honor.

18            THE COURT:  When are you getting to that

19    evidence, Mr. Durham?

20            MR. DURHAM:  I would think that it's second

21    witness.

22            THE COURT:  I'll mark up something now.

23            MR. DURHAM:  If Your Honor were to take the

24    limiting instruction "Re telephone calls," and literally

25    would just say, "limiting instruction re hearing

 1    transcript," you could read it verbatim, just

 2    substituting "hearing transcript" for "recorded

 3    telephone calls."  So you would say, "You are about to

 4    hear certain evidence in the form of" --

 5              THE COURT:  Are they going to hear the court

 6    transcript?

 7              MR. DURHAM:  We intend to have Ms. Cashman

 8    read it.

 9              THE COURT:  I'll say, "You've received certain

10    evidence in the form of a hearing transcript."  I'm

11    going to mark up one right now.

12              Do you want me to use the phrase "hearing

13    transcript"?

14              MR. DURHAM:  Yes, Your Honor.

15                   (Pause.)

16              THE COURT:  Anything else?

17              I'll have you all look at that.

18              Why don't you show them that.

19              MR. DURHAM:  That's fine with the government.

20              THE COURT:  You wouldn't be held to it until

21    you've seen it typed.

22              MR. ROGAN:  Sorry, Your Honor.  Could I just

23    have a moment?

24              THE COURT:  Sure.

25                   (Pause.)

1          MR. ROGAN:  The only portion, Judge Thompson,

2     that may be problematic as to whether a threat was made,

3     I think we can all agree that, on the record of that

4     transcript, there was no threat made; or is Your Honor

5     intending to say that what happened afterwards may have

6     been the genesis of -- because I think even the

7     government would stipulate that, during the course of

8     the hearing before Judge Arterton.

9          THE COURT:  Let me just go right to the

10    ruling.  I believe the government argued, in opposition

11    to the motion, that one of the reasons for which the

12    transcript was being offered was as evidence as to

13    whether a threat was made.  And I read the analysis and

14    concluded that it could be offered for that purpose.

15         It didn't say it was a threat.  It said it's

16    evidence, it's probative.  And I expect Mr. Durham will

17    argue that it's evidence as to whether a threat was

18    made.

19         Am I understanding that correctly, Mr. Durham?

20         MR. DURHAM:  You're understanding that

21    correctly; yes, Your Honor.

22         MR. ROGAN:  So he's arguing that a threat was

23    made during the course of the hearing.

24         THE COURT:  I don't know what he's going to

25    argue, but I think he's going to argue that this is

 1    evidence that a threat was made.

 2              MR. ROGAN:  If that's the limiting

 3    instruction, Your Honor, then I understand it.  The way

 4    it read to me initially was, it appears to me that they

 5    will find in the transcript, or may find in the

 6    transcript, I think, it goes to your intent and motive

 7    as to whether an actual threat was made.

 8              THE COURT:  Looking at the jury charge, I

 9    think Mr. Durham has a valid argument.

10              MR. ROGAN:  All right.  Thank you, Your Honor.

11              MR. DURHAM:  Your Honor, one housekeeping

12    matter, which is, we expected Mr. Parker will be

13    testifying, but he's also the case agent.

14              We'd ask that he be in the courtroom?

15              THE COURT:  Yes, sir.

16              MR. DURHAM:  And then I think counsel wanted

17    the witnesses sequestered.

18              THE COURT:  During openings?

19              MR. ROGAN:  During the entirety of the

20    proceeding, Your Honor.

21              THE COURT:  So we'll have them step out.

22              MR. DURHAM:  One of the first witnesses will

23    be Ms. Amato, so I guess she can stay.

24              THE COURT:  Why don't we have her leave so we

25    have a consistent methodology.

1           And you all will let me know when you want the

2    limiting instructions.

3           MR. ROGAN:  Yes.

4           THE COURT:  I'll give it as many times as you

5    like, within reason.

6           MR. ROGAN:  Thank you, Your Honor.

7           THE COURT:  Are we ready for the jury?

8           MR. DURHAM:  Yes, Your Honor.

9           MR. ROGAN:  Yes, Your Honor.I.

10          THE COURT:  I will have you remind them on who

11   you are, and who's at counsel table with you, early on

12   in my preliminary instructions.

13               (Whereupon, the jury entered the

14   courtroom.)

15          THE COURT:  Please be seated, everyone.

16          Good morning, members of the jury.

17          THE JURY:  Good morning.

18          THE COURT:  Before we begin today's

19   proceedings, I'm going to ask the courtroom deputy to

20   swear in the jury.

21          THE CLERK:  Stand and raise your right hand.

22          You do solemnly swear that you will consider

23   the matters in issue between the United States and the

24   defendant according to the law as the judge shall

25   instruct you, based upon the evidence presented in

1    court, and that you will render a true and just verdict.

2            During the course of the trial and until you

3    have announced your verdict in court, you will speak

4    nothing to anyone of the case now before the Court, nor

5    shall you permit any person to speak to you concerning

6    the same.

7            After your verdict has been announced in

8    court, you will speak to no one concerning the

9    deliberations or vote of the jury, or any individual

10   juror other than yourself, unless the presiding judge

11   gives you permission to do so.

12           So help you God, or you do so affirm?

13           THE JURY:  I do.

14           THE CLERK:  Thank you.

15           THE COURT:  Ladies and gentlemen, the

16   courtroom deputy has notepads for you to use, should you

17   care to use one.  She'll hand those out now.

18               (Pause.)

19           THE COURT:  Members of the jury, we are about

20   begin the trial of the case about which you heard some

21   basic information during the process of jury selection.

22   Before the trial commences, however, there are certain

23   details and instructions you need to help you better

24   understand what will be happening during the trial and

25   how you should conduct yourself.

```
 1              First of all, our trial day will run from
 2    9:30 to 4:30.  Each morning you should plan to arrive in
 3    the jury room at least 15 minutes before court is
 4    scheduled to begin so that even if you are delayed,
 5    you're here in time for the start of that day's
 6    proceedings.  We have a schedule for breaks, and it
 7    should be posted back in the jury room.
 8              As you may recall, the name of this case is
 9    United States of America versus Peter J. Santos.  And at
10    this time I'm going to ask counsel to remind you who
11    they are and who's at counsel table with them.
12              Mr. Durham.
13              MR. DURHAM:  Thank you, Your Honor.
14              Ladies and gentlemen, again, my name is John
15    Durham, and I'm an Assistant United States Attorney here
16    in Connecticut.  You recall when we picked the jury, I
17    said there would be another person at counsel table with
18    us, and this is Senior Inspector Matt Parker of the
19    United States Marshal's Service, who is to my immediate
20    right.  And then I think you'll also recall at jury
21    selection Ms. Arsenault, who's a paralegal and will be
22    assisting in the trial of this matter.
23              Thank you.
24              THE COURT:  Thank you, Mr. Rogan.
25              MR. ROGAN:  Good morning, ladies and
```

1    gentlemen.

2            As I indicated during jury selection, my name

3    is Neil Rogan, and I represent Peter Santos, who is

4    seated to my left at counsel table.

5            Thank you.

6            THE COURT:   Thank you.

7            I want to talk with you, ladies and gentlemen,

8    about the role of the jury.

9            Your role as jurors in this case is to find

10   and determine the facts.  You are the sole judges of the

11   facts.  I will decide all questions of law which may

12   arise during this trial, and before you retire to

13   deliberate I will instruct you as to the law you must

14   follow during your deliberations.

15           Because you will be called upon to determine

16   the facts of this case, you should carefully examine the

17   testimony and other evidence presented for your

18   consideration.

19           Please keep in mind that I will instruct you

20   at the end of the trial concerning how you should

21   evaluate the credibility or believability of each

22   witness and the weight to be given to his or her

23   testimony.

24           You must keep an open mind during this trial.

25   During the trial you are to neither form nor express any

1    opinion about the case to anyone until you have heard

2    and considered all of the testimony and other evidence,

3    and my instructions to you on the applicable law.

4           While the trial is in progress you must not

5    discuss the case in any manner amongst yourselves or

6    with anyone else, nor should you permit anyone to

7    discuss it in your presence.

8           In addition, you should not read, watch or

9    listen to anything in the media or anywhere else related

10   to this trial or any similar matter.  My instructions

11   include discussing or being exposed to this or any

12   similar matter via the internet, including social

13   networking websites such as Twitter, Facebook, My Space,

14   and the various other ones that now exist.  The parties

15   will not have received a fair trial if you consider

16   anything other than the evidence admitted here in the

17   courtroom.

18          Now, each member of the jury has promised that

19   he or she will be a fair and impartial juror.  If any

20   member of the jury becomes aware of a lack of fairness,

21   or becomes aware of any partiality or bias on his or her

22   part, that person should make that state of mind known

23   to the Court right away.

24          Next, I want to talk with you about the fact

25   that, during the trial, it's customary for me to make

1    rulings.

2              From time to time during the trial I may be

3    called upon to make rulings of law on objections or

4    motions made by the attorneys.  It is the duty of an

5    attorney to object when testimony or other evidence

6    which the attorney believes is not admissible is offered

7    for your consideration.

8              You should not be influenced by the objection

9    or by my ruling on it.  You should not infer or conclude

10   from any ruling or comment I may make that I have any

11   opinion on the merits of the case, favoring one side or

12   the other.

13             Now, if I sustain an objection to a question

14   that goes unanswered by the witness, you should not draw

15   any conclusion from the question itself, or speculate as

16   to what the answer might have been.

17             Sometimes a witness may answer a question

18   before I have ruled on an objection.  In that case, I

19   may instruct you to disregard the witness's answer.  If

20   I do so instruct you, you must act as if the question

21   objected to was never answered.

22             If the objection is overruled or denied, or I

23   say the question is allowed or something like that, this

24   means you should treat the answer to the question like

25   any other answer.

1            In addition, in some instances evidence may be

2    admitted for a limited purpose only.  If I instruct you

3    that an item of evidence has been admitted for a limited

4    purpose, you must consider it only for that limited

5    purpose and for no other purpose.  If that happens, I

6    will tell you what the limited purpose is.

7            Now, on occasion, when there is an objection,

8    I may ask the lawyers to come up to the bench, or the

9    sidebar where we questioned you during jury selection,

10   to give me their reasons for the objection out of your

11   hearing, or to confer with me regarding certain

12   questions of law or procedure.

13           This is to avoid the necessity of your leaving

14   the courtroom and the delay that this would entail.

15   Please be patient with us during any such delays.  We

16   try to keep these questions to a minimum by discussing

17   in advance any issues that we can foresee, but you

18   should understand that any such interruptions are

19   necessary in order to enable you to do your job

20   properly.  I would have to tell you that you have to

21   disregard what you've heard, and if you didn't hear it,

22   it will be easier for you not to worry about

23   disregarding it.

24           Now, there are occasions during a trial where

25   jurors may be excused from the courtroom for the same

 1    reason.

 2              Now, it's possible that, during the course of

 3    the trial, I will ask questions of witnesses in order to

 4    bring out points not then fully conveyed in the

 5    testimony.  If I do so, please do not assume that I hold

 6    any opinion on the matters to which my questions may be

 7    related.  Remember that you, as jurors, are at liberty

 8    to disregard all comments of the Court in arriving at

 9    your own findings as to the facts in this case.

10              Next I want to talk with you about evidence.

11              You must consider only the evidence or the

12    lack of evidence in deciding this case.  The evidence

13    from which you are to decide what the facts are comes in

14    three forms:

15              First, there is the sworn testimony of

16    witnesses, both on direct and cross-examination.

17              Second, there are the exhibits that will be

18    received into the trial record.

19              And, third, there may be stipulations by the

20    parties or judicially noticed facts.

21              Now, certain things are not evidence and are

22    not to be considered as such:

23              First, arguments or statements by lawyers are

24    not evidence.  They are designed and permitted to give

25    the lawyers the opportunity to tell you how they think

1    you should evaluate the evidence.

2         Second, the questions to the witnesses are not

3    evidence.  I instructed you earlier, in substance, that

4    my questions and comments are not evidence.  Let me also

5    emphasize that a lawyer's question is not evidence.

6    While you must, at times, consider a lawyer's question

7    to give content and meaning to the witness's answer, it

8    is the witness's answer that is evidence.

9         At times a lawyer may incorporate into a

10   question a statement which assumes certain facts to be

11   true, and then asks the witness if the statement is

12   true.

13        If the witness denies the truth of a

14   statement, and if there is no evidence in the record

15   proving that the assumed fact is true, then you may not

16   consider the fact to be true simply because it is

17   contained in the lawyer's question.  In short, questions

18   are not evidence, answers are.

19        Third, objections and arguments are not

20   evidence.

21        Fourth, testimony that is excluded, stricken,

22   or that you are instructed to disregard is not evidence

23   and must be disregarded.  And if I give you a limiting

24   instruction as to evidence, you must follow that

25   limiting instruction.  Also, exhibits marked for

1   identification but not admitted are not evidence.

2           Fifth, anything you may see or hear outside

3   the courtroom is not evidence and must be disregarded

4   entirely.

5           Now, there are two kinds of evidence, direct

6   and circumstantial.

7           Direct evidence is direct proof of a fact,

8   such as testimony of an eyewitness about what the

9   witness saw or heard or did.

10          Circumstantial evidence is proof of one or

11   more facts from which you could infer the existence of

12   another fact, even though there was no direct proof as

13   to that fact.

14          The word "infer," or the expression "to draw

15   an inference," means to find a fact exists even though

16   it has not been proven directly.  The word "infer," or

17   the expression "to draw an inference," means to find

18   that a fact exists based on proof of another fact.

19          By way of example, if you wake up in the

20   morning and see that the street and sidewalks are wet,

21   you may find from that fact that it rained during the

22   night.  In other words, the fact of rain is a inference

23   that could be drawn from circumstantial evidence, namely

24   the presence of water on the street and sidewalk.

25   Evidence of rain, on the other hand, would be an actual

1    observation of raindrops coming down from the sky.

2         Now, an inference may be drawn only if it is

3    reasonable and logical, not if it is speculative.  You

4    are allowed to draw logical inferences from facts that

5    you find to have been proven, but you may not go outside

6    the evidence to find the facts, nor to resort to

7    guesswork or conjecture.  While you may draw conclusions

8    from proven facts, you may not draw inferences from

9    their inferences.

10        To aid you in better understanding this point,

11   in the rain example I just used, while you could infer

12   from the wet ground that it had rained, you could not

13   infer that there were two inches of rain without more

14   evidence.

15        In other words, you should be careful to avoid

16   resorting to speculation, conjecture, or guesswork to

17   determine critical facts in this case.

18        At the end of the case I will give you further

19   instructions on the matters I'm now touching on, but

20   have in mind that you may consider both sides of

21   evidence; you may indeed consider circumstantial

22   evidence as well as direct evidence; and it is for you

23   to decide how much weight, if any, to give to either.

24        Next I'm going to talk with you about

25   witnesses.

1           The credibility of witnesses and the weight to

2     be given their testimony are matters that are

3     particularly and solely within your province.  No fact

4     is, of course, to be determined simply by the number of

5     witnesses testifying for or against it.  It is the

6     quality, not the quantity, of testimony which controls.

7           In weighing the testimony of a witness, you

8     should consider his or her appearance on the stand.  You

9     should try to size him or her up.  You should have in

10    mind all those little circumstances which point to

11    truthfulness or untruthfulness.

12          You should consider any possible bias or

13    prejudice the witness may have, whether for or against

14    the government or the defendant; his or her interest or

15    lack of interest, of whatever sort, in the outcome of

16    the trial; and his or her ability to observe facts

17    correctly, and to remember and relate them truthfully

18    and accurately.

19          You should test the evidence he or she gives

20    by your own knowledge of human nature and the motives

21    which influence and control human action.  If any facts

22    are admitted or otherwise proven to you, you may well

23    bring them into relation with the witness's testimony

24    and see if they fit together with it.

25          In short, you are to bring to bear upon your

 1    assessment of a witness's testimony the same

 2    considerations and use the same sound judgments and

 3    common sense you apply to the questions of truth and

 4    veracity which daily present themselves in the ordinary

 5    affairs of life.

 6              I now have a few procedural points I want to

 7    discuss with you.

 8              First, at the end of the trial you will have

 9    to make your decision based on what you recall of the

10    evidence.  Although the court reporter is taking down

11    these proceedings, you will not have with you a written

12    transcript with which to consult.  And although it can

13    be done, you would find it difficult and time-consuming

14    for the court reporter to locate and read back lengthy

15    testimony.  Thus, I urge you to pay very close attention

16    to the testimony as it is given to you.

17              Second, during the course of the trial you may

18    cross paths with the attorneys or the parties or

19    witnesses in or around the courthouse.  You should avoid

20    talking to the attorneys, the parties, and the

21    witnesses, and anyone associated with them, during the

22    trial.

23              Similarly, please do not be offended when the

24    attorneys, parties and witnesses do not talk to you or

25    when they seem to avoid you.  They are merely doing what

1    they should do to avoid even the appearance of improper

2    contact with any member of the jury.

3              It's possible that, at times, you may be asked

4    to avoid certain areas of the courthouse the attorneys,

5    parties or witnesses are using so we can minimize the

6    degree to which you cross paths with them.

7              Finally, if you do have any conversations with

8    any of the attorneys or parties, or the witnesses, or

9    anyone associated with them, please tell the courtroom

10   deputy at once.

11             Let me tell you how a trial like this is

12   customarily structured.  The trial in this case will be

13   structured as follows:

14             First, counsel will give opening statements,

15   which I remind you are not evidence.

16             Then the government will present witnesses,

17   and the lawyer for the defendant may cross-examine them.

18             Following the government's case, the lawyer

19   for the defendant may or may not present witnesses.  If

20   witnesses are presented, the prosecutor may

21   cross-examine them.

22             Then it is possible that there may be what we

23   call "rebuttal witnesses."

24             After all the evidence is in, the attorneys

25   will present their closing arguments to summarize and

1    interpret the evidence for you, and I will instruct you

2    on the law.

3           If more than 12 members of the jury remain, we

4    will identify alternate jurors who will remain under

5    court order, in case we need them to replace a

6    deliberating juror, until the jury has been discharged.

7    Then 12 of you will retire to deliberate and come to an

8    unanimous verdict.

9           Let me remind you about what this case

10   concerns.

11          The defendant in this case, Peter J. Santos,

12   is charged with threatening a federal official.

13   Specifically, the indictment charges that Mr. Santos

14   threatened a United States Probation Officer while the

15   officer was engaged in the performance of his official

16   duties on account of the performance by that probation

17   officer of his official duties.

18          At the close of the case, when I give you the

19   jury charge, I will review the elements of the offense

20   with you.  For now, however, I hope that this brief

21   overview will help you understand what your task as

22   jurors in this case involve.

23          Now I want to talk with you about special

24   aspects of criminal indications.

25          There are some basic rules about a criminal

1    case that you must keep in mind.

2            First, you should understand that the

3    indictment is simply a charge by the government to begin

4    a case, and that it is not in any sense evidence of the

5    allegations or statements it contains.

6            The defendant has pled not guilty to the

7    indictment and is presumed innocent unless the jury

8    unanimously finds that the government has proved the

9    defendant's guilt beyond a reasonable doubt.

10            Second, after the government has presented

11    evidence, the defendant may present evidence but is not

12    required to do so.  The burden or obligation is always

13    on the government to prove each and every element of the

14    offense charged beyond a reasonable doubt.

15            The law never imposes on a defendant in a

16    criminal case the burden of calling any witnesses,

17    presenting any exhibits, or introducing any evidence.

18    No inference whatsoever may be drawn from a defendant's

19    election not to call witnesses or present exhibits, or

20    the election of a defendant not to testify.  A defendant

21    is presumed to be innocent of the charge.

22            Third, the government has the burden or

23    obligation to prove each of the essential elements of

24    the crime charged in the indictment beyond a reasonable

25    doubt.

1           I will give you further instructions on this

2      point later, but bear in mind that, in this respect, a

3      criminal case is different from a civil case.

4           Last, I want to say a word about note taking.

5           It is very important to all of us that you

6      achieve as high a level of understanding as possible

7      with respect to what occurs here.  For that reason you

8      have been furnished with notepads for your use if you

9      should care to use them.

10           Please remember when you retire to deliberate,

11      however, that if a fellow juror claims that a certain

12      fact exists because he or she has it written down in his

13      or her notepad, it is your own recollection that must

14      control.

15           Also, please be very careful not to take notes

16      to the exclusion of listening to and observing the

17      witnesses.

18           Finally, at the end of each day's session,

19      please remember to leave your note pads in the jury

20      room.

21           I would like to thank you for your attention,

22      and at this time will ask counsel to proceed with

23      opening statements, which I remind you are not evidence.

24           Mr. Durham.

25           MR. DURHAM:  Thank you, Your Honor.

1           Let me begin by saying that what the purpose

2    of an opening statement is, essentially openings

3    statements are not supposed to be argument and the like.

4    They're designed or intended to give jurors an overview

5    or something of an outline of what the parties expect

6    the evidence in the case will be and what that evidence

7    will show.

8           As Judge Thompson has indicated, at the

9    conclusion of this trial he'll give you detailed

10   instructions on a variety of things, some of which the

11   judge has already touched on, but they would also

12   include what the essential elements of the offense

13   charged are.

14          So in this instance, as Judge Thompson has

15   indicated, the defendant, Mr. Santos, is charged with

16   threatening a federal official.

17          The evidence that we intend to offer -- this

18   is not going to be a long trial.  I think the parties

19   except maybe a day and a half or so of evidence, not a

20   long trial.  But the evidence we design to address what

21   are the three essential elements of the crime for which

22   the defendant has been indicted; that is that the

23   defendant threatened to assault or to kill a United

24   States Probation Officer, Brian Topor.

25          Secondly, at the time of the alleged threat

1    Mr. Topor was a federal official, as the judge will

2    define that term for you.

3              And, third, that the defendant acted with

4    intent to impede, intimidate or interfere with that

5    official while he was engaged in the performance of his

6    official duties or with the intent to retaliate against

7    that official on account of the performance of his

8    official duties.

9              How are we going to go about establishing

10   those three elements.

11             The first individual you will hear from is an

12   individual by the name of Jennifer Amato, who is a

13   senior United States Probation Officer who had nothing

14   to do with Mr. Santos here.

15             We expect her testimony will lay out what

16   supervised release is, in the federal system, and then

17   she will testify to a chronology of events involving

18   Mr. Santos:  How was it that Mr. Santos ended up before

19   a federal judge in New Haven, Judge Janet Bond Arterton,

20   on a particular date, that date being August 31 of last

21   year; how did that come about?

22             So Ms. Amato, who will just set that stage for

23   you.

24             The second witness we're going to call is the

25   courtroom reporter, the stenographer who works for Judge

1    Arterton in New Haven.  Through that witness, Ms. Julia

2    Cashman, we'll offer a transcript of the proceeding that

3    occurred before Judge Arterton on that date of

4    August 31st.  And Ms. Cashman will read portions of

5    that transcript we will offer into evidence.

6           The next witness is Patti Villano.  Patti

7    Villano is the courtroom deputy in Judge Arterton's

8    courtroom.  And Ms. Villano will testify to her

9    observations of events that occurred in the courtroom

10   while Judge Arterton was still on the bench, and then

11   events that occurred after Judge Arterton left the

12   bench, specifically threats that had been made by

13   Mr. Santos, directed specifically at the probation

14   officer, Brian Topor.

15          We'll then call a United States Probation

16   Officer, Daniel Leone, who was in the courtroom that day

17   as well.  Mr. Leone was Mr. Santos' principal probation

18   officer, although he was a relatively young probation

19   officer.  And he will recite the chronology of events

20   relating to Mr. Santos and his continued violation of

21   the terms and conditions of his supervised release,

22   which ultimately resulted in his being before Judge

23   Arterton on August 31st.

24          Mr. Leone will also testify to his personal

25   observations, what he saw Mr. Santos do and what he

1    heard Mr. Santos say in the courtroom after Judge

2    Arterton had left the bench, and specifically a threat

3    directed at his colleague, Brian Topor.

4           We'll then call Mr. Topor himself.  Mr. Topor

5    will testify to his background as a senior United States

6    Probation Officer.  He'll explain his duties and

7    responsibilities.  He will testify to the fact that,

8    prior to August 31st and specifically on or about

9    August 26th, he was in a courtroom in Hartford after

10   the defendant had been arrested for violating his

11   supervised release.

12          He, Mr. Topor, recommended that Santos be

13   detained until he could have a full hearing before Judge

14   Arterton.  And Mr. Santos expressed his upset with

15   Mr. Topor at that time by using vulgarities directed at

16   Mr. Topor.

17          He, Mr. Topor, will also testify about events

18   that occurred in the courtroom while Judge Arterton was

19   till still on the bench, and then the threats made to

20   him by Mr. Santos after Judge Arterton had left the

21   bench.

22          We'll then call two United States Marshals,

23   Deputy United States Marshals who were in the courtroom

24   both during the proceeding before Judge Arterton and

25   after the judge had left the bench.

1          Those Deputy United States Marshals are Mike

2     Curra and Matt Moore, both of whom will testify they

3     were in the courtroom the entire proceeding, and both of

4     whom were involved in taking Santos from the courtroom

5     to an elevator to bring him up to the holding area in

6     the federal courthouse in New Haven.

7          Both of those individuals will testify to

8     their personally having heard the defendant make threat

9     to Mr. Topor in the courtroom.  They will both testify

10    to the fact that, when they suggested to Mr. Santos that

11    he might want to calm down or not get himself in any

12    more trouble, he essentially made a statement to the

13    effect that, "Well, everybody's got to die at some

14    point, whether by me or some other way."  Both

15    individuals will testify to those statements by

16    Mr. Moore.

17          And then fortunately in this case, Mr. Santos

18    is being detained.  He's being held, and the evidence

19    will show that he is being held a detention facility in

20    Rhode Island.  And that detention facility records all

21    telephone calls that are made by inmates, people being

22    held there.

23          So Senior Inspector Parker, who I introduced

24    earlier today, will then testify -- he'll identify

25    various telephone calls that were recorded involving

1     Mr. Santos -- in some instances his mother, in other

2     instances with other individuals -- in which Mr. Santos

3     talks about how he hates the probation people, again

4     vulgarities directed at them.

5            He will testify -- he, Mr. Parker, will

6     testify to a telephone call, particular telephone calls

7     that were made on September 1st of 2016.  That is the

8     day after the proceedings before Judge Arterton.  And

9     you will hear in the defendant's own words that he had

10    threatened to kill Mr. Topor.

11           That, in substance, is the evidence that we

12    will present to you, and the witnesses through whom that

13    evidence and testimony will be presented.

14           At the conclusion of the case, then it will be

15    a request on the part of the government that, balancing

16    all that evidence, weighing all the evidence, that you

17    would find that the three essential elements of the

18    offense -- again, Judge Thompson will instruct you on --

19    have been proven beyond a reasonable doubt; that, in

20    point of fact, Mr. Santos did knowingly direct a threat

21    at Brian Topor, because Brian Topor was simply doing his

22    job as a United States Probation Officer.

23           And accordingly, we would then ask you to

24    return a guilty verdict on the one count with which

25    Mr. Santos has been charged.

1           That is an overview of the evidence to be

2     presented.

3           Thank you.

4           THE COURT:   Thank you.

5           Mr. Rogan.

6           MR. ROGAN:   Thank you, Your Honor.

7           Ladies and gentlemen, as Attorney Durham

8     indicated, opening statements are just that.  They're

9     not argument.

10           Let me start out by explaining to you just

11     generally what's interesting about this case for you,

12     factually and legally.  It's almost a mirror image of

13     the people we see in this courtroom today.

14           We have a judge presiding, we have a court

15     reporter, we have a courtroom deputy.  Many of those

16     witnesses will mirror the witnesses from a New Haven

17     district courthouse.

18           Attorney Durham indicated, and it's correct,

19     that my client has been charged in a one-count

20     indictment of threatening a federal official.  And let

21     me tell you, that's a serious allegation.  However, what

22     is important, and that I ask you more than anything, is

23     to keep an open mind and understand, as Judge Thompson

24     has indicated, until you've heard all of the evidence

25     and seen all of the witnesses testify, the context in

1    which Mr. Santos made a threat, and when I say "threat,"

2    an alleged threat.

3           I will also tell you again what the evidence

4    is going to show.  You're not going to like Peter.  The

5    evidence is going to show, no question, that a colleague

6    of Judge Thompson's, he was disrespectful, he was

7    vulgar, he was rude.  Not a crime.

8           The evidence will show beyond any reasonable

9    doubt that Mr. Santos was unhappy with the outcome of

10   that seminal hearing on August 31, 2016.

11          What the evidence will also show is that all

12   of those people that I just talked to you about have

13   different versions of what they think they saw or heard

14   Mr. Santos say on that date.  That's not conjecture.

15   That's not speculation.

16          And as Attorney Durham -- and I agree with

17   him -- of what the three elements are, that it has to be

18   a threat, it has to a serious threat -- and Judge

19   Thompson will further expand what the definition of that

20   is -- and it has to be done with the intent to

21   retaliate.

22          But as you examine that evidence, what you

23   have to look at is, what was in the mind of the

24   defendant at the time that he's alleged to have made

25   whatever these comments are; what was the reaction of

1    the people that heard that; and more importantly -- and

2    this is why Judge Thompson's instruction to you was so

3    important -- only you are going to decide which

4    witnesses you find to be credible or not credible.

5          And I will tell you now, that's not to suggest

6    that those witnesses are affirmatively not telling the

7    truth.  But we all hear what we want to hear in the

8    context that we hear it.  It's going to be your job to

9    sort out:  Did they accurately hear what they reported;

10   did they have a clear understanding of what said; who

11   was present; where were people standing.

12         I believe that, at the end of this case, what

13   the evidence will show is that the government will not

14   have been able to sustain their burden of proof that

15   Peter, on that date, made a comment that constituted a

16   serious threat.

17         I also want to point out that when Attorney

18   Durham was making his opening statement, he made one of

19   the alleged threats that, "We all have to die sooner or

20   later."

21         Actually, what the evidence is going to show

22   is that the alleged comment, if it was made at all, was,

23   "We all meet our maker sooner or later."

24         So already you can see there is a dispute

25   about what the evidence is going to show.  But that's up

 1    to you to decide, and only you to decide.

 2              And anything I said to you here this morning

 3    is just that, an opening statement.  But what I need

 4    more than anything from all of you, and I ask you on

 5    behalf of my client and also the government, is to keep

 6    an open mind, set aside the fact -- I'll tell you

 7    another fact that's going to come in.

 8              My client, Peter, stone-cold heroin addict.

 9    No doubt about it.  Has been for a very long time.  I

10    don't tell you that for purposes of sympathy.  It's a

11    fact, and it's going to be a fact that's relevant to

12    this case.

13              You're going to be upset that, in a courtroom

14    as somber as this, somebody said the things that they

15    said to a United States district court judge, and to

16    district court personnel who work every day on behalf of

17    the government and behalf of the defendant.  That's not

18    a crime.

19              You're going to have to set aside the fact

20    that you might not like Peter for who he is and how he's

21    led his life, but that is not what he's charged with.

22    And at the end of the day, if you follow Judge

23    Thompson's instruction on the law and set aside whatever

24    dislike or antipathy you might have for my client, I

25    have no doubt that you will return a verdict of not

1    guilty on behalf of Peter Santos.

2              Thank you.

3              THE COURT:  Thank you.

4              I believe we're ready for your first witness.

5              MR. DURHAM:  Yes, Your Honor.

6              Would the Court explain to the jury the

7    sequestration, so it takes a moment to get people.

8              THE COURT:  Members of the jury, in trials

9    it's customary that witnesses are sequestered, which

10   means no witnesses are here listening to the testimony

11   of other witnesses.  It will take time to get the

12   witnesses.  You all can catch your breath and do some

13   mental gymnastics while they're doing that.

14

15

16

17

18

19

20

21

22

23

24

25

1                         JENNIFER AMATO,

2                called as a witness, having been first duly

3                sworn or affirmed, was examined and testified

4                as follows:

5

6                THE CLERK:  Please state your name and spell

7    your last name for the record.

8                THE WITNESS:  Jennifer Amato, A-M-A-T-O.

9                THE CLERK:  And indicate the town and state in

10   which you live or work.

11               THE WITNESS:  Hartford, Connecticut.

12

13                       DIRECT EXAMINATION

14   BY MR. DURHAM:

15   Q.   Ma'am, would you tell the ladies and gentlemen of

16   the jury how you're employed?

17   A.   I'm employed as a supervisory United States

18   Probation Officer for the probation office for the

19   District of Connecticut.

20   Q.   And for how long have you been so employed?

21   A.   I've been with the District of Connecticut for

22   16 and a half years.

23   Q.   Would you describe to the jurors what it is that

24   you receive by way of training in order to become a

25   United States Probation Officer?

1    A.   Well, in my position I started out as a probation

2    officer, and that training ground was about eight and a

3    half, nine years.  You are put through various -- in

4    district training you are required to go to Washington,

5    D.C.  There's a variety of refresher courses that you

6    have to take, and most of it is on-the-job training,

7    supervising cases, experience.

8    Q.   And you've been doing this work for 16-plus years?

9    A.   Yes.  I've been in this line of work for about

10   22 years.

11   Q.   With respect to where you work, you gave Hartford.

12        You work in this building; is that a fair

13   statement?

14   A.   Yes, that is.

15   Q.   And just for the benefit of the jurors, with

16   respect to probation officers, who do they work for?

17        Do they work for the prosecutor, the defense; who

18   do probation offices work for?

19   A.   The probation officers work for the court.

20   Q.   So you don't work for the agents, you don't work

21   for prosecutors; you work for the court, the judges?

22   A.   Yes, that's correct, the judges.

23   Q.   Just also by way of quick background for the

24   jurors, with respect to the kind of work that probation

25   officers do, would it be a fair statement that it

1    varies, that is there is some people that handle the

2    front end of proceedings, pretrial services and the

3    like?

4    A.    Yes, there are some officers who will handle those

5    front-end pretrial matters.  However, we're all trained

6    to handle those matters.  As a probation officer you can

7    handle matters at the pretrial stage; during the

8    sentencing phase of a case; and the following

9    supervision phase, which is the post-conviction phase

10   after somebody has completed a period of custody.

11   Q.    In that regard let me ask you this:  When a person

12   in the United States district court is sentenced to a

13   period of incarceration, and then that person completes

14   the service of his or her prison sentence, typically is

15   that person then just released into the community or

16   what happens?

17   A.    No.  Generally, when somebody completes their

18   period of custody, they are placed on a term of

19   supervised release, which is the community-supervision

20   period following jail time.  So the purpose of that is

21   for somebody to reintegrate back into the community.

22   And that sentence and term of that time is set by the

23   court.

24   Q.    So again, just to kind of provide context to some

25   of this, if a person is sentenced to straight probation,

1    what would that mean in terms of whether they were

2    incarcerated or not?

3    A.    If they are sentenced to straight probation, then

4    they did not receive a period of jail time on their

5    sentence.

6    Q.    Then some people don't get probation, they get sent

7    to jail; is that correct?

8    A.    That's correct.

9    Q.    Now, supervised release that you just described to

10   the jurors, the jurors may be more familiar with the

11   term "parole."

12         You're familiar with the term "parole," correct?

13   A.    I am.

14   Q.    Supervised release, is that sort of the federal

15   version of parole, in a sense?

16   A.    In a sense.  It is that period of time after jail

17   where the probation officers are involved in community

18   supervision.

19   Q.    Now, in this regard, the defendant that is before

20   this jury is Peter Santos.

21         Would you indicate to the ladies and gentlemen of

22   the jury whether or not you have had occasion to review

23   the records relating to Mr. Santos and any term of

24   supervised release he was on?

25   A.    I have reviewed the records in this case.

1    Q.    So it's clear to the jurors, would you indicate

2    whether or not you had any responsibility for

3    supervising Mr. Santos while he was on supervised

4    release?

5    A.    I did not have any responsibility.

6    Q.    So what you're testifying to is in the records and

7    like, but you didn't have any responsibility for him.

8    A.    That's correct.  I have not spoken to Mr. Santos or

9    have had any dealings with him during the pendency of

10   his case.

11   Q.    With respect to Mr. Santos, were you able to

12   determine who the probation officer or probation

13   officers were who had responsibility for supervising his

14   period of supervised release?

15   A.    Yes.

16   Q.    And who was that person or those persons?

17   A.    Officer Daniel Leone, and Officer Brian Topor.

18   Q.    And with respect to those two officers, are they

19   located -- what seat of court are they located in?

20   A.    They are seated in Hartford.

21   Q.    All right.  So they work out of this courthouse.

22   A.    Yes, that's correct.

23   Q.    Now, as to Mr. Santos, you've indicated to the

24   jurors that you have gone through the official records

25   to gather some information for the jury, correct?

1    A.   Correct.

2            MR. DURHAM:   May I approach the witness, Your

3    Honor?

4            THE COURT:   You may.

5    BY MR. DURHAM:

6    Q.   I want to show you what we have marked as

7    Government's Exhibit 1 for identification in this

8    matter, and ask you to take a look at one for

9    identification, and then tell us whether or not that

10   document accurately sets forth chronological events

11   relating to Mr. Santos and his supervised release.

12   A.   Yes, it does.

13           MR. DURHAM:   We'd offer one as a full exhibit,

14   Your Honor.

15           MR. ROGAN:   Your Honor, might I take one look

16   at it?   I don't think I have an objection.

17           THE COURT:   Certainly.

18           MR. ROGAN:   I'm sorry, Attorney Durham, this

19   is the same one you showed me.

20           No objection, Your Honor.   It can come in as a

21   full exhibit.

22           THE COURT:   Government's Exhibit 1 is

23   admitted.

24           MR. DURHAM:   I would ask, Your Honor, that be

25   brought up.

1          Quickly, Your Honor, if the Court could

2   inquire of the jurors that the monitors are working?

3          THE COURT:  Looks like we have success.

4   BY MR. DURHAM:

5   Q.    Thank you.

6          Ms. Amato, referring to what's now a full exhibit

7   in this case, Government's Exhibit 1, the jurors

8   obviously can see this but, for purposes of the written

9   record, would you go through this written chronology for

10  the jurors?

11  A.    Sure.

12          January 21, 2014, Mr. Santos appeared before the

13  Honorable Kimba Wood, in the United States District

14  Court of Southern District of New York.  On that date he

15  pled guilty to Count 1, conspiracy to transport stolen

16  goods in violation of 18 U.S.C.; Section 371; Count 2,

17  conspiracy to receive stolen goods in violation of

18  18 U.S.C., Section 371; and Count 3, conspiracy to

19  commit wire fraud in violation of 18 U.S.C.,

20  Section 1349.

21          On that date, Mr. Santos received a sentence of

22  25 months imprisonment on each count, to run

23  concurrently, to be followed by a term of 36 months of

24  supervised release.

25          The Court imposed a condition, standard condition

1    Number 7, which reads:  "The defendant shall refrain

2    from excessive use of alcohol; shall not purchase,

3    possess, use, distribute, or administer any controlled

4    substance or any paraphernalia related to any controlled

5    substance except as prescribed by a physician."

6    Q.   If I can stop you there; again, for the benefit of

7    the jurors, the reference to the standard condition

8    Number 7, describe, if you would, to the jurors:  When a

9    person is sentenced in federal court by a United States

10   district court judge -- in this instance it was Judge

11   Wood, in the Southern District of New York; correct?

12   A.   Correct.

13   Q.   What conditions -- what are those meant to do?

14   A.   Well, the conditions are -- there's standard

15   conditions, and there's mandatory conditions imposed by

16   the court, and those conditions are to help frame the

17   period of supervision, the following supervised release

18   that helps the probation officer and the individual

19   frame what the supervision is going to entail.

20        There's an series of conditions that are imposed on

21   everyone, but the court also has the choice to impose

22   special conditions, and some of those can be uniquely

23   tailored to an individual's needs.

24   Q.   With respect, then, to Mr. Santos, it would be a

25   fair statement that this is standard condition Number 7,

1     there was 1 through 6 before that, correct?

2     A.   That's correct.

3     Q.   But seven was, no excessive use of alcohol, and no

4     use of essentially illegal drugs.

5     A.   Correct.

6     Q.   Now, you've indicated that the record reflects --

7     or the file reflects that Mr. Santos was sentenced by a

8     judge in the Southern District of New York.

9          Do you know, based on your review of the records,

10    whether Mr. Santos is a Connecticut resident or New York

11    resident, if you know?

12    A.   Well, not based on the review of the record, but if

13    Mr. Santos is being supervised in Connecticut, it means

14    because his residence is in the District of Connecticut.

15    So that would be why he would be supervised here.

16    Q.   All right.  If we could then go back to Exhibit 1,

17    and the remaining items in the chronology.

18    A.   December 31, 2015, Mr. Santos commenced with a

19    scheduled termination date of December 30, 2018.  His

20    supervised release commenced on December 31, 2015, and

21    would be scheduled to expire naturally on December 30,

22    2018.

23    Q.   So he was released from prison and started

24    supervised release as indicated?

25    A.   That's correct.

1    Q.   So on the date of August 31, 2016, was Mr. Santos

2    then on supervised release or not?

3    A.   Yes, he was.

4    Q.   And then the next item in the chronology?

5    A.   That would be May 3, 2016, the jurisdiction of

6    Mr. Santos' case was transferred from the Southern

7    District of New York to the District of Connecticut, and

8    assigned to the Honorable Janet Bond Arterton, United

9    States district judge.

10   Q.   Explain, if you would, to the jurors, when somebody

11   has his or her case transferred from one district to

12   another, in this instance from the Southern District of

13   New York to Connecticut, when the file then gets here to

14   Connecticut, it gets assigned to a particular judge,

15   correct?

16   A.   Correct.

17   Q.   In this instance, Judge Arterton.

18        Would you tell the ladies and gentlemen of the jury

19   where Judge Arterton sits.

20   A.   Judge Arterton sits in New Haven court.

21   Q.   And so once Judge Arterton was given this file,

22   what then happens with supervised release and any

23   questions that come up relating to a person's

24   performance while on supervised release?

25   A.   If there's any performance issues on supervised

1    release, as probation officers we're required to report

2    that performance to the court.  Once jurisdiction is

3    transferred, any performance matters would then be

4    notified to Judge Arterton in New Haven.

5    Q.   And in the next item in Government's Exhibit 1?

6    A.   August 16, 2016, Mr. Santos appears with counsel on

7    an initial appearance on a supervised-release violation

8    petition.  On that date, Mr. Santos admitted to a

9    violation of supervised release and was ordered to

10   immediately admit himself to a drug detoxification

11   program, followed by inpatient treatment and counseling

12   as determined by the program.

13   Q.   Based on your experience, and for the benefit of

14   the jurors, when somebody violates the terms and

15   conditions of supervised release, they automatically go

16   back to jail?

17   A.   No, they don't automatically go back to jail.  They

18   generally appear before the court for a hearing, and the

19   court then makes a determination what the next steps may

20   be.

21   Q.   And with respect to Mr. Santos here, on August 16,

22   2016, Mr. Santos appeared at that time, correct?

23   A.   That's correct.

24   Q.   He didn't go to jail at that point, or did he,

25   based on your review of the record.

1    A.    Based on this particular review, it would appear

2    that the court did not put him in jail; that the court

3    offered him the opportunity for a drug detox program.

4    Q.    If we could go to the next date entry on

5    Government's Exhibit 1?

6    A.    The next one is August 25, 2016.  Mr. Santos was

7    taken into custody on a supervised-release violation

8    arrest warrant.

9    Q.    And in that connection describe, if you would, to

10   the jurors what a supervised-release violation warrant

11   is.

12   A.    Customarily, the warrant is applied for when the

13   conditions that have been in place by the court are no

14   longer adhered to.  The officer would then prepare a

15   request for a warrant.

16   Q.    And in this instance the record reflects that such

17   a warrant issued on August 25th, correct?

18   A.    That's correct.

19   Q.    Go to the next entry?

20   A.    August 31, 2016, Mr. Santos' supervised release

21   hearing and sentencing occurred before United States

22   District Court Judge Janet Bond Arterton.

23   Q.    And again, Judge Arterton sits in which seat of

24   court or which courthouse?

25   A.    New Haven, Connecticut.

1    Q.    And with respect to the August 31, 2016, supervised

2    release hearing and sentencing, do you know whether or

3    not Mr. Santos was again released to go to a drug

4    program or something else happened?

5    A.    It is my understanding that Mr. Santos was then

6    remanded to custody on that date.

7    Q.    Now, you're aware of the indictment that's returned

8    in this case, correct?

9    A.    I am.

10   Q.    And the allegations that Mr. Santos had made direct

11   threats at Brian Topor; is that correct?

12   A.    That's correct.

13   Q.    In your 16 years -- well, withdrawn.

14         During your 16 years as a probation officer, have

15   you had occasion to be in the courtroom very often?

16   A.    Of course.

17   Q.    And sentencing in particular, have you attended

18   many sentencings?

19   A.    I have.

20   Q.    Based on your experience, is it a common or

21   uncommon thing for a criminal defendant to threaten a

22   probation officer?

23              MR. ROGAN:  Objection, Your Honor.

24              THE COURT:  Overruled.

25              THE WITNESS:  In my experience it's an

1    uncommon thing.

2    BY MR. DURHAM:

3    Q.   And how uncommon is it?

4    A.   In my years, this is the first I've had to partake

5    in something such as this.

6              MR. DURHAM:   Thank you, ma'am.

7              I have no further questions, Your Honor.

8              THE COURT:   Mr. Rogan.

9

10                        CROSS-EXAMINATION

11   BY MR. ROGAN:

12   Q.   Good morning, Ms. Amato.

13   A.   Good morning.

14   Q.   In the spirit of mutual disclosure to the jury, you

15   and I have had occasion to have professional interaction

16   before, right?

17   A.   That's correct.

18   Q.   However, to be clear, not on this case, correct?

19   A.   That's correct.

20   Q.   Let me just follow up on a few of the questions

21   that Attorney Durham asked you.

22              First and most importantly, parole is entirely

23   different from probation; would you agree with me?

24   A.   I would agree with you.

25   Q.   So the characterization that he made before was

1    inaccurate, in your mind.

2    A.    I think I would need you to explain that a little

3    bit more.

4    Q.    Sure.

5          So once an individual has been released from the

6    Federal Bureau of Prisons, what we refer to as BOP, then

7    they are typically put on a period of supervised

8    release, right?

9    A.    Correct.

10   Q.    Do you know, from your review of the records, if

11   Mr. Santos served all of the time that he was

12   incarcerated, before the Honorable Kimba Wood, down in

13   the Southern District of New York?

14   A.    Not from what's before me.  I would have to reflect

15   on notes in order to answer that question for you.

16   Q.    Fair enough.

17         Parole, in the context you used here, I really want

18   to focus on what's done when someone is put on

19   supervised release or probation in the District of

20   Connecticut or in the federal system.

21         Did you have an understanding as to how many years

22   Mr. Santos was to be on probation?

23   A.    He was sentenced to a term of 36 months' supervised

24   release.

25   Q.    Would you consider that to be, given the years of

1    experience you've had in the district, a fairly standard

2    period of supervised release?

3    A.   I would say that's standard.

4    Q.   And those conditions that were imposed on him, one

5    through seven that AUSA Durham referred to, those

6    generally apply to everyone, is that fair to say?

7    A.   That's correct.

8    Q.   And then depending on the particular crime that the

9    individual may have been convicted for, there may be

10   additional conditions, as you said, that are almost

11   customized or tailored to make sure that person is

12   complicit with the rules of society, is that fair to

13   say?

14   A.   That's correct.

15   Q.   Are you aware of any special conditions imposed by

16   Judge Kimba wood for the period of supervised release

17   for Mr. Santos?

18   A.   Not without looking at the judgment and the

19   commitment order from the case.

20   Q.   And you haven't looked at that?

21   A.   I have not.

22   Q.   Fair enough.

23        I also want to make sure I understand correctly --

24   and I'm going to come to the last question that you were

25   asked by Attorney Durham -- you have no personal

1    involvement -- sorry -- you have no professional

2    involvement, Ms. Amato, in this case, in that you were

3    not present in the courtroom on any of the proceedings

4    for Peter Santos, here in the District of Connecticut.

5    A.   I was not present.

6    Q.   And without telling me what, if anything, they

7    said, did anyone either Brian Topor, who the alleged

8    threat was made against, or Mr. Leone have any

9    conversations with you about the investigation?

10   A.   The information that I have regarding this case is

11   because I have access to the file.

12   Q.   Then the answer to my question would be, they had

13   no direct conversations with you about it.

14   A.   They have not had any direct conversations with me.

15   Q.   Fair enough.

16        And also for the jury, when you indicated that when

17   Judge Kimba Wood, down in the Southern District, had

18   sentenced Mr. Santos concurrently, can you explain to

19   the jury -- I think they know, but can you explain what

20   that means as opposed to a consecutive term.

21   A.   A concurrent sentence means the court sentenced him

22   to 25 months on each count, so there were 3.  So he

23   doesn't get 25 months, 25 months, 25 months.  He just

24   gets one period of 25 months concurrent.

25   Q.   Thanks, Ms. Amato.

1            And the transfer, it's not uncommon within the

2       federal system -- not the state of Connecticut but

3       within the federal judicial system -- that oftentimes

4       for different reasons, people who are on that period of

5       supervised release, that supervised release might be

6       transferred from one district to another.

7       A.    That is common, yes.

8       Q.    And do you know why, besides the fact that

9       Mr. Santos was a resident of the state of Connecticut,

10      why the transfer was made from the Southern District up

11      here to the United States District of Connecticut?

12      A.    I don't know the exact reasons.  I can only assume

13      professionally, by policy, our administrative offices

14      encourage probation offices to take jurisdiction of

15      cases so that if there are matters that require court

16      appearances, the individuals on supervision can access

17      the court relatively easily without travel and added

18      expense.

19      Q.    Fair enough.  And I want to walk through the last

20      portion of the time line that you talked to Attorney

21      Durham about.

22            You indicated on August 16, 2016, was when that

23      violation was reported here, in the District of

24      Connecticut, correct?

25      A.    Correct.

1    Q.    And do you know what that violation was for?

2    A.    I would have to reflect back to my notes to give

3    the specifics.

4    Q.    Would it be a fair inference that, given that he

5    was ordered into drug detox, that it was probably for

6    violation of standard condition Number 7, as you told

7    the jury before?

8    A.    It would be a fair inference.

9    Q.    Then nine days later there's a warrant issued for

10   his arrest.  Did you understand that to be accurate?

11   A.    I do.

12   Q.    Do you know what happened in the interceding

13   nine-day period?

14   A.    I don't know the specifics.  As I said, I wasn't

15   involved in this case, but it would be a fair inference

16   to say that he didn't comply with the court order on

17   August 16th.

18   Q.    Right, or may not have fully complied.  But to be

19   fair to you, Ms. Amato, you don't know, and not because

20   you don't know or you're not smart, but because you just

21   weren't doing -- because in addition to your role as a

22   supervisor, you also handle probation cases.

23   A.    That's correct.

24   Q.    So not only are you in charge, but you also do

25   day-to-day stuff.  So that inference you draw is a fair

1    one that something happened in that nine-day period with

2    Peter, such that the court brought him back in.

3    A.    That would be fair.

4    Q.    And then we come to the August 31st hearing

5    before Janet Bond Arterton, who we all now know is

6    seated down in New Haven.

7          And you do know the outcome of that, correct?

8    A.    I do know the outcome of that.

9    Q.    What was that?

10   A.    Mr. Santos was revoked and was given a period of

11   jail time with supervised release to follow that period

12   of jail time.

13   Q.    And it was for what we typically refer to as a VOP,

14   violation of probation; is that fair to say?

15   A.    Violation of supervised release.

16   Q.    Violation of supervised release.

17         And again, if you can from the records that you

18   have, do you know what that violation was for?

19   A.    I know that it was primarily based on Mr. Santos'

20   failure to comply with drug treatment.

21   Q.    Now, just a couple more questions, and I really

22   appreciate your patience.

23         You indicated at the very beginning that you've

24   been 16 and a half years working in the probation

25   division for the district of Connecticut, right?

1    A.    Correct.

2    Q.    But I think you said you had 22 overall years of

3    experience?

4    A.    Correct.

5    Q.    I'm going to paraphrase, but you were asked a

6    question by the government about, had you ever had

7    occasion, before, to be involved where someone is

8    alleged to have threatened a probation officer.

9          Do you remember that question?

10   A.    I do.

11   Q.    And do you recall what your answer was?

12   A.    My answer was that this is not something that I've

13   experienced in my career.

14   Q.    And, Ms. Amato, with that in mind -- and given the

15   fact that you've never spoken with Brian Topor about

16   this incident, against who the threat is alleged to have

17   been made, or anyone else significantly involved in the

18   investigation -- is it fair to say to this jury that you

19   don't know if, in fact, a threat was made as defined by

20   the law in the state of Connecticut?

21   A.    That would be fair to say.

22         MR. ROGAN:   Great.   Thanks very much.

23

24                     REDIRECT EXAMINATION

25

1    BY MR. DURHAM:

2    Q.   You weren't in the courtroom when any of these

3    events occurred on August 31, right?

4    A.   I was not in the courtroom.

5    Q.   So you wouldn't be able to speak to that issue?

6    A.   I would not.

7              MR. DURHAM:  Nothing further.

8              THE COURT:  Thank you, ma'am, you may step

9    down.

10             (Whereupon, the witness was excused.)

11             THE COURT:  Do you want to get started with

12   the witness?  We'll let the jurors decide.

13             MR. DURHAM:  Our next witness is probably

14   going to be a little over an hour.  Maybe it makes sense

15   to take the break now.

16             THE COURT:  We'll take the break now, and you

17   all can have some coffee.

18             We'll recess.

19                  (Whereupon, the jury left the courtroom.)

20                  (Whereupon, a recess followed.)

21             THE COURT:  Ready for the jury?

22             MR. DURHAM:  Yes, Your Honor.

23                  (Whereupon, the jury entered the

24   courtroom.)

25             THE COURT:  Please be seated, everyone.

1            I think we're ready for our next witness.

2            MR. DURHAM:  Thank you, Your Honor.

3            Julie Cashman.

4                      JULIE CASHMAN,

5            called as a witness, having been first duly

6            sworn or affirmed, was examined and testified

7            as follows:

8

9            THE CLERK:  Please state your name and spell

10    your last name for the record.

11           THE WITNESS:  I do.

12           THE CLERK:  State your name and spell your

13    last name.

14           THE WITNESS:  Julie Cashman, C-A-S-H-M-A-N.

15           THE CLERK:  And indicate the town and state in

16    which you live or work.

17           THE WITNESS:  New Haven, Connecticut.

18

19                    DIRECT EXAMINATION

20    BY MR. DURHAM:

21    Q.   Ms. Cashman, would you tell the ladies and

22    gentlemen of the jury how you're employed?

23    A.   I'm employed as a court reporter for the

24    U.S. district court in New Haven.

25    Q.   Is there a particular judge, federal judge, that

1    you typically work with?

2    A.    Yes, Judge Janet Bond Arterton.

3    Q.    Would you tell the ladies and gentlemen of the

4    jury, as a court reporter, what your general duties and

5    responsibilities are?

6    A.    Generally, I am responsible for recording all court

7    proceedings, making a verbatim record of whatever

8    happens in the courtroom before Judge Arterton.

9    Q.    And how long have you been providing court

10   reporting services to judges in the state of

11   Connecticut?

12   A.    Well, I initially started in superior court, so

13   that was a ten-year stint; and most recently, in federal

14   court, is a two-year stint.  And -- but I've

15   continuously done court reporting, not in a courtroom

16   setting, my whole entire adult life basically.

17   Q.    Just for the benefit of the jurors, when you do

18   your recording, is it with a tape recorder, or how do

19   you go about recording the proceedings that occur in

20   federal court?

21   A.    So I have a stenograph machine that's a

22   computerized machine, much the same system as what's

23   going on right now, and I record everything

24   stenographically.

25   Q.    I want to draw your attention to August 31st of

```
 1    last year; and August 31, 2016, you were then employed

 2    as a court reporter?

 3    A.   Yes.

 4    Q.   And you were working with a particular federal

 5    judge?

 6    A.   Yes, with Judge Arterton.

 7    Q.   And do you recall, Ms. Cashman, whether or not, on

 8    that date of August 31st of 2016, if there was a

 9    proceeding involving an individual by the name of Peter

10    Santos?

11    A.   Yes.

12    Q.   And what, if any, participation did you have in

13    that hearing?

14    A.   I was the court reporter present in the courtroom,

15    recording the proceedings.

16    Q.   Now, as to Judge Arterton's courtroom, that's in

17    New Haven, correct?

18    A.   Yes.

19    Q.   And I want to --

20              MR. DURHAM:  If I might approach the witness,

21    Your Honor?

22              THE COURT:  You may.

23    BY MR. DURHAM:

24    Q.   I want to show what you we premarked as

25    Government's Exhibit 3A and 4A.
```

 1          I'd ask you to look at those two items and tell us

 2     whether or not you can identify what's depicted first in

 3     3A, for identification.

 4     A.    Yes.   This is Judge Arterton's courtroom.

 5     Q.    Does it provide a particular perspective of that

 6     courtroom?

 7     A.    Yes.   It's actually similar to my perspective.

 8     It's facing toward the back of the courtroom.

 9     Q.    Do you recognize the persons who are contained in

10     that photograph in addition to the courtroom itself?

11     A.    Yes.

12     Q.    And as to Government's Exhibit 4A, for

13     identification, what is that a photograph of?

14     A.    That is a photograph of myself and the judge; and

15     her law clerk, deputy clerk; and a probation officer is

16     sitting in the jury box.

17     Q.    And as to both 3A and 4A, for identification, do

18     they fairly and accurately depict the inside of Judge

19     Arterton's courtroom --

20     A.    Yes.

21     Q.    -- and where the parties were on August 31st

22     of 2016?

23     A.    Yes.

24          MR. DURHAM:   Woo would offer 3A and 4A as full

25     exhibits, Your Honor.

1          MR. ROGAN:  No objection, Your Honor.  I'll

2     wait for cross-examination.

3          THE COURT:  Government's Exhibit 3A and 4A are

4     admitted.

5          MR. DURHAM:  Thank you, Your Honor.

6          I'd ask that 3A be brought up on the monitors,

7     please?

8     BY MR. DURHAM:

9     Q.    And is the witness monitor working?

10    A.    Yes.

11    Q.    So if we look at the photograph marked

12    Government's Exhibit 3A, again, this is a perspective

13    looking basically from the bench toward the tables where

14    the parties are located, correct?

15    A.    Correct.

16    Q.    And as you look at Government's Exhibit 3A, there's

17    an individual who has khaki-colored clothing on,

18    correct?

19          MR. DURHAM:  If we could circle that, please.

20    BY MR. DURHAM:

21    Q.    Who's that individual?

22    A.    That's Mr. Santos.

23    Q.    And the person to Mr. Santos' left, to the right

24    looking at the photograph, do you recall who defense

25    counsel was that day?

 1   A.   Yes.   That's Terry Ward.

 2   Q.   And then if we go to the other side of the

 3   courtroom, there's an individual who's sitting down.

 4   Maybe we could circle that person as well.

 5        In Judge Arterton's courtroom, who typically sits

 6   at that table?

 7   A.   That's the U.S. Attorney's table.

 8   Q.   And in this instance do you recognize the

 9   prosecutor in that case?

10   A.   I believe his last name is Schmeisser.

11   Q.   Kit Schmeisser?

12   A.   Yes.

13   Q.   Then there are a couple of other people who can be

14   seen in this particular photograph, 3A.  For example --

15   well, withdrawn.

16        In the foreground of this picture, maybe we could

17   circle that a different color, the witness box?

18   A.   You would like me to circle the witness box?

19   Q.   The person who is circled on there now, do you

20   recall who that is?

21   A.   I don't know his name, but he is U.S. Marshal.

22   Q.   And do you remember there being marshals in the

23   courtroom that day?

24   A.   Yes.

25   Q.   Behind Mr. Santos there is somebody in this picture

1    who's seated.

2         Do you see the top of that individual's head?

3    A.   Yes.

4    Q.   Do you remember who that was?

5    A.   I know one of them is Mr. Santos' father.

6    Q.   And then you've identified the person who's

7    circled, the white circle, there's an empty chair next

8    to him, correct?

9    A.   Yes.

10   Q.   And unlike this courtroom, as the jurors look at

11   this photograph, that's where the witness stand is

12   actually located in Judge Arterton's courtroom, correct?

13   A.   Correct.

14   Q.   If we can then turn to Government's Exhibit 4A,

15   please.

16        Looking at Government's Exhibit 4A, in the

17   foreground the person seated who has a light-colored

18   jacket on, and blond hair, do you recognize who that

19   person might be?

20   A.   Yes, I do.

21   Q.   For the written record, who's that person?

22   A.   That's me.

23   Q.   And then progressing to the top of the photograph

24   first, there's a gentleman who's seated, correct?

25   A.   Yes.

1    Q.    And who's that person, if you know?

2    A.    Are you talking about the gentleman seated to my

3    right?

4    Q.    To your right, yes.

5    A.    That's Judge Arterton's law clerk, Steve.

6    Q.    And then to Steve's right, there's a person who's

7    seated, correct?

8    A.    Yes.

9    Q.    And who's that individual?

10   A.    That's her deputy clerk, Patty.

11   Q.    And do you know Patty's last name?

12   A.    Villano.

13   Q.    And as to each federal judge in the district court,

14   here in Connecticut, does he or she have a courtroom

15   deputy clerk who assists with the proceedings as they

16   are ongoing?

17   A.    Yes.

18   Q.    And then looking to the back part of the

19   photograph, the upper part of the photograph, there are

20   two individuals seated in the jury box, correct?

21   A.    Yes.

22   Q.    And do you remember who those two individuals were?

23   A.    Sure.  That's probation, Brian Topor and Dan --

24   Leone, I think is his last name.

25   Q.    Mr. Topor, is he the gentleman on the left or on

1    the right?

2    A.    On the left.

3    Q.    And then you've testified that you were providing

4    court reporting services to the court, Judge Arterton.

5          Is Judge Arterton depicted in

6    Government's Exhibit 4A?

7    A.    Yes.   She's to the right, seated on the bench.

8    Q.    So when jurors here about events in front of Judge

9    Arterton and so forth, that's the individual on the

10   right-hand portion of the picture marked

11   Government's Exhibit 4A.

12   A.    Correct.

13   Q.    Now, turning your attention specifically to the

14   events of August 31 of 2016, you've told the jurors that

15   you do the stenography, you take down the proceedings

16   that occur before the judge, correct?

17   A.    Yes.

18   Q.    And with respect to what information you take down,

19   is that eventually turned into a transcript?

20   A.    Yes.

21   Q.    And just briefly, how do you turn it into a

22   transcript; how does it get from your machine into a

23   transcript?

24   A.    So while I'm writing at, the same time the computer

25   has software that turns it into English on the laptop.

1    And then we sort of clean it up to punctuate it and make

2    sure the spellings are correct, and it ends up in a

3    booklet form that anyone can read.

4              MR. DURHAM:  May I approach again, Your Honor?

5              THE COURT:  You may.

6    BY MR. DURHAM:

7    Q.   I want to show you what we marked as Government's

8    Exhibit 2 for identification in this matter, and ask you

9    to take a look at that document and tell us whether you

10   recognize Government's Exhibit 2 for identification.

11   A.   I do.

12   Q.   And how do you recognize two, for identification?

13   A.   It's a transcript I prepared.

14   Q.   And is it for a particular proceeding?

15   A.   Yes.  It's for the proceedings on August 31, 2016.

16   Q.   And in what matter?

17   A.   United States versus Peter Santos.

18   Q.   Does it reflect who the attorneys are, representing

19   the respective parties?

20   A.   It does.

21   Q.   And does indicate anywhere who the court reporter

22   was that took the recording and then prepared the

23   transcript?

24   A.   Yes.  On the bottom of the title page, and also

25   it's certified at the end.

1    Q.   And in connection with that transcript,

2    Government's Exhibit 2 for identification, what can you

3    tell the jurors as to the truth and accuracy and

4    completeness of that transcript as regards to the

5    proceeding that was held before Judge Arterton on

6    August 31st of 2016?

7    A.   It's 100 percent accurate and correct, and I

8    certify to that effect.

9    Q.   And, in fact, you prepared it, correct?

10   A.   Yes.

11           MR. DURHAM:  We would offer two as a full

12   exhibit, Your Honor.

13           MR. ROGAN:  Your Honor, I renew my earlier

14   objection as articulated in my motion in limine

15   regarding the relevancy of this document.

16           THE COURT:  Objection preserved.

17           Government's Exhibit 2 is admitted.

18           MR. ROGAN:  And then, Your Honor, I would ask

19   for -- at the conclusion for that limiting instruction,

20   but I'll raise that at the appropriate time.

21           THE COURT:  That's fine.  I'll be ready.

22           MR. ROGAN:  Thank you, Your Honor.

23           MR. DURHAM:  I ask that the cover page of the

24   transcript be brought up.

25

1    BY MR. DURHAM:

2    Q.   Now, you've indicated, Ms. Cashman, that this is

3    the transcript from a proceeding that occurred on a

4    particular date, correct?

5    A.   Correct.

6    Q.   And if you look at Government's Exhibit 2, is this

7    the standard format that's followed in preparation of

8    transcripts for federal judicial proceedings?

9    A.   Yes.

10             MR. DURHAM:   I ask that we highlight the

11   caption of the case, please.

12   BY MR. DURHAM:

13   Q.   Again, this is in what matter?

14   A.   United States of America versus Peter Santos.

15   Q.   And the date?

16   A.   August 31, 2016.

17   Q.   And if we can then indicate who the presiding

18   judicial officer was?

19   A.   The Honorable Janet Bond Arterton.

20   Q.   And then I believe you testified that the

21   government counsel was Kit or Christopher Schmeisser,

22   and defense counsel was Mr. Ward, correct?

23   A.   Yes.

24   Q.   And this is all reflected in the cover sheet of the

25   transcript.

1    A.    Yes.

2    Q.    And then you were the court reporter; does that

3    appear also at the bottom of the page?

4    A.    Correct.

5    Q.    Now, I'd ask you, if you would, in looking at the

6    transcript of the proceeding, and tell us whether or not

7    if you recall -- withdrawn.

8          You identified from Government's Exhibit 4A, one of

9    the individuals from probation who was in the courtroom

10   at the time was Brian Topor, correct?

11   A.    Correct.

12   Q.    With respect to Mr. Topor, do you remember whether

13   or not Mr. Topor addressed Judge Arterton concerning the

14   supervised-release violation hearing?

15   A.    Yes, he did.

16   Q.    I ask that you turn, please, to page 10 of the

17   transcript.

18         I would ask that you read into the record the

19   transcript, beginning at page 10, line 23, of the

20   transcript, and then continuing to page -- the end of

21   page 15.

22   A.    Okay.  It starts with the Court asking:  "All

23   right, Mr. Leone, or Mr. Topor, do you wish to be

24   heard?"

25         And Mr. Torpor responds:  "Yes, Your Honor, thank

1    you.  The probation office, defense counsel, the

2    government, Mr. Santos, and Mr. Santos' family, who

3    actually are in court today" --

4              And the Court says:  "Yes, I do see them.

5              "Good morning."

6              And then Mr. Topor continues:  -- "have had

7    numerous conversations together, collectively, to

8    discuss Mr. Santos' long-term addition of 20 years-plus

9    to heroin.  And for all intents and purposes, everybody

10   has been on the same page, including Mr. Santos, is that

11   this is a demon that he's been struggling with many,

12   many years; and that he is in need of treatment in order

13   to rid himself of such.

14             The issue that comes at hand is whether or

15   not, at this point in time, Mr. Santos has reached a

16   point in time where he wants to rid himself of that

17   demon.  Because it's the impression that we have been

18   getting that, over the past several months, Mr. Santos

19   has been referred to, I believe, at least seven

20   inpatient residential treatment facilities; and

21   sometimes" -- "and at times has literally walked in the

22   front door and out the back, not having even given that

23   program the opportunity to provide that assistance and

24   help that we believe, as professionals, that he is in

25   need of.

1              "I think that's where the amiss comes, with

2       the Court, defense counsel, family, the government, the

3       treatment providers, are on the same pages, but

4       Mr. Santos isn't quite there yet.

5              It's the impression that, at least from the

6       probation office's perspective, is that Mr. Santos' life

7       after supervision, or even prior to supervision, prior

8       to this case, was he went to work.  He works for his

9       father's company in the HVAC career field.  He makes

10      money.  He supports his addiction through that.  There

11      is no evidence to date that we have that would suggest

12      that Mr. Santos is out there committing other crimes in

13      order to support his habit, and that he would just kind

14      of go along in life that way until one day, that number

15      of 200 reaches 201.

16             "And that's where our concern is, and that's

17      what we've expressed to Mr. Santos -- his family has

18      joined forces in that -- that given the state of what's

19      out in the community now, what drug dealers are using in

20      order to -- whether it's increase their profit or just

21      really supplement the heroin that's out there, is the

22      fentanyl, the higher doses, higher strength of heroin,

23      is that one day, that Mr. Santos' family is going to get

24      that phone call from a hospital, from a police agency,

25      to say, "Come here and please identify your son,"

 1    instead of, "Come here and pick up his car keys and cell

 2    phone because he's going to be presented before the

 3    Court."

 4           So it's been -- I believe, as professionals,

 5    we appreciate the struggle, but I don't believe at this

 6    point in time that Mr. Santos is totally on board with

 7    where he needs to be at in order to buy into that.  And

 8    we can't do it for him.  He needs to be part of that

 9    process.

10           "There are numerous other programs out there,

11    whether he's on supervised release or not.  They're

12    available to him.  So one of the these days, Mr. Santos

13    will no longer be under the supervision of our office;

14    however, those programs will still be available to him.

15    He can still reach out to Youth Challenge, he can still

16    reach out to Trinity Glen, he can still reach out to

17    CRT, if he so chooses.

18           "So really, at this point in time, is it

19    Mr. Santos' addiction, or is it his attitude that comes

20    into play as to where he wants to go when it comes to

21    dealing with his addiction.

22           "For all intents and purposes, Your Honor,

23    historically, in our interactions, my interactions with

24    Mr. Santos have been very cordial up until recently.  We

25    had one interaction that was less than cordial.

1           "Is that part of who Mr. Santos really is?

2           "Is it, you know, if he's not getting what he

3      wants does he get nasty, or is it the effect of the

4      addiction process?

5           "I sort of give it a 50/50 credence.  I know

6      that even we've received phone calls from codefendants

7      in his case who were concerned for Mr. Santos' welfare,

8      knowing that he left the program and went back out and

9      used; that he's not viewed, even by his codefendants, as

10     somebody who's a nasty individual or a thief at heart,

11     but just an individual who got caught up in a -- in a

12     situation because of his addiction process.

13           'so at this point in time, Mr. Santos is very

14     clear as to Your Honor's message.  He's been very clear

15     as to the message that I believe the probation office

16     has been giving him, his defense counsel has been giving

17     him, his family has been giving him.

18           "And it really has been a concern, and not so

19     much as an adversarial message but, "You have a demon;

20     you need to be a part of shedding that demon."  And I

21     think, at this point in time, Mr. Santos not ready to

22     get on that train.

23           "And so, therefore, I believe that being taken

24     out of a environment where he has readily accessible

25     access to heroin is in his best interests; in the best

1     interests of getting him clean, getting him to a point

2     where he can hopefully think clearly, getting him to a

3     point where he understands that people are not out to

4     harm him in the system but really want to provide him

5     with as much structure and as much support as possible.

6               "But we haven't been able to do it.  I don't

7     know if, as a system, we take ownership as failing in

8     part of that, but I truly believe that we have not.  I

9     believe that we are thinking outside the box, we're

10    providing the opportunity, but I do believe that it gets

11    to a point in time where Mr. Santos needs to take some

12    responsibility for his actions and his attitude.  And I

13    think that's where we are at today."

14    Q.    And that's -- to the best of your recollection,

15    those are Mr. Topor -- his remarks to Judge Arterton

16    that day, correct?

17    A.    Correct.

18    Q.    And on August 31st of 2016, Mr. Topor was

19    employed how?

20    A.    Probation officer.

21    Q.    As best you recall, Ms. Cashman, with respect to

22    the proceedings before Judge Arterton that day, do you

23    recall whether the judge gave Mr. Santos an opportunity

24    to speak to the Court?

25    A.    Yes, she did.

1    Q.   And what, if any, recollection do you have

2    concerning, at least initially, what Mr. Santos'

3    demeanor was in speaking to the Court?

4    A.   He was very respectful and calm.

5    Q.   And did that remain the case during all of his

6    remarks?

7    A.   No.

8    Q.   What can you tell the jurors about any change in

9    his demeanor?

10   A.   Well, he became agitated as the proceedings

11   progressed and as she interacted with him more.

12   Q.   To the best of your recollection, is that reflected

13   in the transcript, that is the change of attitude?

14   A.   Yes.

15   Q.   During the entire period of time that Mr. Santos

16   was speaking to the judge or having exchange with the

17   judge, do you recall whether he, by all appearances to

18   you, was lucid?

19   A.   I'd say he was lucid.

20        MR. ROGAN:  Your Honor, I'll object as to

21   leading.

22        MR. DURHAM:  All right.  Fair enough.

23   BY MR. DURHAM:

24   Q.   What can you tell the jurors about whether or not

25   you were able to understand what Mr. Santos was saying?

1    A.   I totally understood what he was saying, and I

2    recorded what he said.

3    Q.   To the best of your recollection, did Mr. Santos

4    have any difficulty in communicating that day?

5    A.   No difficulty.

6              MR. ROGAN:  Your Honor, I'm going to object on

7    the grounds it may be outside the scope of this

8    individual, as a layperson, to make a determination as

9    to whether or not he had any difficulty communicating.

10             THE COURT:  Lay a foundation with a couple of

11   questions, Mr. Durham.

12             MR. DURHAM:  Yes, Your Honor.

13   BY MR. DURHAM:

14   Q.   With respect to the proceedings on August 31st of

15   2016, how far away from you was Mr. Santos, roughly?

16   A.   The same distance as the court reporter, now, to

17   your table in this courtroom.

18   Q.   During that period of time, did you have the

19   opportunity to visually observe Mr. Santos?

20   A.   Yes.

21   Q.   Did you have the opportunity to hear Mr. Santos

22   speak?

23   A.   Yes.

24   Q.   From that distance, watching Mr. Santos and

25   listening to Mr. Santos, did you notice any difficulties

1    he had in communicating clearly?

2    A.    No.

3    Q.    Now, you've told the jurors that, initially,

4    Mr. Santos was just speaking normally, correct?

5    A.    Correct.

6    Q.    If you would, I'd like to turn your attention to

7    the transcript, Government's Exhibit 2, page 16, the top

8    of the page.  And I'd ask you to read through page 20,

9    line 24, and then I have some questions.  Okay?

10        So you can start at page 16.

11   A.    I'm sorry.  You said 20?

12   Q.    On page 16, you can start at line 1, and then we

13   want to go through page 20, line 24.

14   A.    "The Court:  Mr. Ward, do you and Mrs. Santos wish

15   to be heard?

16        "Mr. Ward:  No, not this morning, Your Honor.

17        "The Court:  Mr. Santos?

18        "The Defendant:  You know, every time I go into

19   those programs, I'm usually loaded, and then that's why

20   I leave.  I have had a little time now to think about

21   what you said last time about that both.  And I have

22   been thinking about it for seven days, and I really

23   think a church-oriented program would really help me

24   out.  And they got a bed today.  I was supposed to go on

25   Monday.

1          "Jail's not going to do nothing but make me harder

2     and hate the system more, you know.  It ain't gonna do

3     nothing, you know.  There's nothing in there to help

4     you.  And I know I left the programs.  You know, that's

5     a shame.  But they got a bed today.  My parents are here

6     to drive me there.  If I leave, you know where I'm

7     going, right back to probation and the marshals to come

8     see you again.  So if you can give me one last chance, I

9     hope I can show you, Your Honor.  I said that last time

10    and I failed you.

11         "The Court:  Why is it going to be any different

12    this time?

13         "The Defendant:  You asked me that last time.  I

14    had seven days to think about it, sitting in lockdown,

15    thinking about that story you told me about that boat.

16    And you know what, it got a little rough.  I didn't

17    paddle hard enough.

18         "The Court:  I guess the problem, Mr. Santos, is

19    that when I described the boat in fast water, I

20    described the various perils that befall a boater who

21    doesn't paddle fast enough or hard enough, or with the

22    requisite skill.  And in your instance, I told you what

23    the peril would be.  And I hoped that, knowing that,

24    knowing that if you didn't rally your resources and

25    paddle hard enough, you're going to a place that you

1    didn't want to be, and which you don't believe would

2    help you.

3        "So I see your boat washed up on the shore, and as

4    it has been seven times since you have been on

5    supervised release.

6        "You started on supervised release in December?

7        "The Defendant:  The first of this year, Your

8    Honor.

9        "The Court:  And that's not a good track record.

10       "The Defendant:  No, it's not.

11       "The Court:  What I sought to do last time was to

12   do something that was different from the prior five

13   times, and it was unsuccessful.

14       "The Defendant:  Like I said, every time I've gone

15   into the programs, I was always using and high as a

16   kite, and today I'm not.  I'm ready to go.  If I leave,

17   I'm coming back before you."

18   Q.   Can I stop you there.

19       The passage where the defendant says, "Like I said,

20   every time I've gone into the program, I was always

21   using and high as a kite, and today I'm not," those are

22   the defendant's words --

23   A.   Correct.

24   Q.   -- in that courtroom that day, that he was not high

25   that day?

1    A.    Correct.

2    Q.    Thank you.

3    A.    And the Court continues:

4         "The Court:  I understand the point that you're

5    making, that you believe entering a detox program high

6    altered your ability to advantage of its services.  But

7    if we step back one more step, there is a very huge

8    irony of using before you go to the detox program.  And

9    even more so, doing that repeatedly, having seen in the

10   past that using before you start detox makes you turn

11   around and walk out.  You did it nonetheless.

12        "And so I ask the same question I asked last time:

13   Why, if we do the same thing as we have done in the

14   previous times, should we expect any different result?"

15            And the Defendant says:  "I'm sober today,

16   Your Honor, for the first time in a while."

17            And the Court says:  "Of course you're sober,

18   because you're locked up."

19            And the Defendant says:  "I could have got

20   something in there if I wanted.  They asked me, and I

21   said no.  I can give you a urine right now if you'd

22   like."

23            And the Court says:  "So that's a good step."

24            And the Defendant says:  "Yes, it is, Your

25   Honor."

1              And the Court says:  "It's one step.  You have

2      many on your trip of a thousand miles, and only you can

3      put that one foot in front of the other, only you can

4      pull the oar or pull the paddle.

5              "I really have -- I really give serious

6      thought to the alternatives that Mr. Ward has found, and

7      I commend him for his perseverance on your behalf."

8              And the Defendant says:  "I do appreciate it,

9      Your Honor."

10             And the Court says:  "The Youth Challenge

11     isn't going away.  And if you're serious about more

12     steps in the same correct direction, that will be

13     available to you in the future when you are -- when you

14     have been, by your own act and volition, clean for a

15     long while.

16             "The bottom line, of course, as you know, is

17     that the Court sets conditions of supervised release.

18     The Court has modified the condition of supervised

19     release; and when you violate a term of supervised

20     release, you're violating a court order."

21             And the Defendant says:  "Yes, Your Honor."

22             And the Court says:  "And that's not your

23     choice to do.  At least, it's not your choice to do

24     without consequence, and that seems to me to be where we

25     are.  If you have taken the first step by not seeking

1      out heroin while you're detained -- and you do seem to

2      have an unerring ability to find it -- that's positive.

3      You should recognize it as positive, and recognize that

4      what you're telling me is that, after seven days without

5      heroin, you can think better."

6              And the Defendant says:  "Yes, Your Honor, I

7      can."

8              And the Court says:  "But in the scope of

9      20 years, that's a beginning step."

10             And the Defendant says:  "Baby step; yes,

11     you're right, Your Honor."

12     Q.    Okay.  You told the jurors that, at a particular

13     point in time, you had a recollection of the defendant's

14     demeanor changing, correct?

15     A.    Correct.

16     Q.    I'd ask you to pick up on line 20 -- page 20,

17     line 25, and then read to the end of the transcript,

18     which is at page 26, line 6.

19     A.    Okay.

20             So the Court continues:

21             "The Court:  And so I was hopeful that, in being

22     persuaded by Mr. Ward, that we could give you another

23     chance, another program.  You had two programs that" --

24             And the Defendant says:  "Those were detoxes, Your

25     Honor.  I never went into a real program."

1            And the Court says:  "Okay.  But you have to

2     start with a detox."

3            And the Defendant says:  "Yeah, I'm all done

4     with that though, now."

5            And the Court says:  "But we didn't get past

6     that gate."

7            And the Defendant says:  "Maybe it took the

8     seven days to do it.  I'm not trying to fight you either

9     way.  It's up to you, Your Honor.  I mean, I'm willing

10    to go to the program or go to jail.  I'm sorry for what

11    I did, and that's all I can say, you know.  I'd like to

12    get the help.  If I leave, I'm going to be before you,

13    if not in six months, then I will be out and hopefully I

14    won't see you again.  But" --

15           And the Court says:  "Well, I'd like to see

16    you with a successful story."

17           And the Defendant says:  "Well, yeah, that's

18    what I mean.  Hopefully I won't see you again.  That's

19    what I meant by that.  But I think, you know, it ain't

20    going to hurt to give me another shot, Your Honor.  I'm

21    not going nowhere.  I always report to Probation."

22           And the Court says:  "I'm not sure that's

23    true.  It not sure that it doesn't essentially enable

24    you.  I'm not at all sure that seven days of sobriety is

25    enough to persuade the Court that you should be able to,

1    right now, enter that program.

2         "I'm also not sure that the message got

3    through, which is:  If you use, if you don't go to the

4    programs that are a requirement of your supervised

5    release, if you disrespect everybody in the system --

6    maybe it's because you're high -- it's not an endless

7    opportunity.

8         "I have no doubt that the journey of putting

9    one step in front of another -- or pulling hard, hard,

10   hard on those oars all the time -- that's not easy.

11   But, you know, it's got to come from you.  Nobody can

12   pull that oar for you.  Maybe you started, but maybe you

13   haven't.  I don't know.

14        "And I think, Mr. Santos, that a sentence that

15   I told you I would impose if you failed, if you failed

16   me, gives you six months to think, to think sober, to

17   withstand whatever opportunities may present themselves

18   to you to get heroin.  It is, in a way, your own

19   self-treatment opportunity, so that when you come

20   out" --

21        And the Defendant says:  "You can just stop,

22   all right?  You're giving me the time, you give me the

23   time.  I'll crawl and scratch.  When I get out, I'm not

24   going to the halfway house.  Do what you want.  Here,

25   put the cuffs on.  Let's go.  All right?"

1              And this the Court says:  "Well, you" --

2              And the Defendant says:  "You already said

3    you'd sentence me.  Let's go.  Get it over with."

4              And the Court says:  "Now you're beginning to

5    show another side" --

6              And the Defendant says:  "I'm ready to go to a

7    program and say I'm ready, and in the six months" --

8              And the Court says:  "You're just not going to

9    get your way."

10             And the Defendant says:  "No, I already know

11   that now, so let's go.  Let's rock and roll."

12             And the Court says:  "When you come out, and

13   when you go to a program" --

14             And the Defendant says:  "I ain't going to go

15   to a program, all right?  So let's go, put the cuffs

16   on."

17             And the Court says:  "Yes, you are."

18             And the Defendant says:  "You want to bet?"

19             And the Court says:  "Yes."

20             And the Defendant says:  "All right.  I'll bet

21   you.  All right?"

22             And the Court says:  "You don't want to see me

23   again" --

24             And the Defendant says:  "I'll be here until I

25   die then, or you die."

1              And the Court says:  "Don't make that" --

2              And the Defendant says:  "All right.  So you

3    can row that boat that we were talking about straight up

4    you know where."

5              And the Court says:  "Do you think your

6    parents are enjoying this conversation?  Are you not

7    ashamed?"

8              And the Defendant says:  "No, I'm not."

9              And the Court says:  "I guess not."

10             And the Defendant says:  "Because I asked for

11   an opportunity and you didn't give it to me, so" --

12             And the Court says:  "That's right.  Not

13   again.  I gave it to you before."

14             And the Defendant says:  "So put the cuffs on.

15   Let's go."

16             And the Court says:  "All right.  Now that we

17   see the real Mr. Santos, he is remanded to the Attorney

18   General for a period of six months.  Following that

19   period of incarceration, he will be on supervised

20   release for 24 months, the first 6 months of which will

21   be spent in a halfway house."

22   Q.   Let me interrupt.

23        The passage that says, "All right, now that we see

24   the real Mr. Santos, he's remanded to the Attorney

25   General for the period of 6 months," that's Judge

1    Arterton saying, "Now that we see the real Mr. Santos"?

2    A.   Correct.

3            MR. ROGAN:  Your Honor, objection.  The

4    question already speaks for itself.

5            THE COURT:  It's allowable.

6            MR. ROGAN:  Move to strike.

7            THE COURT:  Denied.

8    BY MR. DURHAM:

9    Q.   If you could continue?

10   A.   The judge continues:  "All the other terms and

11   conditions of supervision previously imposed remain in

12   effect.  The modification of the condition of supervised

13   release having been an interim one, it reverts back to

14   the requirement that he participate in a program of

15   substance abuse treatment.

16            "You have the right to appeal this sentence.

17   Any notice of appeal has to be filed within 14 days.  If

18   you cannot afford the cost of the appeal, at your

19   request the clerk will file that notice of appeal for

20   you.  If you cannot afford counsel for your appeal, you

21   may apply, and the Court will appoint counsel for you to

22   represent you without cost.

23            "Is there anything that I have been unclear

24   about; that I have omitted or overlooked, or that should

25   be addressed?

1          Mr. Schmeisser responds:  "No, Your Honor."

2          The Court says:  "From Probation?"

3          Mr. Topor says:  "No, Your Honor."

4          The Court says:  "Mr. Ward?"

5          Mr. Ward says:  "No, Your Honor."

6          The Court says:  "All right.  Very good.

7     Thank you very much.  We stand in recess."

8     Q.   Ms. Cashman, with respect to these proceedings in

9     this instance, when Judge Arterton had imposed the

10    sentence and said we were in recess, what, if anything,

11    do you recall the judge doing?

12    A.   The judge stands, everyone stands in the courtroom,

13    and the judge leaves the bench.

14          MR. DURHAM:  May I approach, Your Honor?

15          THE COURT:  You may.

16    BY MR. DURHAM:

17    Q.   I want to show you what we've marked as

18    Government's Exhibit 4B, C, D, and E, for

19    identification.  I'll ask you to look at those

20    photographs and tell us if you recognize what they show

21    or depict.

22    A.   Yes.  It shows the judge leaving the bench.

23    Q.   And with respect to -- it's a series of

24    photographs, right, 4B through D?

25    A.    Through E.

1    Q.    Through E, I'm sorry.

2          Do they truly and accurately depict, first, Judge

3    Arterton's courtroom on that day?

4    A.    Yes.

5    Q.    Does it show the individuals that you testified to

6    previously, including Mr. Santos, in one or another of

7    those photographs, pictures?

8    A.    Yes.

9                MR. DURHAM:   We move 4B through E as full

10   exhibits, Your Honor.

11               MR. ROGAN:   Did counsel say through E?

12               MR. DURHAM:   Yes.

13               MR. ROGAN:   No objection, Your Honor.

14               THE COURT:   Government's Exhibit 4B, C, D,

15   and E admitted.

16               MR. DURHAM:   I would ask that

17   Government's Exhibit 4B be brought up?

18   BY MR. DURHAM:

19   Q.    As the jurors look at 4B, what is Judge Arterton

20   doing -- again, the jurors can see this, but for

21   purposes of the written record, what is Judge Arterton

22   doing?

23   A.    She's leaving the bench.

24   Q.    And to orient the jurors as to Judge Arterton's

25   courtroom, when she leaves the courtroom, how does

```
 1    she -- depart from, where does she go to?
 2    A.    From where she is, she descends a series of steps
 3    and goes out a door directly in front of her.
 4    Q.    In this instance, then, when the judge is
 5    recessing, everybody is standing, correct, including
 6    yourself?
 7    A.    Yes.
 8    Q.    If we could look at 4C, please, and what's depicted
 9    or shown in 4C?
10    A.    The judge has left the bench, and myself and
11    Ms. Villano.
12    Q.    Let me ask you this:  Do you recall, Ms. Cashman,
13    after the judge had left the bench in the courtroom, do
14    you recall anything occurring by way of any statement
15    made by Mr. Santos to anybody in the courtroom?
16    A.    Yes.
17    Q.    Tell the jurors, as best you recall, after the
18    judge had left the courtroom, what if anything did
19    Mr. Santos say to anybody in the courtroom?
20    A.    So we were in recess; and once the judge leaves the
21    bench, the marshals will escort the defendant out that
22    same door that Judge Arterton has already walked
23    through.  So they actually walk by me to my left.  And
24    because we were in recess, I cannot give you a verbatim
25    quote, but I do recall Mr. Santos saying something to
```

 1    the effect of, "When I get out, I'll come see you," or,

 2    "I'll come look for you," something along those lines.

 3    Q.   And could you tell who he said that to?

 4    A.   He was looking in the direction of Mr. Topor and

 5    Mr. Leone.

 6    Q.   And do you recall whether there was any response

 7    made to the statement made by Mr. Santos?

 8    A.   I believe Mr. Topor said -- he either said, "Are

 9    you talking to me," or, "What," you know, either/or.

10         And Mr. Santos said, "You heard me."

11         Do you want me to continue?

12    Q.   Sure.

13    A.   Then the marshal behind Mr. Santos said something

14    like, "Come on, man, knock it off," and they continued

15    walking out the courtroom.

16    Q.   If we could look at Government's Exhibit 4D,

17    please.

18         Looking at this photograph, you just told the

19    jurors that Santos walked basically by where you were,

20    correct?

21    A.   My back would be to where he's walking.  You can

22    see in the left that he's starting that path.

23    Q.   And then if we could look at 4E, please.

24         And again, with respect to where Mr. Santos is at

25    this point, where is he headed?

1    A.    He's headed out that door.

2    Q.    You've indicated -- you've told the jurors that

3    Mr. Topor made some response about, "What did you say,"

4    or whatever the exact words were.

5         Do you recall whether you had occasion to not just

6    hear Mr. Topor, but to look at Mr. Topor?

7    A.    Yes.

8    Q.    And what, if anything, can you tell the jurors

9    about your observations of Mr. Topor's response was to

10   the statement made by Mr. Santos?

11   A.    He was surprised.  I don't think I can elaborate

12   more than that.

13   Q.    And in that connection I want to ask you, with

14   respect to Mr. Santos, do you recall whether -- what was

15   his tone of voice when he made the statement that he

16   made to Mr. Topor?

17            MR. ROGAN:  Your Honor, I'm going to object on

18   the grounds, I don't think this witness is qualified to

19   fairly tell the jury or is qualified to speak as to

20   someone's tone of voice.

21            THE COURT:  701?

22            MR. DURHAM:  We would claim it.  I think it's

23   within common experience.

24            THE COURT:  701.

25            MR. DURHAM:  Yes.

 1                    THE COURT:  And you can cross on it.

 2                    MR. ROGAN:  Understood.

 3                    THE WITNESS:  He was serious, serious tone.

 4      BY MR. DURHAM:

 5      Q.    Do you remember Mr. Santos laughing about it or

 6      anything of that sort?

 7      A.    No.

 8      Q.    Now, you've told the jurors that you have been with

 9      Judge Arterton for about two years --

10      A.    Correct.

11      Q.    -- and had been a court reporter in the superior

12      court for some ten years as well?

13      A.    Correct.

14      Q.    Would you tell the ladies and gentlemen of the

15      jury, based on your experience of some 12 years being in

16      the courtroom for criminal proceedings, how common or

17      uncommon it is, in your experience, for a defendant to

18      make that kind of a statement to a probation officer?

19                    MR. ROGAN:  Your Honor, I'm going to object

20      again, on grounds that that really doesn't matter, for

21      purposes of this, how common the experience is.  The

22      question is before the jury.

23                    THE COURT:  Objection, relevance.

24                    MR. ROGAN:  Exactly.

25                    THE COURT:  Overruled.

1            THE WITNESS:  In my experience it's very

2    uncommon.

3    BY MR. DURHAM:

4    Q.   Did you have any further contact that day with

5    Mr. Santos, as best you can recall?

6    A.   No, none whatsoever.

7    Q.   When Mr. Santos left the courtroom, do you recall

8    whether he left with any person or persons?

9    A.   With the two marshals.

10   Q.   Other than maybe having been -- withdrawn.

11        At some point in time on that same day,

12   August 31st of 2016, do you recall whether you were

13   interviewed about this event?

14   A.   I was interviewed at some point about the event.

15   Q.   Do you remember, it was close in time to when it

16   occurred?

17   A.   I believe so, but I don't recall exactly.

18            MR. DURHAM:  Thank you.

19            I have no further questions, Your Honor.

20

21                    CROSS-EXAMINATION

22   BY MR. ROGAN:

23   Q.   Good afternoon, Ms. Cashman.

24   A.   Good afternoon.

25   Q.   In point of fact, you told Judge Arterton on the

1    day of the sentencing, August 31, 2016, that, in your

2    opinion, Mr. Santos appeared to be high; is that

3    correct?

4    A.   No, that's not correct.

5    Q.   Do you recall being interviewed by Mr. Parker,

6    who's seated in the middle of counsel table?

7    A.   Yes.

8    Q.   Do you recall telling him or giving him a

9    recitation of the events that you recall transpiring?

10   A.   Yes.

11   Q.   Okay.  And do you also recall -- on May 18th of

12   this year, just a few days ago -- you were prepared by

13   Mr. Parker for your testimony today, right?

14   A.   I don't believe I was prepared by Mr. Parker for my

15   testimony.

16   Q.   Were you prepared by anyone in the last 30 days for

17   your testimony in court today?

18   A.   I had a conversation about my recollection, if

19   that's what you mean.

20   Q.   Yes.

21   A.   Okay.

22   Q.   Who did you have that conversation with?

23   A.   With Mr. Durham and Mr. Parker.

24   Q.   And during the course of that, did you tell

25   Mr. Parker that, in fact, that you, Julie -- and that's

1    your first name, right?

2    A.    Correct.

3    Q.    -- thought he appeared high, Mr. Santos.

4    A.    If I can qualify it, that's not quite what I

5    indicated.

6    Q.    Okay.  So then this is only a couple of weeks ago.

7          So what did you indicate, back on May 17th, about

8    my client's state on August 31, 2016?

9    A.    What I meant by that comment was that, because of

10   the way he was addressing the Court, in my mind he had

11   to have been high.  Not that I literally knew that he

12   was, or that he was acting in a manner of -- in other

13   words, he spoke clearly; but in my mind, I'm saying, for

14   someone to speak like that to the Court, they had to be

15   high.  That's what I meant by that comment, not that I'm

16   assessing him literally.

17   Q.    Okay.

18         MR. DURHAM:  Your Honor, the government would

19   object.  Counsel said, "Did you talk to Judge Arterton

20   about this," and that's not what the testimony is, and

21   that's not what's in the notes provided to counsel.

22         I think the question started out, "Didn't you

23   tell Judge Arterton," and that's not what's reflected.

24         MR. ROGAN:  I apologize.

25

1    BY MR. ROGAN:

2    Q.    You actually then went -- now I'm going back to

3    August 31, not even a year ago.

4    A.    Yep.

5    Q.    On that day you then had a conversation with the

6    Honorable Judge Arterton, correct?

7    A.    I assume so, yes.  We speak all the time.

8    Q.    But specifically, ma'am, about what had transpired

9    in the courtroom; do you recall having that conversation

10   with her?

11   A.    I do.

12   Q.    Do you recall you telling Judge Arterton that my

13   client, Peter, was, quote, probably just blowing off

14   steam?

15   A.    Something to that effect, that's true.

16   Q.    So in your mind, as one of the observers in the

17   courtroom, whatever it is you think he said, you didn't

18   take it seriously; you thought, quote, he was just

19   blowing off steam?

20   A.    True.

21   Q.    So you didn't then view it as a threat?

22   A.    True.

23   Q.    Great.

24         And also you indicated on direct examination from

25   Mr. Durham, in fairness, that you don't even know what

1    it was you think you heard that he said.

2    A.    True, I can't quote verbatim.

3    Q.    What you did say was, first of all, Mr. Topor, to

4    your mind, didn't look concerned or frightened, right;

5    he just, quote, looked surprised.

6         That's what you just told us a few minutes ago,

7    correct?

8    A.    Now that you say the word "concerned," I would add

9    the word "concerned" to "surprised," but he did not look

10   frightened.  He just was taken aback.

11   Q.    Taken aback.

12        So you're not changing -- I want to be respectful.

13   So you're not changing your testimony; you're just

14   saying, he just looked surprised and taken aback by

15   someone speaking that way.

16   A.    True.

17   Q.    Is it fair to say, Ms. Cashman, that everyone in

18   the courtroom was a bit taken aback -- and I'll start

19   with, on the record -- by my client's demeanor in front

20   of a United States district court judge?

21   A.    True.

22   Q.    And what you were really telling the jury before,

23   on direct examination from Mr. Durham, was, in your

24   experience, you hadn't heard defendants be that

25   disrespectful.

1    A.   Correct.

2    Q.   And it's rude.

3    A.   Correct.

4    Q.   And it's beyond rude.

5    A.   Correct.

6    Q.   It's obnoxious.

7    A.   I don't know that I would agree with your

8    characterization, but it's --

9    Q.   But you hadn't heard that -- you hadn't heard that

10   type of response, you said, in your experience.

11   A.   True.

12   Q.   Now let's talk about what happened after the judge

13   left the bench.

14        I wanted to ask you a question.  Sorry.  Withdrawn.

15   Let me ask another question.

16        Anywhere in that transcript, Government's

17   Exhibit 2 -- you were the stenographer, did you read

18   anything into that transcript that you perceived as a

19   threat?

20        I'm only talking now about the official transcript

21   that's Government's Exhibit 2.

22   A.   No.

23   Q.   And you would agree with me, there's nothing either

24   implicit or explicit in that transcript that could be

25   construed as a threat to anyone by anyone.

1    A.    Correct.

2    Q.    So to the extent there was a threat, it had to have

3    occurred after the Court had closed the record?

4    A.    Okay.

5    Q.    Yes or no.

6    A.    It's not in the record, so yes.

7    Q.    And that's because, to be fair, once a district

8    court judge says, "We're in recess," you as the court

9    reporter, one of the first things you do, you then --

10   the court reporting or the monitoring stops?

11   A.    Yes.

12   Q.    I don't have the technology that the government

13   has, but I wanted to ask you about some of these on the

14   photographs.

15          MR. ROGAN:   Could I approach the witness?

16   BY MR. ROGAN:

17   Q.    Do you have them there?

18   A.    I do, if they are the same.

19   Q.    Let's go to Government's Exhibit 4A; do you see

20   that one?

21   A.    Yes.

22          MR. ROGAN:   Does everyone see 4A?

23   BY MR. ROGAN:

24   Q.    Ms. Cashman, you see 4A, right, on the monitor?

25   A.    Yes.

1    Q.    Okay.  Fair to say that that is a depiction of what

2    was happening on the record on August 31, 2016?

3    A.    Correct.

4    Q.    Because everyone is in the place where they should

5    be, and, as Attorney Durham identified, you're the young

6    woman closest in the foreground to us, as the court

7    reporter, right?

8    A.    I'm the woman in the foreground.

9    Q.    You understand what I'm saying.

10         This individual who's then immediately to your

11   right, as depicted in the photograph, that would be the

12   equivalent of Judge Thompson's law clerk, but do you

13   remember his full name?

14   A.    Steve Farrelly, which is F-A-R-R-E-L-L-Y.

15   Q.    Is he still Judge Arterton's law clerk?

16   A.    Yes.

17   Q.    And you indicated -- they're kind of blurry, but I

18   want to make sure I have everybody correctly positioned,

19   and we're staying on 4A.

20         The individual to the left, in what would be the

21   jury box that these folks are sitting in, on the

22   farthest left, you believe is Probation Officer Topor,

23   correct?

24   A.    Correct.

25   Q.    And you think the other one is Mr. Leone?

1    A.    Yes.

2    Q.    Great.  Done with that one.

3          Now, if you turn to -- if the government would be

4    so kind as to assist me -- 3A, ma'am.

5          The gentleman -- of course you recognize my client

6    here in the courtroom today, don't you?

7    A.    Yes.

8    Q.    The gentleman directly behind him, you don't know

9    who that is, the individual that's seated, correct?

10   A.    In the audience?

11   Q.    No, no.  If you look directly behind where the

12   government is so kind to circle that man who appears to

13   either --

14   A.    He's a U.S. Marshal.

15   Q.    Do you know what his name is?

16   A.    I don't know all their names.

17   Q.    If you don't know, that's not a problem.

18         And you don't know the three folks now, in what we

19   would call the gallery, as defined back there?

20   A.    I remember Mr. Santos' father, but I'm not sure

21   about the other two.

22   Q.    Is it fair so say that Government's Exhibit 3A also

23   depicts the proceedings on August 31 that was on the

24   record?

25   A.    Yes.

1    Q.   And that's because you can tell people are where

2    they're supposed to be, defense counsel, the government,

3    et cetera, correct?

4    A.   Correct.

5    Q.   Great.  We can move on from that photo.

6         So when you were asked on direct examination by the

7    government, you said the statement that was made by my

8    client was -- now I'm quoting you quoting him, if this

9    question comes out badly you'll let me know -- he said

10   something to the effect, "I'll come see you," or, "I'll

11   look for you."

12        Do you remember telling the jury that?

13   A.   Yes.

14   Q.   You said, when my client made that statement,

15   whatever it means, that he was looking in the direction

16   of Mr. Topor?

17   A.   I believe so.  Yes; yes, he was.

18   Q.   That's what you said, he was looking in the

19   direction of Mr. Topor.

20   A.   Yes.

21   Q.   But do you know if he was directing the comment to

22   Mr. Topor or someone else, or are you guessing?

23   A.   I don't know.

24   Q.   Great.

25        I think you said somebody said, "Come on, man,

1    knock it off."

2    A.   Correct.

3    Q.   Do you know who that was?

4    A.   One of the U.S. Marshals; but I, at this point,

5    don't remember.

6    Q.   After the proceeding had ended --

7              MR. ROGAN:  So let's, just for purposes to

8    show the jury, if we could put up

9    Government's Exhibit 4D, which is a full exhibit.

10   BY MR. DURHAM:

11   Q.   What we see -- actually, I want you to tell us what

12   we see, or I'll ask you some questions.

13        So we see you now standing.  We see a woman that I

14   recognize to your right, who's the courtroom deputy, but

15   the law clerk is no longer in the picture.

16        Do you notice that?

17   A.   Correct.

18   Q.   Do you know when that individual left the

19   proceeding; did he leave with Judge Arterton?

20   A.   Correct.

21   Q.   Do you know if he ever came back into the

22   courtroom?

23   A.   Not in terms of these proceedings.

24   Q.   Again, all my questions, Ms. Cashman, are limited

25   solely to what you saw and observed that day.

1       Now, I just want to check one other thing.

2       You were asked about, I think by Mr. Durham, about

3  how loudly my client was speaking.

4       Do you recall that?

5  A.  Yes.

6  Q.  Do you recall telling Mr. Parker, during that prep

7  session on the 18th, 12 days ago, that my client was

8  speaking out of the side of his mouth?

9  A.  Yes.

10  Q.  I'm going to do a bad imitation, but was it like,

11  "I'm going to come see you" (gesturing)?

12  A.  No.  I'm trying to think of a better way to

13  describe it.  Like a tough guy, kind of -- I can't

14  describe it any other way.

15  Q.  Him as a tough guy?

16  A.  Well, you asked me the demeanor, and that's kind of

17  how it was.  When I say "side of the mouth," it was

18  like -- I can't put it into words.  I know --

19  Q.  You're doing fine.

20       Now, you would agree, because it's obvious we've

21  got the government photograph or - actually, let me ask

22  this question:

23       You were in the courtroom afterwards, you realize

24  that my client was handcuffed, correct?

25  A.  Correct.

1    Q.    After you heard what you think you heard, did the

2    marshals do anything other than somebody saying, "Come

3    on, man, knock it off"?

4    A.    They continued to walk out the door.

5    Q.    The marshals didn't change their approach, didn't

6    heighten security, didn't put a tight circle around him,

7    anything else like that?

8    A.    No.

9    Q.    No.  Just standard operating procedure for when a

10   defendant is escorted out of a courtroom.

11   A.    True.

12   Q.    Wasn't taken to the ground?

13   A.    No.

14   Q.    You know the marshals are armed, right?

15   A.    Yes.

16   Q.    I assume they were armed that day in the courtroom?

17   A.    I assume.

18   Q.    After that day, have you had any other

19   conversations with any U.S. district court employees in

20   either New Haven or Hartford, other than Mr. Parker and

21   Attorney Durham, about what allegedly transpired that

22   day?

23   A.    Probably Ms. Villano and I reviewed it.

24   Q.    Ms. Villano is who?

25   A.    The deputy clerk.

1    Q.    Who would be similar to the lady directly to my

2    left, correct?

3    A.    Correct.

4    Q.    So how many times did you and Ms. Villano have

5    conversations about that day?

6    A.    I mean, maybe once right after.  That's probably

7    it.

8    Q.    No other conversation that you can remember with

9    her or anyone else, other than the U.S. Attorney and the

10   inspector?

11   A.    You know, we have so many cases, there's nothing

12   that really is coming to mind at this moment.

13   Q.    But I thought you told the jury before that this

14   was really unusual, this case.

15         You'd agree with me on that, right?

16   A.    Yes.

17   Q.    And you knew you were going to be called as a

18   witness in this case, right?

19   A.    Not until recently, but yes.

20   Q.    But you gave a statement or you talked with

21   Inspector Parker fairly early on in the process.

22         Do you recall that?

23   A.    Yes.

24   Q.    Do you recall what date that was?

25   A.    No.

1    Q.    Let's see if I can refresh your recollection.

2          The incident happened on August 31?

3    A.    Yes.

4    Q.    You were interviewed the next day by Mr. Parker.

5    A.    Okay.

6    Q.    Okay.  And at that time you indicated that then it

7    was, "I'll come for you," or, "I'll look for you,"

8    that's what he said in the general direction of

9    Mr. Topor.

10   A.    Yes.

11   Q.    But you don't know if he was actually directing it

12   to Mr. Topor.

13   A.    He was looking in that direction.

14   Q.    But my question was more direct than that.  You

15   don't know if he was directing the comment to Mr. Topor

16   or to someone else?

17   A.    I can't say.

18   Q.    Great.

19         So other than that interview, and then your prep

20   session or your meeting 12 days ago with the government,

21   you've never spoken with anybody besides Ms. Villano

22   about this incident?

23   A.    Nothing's coming to mind.

24   Q.    And the conversation that you had with

25   Ms. Villano -- who we're going to hear testimony from, I

1    think, today -- what did you and she talk about?

2    A.   Just, "Wow, I can't believe he talked to her that

3    way."  That was the gist of it.

4    Q.   It's funny you say that, Ms. Cashman, but isn't

5    that what a lot of this is about; that, in fact, you and

6    Ms. Villano, as well you should, have a great deal of

7    respect for Judge Arterton.

8         Is that fair to say?

9    A.   Of course.

10   Q.   And you have -- and she's a fine jurist, we can

11   agree on that.

12        And part of what this is about is, you were really

13   upset that Peter was so rude and disrespectful to a

14   renowned jurist.

15   A.   I personally was not upset.  It was just an

16   observation, but I can't say to you that I found it

17   upsetting.  It was an observation, and it was more

18   disbelief, "Wow" --

19   Q.   Wow.

20   A.   -- but not in terms of being upset.

21   Q.   Were you offended?

22   A.   No.

23   Q.   Other than that one conversation that you had with

24   Judge Arterton, any other conversations with her about

25   what happened that day?

1    A.    I don't believe so.  I think it was just a review,

2    a conversation in passing.

3    Q.    Just a couple more questions.  You've been very

4    patient, Ms. Cashman, and I appreciate that.  And this

5    is just an estimate.

6          I know you were with the superior court for a lot

7    of years, and then the district court for the last

8    couple of years; is that right?

9    A.    Yes.

10   Q.    Just an estimate -- no one is going to say -- how

11   many proceedings do you think you've been in front of,

12   been the official stenographer or court reporter, where

13   someone has gotten a sentence or a trial or something

14   like that?

15   A.    Hundreds, thousands.  It's really difficult to say.

16   I don't know.

17   Q.    And that's fair.  This is not a memory contest, or

18   at least this portion isn't.

19         You said you had never heard anything like that as

20   relating to my client.

21         Do you remember that testimony?

22   A.    Yes.

23   Q.    Is it fair to say, in those hundreds and thousands

24   of proceedings that you've been in front of, whether

25   sentences or pretrial proceedings, that you've heard

1    defendants say some pretty dumb stuff in front of a

2    judge?

3    A.    Probably.

4    Q.    Would you agree with me that there's been times,

5    whether they are represented by counsel or not, they've

6    said some pretty dumb stuff in front of a judge?

7    A.    Probably so.

8    Q.    There's been times defense counsel like me say

9    plenty of dumb stuff in front of a judge?

10   A.    Yes, sir.

11         MR. ROGAN:   With that, Ms. Cashman, I

12   appreciate your testimony, and I have nothing further.

13

14                    REDIRECT EXAMINATION

15   BY MR. DURHAM:

16   Q.    Have you ever heard a defense attorney tell a judge

17   where she can stick that boat?

18   A.    A defense attorney?

19   Q.    Yes.

20   A.    No.

21   Q.    Did you ever hear any defendant speak to a judge

22   that way, other than Mr. Santos?

23   A.    No.

24   Q.    Counsel had asked you a series of questions about

25   what was said.

1    Do you have a clear recollection today as to

2    exactly what it was that Mr. Santos said that day after

3    the judge had left the bench?

4    A.    No.

5    Q.    In the pictures, it looks like you're picking up

6    some of your papers and whatnot, correct?

7    A.    Correct.

8    Q.    As you sit here today, was Santos directing his

9    comments to you?

10   A.    No.

11   Q.    All right.  Then counsel asked you questions about

12   whether it was directed -- his comments, Santos'

13   comments, were directed to Mr. Topor.  I want to ask

14   you, if you would, to go to Government's Exhibit 2,

15   page 14.

16        Do you have that?

17   A.    One second.

18   Q.    Go to page 14.

19   A.    Okay.

20   Q.    And then starting at line 3.  This is a full

21   exhibit in the record.

22        It says:  "For all intents and purposes, Your

23   Honor, historically in your interactions, my

24   interactions with Mr. Santos have been very cordial up

25   until recently.  We had one interaction that was less

1    than cordial.  Is that part of who Mr. Santos really is?

2    Is it, you know, if he doesn't get what he wants, does

3    he get nasty, or is it the effect of the addiction

4    process?  I sort of give it a 50/50 credence."

5          With respect to that portion of the proceeding

6    before Judge Arterton, did you have any knowledge of any

7    incident that had occurred between Santos, Mr. Santos,

8    and Mr. Topor at an earlier hearing where Mr. Santos was

9    detained?

10         MR. ROGAN:  Your Honor, objection.  Outside

11   the scope of my cross-examination of this witness.

12         THE COURT:  It's within.

13   BY MR. DURHAM:

14   Q.   Other than what's in the transcript.

15   A.   Other than what's in the transcript, no.

16   Q.   So there was if there was some event that occurred

17   prior to August 31st, that would be outside the scope

18   of your knowledge.

19   A.   Correct.

20   Q.   But with respect to what Mr. Santos said in the

21   courtroom, as best you recall, was it difficult for you

22   to hear -- you might not remember the exact words, but

23   could you hear what he said?

24   A.   Correct, I could.

25   Q.   And from your observations he was directing his

1    comments at who?

2    A.    Towards Probation.

3    Q.    Okay.  Do you remember whether or not either

4    Mr. Topor or Mr. Leone said anything, to the best of

5    your recollection, to Mr. Santos?

6    A.    My recollection is, Mr. Topor said, "What did you

7    just say," or something along those lines.

8    Q.    Okay.  And aside from talking to Ms. Villano, as

9    you've said -- withdrawn.

10        You said you had spoken or you recall talking to

11   Ms. Villano about this on an occasion or two?

12   A.    Probably, yeah.  Yes.

13   Q.    Other than that, and been being interviewed in

14   connection with these proceedings, no other

15   conversations that you can recall?

16   A.    Not that I can recall.

17            MR. DURHAM:  Okay.  Thank you, Your Honor.

18            THE COURT:  Mr. Rogan.

19

20                    RECROSS-EXAMINATION

21   BY MR. ROGAN:

22   Q.    Just briefly, Ms. Cashman.

23        Returning to Government's Exhibit 2, the

24   transcript, I'll just summarize.

25        So this rude comment that my client made, about

1    putting a boat where it doesn't belong, for want of a

2    better term, not anything other than incredibly

3    disrespectful to a judge, right?

4    A.    True.

5    Q.    And you didn't -- no one is claiming that that was

6    the threat made, correct?

7    A.    Not to my knowledge.

8    Q.    Great.

9          And again, in fairness to you, Ms. Cashman, and I'm

10   not going to keep you up here forever, you don't have a

11   good recollection of exactly what my client is alleged

12   to have said; is that fair to say?

13   A.    True.

14   Q.    And is it fair to say, also, that you don't have a

15   good recollection, despite being in the courtroom, of to

16   whom those remarks were directed?

17   A.    Other than the general direction.

18   Q.    Right.  But you didn't hear him refer to someone by

19   name or say, "Hey, you guys in Probation," right,

20   nothing like that.

21   A.    Correct.

22              MR. ROGAN:  Great.  Thank you.

23              THE COURT:  Mr. Rogan, earlier you mentioned

24   you might want me to give a limiting instruction.  Do

25   you want me to do that?

1                  MR. ROGAN:  Yes.  If you would, Your Honor.

2        Thank you so much for reminding me.

3                  THE COURT:  And then we'll take our lunch

4        break.

5                  I have a limiting instruction, ladies and

6        gentlemen, with respect to the hearing transcript which

7        is Government's Exhibit 2.

8                  We have received into evidence certain

9        evidence in the form of a hearing transcript.  This

10       evidence was admitted for limited purposes only.  It was

11       offered by the government as evidence of the defendant's

12       intent, of his motive, and as to whether a threat was

13       made, and it is admitted only for those limited

14       purposes.

15                 If you choose to credit this evidence, you

16       must consider it only for those limited purposes.

17                 Thank you for your attention.

18                 We'll take our lunch break, ladies and

19       gentlemen.

20                 You're excused.

21                      (Whereupon, the witness was excused.)

22                      (Whereupon, the jury left the courtroom.)

23                 THE COURT:  Looks like we're ready to bring in

24       the jury.

25                 MR. DURHAM:  Yes, Your Honor.

```
 1                    (Whereupon, the jury entered the

 2      courtroom.)

 3                 THE COURT:  Please be seated, everyone.

 4                        PATRICIA VILLANO,

 5                 called as a witness, having been first duly

 6                 sworn or affirmed, was examined and testified

 7                 as follows:

 8

 9                 THE CLERK:  Please state your name and spell

10      your last name for the record.

11                 THE WITNESS:  Patricia A. Villano,

12      V-I-L-L-A-N-O.

13                 THE CLERK:  And indicate the town and state in

14      which you live or work.

15                 THE WITNESS:  New Haven, Connecticut.

16                 THE CLERK:  Thank you.

17

18                      DIRECT EXAMINATION

19      BY MR. DURHAM:

20      Q.   Ms. Villano, would you tell the ladies and

21      gentlemen of the jury how you're employed?

22      A.   I work as a courtroom deputy to Judge Janet B.

23      Arterton, in New Haven.

24      Q.   And for how long have you been courtroom deputy in

25      the courthouse in New Haven?
```

1    A.    In general?

2    Q.    Yes.

3    A.    I've been with the court for 31 years, I'd say a

4    good 28 years.

5    Q.    And describe, if you would, generally what your

6    duties and responsibilities are as a courtroom deputy.

7    A.    I do scheduling for the judge's trials, reports,

8    and swear in witnesses and keep the exhibits during the

9    trial.

10   Q.    And for some 28 years plus, that's what you've been

11   doing in the courtroom.

12   A.    Basically, yeah.  I began working for a magistrate

13   judge, which isn't as much, but yeah.

14   Q.    All right.

15          MR. DURHAM:  Now, I want to ask, can we bring

16   up Government's Exhibit 4A, please.

17   BY MR. DURHAM:

18   Q.    Is your monitor working, can you see the monitor?

19          As you look at the photograph that's been marked as

20   Government's Exhibit 4A in this case, do you recognize

21   what's shown in that picture?

22   A.    Yes, I do.

23   Q.    What is it?

24   A.    Judge Arterton, to the left, on the bench; then

25   right in front of her is me; and I believe it's our law

1    clerk, Steve; and then our court reporter, Julie

2    Cashman.

3    Q.   And there were two people in the jury box, correct?

4    A.   Yes.

5    Q.   Do you recall, on August 31st of 2016, when there

6    was a hearing before Judge Arterton involving the

7    defendant in this case, Mr. Santos, were there probation

8    officers present in the courtroom?

9    A.   Yes.

10   Q.   And do you remember who they were?

11   A.   I believe it was Daniel Leone and Brian Topor.

12   Q.   As you sit here now, Ms. Villano, do you have a

13   recollection of what the proceeding involved on

14   August 31, 2016 --

15   A.   Yes.

16   Q.   -- regarding Mr. Santos?

17   A.   Yes.

18   Q.   What's your best recollection; what was that

19   proceeding about?

20   A.   It was a violation of supervised release.

21   Q.   And in connection with violation of supervised

22   release, just for the benefit of the jurors, are those

23   typically handled in court, out of court; how do those

24   proceedings work?

25   A.   In court.

1    Q.   Is it a public or a closed proceeding?

2    A.   It's public.

3    Q.   And with regard to Mr. Santos' supervised-release

4    violation hearing then, on August 31st, that was an

5    open courtroom in New Haven?

6    A.   Yes.

7    Q.   I want to ask you if you have any current

8    recollection as to whether or not Mr. Santos addressed

9    the Court on that day.

10   A.   Yes, he did.

11   Q.   Do you recall whether anybody from probation had

12   addressed the Court?

13   A.   Yes.

14   Q.   Let me start there.

15        Which probation officer, officers, spoke to the

16   Court on August 31 of 2016, regarding this

17   supervised-release violation?

18   A.   I'm trying to remember.  Usually the judge talks to

19   them beforehand, and then she asks sometimes for more

20   information.  I believe it was Brian.

21   Q.   And then with respect to the defendant, do you

22   remember whether Mr. Santos had the opportunity address

23   Judge Arterton?

24   A.   Yes.

25   Q.   And to the best of your recollection, did he take

1    advantage of that opportunity; that is, did he speak to

2    the judge?

3    A.   Yes.

4    Q.   Do you recall now, with respect to Mr. Santos when

5    he addressed the Court, did his demeanor remain the

6    same, or did it change during the course of his remarks?

7    A.   It changed during the course of his remarks.

8    Q.   What can you tell the jurors in that regard; what

9    do you remember about that change?

10   A.   What I remember is, it started off nice and easy;

11   and then, when he found out he wasn't going to get out,

12   he just let it go.

13   Q.   At the time that this is occurring, that is the

14   time that Mr. Santos is addressing Judge Arterton, were

15   you in the courtroom for the entire period of time?

16   A.   Yes, I was.

17   Q.   Do you remember, with respect to when Mr. Santos

18   let it go, anything in particular that Mr. Santos was

19   saying to Judge Arterton?

20   A.   He was saying things like, "Just don't even bother,

21   just put the handcuffs on me, let's go, I'm not going to

22   do any supervised release afterwards," all this other

23   stuff.  I was just in shock.

24   Q.   Let me ask you this:  With respect to Mr. Santos,

25   before he made those statements, do you recall as you

1    sit here now, was he able to speak clearly or not?

2    A.    Oh, yes.

3    Q.    Before he made the remarks that you commented

4    about, did he speak in a normal tone or not?

5    A.    At the beginning, yes, he spoke in a normal tone.

6    Q.    And then when he changed -- withdrawn.

7          Did you say he, at some point, changed his tone

8    with the Court?

9    A.    Yes.

10   Q.    And how would you describe that, or how do you

11   describe that?

12   A.    Well, when he found out he wasn't going to get out

13   like he wanted to and promised, he just lost his cool

14   and started saying, "Just lock me up, don't bother

15   telling me" -- you know, just -- the judge was trying to

16   explain that she was going to put him back on supervised

17   release, "I'm not going to do it," or put him in a

18   halfway house, "I'm not going."  I was just in shock.

19   Q.    And then at some point in time did the Court take

20   some action in terms of a sentence that was imposed?

21   A.    Yes.

22   Q.    After the Court had imposed the sentence -- let's

23   assume that the jury has listened to the transcript or

24   seen the transcript -- after the Court had imposed

25   sentence, did the proceedings at that point essentially

1    end?

2    A.   Well, she -- yeah, she got up.  She recessed court.

3            MR. DURHAM:  And if we could pull up, just

4    briefly, Government's Exhibit 4B, please.

5    BY MR. DURHAM:

6    Q.   As you look at this photograph,

7    Government's Exhibit 4B, what does that appear to be?

8    A.   The judge was starting to leave the bench.  I

9    recessed court.  We all were standing, and she was

10   leaving the bench to go back to chambers.

11   Q.   With respect to Judge Arterton's practice when she

12   leaves the bench at the end of a proceeding, what if

13   anything do you do, as the courtroom deputy?

14   A.   I wait until she leaves, and then I start picking

15   up my stuff.  And I go out, usually leave after her.

16   Q.   If we go to Government's Exhibit 4C quickly, at

17   this point Judge Arterton has left the courtroom,

18   correct?

19   A.   Yes, she has.

20   Q.   But the people who are still in the courtroom from

21   this vantage point include who -- you're still there?

22   A.   I'm still there.

23   Q.   And Ms. Cashman is there --

24   A.   Ms. Cashman.

25   Q.   -- and Probation.

1    A.   And Probation, yes.

2    Q.   I want to ask you whether you have any recollection

3    as to anything unusual occurring after Judge Arterton

4    had left the bench and left the courtroom and before the

5    defendant was actually out of the courtroom.

6    A.   As they were escorting him out, he looked over at

7    Brian and said something to the effect, "I'll look for

8    you when I get out, I'll come and get you."

9    Q.   Let me ask you about that.  First, could you take a

10   look at Government's Exhibit 4D.

11        In this photograph, can you recognize who's in the

12   lower left-hand corner?

13   A.   Yes.

14   Q.   Who's that?

15   A.   Peter Santos.

16   Q.   Where is he looking as depicted in that frame?

17   A.   He's looking over at Brian Topor.

18   Q.   Now, with respect to where you were located and

19   what you heard, I want to break that down a little bit.

20        As to who said the words to Mr. Topor that you

21   indicated, "I'll look you up" -- withdrawn.

22        What do you recall him saying; that is him,

23   Mr. Santos, saying?

24   A.   He turned to Brian like he is in the picture, and

25   he says -- he said, "I know where to look for you when I

1    get out."

2    Q.   How clear is it in your mind, as you sit here

3    today, that Mr. Santos was directing his statement, his

4    words, to Brian Topor?

5    A.   Oh, very clear.

6    Q.   With respect to the defendant's tone of voice, how

7    would you describe the defendant's tone of voice when he

8    made the statement to Brian Topor?

9    A.   It was a threat.

10   Q.   And with respect to your experience in the

11   courtroom, how common or uncommon has it been in your

12   experience for a defendant to threaten a probation

13   officer?

14   A.   I've never heard it.  Never happened before.

15   Q.   When Mr. Santos made this statement to Brian Topor,

16   do you recall whether or not Mr. Topor said anything in

17   response?

18   A.   I don't think he did, but the look on -- he was

19   just like shocked.

20   Q.   As best you can recall, after Mr. Santos had made

21   the statement to Mr. Topor as he was walking out of the

22   courtroom, what then happened?

23   A.   The marshals were trying to calm him down and kept

24   him going to get him out of the courtroom.

25   Q.   And with respect to the statement that Santos made

1    to Mr. Topor, loud enough for you to hear?

2    A.    Oh, yeah.

3    Q.    Any difficulties in hearing him make the statement?

4    A.    No.

5    Q.    You said he made the statement to Mr. Topor; what's

6    the basis for your testimony that he made the statement

7    to Brian Topor?

8    A.    Because Brian was the one that was speaking during

9    the hearing when the judge asked for his output.

10   Q.    As you sit here now, is there any doubt at all as

11   to the fact that Mr. Santos directed his remark to Brian

12   Topor?

13   A.    No.

14   Q.    Did you have any further contact that day with

15   Mr. Santos?

16   A.    No.

17   Q.    To your knowledge, did Mr. Santos come back to the

18   courtroom that day, or that was it for August 31st?

19   A.    That was it.

20          MR. DURHAM:  Thank you, ma'am.

21          I have no further questions, Your Honor.

22

23                    CROSS-EXAMINATION

24   BY MR. DURHAM:

25   Q.    Good afternoon, Ms. Villano, how are you?

1    A.   Good.   And you?

2    Q.   Good.

3         In the spirit of full disclosure, I've appeared

4    before Judge Arterton in your courtroom, haven't I?

5    A.   Yes.

6    Q.   I'm going to ask you some follow-up questions.  I'm

7    going to start with the most recent statement you just

8    made to the jury.

9         Did I understand your testimony correctly that you

10   believe whatever you heard, the comment was that was

11   made by my client, that it was made to Mr. Topor, based

12   on the fact that it was Mr. Topor that testified at the

13   revocation hearing?

14   A.   Yes.

15   Q.   Would you also -- so that was why you think it was

16   directed to Mr. Topor?

17   A.   Oh, yeah.  It was directed at him.

18   Q.   Let me ask you -- and it was based upon the fact

19   that he had testified that Mr. Santos, Peter, should get

20   a period of incarceration as opposed to release to a

21   halfway house.

22             MR. ROGAN:  Again, I'm kind of low tech, so if

23   I can approach, Your Honor?

24             THE COURT:  Certainly.

25

1    BY MR. ROGAN:

2    Q.    I'm going to show you what's a full exhibit,

3    Ms. Villano, 4D.

4          And you see those two individuals, those are the

5    individuals - thank you -- that you identified in the

6    jury box as being Mr. Topor and Mr. Leone, correct?

7    A.    Right.

8    Q.    You would agree with me that you just testified to

9    this jury that he turned in the direction of the jury

10   box and made that comment, correct?

11   A.    Yes.

12   Q.    But you don't know specifically if he made that

13   comment to Mr. Topor or Mr. Leone, other than the fact

14   that Mr. Topor testified not to the benefit of my

15   client.

16   A.    He looked directly at Brian.

17   Q.    Well, standing right next to him is Mr. Leone,

18   right?

19   A.    Yeah, but he was looking at Brian.

20   Q.    But he didn't say, "Hey, Mr. Topor," or, "Hey,

21   Topor," or, "Hey, Brian," he just made this statement.

22   A.    He just made that statement, that I recall.

23   Q.    Right.  And I wanted to ask you about that.

24         In fairness, Ms. Villano, you indicated just now to

25   this jury, you said that you believe the comment that

1    was made was, "I'll look for you when I get out, I'll

2    come and get you."

3        Is that a paraphrase of what you remember him

4    saying, or do you have any precise recall of what he

5    said?

6    A.    I know he said to Brian, "I'm going" -- well --

7    "I'm gonna" -- "I'm going to get you when I get out."

8    Q.    That's a different statement now, so I just want to

9    be fair --

10   A.    "I'm going to look for you," you know.

11   Q.    I want to let you finish your answer, Ms. Villano.

12   A.    I'm trying to recall.

13   Q.    Sure.

14   A.    "I'm going to come and get you when I get out."

15   Q.    That's it.

16   A.    Yeah.

17   Q.    So you believe he said, "I'm going to come and get

18   you when I get out"; that's your testimony to the jury?

19   A.    Yes.

20   Q.    Do you recall approximately what time the hearing

21   ended on August 31, 2016?

22   A.    No.

23   Q.    Let me just show you, or perhaps the government can

24   stipulate based upon the full exhibit, that it ended at

25   10:44, let's say 10:45.

1    A.    Okay.

2    Q.    Do you recall, at 3:45 that very same day, you were

3    interviewed by Inspector Parker, who's seated at counsel

4    table?

5    A.    Yeah.  He came up to my desk.

6    Q.    And he interviewed you, right?

7    A.    Yep.

8    Q.    And part of what he asked you was, do you remember

9    what it was that my client Peter is alleged to have

10   said.

11   A.    Right.

12   Q.    Do you remember what you told him then?

13   A.    The same thing.  I don't -- you know.

14   Q.    No.  Does this sound familiar, "I'll look you up,"

15   or, "I'll get you"?

16   A.    Well, yeah.

17   Q.    Well, that's different, ma'am, from, "I'm going to

18   come get you when I get out," and that was less than

19   five hours after the event?

20   A.    Whatever I said to him, that's what --

21   Q.    Whatever you said to Mr. Parker?

22   A.    Yes.

23   Q.    Not what you said to the jury now?

24   A.    Well, it's the same thing.  He's going to come out

25   and get you.  I mean, that was back in August, but I

1    know he threatened him.

2    Q.   I don't mean to be -- and I'm not being

3    disrespectful, but it's not the same thing, but --

4         MR. DURHAM:  Your Honor, the government is

5    going to object to counsel's commentary.  It is what it

6    is.

7         MR. ROGAN:  It's cross-examination, Your

8    Honor.

9         THE COURT:  You can continue.

10        MR. ROGAN:  Thank you.

11   BY MR. ROGAN:

12   Q.   It's not the same comment, ma'am, that you just

13   told this jury under oath.  And what's more important,

14   and I just want to make sure that I've got the facts

15   right, on the very same day, five hours later, you said

16   something else to Mr. Parker, on the very day that it

17   happened, than you just told this jury.

18        Would you agree with me on that?

19   A.   Not really.  He said he's going to come and get him

20   when he gets out.

21   Q.   But you would agree with me that he told

22   Mr. Parker, "I'll look you up," or, "I'll get you,"

23   nothing about, "I'm going to come get you when I get

24   out."

25   A.   It's the same thing.

1    Q.   I'm going to move on, ma'am.  Let me ask you a

2    couple more questions.

3         Do you also recall, just a couple of weeks ago,

4    back on May 18th of this year, do you recall

5    participating in a meeting with Attorney Durham and

6    Mr. Parker --

7    A.   Yes.

8    Q.   -- to prepare you for your testimony?

9    A.   Yes.

10   Q.   As part of that preparation, did you review with

11   Mr. Parker and the government what it was you recall

12   Mr. Santos saying back on August 31st?

13   A.   Somewhat, that he threatened Brian he's going to

14   come and get him when he gets out, look him up.

15   Q.   You seem focused on the word "threatened."  To be

16   fair, that's your perception of whatever it is you think

17   you heard on that date constitutes a threat; is that

18   fair to say?

19   A.   Yeah.

20   Q.   Back on May 18th, you said to Mr. Parker --

21   that's only 12 days ago -- said something like, "When I

22   get out, I'll come looking for you," and that's

23   something different again, ma'am.

24        Would you agree with me?

25             MR. DURHAM:  Your Honor, I'm going to object

1      to the commentary.

2            THE COURT:  He's asking a question.  He's

3      asking whether she'll agree.

4            MR. ROGAN:  Right, that it's something

5      different again.

6            THE COURT:  Maybe put the question at the

7      beginning so Mr. Durham knows where you're going.

8            MR. ROGAN:  Let me reframe the question.

9      BY MR. ROGAN:

10     Q.   You agree with me that you met with the government

11     back on May 18th, just 12 days ago.

12     A.   Yes.

13     Q.   Okay.  Would you agree with me that then you said,

14     "When I get out, I'll come looking for you"?

15     A.   If that's what I said.

16     Q.   Well, I'm actually asking you, ma'am, if that's

17     what you said less than two weeks ago.

18     A.   I could have said that, yes.

19     Q.   Would you agree with me that that is different from

20     what you told the jury today?

21     A.   A little, yeah.

22     Q.   Would you agree that it's different again from what

23     you told Mr. Parker back on the very date that these

24     events are alleged to have happened, August 31, 2016?

25     A.   I don't know.

1    Q.    You don't know?

2    A.    What did I say back then?

3    Q.    Well, what you said back on August 31, 2016, five

4    hours -- less than five hours after the incident is,

5    "I'll look you up," or, "I'll get you."

6    A.    That's more accurate.

7    Q.    That's more accurate.

8    A.    Yeah.

9    Q.    Not what you just told the jury?

10   A.    Well, it's basically what I told the jury.

11   Q.    Again -- okay.

12   A.    I don't remember word from word.  I can only --

13   Q.    And I understand that, but I think you also told

14   the investigator that this event stood out in your mind.

15        In fact, that's what you just told the jury today,

16   right?

17   A.    Yes.

18   Q.    That in 30 some-odd years, you'd never heard anyone

19   be as rude and disrespectful as my client was during the

20   hearing.

21   A.    Correct.

22   Q.    Were you offended by that?

23   A.    I was shocked by it.

24   Q.    My question is a little different:  Were you

25   offended by it?

1   A.   He wasn't talking to me; so, no, I wasn't offended

2   by it.

3   Q.   But you were shocked by it.

4   A.   I was shocked by it, yeah.

5   Q.   Did you have a conversation with Judge Arterton on

6   that day after the incident happened, either in chambers

7   or somewhere else?

8   A.   I told her, after the marshal came, that I was

9   questioned by the marshal.  What I said to her, I don't

10  remember.

11  Q.   So on this same day that you were interviewed by

12  the marshal.  You then had a conversation with Judge

13  Arterton about the interview with the marshal and what

14  you told him?

15  A.   Well, I told her, you know, the marshal questioned

16  me about what went on in the courtroom after she got off

17  the bench.

18  Q.   Again, I don't want to beat a dead horse, but you

19  don't remember what you said to Judge Arterton?

20  A.   No, not word for word.

21  Q.   Rough idea?

22  A.   I told her that he threatened a probation officer

23  on his way out.

24  Q.   By the way, during your prep session with the

25  government a couple of weeks ago, did they tell you what

1    the elements of a threat were?

2    A.    They must have.   I don't remember.

3    Q.    Well, what do you remember about the prep session

4    that you had with the federal government just a couple

5    of weeks ago, besides going over what you recall or you

6    think you recall he said?

7    A.    That's about it.

8    Q.    How long did the session last, approximately?

9    A.    Maybe 20 minutes to a half hour.   Not long.

10   Q.    And where did that meeting take place?

11   A.    U.S. Attorney's office.

12   Q.    In New Haven?

13   A.    New Haven.

14   Q.    And you were asked, on direct examination from the

15   government, if you were in a position to hear.

16         Do you remember that?

17   A.    Uh-huh.

18   Q.    And do you remember your response?

19         You said, yes, you could, right?

20   A.    Yes.

21   Q.    But I think you said there was no response from

22   Probation Officer Brian Topor.

23   A.    Not that I can remember.   I know the look he gave,

24   but I don't remember him saying anything.

25   Q.    I know.   I wrote that down.   You said, no response

1    from Topor, but he looked shocked.

2            MR. DURHAM:  Your Honor, I'm just going to

3    object, because what I think the witness testimony was,

4    she doesn't remember Mr. Topor saying anything.

5            THE WITNESS:  I don't remember if he said

6    anything.

7            THE COURT:  We'll keep going.

8    BY MR. ROGAN:

9    Q.   Either back on August 31st, when you were in the

10   courtroom and in a position to hear, or later that same

11   day, when you were interviewed by Mr. Parker, or a

12   couple of weeks ago, when you were interviewed again by

13   the government, you don't have any recollection if

14   Probation Officer Topor made an articulable response to

15   Peter Santos.

16   A.   No.

17   Q.   And when you said -- I want to ask you this:  You

18   said, quote, on direct examination today, that you were

19   in shock during the hearing.

20       Do you remember that?

21   A.   Yes.

22   Q.   And in fact, you said it twice when you were asked

23   by Attorney Durham.

24       Did that impede or impair your ability to

25   understand what was going on?

1    A.   No.  Because I was shocked during the hearing.

2    Q.   Right.  But once the hearing ended at 10:44, as you

3    know from your long years of experience in the

4    courtroom, that defendant is taken out very quickly,

5    correct?

6    A.   Yeah, normally.

7    Q.   Let's try and see if we can fairly estimate:  Would

8    you agree with me that it was less than three minutes

9    after Judge Arterton stepped away from the bench that

10   Mr. Santos was taken from the courtroom?

11   A.   It could have been.  About that maybe.  They're

12   usually good about taking them out.

13   Q.   They move them out --

14   A.   They wait until the judge leaves the bench --

15   Q.   And then the proceeding is over and off they go.

16   And that's what's depicted in the photographs that --

17   A.   Right.

18   Q.   -- that you were shown by Mr. Durham.

19       So -- and by the way, to be fair, my client said

20   far worse to Judge Arterton during the course of that

21   hearing than what you were asked about on direct

22   examination.

23   A.   Right.  But he never threatened her.

24   Q.   But he was quite outrageous in his language; is

25   that fair to say?

1    A.    Yes.

2    Q.    When you said, "He just let it go," you never

3    really explained to the jury what you meant by that.

4    A.    He lost his temper.

5    Q.    And when you claim that he lost his temper, other

6    than being disrespectful to the Court, which I'm not

7    saying is a good idea or bad idea, what else did he do,

8    besides speaking or addressing the Court in a

9    disrespectful manner, that was indicative of him losing

10   his temper?

11   A.    Any time the judge tried to speak, he was

12   overriding her.

13   Q.    He was being rude and disrespectful?

14   A.    Yeah.

15   Q.    Other than that, what other manifestation did you

16   see in that courtroom during the hearing that was

17   indicative of him losing his temper other than cutting

18   the judge off when she was trying to address him?

19   A.    He was standing up.  He was -- I don't know.  He

20   was waving his arms, "Take me away, handcuff me now."

21   Q.    Are you indicating that when --

22   A.    He didn't want to listen to anything she had to

23   say.

24   Q.    Okay.  So that's another indication.

25   A.    Uh-huh.

```
 1   Q.    I think you also were asked, on direct examination
 2   by Mr. Durham, if he had been given an opportunity to
 3   address the Court.
 4         Do you remember that?
 5   A.    Uh-huh.
 6   Q.    And he did, correct?
 7   A.    Yes.
 8   Q.    And typically even a defendant, when they address
 9   the Court, they stand up, right?
10   A.    Right.
11   Q.    When you say he stood up, it's not like he got out
12   of his chair at any point, other than the point when he
13   was being -- directly addressing a United States
14   district court judge.
15   A.    Well, he stood up to address the Court.  He was --
16   he wanted to get out.  He was making promises.  Then he
17   sat down, because the judge didn't give her decision
18   right away.
19         And then she thought about it, and she started to
20   go into the fact she was going to sentence him.  And he
21   stood up again and started, "Just don't bother, just
22   cuff me, take me away."
23   Q.    Did the marshals in the courtroom at that point do
24   anything to restrain or enjoin Mr. Santos from standing
25   up when he wasn't supposed to be?
```

```
 1    A.    They just approached him to make sure he wasn't
 2    going to do anything irrational.
 3    Q.    Well --
 4    A.    They didn't handcuff him -- from what I can
 5    remember, they didn't handcuff him until after the
 6    hearing.
 7    Q.    That's right.
 8    A.    Right.
 9    Q.    So at any time his manner or demeanor wasn't such
10    that the United States Marshals, who are here in this
11    courtroom, felt compelled to restrain him during the
12    course of the hearing --
13    A.    They were sitting down.  As soon as he started
14    acting like that, they stood up and started getting
15    closer to him.
16    Q.    Okay.  But they didn't take any other action.
17    A.    Not at that point, no.
18    Q.    Have you ever reviewed the transcript of the
19    hearing?
20    A.    Not really, no.  I glanced over it, but what
21    happened didn't happen so much until after the
22    transcript.
23    Q.    Okay.  But a lot of what you've testified about is
24    during the hearing, so when did you review the
25    transcript?
```

1    A.    Well, when I found out I was going to be a witness,

2    I kind of looked at the case.

3    Q.    When did you find out that you were going to be a

4    witness such that you went and reviewed the transcript?

5    A.    I didn't review the transcript.  I just glanced

6    over it.

7          When I first got the first e-mail.  Because I

8    wasn't sure -- I says, "I think I remember the case,"

9    and sure enough.

10   Q.    When you say, "When I think I got the first

11   e-mail," who did you get an e-mail from?

12   A.    Matt Parker.

13   Q.    Okay.  So let me just stay on the date, which is

14   August --

15   A.    Okay.

16   Q.    I'm not going to ask you, that's not fair to ask

17   you about a date you got an e-mail.

18         August 31, though, same day, five hours later,

19   you're already being interviewed by Matt Parker.

20   A.    Right.

21   Q.    And that was face to face.

22   A.    Right.

23   Q.    When did you review the transcript?

24   A.    When I got the e-mail earlier this year.  Because I

25   heard nothing after that.  So the transcript didn't go

1    on right away, and I just let it go.  And then all of a

2    sudden, earlier this year, I got an e-mail about it.

3    And I'm like, "What's this about," and then I

4    remembered.

5    Q.   So you had completely forgotten about this

6    incident?

7    A.   Well, yeah.  I just put it aside and moved on.

8    Q.   Where did you go to get the transcript?

9    A.   The docket.

10   Q.   So you just pulled it off the docket.

11        What else did you do besides -- when you found out

12   you were going to be a witness, besides looking at the

13   transcript?

14   A.   Nothing.

15   Q.   Talk to anybody?

16   A.   I just advised my supervisor that I might be

17   testifying in the trial.  That's it.

18   Q.   Did you talk to anyone about that day, other than

19   Mr. Parker and the Assistant United States Attorney

20   Durham?

21   A.   Well, I mentioned to Julie, the court reporter,

22   asked her if she got the e-mail too, and she said yeah.

23   Q.   Did you two talk at all about what had happened?

24   A.   Not really, no.

25   Q.   Would it surprise you to learn that her

 1    recollection of the events is different than yours?

 2    A.    Could be.  I don't know what her recollection is.

 3    Q.    Hang on one second, please.

 4              (Pause.)

 5    BY MR. ROGAN:

 6    Q.    Last question:  Is it fair to say that you don't

 7    have a precise recall of the events that transpired back

 8    on August 31, 2016?

 9    A.    I could be wrong -- not wrong, but maybe not

10    100 percent.  I don't know.  I'm just recalling what I

11    remember.

12    Q.    Ma'am, I want to be clear.  I'm not suggesting in

13    any way that you're -- I'm just asking, is it fair to

14    say that you don't have a recall of exactly what is

15    alleged that my client said on that date?

16    A.    I don't know.  I know it was a threat.

17    Q.    Could you just -- I'm going to be polite.  Could

18    you just answer my question.

19         I know you want to say it's a threat, but could you

20    answer my question, which is:  Is it fair to say that

21    you don't have, even today or then, a precise recall of

22    what is claimed that is alleged that my client said

23    after the hearing?

24    A.    Back then I probably did; maybe now, I don't.  You

25    know, time.  Like I said, I put it aside, I moved on.

1    But it did trigger when I saw who it was, that it

2    happened.

3         MR. ROGAN:  Thank you, ma'am.  I have no

4    further questions.

5

6                    REDIRECT EXAMINATION

7    BY MR. DURHAM:

8    Q.   Ms. Villano, do you have a precise recollection of

9    what you had for breakfast on August 31 of 2016?

10   A.   No.

11   Q.   Or precise recollection of other things that

12   happened on August 31st of 2016?

13   A.   No.

14   Q.   With respect to this proceeding, do you remember

15   the proceeding?

16   A.   Oh, yes.

17   Q.   And with respect to the events that occurred in the

18   courtroom involving Mr. Santos, do you recall those?

19   A.   Yes.

20   Q.   And with respect to what happened after Judge

21   Arterton had left the bench and what occurred in the

22   courtroom, do you remember that?

23   A.   Yes.

24   Q.   So when counsel asks you the question about a

25   precise recollection, do you have a precise recollection

1     of the exact words that were said by Mr. Santos?

2     A.    No.

3     Q.    But with respect to what you do recall, how clear

4     is it in your mind that he, Mr. Santos, said words to

5     the effect of, "When I come out, I'll get you," or, "I'm

6     going to get you," or words to that effect?

7     A.    That I remember.

8     Q.    Do you have any doubt at all that it was words to

9     that -- that's not a quote --

10    A.    No, it's not.

11    Q.    -- but best recollection is words to that effect.

12    A.    That's my best recollection.

13    Q.    Any doubt in your mind whatsoever that he said

14    that?

15    A.    No.

16    Q.    With respect to counsel's questions to you

17    referring to it as being a threat, if Santos had said

18    that to you, had said the same words to you, as the

19    courtroom deputy, would you have considered that a

20    threat to you?

21          MR. ROGAN:  Your Honor, objection.  Outside

22    the scope of my cross, and also calls for a

23    hypothetical.

24          MR. DURHAM:  I don't think it's outside the

25    scope of the cross because counsel asked specifically

1    about the witness's reference to threats, so I just

2    wanted to --

3              THE COURT:  Overruled.

4              MR. DURHAM:  -- explore that.

5    BY MR. DURHAM:

6    Q.   If Mr. Santos had said to you what he said to Brian

7    Topor in that courtroom, would you have taken that as a

8    threat?

9    A.   Yes.

10   Q.   In fact, counsel asked you about having met to

11   prepare to testify today.

12             Do you remember that?

13   A.   Yes.

14   Q.   Do you recall -- well, with respect to that, do you

15   remember what, if anything, you said you would have done

16   if Mr. Santos had directed his comments to you?

17             MR. ROGAN:  Your Honor, same objection.  Now

18   it's significantly outside the scope.

19             THE COURT:  Sustained.

20   BY MR. DURHAM:

21   Q.   Mr. Rogan asked some questions about the

22   transcript.  You said you had sort of looked at the

23   transcript, although not reviewed it carefully.

24             Is that a fair characterization?

25   A.   Right.

1    Q.   He asked you where you had gotten a transcript or

2    how you saw it, and you made reference to the docket.

3         Would you explain that to the jury, when you say

4    the docket, how is it that you get the transcript?

5    A.   The court reporter will file a transcript of the

6    proceeding, and it goes on our docket.  You can

7    actually -- once a period goes by, it will be unsealed.

8    And it's open to the public, but you can read the whole

9    transcript of what went on in court unless it's sealed,

10   which it wasn't.

11   Q.   You said you were shocked at the manner in which

12   the defendant Santos was talking to the judge.

13        Do you recall that?

14   A.   Yes.

15   Q.   To distinguish, when you talk about, you were

16   shocked, do you mean you had completely lost your wits

17   about you, or what did you mean when you were shocked

18   about it?

19   A.   No, I didn't lose my wits.  I was shocked that

20   anybody would talk to a judge that way.  Even though he

21   didn't threaten her, just being the way they were, never

22   had it happen.

23   Q.   And then with respect to Mr. Santos' remarks to

24   Probation Officer Topor, did you lose your wits about

25   that?

1    A.    No.

2    Q.    You have a clear recollection as to the event?

3    A.    Yes, I do.  I looked over at Brian, and I saw the

4    look on his face.  To me, he got the message.

5    Q.    And in that regard, let me ask you:  When

6    Mr. Santos looked over to Mr. Topor and made those

7    remarks -- and based on your observation, what you saw,

8    what you heard -- did he appear to be joking in any way?

9    A.    No.

10   Q.    Did it appear that Mr. Topor took his comments to

11   him as a joke in any way?

12   A.    No.

13            MR. DURHAM:  Thank you, Your Honor.

14

15                    RECROSS-EXAMINATION

16   BY MR. ROGAN:

17   Q.    Ms. Villano, as someone who's got over 30 years'

18   experience as deputy clerk, would you agree with me that

19   what's going on here today is a whole lot more important

20   than your recollection of what you had for breakfast?

21   A.    Yeah.

22   Q.    Yeah.  It's important to my client, and it's

23   important to the government, correct?

24   A.    Correct.

25   Q.    And you don't have a recollection of what was said

1    back on August 31, because you've given this jury three

2    different statements today as to what you think you

3    heard was said back then; isn't that true?

4    A.   No, I heard something.  I heard it.

5    Q.   You heard something, but you don't know what.

6    A.   I heard him threaten.

7    Q.   But I'm asking you to confirm for this jury whether

8    you perceived that as a threat or not.  What matters

9    here is what you recall the words were, and you don't.

10   A.   I recall -- well, not exactly, but --

11          MR. ROGAN:  Right.  Thank you, ma'am.

12

13                  FURTHER REDIRECT EXAMINATION

14   BY MR. DURHAM:

15   Q.   What's your best recollection -- you don't have a

16   precise recollection of the exact words, right?

17   A.   Right.

18   Q.   You didn't have a tape recorder going.

19   A.   No, I didn't.

20   Q.   But where were you located in the courtroom?

21   A.   Right by the judge, right where the -- young lady

22   right there.

23   Q.   What's your best recollection, whether it's a quote

24   or not, what's your best recollection of what Mr. Santos

25   said to Brian Topor?

1    A.    He said he was going to find him, get him, when he

2    got out.

3              MR. DURHAM:   Thank you, ma'am.

4              Nothing further, Your Honor.

5              THE COURT:   Thank you, ma'am.   You may step

6    down.

7                   (Whereupon, the witness was excused.)

8              MR. DURHAM:   Daniel Leone, Your Honor.

9                        DANIEL LEONE,

10             called as a witness, having been first duly

11             sworn or affirmed, was examined and testified

12             as follows:

13

14             THE CLERK:   Please state your name and spell

15   your last name for the record.

16             THE WITNESS:   Daniel Leone, L-E-O-N-E.

17             THE CLERK:   And indicate the town and state in

18   which you live or work.

19             THE WITNESS:   I work in Hartford, Connecticut.

20             THE CLERK:   Thank you.

21

22                    DIRECT EXAMINATION

23   BY MR. DURHAM:

24   Q.    Mr. Leone, would you indicate or tell the jurors

25   how you're employed?

1    A.    I'm employed as a United States probation officer,

2    here in Hartford.

3    Q.    And for how long have you been a U.S. probation

4    officer?

5    A.    I was hired in July of 2015.

6    Q.    And prior to becoming a probation officer in the

7    federal system, what did you do?

8    A.    I was a judicial marshal for the state of

9    Connecticut.  I worked at Middletown courthouse.

10   Q.    So I want to focus your attention on your time as a

11   United States probation officer.

12         Would you tell the ladies and gentlemen of the jury

13   what training you received in order to become an

14   U.S. probation officer?

15   A.    Upon hiring, I participated in a six-week training

16   facility, federal training academy in Charleston, South

17   Carolina, which went over several aspects of the job.

18   Q.    And then, when you first started to actually

19   perform the functions of a probation officer, were you

20   assigned to a particular type of work in probation?

21   A.    I worked in the supervision unit of probation.

22   Q.    And explain to the jurors what the supervision unit

23   does?

24   A.    Supervise the clients in the community who were

25   sentenced to a period of probation, or a period of

1    supervised release, or a period of pretrial supervision.

2         And with that, we assist clients; and again, if

3    it's probation or supervised release, reintegration.  If

4    it's supervised release, we work on reintegration into

5    the community, whether it's getting them engaged in

6    substance abuse treatment, mental health treatment,

7    assisting them with needs with employment, and to allow

8    for -- to reduce recidivism so they do not commit more

9    crimes.

10   Q.   In that regard, as you sit here today, are you

11   still in the supervision unit within probation?

12   A.   I'm still within the supervision unit, yes.

13   Q.   Describe, if you would, to the jurors how you get

14   cases assigned to you.  How does that come about?

15   A.   We are assigned cases through our supervisors.  The

16   supervisors assign the case to us according to

17   specialties.  There are specialists in the supervision

18   unit, as well as generalized line officers.

19   Q.   Now, I want to focus your attention, if I might,

20   particularly on an individual by the name of Peter

21   Santos.

22        Do you know Peter Santos?

23   A.   I do.

24   Q.   How did you first become aware of who Mr. Santos

25   was?

1    A.    I was assigned his case.

2    Q.    And do you remember approximately when you were

3    assigned to the case?

4    A.    At the end of 2015.

5    Q.    So you had come on, did you say, in July of 2015?

6    A.    That's correct.

7    Q.    So it's toward the end, maybe six months or maybe a

8    little more or less after you had come on, that you were

9    assigned Mr. Santos' case?

10   A.    That's correct.

11   Q.    Do you recall, sir, whether or not there were any

12   standard conditions of supervised release that applied

13   to Mr. Santos?

14   A.    I recall substance abuse treatment, restitution

15   payments.  Those are the ones specific to him.  There's

16   a list of standard conditions, as well as mandatory

17   conditions, that go along with everybody who's under

18   supervision.

19   Q.    And with regard to Mr. Santos' supervision, were

20   you doing that alone, or did you do that in conjunction

21   with others?

22   A.    I was the main officer assigned to the case.

23   However, I do have a supervisor, Brian Topor, who was

24   very involved with the matter.

25   Q.    And describe, if you would, to the jurors -- in

1    terms of the supervision of somebody who's on pretrial

2    release, not necessarily Mr. Santos, but just in

3    general -- what do you do as a probation officer, and

4    then supervising the individual who's on supervised

5    release?

6    A.   I'm sorry, could you repeat that.

7    Q.   Sure.

8         Somebody's on supervised release; what kind of

9    contact do you have with that person when he or she is

10   on supervised release?

11   A.   The contact is based on the risk level.  We risk

12   offenders out based on their personal history, criminal

13   histories, employment, substance abuse history.  And

14   with that, we supervise them according to a risk level.

15   A higher risk would mean more contacts, lower risk would

16   mean less contacts.

17        We supervise them in the community through home

18   contacts, field contacts at employment or treatment

19   facilities, as well as office visits.

20   Q.   I want to focus specifically on Mr. Santos.

21        He came essentially into your caseload sometime in

22   the end of 2015, early 2016, someplace in there?

23   A.   Correct.

24   Q.   And were you present for a hearing that occurred

25   before Judge Arterton on August 31st of 2016?

1     A.   Yes.

2     Q.   So between the time that Mr. Santos came on to your

3     docket or your caseload and August 31st of 2016, who

4     was his principal supervisor -- or probation officer?

5     A.   That was me.

6     Q.   And was that uninterrupted, you pretty much were

7     the supervisor for that whole period?

8     A.   That's correct.  When he left BOP custody, I began

9     supervision.

10    Q.   As to your relationship involvement with

11    Mr. Santos, other than your professional relationship --

12    that is you as probation officer, he as a supervised

13    release person -- any other knowledge or contact with

14    Mr. Santos?

15    A.   Not prior.

16    Q.   Purely your job as a probation officer, his job

17    as -- his role as being on supervised release, right?

18    A.   That's correct.

19    Q.   And when he first came out of prison, do you recall

20    how long it was before you did meet with him to sort of

21    go over the rules of the road?

22    A.   He was released from incarceration on

23    December 31st, 2015.  He met me in my office on

24    January 4th, 2016.

25    Q.   In that connection, when you met with Mr. Santos,

1    what, if anything, did you go over with Mr. Santos

2    concerning his supervised release?

3    A.    Reviewed the judgment and commitment order, which

4    is his conditions of supervision.

5    Q.    And in that connection, the jury -- the jury has

6    heard that a special condition, Special Condition 7, had

7    to do with no excessive use of alcohol or the use of,

8    essentially, controlled drugs.

9         Do you recall that being one of those conditions?

10   A.    I do.

11   Q.    Do you remember, sir, whether or not that condition

12   was discussed with Mr. Santos?

13   A.    I don't recall specifically.  Typically, I do read

14   through the entire JNC with the client while he's in the

15   office.

16   Q.    Let me focus on that condition about the possession

17   or use of controlled substances.

18        Do you recall, sir, at any time of a January 4th

19   of 2016, if it ever came to your attention that

20   Mr. Santos was in violation of that specific condition

21   of the terms and conditions of his supervised release?

22   A.    Yes.

23   Q.    And how did that come to your attention?

24   A.    Mr. Santos provided the United States Probation

25   Office, as well as treatment facilities, with positive

1    drug tests.

2    Q.   With respect to drug tests, explain to the jurors,

3    if you would, who makes the decision as to when somebody

4    is going to be tested, drug tested?

5    A.   It is a condition of supervision, and there's a

6    couple ways we do it.  A probation officer would call in

7    a client to render a urine in the office, or we do have

8    a comply line, which is a random call-in line through

9    our treatment providers.  The client would have to call

10   this call-in line, and they would tell them if they had

11   to render a urine the following day.  So that's

12   randomized.

13   Q.   Explain to the jurors, if you would, sir, how

14   Mr. Santos' progress went.

15       How was his conduct while he was on supervised

16   release with you as his probation officer?

17   A.   My interactions with Mr. Santos were cordial.

18   Mr. Santos struggled with a drug addiction, and that

19   tended to be the focus of our conversations and our

20   contacts.

21   Q.   Would you tell the ladies and gentlemen of the jury

22   whether or not Mr. Santos was given any opportunity, or

23   maybe opportunities, to address his continued possession

24   and use of heroin?

25   A.   On January 4th, the first day I met Mr. Santos, I

1    referred him to an outpatient program here in Hartford,

2    Community Renewal Team.  After continued use of drugs,

3    he was recommended for a higher level of care.  A detox

4    program, followed by an inpatient program, roughly

5    30-day inpatient program was recommended to Mr. Santos.

6    Q.   And in that connection, tell the jurors, if you

7    would, what, if anything, happened with respect to that

8    program and Mr. Santos.

9    A.   Which program?

10   Q.   The first program, did you say Community Renewal

11   Team?

12   A.   Yes, that's correct.

13        So Mr. Santos was engaged in Community Renewal

14   Team.  Treatment there was increased from weekly groups

15   to three times a week, which was IOP, intensive

16   outpatient.  Because Mr. Santos needed a high level of

17   care, he was ultimately discharged from that program due

18   to his continued use.

19   Q.   And did his use of heroin stop at that point?

20   A.   It did not.

21   Q.   Would you tell the ladies and gentlemen of the jury

22   whether he was given the opportunity to attend other

23   programs, drug treatment programs?

24   A.   It was recommended Mr. Santos engage in a detox and

25   inpatient facility.  Mr. Santos engaged in a small

1    handful on his own.  The U.S. probation office also

2    referred Mr. Santos to a program in which we have a

3    contract to.  That's the APT Foundation in Bridgeport.

4    Q.   With respect to those programs, did Mr. Santos, to

5    your personal knowledge, adhere to the terms and

6    conditions of those programs?

7    A.   Mr. Santos entered each program, and left the

8    program against medical advice roughly two to three days

9    after entering each program.  He entered a total of

10   seven programs and left against medical advice each

11   time.

12   Q.   So there's seven programs.  Just so the jurors

13   know, when these various programs are being afforded --

14   Mr. Santos is being afforded the opportunity for seven

15   different programs, is the court apprized of what's

16   going on, or is that just between probation and

17   Mr. Santos?

18   A.   The court was notified of all the times Mr. Santos

19   entered a program and left the program.

20   Q.   And so with respect to each time that he would

21   enter a program and then leave, would the court be

22   advised of that?

23   A.   Yes.

24   Q.   And just so that this record is clear, with respect

25   to the judge in Connecticut, do you remember who the

1    federal judge was who had received the reports

2    concerning Mr. Santos' progress or lack of progress?

3    A.    Judge Janet Bond Arterton.

4    Q.    Do you recall, sir, whether or not, at a particular

5    point in time, you had occasion to seek any kind of a

6    file, an application with Judge Arterton, concerning

7    Mr. Santos' conduct while on supervised release?

8    A.    Yes.  I filed a petition.

9    Q.    Explain to the jurors what that was.

10   A.    I filed a petition with the judge, first in July of

11   2016, requesting a summons for Mr. Santos to appear

12   before Judge Arterton on his conduct of entering and

13   leaving programs, as well as the continued use of drugs.

14   Q.    And did that summons issue?

15   A.    The summons was issued.

16   Q.    And what followed the issuance of the summons; what

17   happened next, once the summons went out?

18   A.    A violation hearing was held on August 16, 2016.

19   Q.    And with respect to the August 16, 2016, hearing,

20   were you present for that?

21   A.    I was.

22   Q.    Where was that held?

23   A.    New Haven, before Judge Arterton.

24   Q.    And what was the result of that hearing on

25   August 16?

1    A.   Mr. Santos' terms of supervision were modified to

2    include inpatient program, inpatient programming for

3    substance abuse.  If Mr. Santos failed to complete the

4    inpatient program, he would be required to appear before

5    the judge again.

6    Q.   And for what purpose would he, Mr. Santos, then be

7    appearing before the judge if he failed to comply?

8    A.   Can you repeat that again?

9    Q.   Sure.

10        The hearing occurred on August 16th, correct?

11   A.   Correct.

12   Q.   And he was going to go to another program at that

13   point?

14   A.   Correct.

15   Q.   Is that the seventh program that he was going to at

16   that point?

17   A.   Sixth and seventh.

18   Q.   Sixth and seventh.

19        What was going to happen -- if you recall, what was

20   supposed to happen if Mr. Santos did not comply with the

21   program requirements?

22   A.   Mr. Santos' supervision would be revoked, and he

23   would be sentenced to a term of six months'

24   incarceration followed by 24 months' supervised release.

25   Q.   And do you recall, sir, whether or not Mr. Santos

1    was made aware of that fact; that is, what the

2    consequence is going to be if he didn't comply with

3    Programs 6 and 7 that were afforded to him?

4    A.   Mr. Santos was made aware.

5    Q.   And what's the basis of your knowledge that

6    Mr. Santos was made aware of what the consequence would

7    be?

8    A.   The judge mentioned it on record.

9    Q.   So August 16th comes; they have the hearing before

10   Judge Burns (sic); and then, to your knowledge, what

11   happened with respect to Mr. Santos and these additional

12   programs which were made available to him?

13   A.   So after that August 16th hearing, Mr. Santos was

14   admitted into two separate inpatient programs; and again

15   left against medical advice, both programs.

16   Q.   And do you recall, sir, whether you were made aware

17   of the fact that he had left the programs?

18   A.   I was made aware.

19   Q.   And do you recall how long he even stayed at the

20   programs after having gone -- initially being admitted

21   to them?

22   A.   Roughly two to three days for each program.

23   Q.   And how were you advised of the fact that he left

24   the program?

25   A.   The staff at the program would contact me.

1    Q.    When it was brought to your attention that now, the

2    sixth and seventh program that had been made available

3    to him, he hadn't adhered to the conditions and had

4    left, what, if anything, did you do?

5    A.    Petitioned the court to notify the judge of

6    Mr. Santos' noncompliance.

7    Q.    Do you remember approximately when it was that you

8    filed the petition with the court?

9    A.    That was August 24th of 2016.

10    Q.    And as a result of the petition that was filed, do

11    you recall whether or not Judge Arterton issued any kind

12    of an order or a warrant?

13    A.    At that time the U.S. probation office requested a

14    warrant, and Judge Arterton agreed to that request.

15    Q.    Do you know whether or not Mr. Santos was, at any

16    point in time, taken into custody on that warrant?

17    A.    Mr. Santos was taken into custody the following

18    day, August 25.

19    Q.    Were you involved in that or not?

20    A.    I was not.

21    Q.    Who was involved in taking Mr. Santos into custody

22    on August 25?

23    A.    My supervisor, Brian Topor, was present.

24    Q.    Do you recall, sir, whether or not -- withdrawn.

25    Let me ask it this way.

1          When anybody is arrested on a federal arrest

2      warrant, do you know procedurally what the people making

3      the arrest, taking the person into custody, what they

4      have to do with respect to advising the court that the

5      person's been taken into custody?

6          Let me ask you again.

7          Somebody is arrested on a federal warrant, what has

8      to happen without any unreasonable delay?

9      A.    Mr. Santos must appear before a magistrate judge.

10     Q.    So he is taken into custody, to your knowledge, on

11     August 25th by Brian Topor, correct?

12     A.    My supervisor, Brian Topor, did not physically take

13     Mr. Santos into custody.  That was, to my knowledge, the

14     U.S. Marshals.  However, it was in Brian Topor's office.

15     Q.    So Mr. Santos was in your supervisor's office,

16     Mr. Topor and the marshals came and arrested him,

17     essentially on the warrant that had been issued by Judge

18     Arterton.

19     A.    That's correct.

20     Q.    That's August 25th; do you know if Mr. Santos was

21     presented that day or not, August 25th?

22     A.    Yes.

23     Q.    And do you remember who the judge or magistrate

24     judge was?

25     A.    Judge Richardson, here in Hartford.

1    Q.   Did you attend that hearing?

2    A.   I did not.

3    Q.   Do you know who, if anybody, from your office did

4    attend that hearing?

5    A.   That was my supervisor, Brian Topor.

6    Q.   With respect to his being presented, that is

7    Mr. Santos being presented before Magistrate Judge

8    Richardson, for the benefit of the jurors, again, where

9    is Magistrate Judge Richardson located, which

10   courthouse?

11   A.   This building in Hartford.

12   Q.   This building.

13        He's presented here, before Magistrate Judge

14   Richardson, correct?

15   A.   Correct.

16   Q.   With respect to when somebody is presented after

17   having been arrested, do you know, sir, whether or not

18   one of the initial issues to be addressed is whether the

19   person is going to be held or the person is going to be

20   released?

21   A.   That's correct.

22   Q.   With respect to Mr. Santos having been taken into

23   custody on or about August 25th, do you recall, sir,

24   whether or not probation had a -- this calls for yes or

25   no -- did probation have a position on whether he should

1    be released or he should be held?

2    A.    I do not recall specifically.

3    Q.    All right.  The decision, the person who would

4    advise the court, Judge Richardson, as to whether

5    Mr. Santos should be held or released, the

6    recommendation, who in your office made that

7    recommendation, if you know?

8    A.    My supervisor, Brian Topor.

9    Q.    Okay.  Did you learn whether or not Mr. Santos was

10   held or he was released when he was presented before

11   Magistrate Judge Richardson?

12   A.    Mr. Santos was held in detention.

13   Q.    Now, again for the benefit of the jurors, somebody

14   appears for the initial presentment, correct?

15   A.    Correct.

16   Q.    Bond is decided, if somebody is going to get bond

17   or not, correct?

18   A.    Correct.

19   Q.    With respect to the underlying petition that you

20   had filed with Judge Arterton, for the

21   supervised-release violation, do you remember, sir,

22   whether or not Judge Arterton scheduled a hearing on

23   that petition?

24   A.    A hearing was scheduled for August 31st.

25   Q.    You've indicated to the jurors that you weren't

1    able to attend the hearing before Magistrate Judge

2    Richardson.

3          How about the proceeding before Judge Arterton on

4    August 31, 2016, were you present for that?

5    A.    I was present.

6    Q.    Let me ask you:  Who, aside from yourself, if

7    anybody, from probation was at that hearing?

8    A.    It was me, along with my supervisor, Brian Topor.

9    Q.    I want to direct your attention, if I might, to

10   Government's Exhibit 3A, please.

11         Is the monitor on?

12   A.    Yes.

13   Q.    If you look at that photograph, do you recognize

14   what's depicted or shown in that picture?

15   A.    That is Judge Arterton's courtroom.

16   Q.    And the person who's standing up and has, looks

17   like, khaki-colored clothing on, who's that?

18   A.    That's Mr. Peter Santos.

19   Q.    Does that appear to be the proceeding on the

20   31st of August, 2016?

21   A.    Yes.

22              MR. DURHAM:  I want to ask that

23   Government's Exhibit 4A be pulled up, please.

24   BY MR. DURHAM:

25   Q.    With respect to 4A, what do you recognize that

1    picture to show?

2    A.   Judge Arterton's bench, along with her staff and

3    myself, and Brian Topor in the jury box.

4    Q.   And as the jury looks at this photograph and the

5    jury box, there are two persons, correct?

6    A.   That's correct.

7    Q.   And who's on the left and who's on the right?

8    A.   I am on the right, closest to Judge Arterton.

9    Q.   And the other person, then, was Mr. Topor?

10   A.   That's correct.

11   Q.   Tell the ladies and gentlemen of the jury, if you

12   recall, were you present for all or just part of the

13   proceeding before Judge Arterton?

14   A.   I was present the entire hearing.

15   Q.   And do you recall, sir, whether or not Judge

16   Arterton ever asked to hear from probation; that is,

17   what probation's view was concerning what ought to

18   happen with respect to Mr. Santos' supervised-release

19   violation?

20   A.   She did ask.

21   Q.   Do you remember who, if anybody, from probation

22   then addressed the court about the matter?

23   A.   My supervisor, Brian Topor, addressed the court on

24   behalf of probation.

25   Q.   And at any point in time during the proceeding on

1    the record with Judge Arterton, did you speak to the

2    court, or was it always Mr. Topor?

3    A.    I did not speak.

4    Q.    Do you recall, sir, whether or not at any point in

5    time the defendant, Mr. Santos, addressed the court?

6    A.    Mr. Santos did address the court.

7    Q.    What can you tell the jury about that.

8          Let me take a step back.

9          Would you tell the jury whether or not, to your

10   recollection, Mr. Santos' demeanor in addressing Judge

11   Arterton remained constant or it changed in some way

12   during the proceeding?

13   A.    It changed in some way during the proceeding.

14   Q.    And describe to the jurors what you recall about

15   that; when Mr. Santos is initially addressing Judge

16   Arterton, what do you recall about that?

17   A.    When Mr. Santos was initially addressing Judge

18   Arterton, he was respectful, calm, and pleaded his case

19   to attend a treatment facility, a six-month-long

20   treatment facility.

21   Q.    If the jury has seen a transcript of the proceeding

22   and there is a reference something called a Youth

23   Challenge, does that sound familiar to you?

24   A.    That's correct.

25   Q.    What's a Youth Challenge?

1    A.   I'm not too familiar with the program, so I don't

2    want to speak, but it is a six-month substance-abuse

3    inpatient program.

4    Q.   So with respect to Youth Challenge, what was

5    Mr. Santos saying, if anything, about wanting to go to

6    Youth Challenge, if you recall.

7    A.   I don't recall without looking at my notes.

8    Q.   You remember Mr. Santos talking to the judge about

9    going to -- would that have been the eighth program?

10   A.   It would be, yes.

11        He was requesting to go to that program.

12   Q.   Now, you've told the jury that the prior hearing on

13   August 16th, the judge told Mr. Santos that if he didn't

14   comply with the conditions of the programs that he was

15   going to go to then, he was going to jail, correct?

16   A.   Correct.

17   Q.   Did -- to the best of your recollection, during the

18   course of the proceeding before Judge Arterton on

19   August 31st, did the court say anything, to your

20   recollection, which indicated that she was going to

21   follow through on that?

22   A.   She did.

23   Q.   Describe or explain to the jurors what you remember

24   about that.

25   A.   Following Mr. Santos' speaking for himself, Judge

1    Arterton spoke on behalf of the court and advised

2    Mr. Santos that he was given the opportunity to follow

3    through with the treatment program prior, however, he

4    has failed to do so; and that she was going to follow

5    through with her previous recommendation.

6    Q.   Do you recall, sir, during the proceeding before

7    Judge Arterton on the 31st, about some references

8    being made to an analogy of rowing a boat and so forth?

9    A.   I do.

10   Q.   To put things in context, on August 16 of 2016,

11   when the judge was giving Mr. Santos the opportunity to

12   go to yet another program, do you remember what the

13   analogy was?

14   A.   Yes.  The analogy that Judge Arterton explained was

15   Mr. Santos in a rowboat, paddling against rough waters.

16   However, she described that Mr. Santos needs to engage

17   in his own treatment, in reference meaning to paddle

18   harder for himself.

19   Q.   Do you remember, then, some discussion about that

20   analogy during the course of the hearing on

21   August 31st?

22   A.   I do.

23   Q.   So the jury has heard -- have seen the transcript

24   of the proceeding from August 38th (sic), with the

25   defendant saying to Judge Arterton, "All right, so you

1    can row that boat that we were talking about straight up

2    you know where," that's the context?

3    A.    That's correct.

4    Q.    You had indicated that Mr. Santos was initially

5    respectful to -- I may have asked this:  There came a

6    point in time where he became somewhat less respectful?

7    A.    Yes.

8    Q.    Tell the jurors what you remember about that.

9    A.    Upon Mister -- upon the judge stating that she was

10   going to follow through with her six months'

11   imprisonment, followed by the 24 months' supervised

12   release, Mr. Santos became agitated, verbally agitated

13   as well as standing up physically.

14   Q.    And do you recall, sir, whether or not the exchange

15   between Judge Arterton and the defendant was; were they

16   speaking one after the other, or how did that go?

17   A.    There was a back-and-forth.  Again, when Judge

18   Arterton began to explain that she was going to follow

19   through on her sentence of imprisonment, Mr. Santos

20   stood up, said, "You can stop right there, just cuff me,

21   let's rock and roll, send me to jail."

22   Q.    At the point in time where Mr. Santos wasn't going

23   to get his own way and go to yet another program, how

24   would you describe the speed with which his attitude

25   changed?

 1          MR. ROGAN:  Your Honor, objection to the

 2    characterization of not going to get his own way.

 3          MR. DURHAM:  Withdrawn.

 4          THE COURT:  Let me know when you're at a good

 5    transition point.  It's time for the afternoon break.

 6          MR. DURHAM:  Yes, Your Honor.

 7    BY MR. DURHAM:

 8    Q.   You have told the jury that, during the

 9    proceedings, Mr. Santos was initially respectful in his

10    comments, correct?

11    A.   Correct.

12    Q.   And that he was asking the court to go to another

13    program, correct?

14    A.   Correct.

15    Q.   At some point that changed.

16    A.   Correct.

17    Q.   And you indicated that's when the judge made clear

18    she was going to follow through on what she'd told him

19    on August 16?

20    A.   Correct.

21    Q.   How quickly did Mr. Santos's demeanor change, to

22    the best of your recollection?

23    A.   Relatively immediately.  Pretty quickly.

24          MR. DURHAM:  Your Honor, I'm not exactly sure

25    how you want me to go.  I am going to transition to what

 1    happened after the court left the bench.

 2              THE COURT:  Why don't we take our break first.

 3              We'll take our afternoon break, ladies and

 4    gentlemen.

 5                   (Whereupon, the jury left the courtroom.)

 6                   (Whereupon, a recess followed.)

 7              THE COURT:  Looks like we're ready for the

 8    jury.

 9                   (Whereupon, the jury entered the

10    courtroom.)

11              THE COURT:  Please be seated, everyone.

12              Looks like we're ready.

13              MR. DURHAM:  Thank you, Your Honor.

14    BY MR. DURHAM:

15    Q.   Mr. Leone, when we had taken the afternoon recess,

16    I just asked you a series of questions regarding

17    Mr. Santos' comments to the judge after it became clear

18    the judge was going to follow through with what she told

19    him on August 16.

20         Do you recall that?

21    A.   Yes.

22    Q.   Do you remember, sir, whether or not the judge did,

23    in fact, then reach a decision, a sentencing decision

24    for the violation of terms and conditions of Mr. Santos'

25    supervised release?

1    A.    She did.

2    Q.    And what did the judge do at that point, if you

3    recall?

4    A.    She revoked Mr. Santos' supervision and sentenced

5    him to six months incarceration.

6    Q.    And in addition to the six months' incarceration,

7    do you recall, sir, whether or not there was any

8    additional period of supervised release which was also

9    made part of that sentence?

10   A.    There is.

11   Q.    And what can you tell the jurors about that?

12   A.    Twenty-four months' supervised release, with the

13   first six months to be served in a halfway house.

14   Q.    After the judge had imposed that sentence on

15   Mr. Santos, do you recall whether that concluded the

16   proceedings for the day, as relates to Mr. Santos?

17   A.    Just about, yes.

18   Q.    Now, so it's clear, between August 16th --

19   withdrawn.

20         Between the time you applied for the warrant,

21   supervised-release warrant for Mr. Santos, and then this

22   hearing that took place in front of Judge Arterton on

23   August 31st, do you recall, did you have any direct

24   contact with Mr. Santos?

25   A.    I did not.

1  Q.   And then after he had been taken into custody on or

2  about August 25th, and then prior to the hearing on

3  August 30th before Judge Arterton, had you had any

4  direct contact with him?

5  A.   I did not.

6  Q.   So the jurors know, after the hearing before Judge

7  Arterton on August 31st, have you had any subsequent

8  contact, direct contact, with Mr. Santos?

9  A.   I did.

10  Q.   What were the circumstances under which you had

11  contact with him after August 31st?

12  A.   I'm sorry.  After August 31st?

13  Q.   Yes.

14  A.   I did not have contact.  I apologize.

15  Q.   So proceedings conclude in front of Judge Arterton,

16  correct?

17  A.   Correct.

18  Q.   Do you remember, sir, whether you remained in the

19  courtroom, immediately left the courtroom; what did you

20  do after the judge had imposed sentence?

21  A.   I remained in the courtroom.

22  Q.   Do you remember whether there were any other

23  persons in the courtroom after the judge left the

24  courtroom?

25  A.   Everybody who was in the courtroom during the

1    hearing was present except for the judge.

2    Q.   After the judge had left the courtroom, do you

3    recall anything that occurred that was, in your

4    experience, unusual?

5    A.   Yes.

6    Q.   Describe to the jurors what, if anything, unusual

7    occurred after Judge Arterton had left the bench.

8    A.   Following Judge Arterton leaving the bench,

9    Mr. Santos was handcuffed and was being escorted out of

10   the courtroom.  As he was exiting, he looked in the

11   direction of myself and my supervisor, Brian Topor,

12   towards the jury box and in the direction of Mr. Topor.

13        Mr. Santos said, "When I come out, I'm coming for

14   you."

15   Q.   I want to show you -- we will pull up on the screen

16   what's been marked as a full exhibit,

17   Government's Exhibit 4D.

18        You can see that on your monitor?

19   A.   Yes.

20   Q.   And when you said that Mr. Santos is coming by, did

21   you say, by the witness box, he looked over?

22   A.   That's correct.

23   Q.   And does 4D appear to represent exactly how that

24   happened?

25   A.   Yes.

1    Q.    Now, you said that Mr. Santos was speaking to
2    Mr. Topor, correct?
3    A.    Correct.
4    Q.    I just want to explore that for a moment.
5          How do you know that Mr. Santos was directing his
6    remarks to Mr. Topor, as opposed to you?
7    A.    It was direct eye contact with Mr. Topor.
8    Q.    And as to what it was that Mr. Santos said to
9    Mr. Topor, do you remember one way or the other whether
10   Mr. Topor had said anything to initiate conversation?
11   A.    I do not recall.
12   Q.    And with respect to what it is that Mr. Santos said
13   directly to Mr. Topor, I want to ask you a couple of
14   things.
15         What, if anything, can you tell the jury about
16   Mr. Santos's tone of voice when he made the statement to
17   Mr. Topor?
18   A.    Very direct, loud, aggressive.
19   Q.    With respect to the loud remark that he made to
20   Mr. Topor, based on what you saw and what you heard, did
21   it appear to you to have been said in some sort of
22   joking fashion?
23   A.    It did not.
24   Q.    Did you yourself take the comment as a joke?
25   A.    I did not.

1    Q.   Do you recall what, if anything, Mr. Topor may have

2    said in response to Mr. Santos' statement to him?

3    A.   He said, "What was that, Peter?"

4    Q.   Was there any response then, from Mr. Santos?

5    A.    Mr. Santos replied with, "You heard me."

6    Q.   Can you tell the jury, what, if anything, you

7    observed about your supervisor Mr. Topor's reaction to

8    the statement that Santos had made to him?

9    A.   With respect to the comment going back of, "excuse

10   me," there was no other verbal communication, but

11   Mr. Topor remained in the same place.

12   Q.   As to your observations with respect to, again,

13   what you heard and what you saw Mr. Santos say, it

14   wasn't said to you, correct?

15   A.   Correct.

16   Q.   Did you take it seriously?

17   A.   I did.

18   Q.   As you sit here now, do you take it seriously?

19   A.   I do.

20   Q.   Now, you told the jury that you are relatively new

21   to the U.S. probation office.  You started in July of

22   2015, so relatively new.

23        Would you tell the jury how often an event like

24   this has happened where you've been present to observe

25   it?

1    A.    This has never happened in my presence.

2    Q.    Based on your observation in the courtroom, did

3    Mr. Topor appear to take the statements from Mr. Santos,

4    about he'll be coming for him, seriously?

5    A.    Yes.

6              MR. DURHAM:   Nothing further, Your Honor.

7

8                     CROSS-EXAMINATION

9    BY MR. ROGAN:

10   Q.    Good afternoon, Mr. Leone.   How are you today?

11   A.    Good.   How are you?

12   Q.    Good.

13         You and I have had no professional interaction

14   before today, have we?

15   A.    No.

16   Q.    Okay.   I'm just going to follow up on some

17   questions that Mr. Durham asked you.

18         Let me begin with the statement that you referred

19   repeatedly, during your direct examination in front of

20   the jury, to Peter as your client, right?

21   A.    Correct.

22   Q.    Is that a word that's used within the department of

23   probation?

24   A.    Among others, yes.

25   Q.    Because in point of fact, Mr. Leone, to be fair,

1   he's not actually your client.

2       Your job and you're charged with supervising him

3   and making sure that he doesn't violate his probation;

4   and if he does, you have the authority and the power to

5   have him arrested; is that correct?

6   A.   Correct.

7   Q.   And that's, in fact, what you did here, isn't it?

8   A.   Correct.

9   Q.   So that's a whole lot less than a client.

10       That's somebody whom you're charged with

11   supervising when they are on supervised release, right?

12   A.   Correct.

13   Q.   And, in point of fact, you don't just supervise

14   people like Mr. Santos, who's charged with violating a

15   condition of his release for using narcotics, you do

16   more serious crimes, correct?

17   A.   Correct.  We do a wide variety of federal crimes.

18   Q.   Everything from murder to larceny, and anything in

19   between; fair to say?

20   A.   Federal crimes, yes.

21   Q.   Also, you indicated on direct examination that you

22   were the main officer assigned to Peter's case.

23       Is that a fair characterization?

24   A.   That's correct.

25   Q.   And if I understood your testimony correctly, on

1    the date of the August 31, 2016, hearing, you were

2    present in the courtroom.

3         You were the primary probation officer, right?

4    A.   Correct.

5    Q.   How come you didn't testify and Mr. Topor did?

6         Just answer that question first.

7    A.   Mr. Topor is my supervisor and had several direct

8    contacts with Mr. Santos, along with assisting me on the

9    case throughout Mr. Santos' term of supervision.  Me and

10   Mr. Topor, my supervisor, spoke beforehand, and we

11   thought it was best that Mr. Topor would speak on behalf

12   of the probation office.

13   Q.   So he made -- he, being Mr. Topor, made that

14   decision, despite the fact that, from your first meeting

15   of January 4, 2016, which is what you told the jury on

16   direct exam, that he was, quote, Peter was your client,

17   Mr. Topor made the decision at the violation hearing

18   that he would take the lead in testifying in court?

19   A.   Correct.

20   Q.   Did you agree with that decision?

21   A.   I did.

22   Q.   Did you have a choice in agreeing with that

23   decision?

24   A.   I did.

25   Q.   Why did you feel it was best that Mr. Topor speak

1    directly to the court in regards to probation's position

2    as opposed to you?

3    A.   It was a very involved case, Mr. Topor has more

4    experience, and we decided it was best for him to speak.

5    Q.   And, in fact, let me follow up on that, because you

6    spent quite a bit of time on direct examination talking

7    about the history of this case and the numerous attempts

8    to get Mr. Santos, my client, to be complicit in these

9    drug rehabilitation programs.

10        But would you agree with me that, in point of fact,

11   it's not unusual for someone who has a substance abuse

12   problem -- in your experience, either alcohol or drugs

13   or something else -- that they fail repeatedly?

14   A.   It's not unusual, no.

15   Q.   So there's nothing particularly complicated or

16   unusual about this case despite your testimony.

17        Would you agree with me on that?

18   A.   What is unusual about it was the quick turnover, as

19   far as entering the program and immediately walking out

20   of the program.

21   Q.   But again, that's not the first time -- even since

22   you've joined the probation office in 2015, it's not the

23   first time you've seen someone walk in the door and then

24   walk out the door against medical advice.

25   A.   It was the first time.

1    Q.    Is that only because you've been on the job

2    since 2015?

3    A.    Correct.

4    Q.    You've seen a limited number of cases?

5    A.    Correct.

6    Q.    But it's not the only time -- is it the only time

7    you've ever seen someone leave against medical advice,

8    or the only time you've ever seen somebody leave against

9    medical advice that many times?

10   A.    The only time I've seen someone leave against

11   medical leave that many times.

12   Q.    But it's happened before that people have been

13   given the opportunity for these programs and walk out

14   the door, whether it's within one day or two days or

15   multiple times.

16   A.    Yes.

17   Q.    You also indicated -- well, I wanted to ask you:

18   When you became the primary probation officer in this

19   file, did you review Mr. Santos' past criminal history,

20   what had led him to be on supervised release?

21   A.    Yes.

22   Q.    And did any of those crimes involve crimes of

23   violence?

24   A.    I do not recall.

25   Q.    I'm going to show you a document, if I can

1    approach.  It's Government's Exhibit 1.

2              MR. ROGAN:  I don't know if you want to put it

3    on the monitor.

4              Thank you so much.

5    BY MR. ROGAN:

6    Q.   Can you see that?

7    A.   Yes.

8    Q.   This document was entered by the government this

9    morning outside your presence.  It was characterized as

10   a time line.

11        If you take a look at the first entry, January 21,

12   2014, I want you to take a moment and read that, and

13   then tell me if you would characterize those crimes as

14   crimes of violence.

15   A.   Those are not crimes of violence.

16   Q.   Okay.  And as far as you know -- and I think you

17   testified about this -- other than Mr. Santos violating

18   standard condition Number 7, which is not to possess or

19   use drugs, had he ever violated his probation on any

20   other basis?

21   A.   No.

22   Q.   Right.  Such as one of the other standard

23   conditions is felon in possession of a firearm, that's

24   an automatic violation, right, you're going to jail;

25   fair to say?

 1    A.    I don't make those calls.

 2    Q.    Let me put it this way:  As a probation officer, if

 3    you found out about it, you wouldn't hesitate to go get

 4    a warrant for that.

 5    A.    The court would be notified.

 6    Q.    Immediately, right?

 7    A.    Uh-huh.

 8    Q.    You also gave a statement -- sorry.

 9          You were interviewed by Inspector Parker; do you

10    remember that?

11    A.    I do.

12    Q.    Before I get to that, have you ever had an

13    opportunity to review the actual -- even though you were

14    there, have you ever actually reviewed the transcript of

15    the hearing before Judge Arterton on August 31, 2016?

16    A.    I did.

17    Q.    Based upon -- when did you do that?

18    A.    Within the last couple of days.

19    Q.    And did you do that on your own accord or at

20    someone's direction?

21    A.    Both.

22    Q.    So I know who -- if you did it yourself, but who

23    else directed you to do that?

24    A.    Supervisor.

25    Q.    And Ms. Amato?

1    A.    Correct.  And Brian Topor.

2    Q.    And Mr. Topor?

3    A.    Yes.

4    Q.    And why did they tell you they wanted you to do

5    that?

6    A.    Review the case.

7    Q.    Would you agree with me that nowhere in that

8    transcript on the record is any threat directed to

9    anyone, not to Judge Arterton, not to Mr. Topor, not to

10   you?

11   A.    Correct.

12   Q.    And, in fact, you were interviewed then

13   telephonically, by Inspector Parker, on September 1,

14   2016.

15         Do you recall that?

16   A.    I don't recall the date, but I do recall my

17   conversation.

18   Q.    Do you recall that it was fairly early on after the

19   incident?

20   A.    Yes.

21   Q.    In fact, I may have misstated it.

22         Did I say September 1?  I think it was actually

23   September 2.

24         So did Inspector -- question withdrawn.

25         In your experience as a probation officer, and in

1    particular with regard to this case, did you come to an

2    understanding as to what Mr. Santos' daily heroin usage

3    was, in terms of bags of heroin per day?

4    A.    According to Mr. Santos when we spoke, he used

5    roughly five bags a day.

6    Q.    Are you aware that Officer Topor indicated that

7    there was --

8          MR. DURHAM:  Your Honor, the government is

9    going to object.  We're calling Mr. Topor.  He can ask

10   Mr. Topor.  This is calling for hearsay.

11         MR. ROGAN:  Fair enough.  I'll withdraw that

12   question.

13   BY MR. ROGAN:

14   Q.    All of the history that you gave about Mr. Santos

15   and everything leading up to the actual revocation

16   hearing on August 31, 2016, you would agree, has no

17   particular import as it relates to whether or not a

18   threat was made, as you understand it, after the hearing

19   was over, correct?

20   A.    Can you repeat that?

21   Q.    Sure.

22         On direct examination you testified at length about

23   the processes and procedures that were in place that

24   ultimately led to the revocation hearing, your first

25   meeting, the multiple in and outs of rehab facilities.

1        You would agree with me that, at the end of the

2    day, none of that has anything to do with whether or not

3    you think you heard a threat after the hearing was over.

4    A.    Correct.

5    Q.    Okay.  And in point of fact, on direct examination,

6    what you indicated to Mr. Durham was --

7            MR. ROGAN:  If we could -- if I could be so

8    kind as to ask if we could put up Government's 4D, I

9    appreciate the courtesy.

10           Can everyone see that?

11           THE JURY:  Uh-huh.

12   BY MR. ROGAN:

13   Q.    So this is a picture that's taken in Judge

14   Arterton's courtroom down in New Haven.

15           And this is you, I think you identified, to the

16   right, closest to where Judge Arterton was when she was

17   on the bench, correct?

18   A.    Correct.

19   Q.    And do you see in the left foreground a kind of

20   blurry individual in brown khakis?

21   A.    Correct.

22   Q.    Who's that?

23   A.    Mr. Peter Santos.

24   Q.    And that's the individual seated with me at counsel

25   table, right?

1    A.    That's correct.

2    Q.    Do you know approximately the distance -- this is

3    only an estimate, not a trick question -- between where

4    he was standing and where you and Mr. Topor were?

5    A.    Say that again.

6    Q.    Do you know the approximate distance in terms of

7    feet?

8    A.    Twenty feet, twenty-five feet.

9    Q.    Further away than I am?

10   A.    Yes.

11   Q.    Here?

12   A.    That looks about right.

13   Q.    You indicated on direct examination that Mr. Topor

14   (sic) wasn't yelling, correct, when he made the comment

15   that you claim that he made, which was that, "When I

16   come out I'm coming for you."

17             MR. DURHAM:   Your Honor, I think he misspoke.

18             You said Mr. Topor said that.

19             MR. ROGAN:   I apologize.   Sorry.

20   BY MR. ROGAN:

21   Q.    So when Mr. Santos is alleged to have made the

22   comment, "When I come out, I'm coming for you," that was

23   more than 20 feet away.

24             Was he using a loud voice, a low voice; how would

25   you describe it?

1    A.    It was a loud voice.

2    Q.    Was he yelling?

3    A.    Loud enough to -- for us to hear it.

4    Q.    But you said on direct examination that -- and

5    we'll keep Government's Exhibit 4D up -- that, quote, he

6    looked in the direction of you and Mr. Topor when he

7    made that statement, right?

8    A.    Correct.  Towards the jury box, yes.

9    Q.    Towards the jury box where you were both standing

10   side by side, next to one another?

11   A.    Correct.

12   Q.    And what is your basis for your testimony before

13   the jury today that, in your mind, that comment or

14   statement, whether it was a threat or not, was directed

15   towards Mr. Topor and not to you?

16   A.    I do not believe he was looking directly at me;

17   rather, off to my right.  And it would be my -- and

18   because Mr. Topor spoke on behalf of U.S. probation.

19   Q.    You were starting to say something else in your

20   answer.

21         So you believe that the comment was directed to

22   Brian Topor because he spoke at the revocation hearing,

23   but do you know whether or not that comment was directed

24   to you, him, or both?

25   A.    I do not know.

1    Q.    So he could have been threatening you?

2    A.    That's a possibility, yes.

3    Q.    And in point of fact -- I'll get to that in a

4    moment.

5          So that's a possibility, that he could have been

6    directing that to you?

7    A.    Yes.

8    Q.    And you said on direct examination that you don't

9    recall if Topor -- that was your words -- if Officer

10   Topor initiated any conversation.

11         And by that I mean, the hearing's over, Judge

12   Arterton is off the bench, the court monitor has turned

13   everything off; do you know if Mr. Topor said anything

14   to Peter, prior to Peter saying what you claim he said?

15   A.    I don't recall anything.

16   Q.    Do you recall receiving a telephone call, either on

17   August 31st or September 1, from Peter Santos' mother,

18   Sandy Santos?

19   A.    Yes.

20   Q.    And what was the nature of the conversation

21   between -- question withdrawn.

22         What information did you provide to Ms. Santos?

23   A.    She requested Mr. Topor's phone number.

24   Q.    And did you provide Mr. Topor's phone number to

25   Peter's mother?

1    A.    I did.

2    Q.    And did you know what the purpose of getting that

3    phone number was?

4    A.    I did not.

5    Q.    You didn't inquire?

6    A.    I did not.

7    Q.    You just gave the number?

8    A.    Correct.

9    Q.    Subsequently, at any point, did you learn if

10   Ms. Santos had initiated a phone call to Mr. Topor?

11   A.    Yes.

12   Q.    And how did you learn that?

13   A.    Conversations with my supervisor.

14   Q.    Mr. Topor?

15   A.    Correct.

16   Q.    And what, if anything, was the purpose of the phone

17   call from Ms. Santos to Brian Topor, if you know?

18        MR. DURHAM:  Objection, Your Honor calls for

19   hearsay, and Mr. Topor is going to testify.  As to this

20   witness it would be hearsay.

21        MR. ROGAN:  I can work around that.

22   BY MR. ROGAN:

23   Q.    You actually also had -- do you remember meeting

24   with Mr. Parker and Assistant United States Attorney

25   Durham -- actually, you met with them on the 19th, so

1    that's only 11 days ago.

2         Do you remember that?

3    A.   I do.

4    Q.   Do you know what the purpose of that was?

5    A.   Preparing for this case.

6    Q.   To review your testimony for today, right?

7    A.   Correct.

8    Q.   Do you recall -- question withdrawn.

9         Have you ever been to Wyatt correctional facility?

10   A.   Yes.

11   Q.   How many times have you been there?

12   A.   I've been there once.

13   Q.   And for the ladies and gentlemen of the jury that

14   don't know, can you identify where it is?

15   A.   Central Falls, Rhode Island.

16   Q.   And is that where -- question withdrawn.

17        Do you know if that is a private facility, or is it

18   managed by the Federal Bureau of Prisons?

19   A.   It's a private facility.

20   Q.   And can you explain the jury the distinction, if

21   you know, between a facility that's privately run versus

22   one that's under the jurisdiction of the Federal Bureau

23   of Prisons?

24   A.   It's a private company that runs it for profit, my

25   understanding, and they're paid by their contracts in

1    which the inmates are held by.  In this case, the

2    U.S. Marshals Services contracts with Wyatt to hold the

3    inmates.

4    Q.   And in fact, just based upon your experience,

5    Mr. Leone, with limited exception, people who have been

6    detained and are waiting for a hearing and waiting for

7    trial and haven't been released on bond, that's

8    generally where they go for the District of Connecticut,

9    correct?

10   A.   Correct.

11   Q.   Not 100 percent of the cases --

12   A.   Correct, yes.

13   Q.   -- but that is where Mr. Santos was sent between

14   the date of his presentment and the date of the

15   revocation hearing, correct?

16   A.   I do not recall specifically.

17   Q.   Would you disagree with -- you just don't recall?

18   A.   I don't recall.

19   Q.   Fair enough.

20        You also testified on direct examination that when

21   he looked in the direction of the jury box -- where you

22   and Mr. Topor were standing as depicted in Exhibit 4D,

23   and you've indicated now that that comment could have

24   been directed to you -- you said that Mr. Topor

25   articulated a response, on direct.

1          Do you remember what your response was?

2     A.   What Mr. Topor's response to --

3     Q.   Yes.  Sorry, yes, as indicated by what you told

4     Attorney Durham.

5     A.   "What was that, Peter."

6     Q.   Then later on you said, Mr. Topor remained in

7     place.

8          Did I understand that?

9     A.   Correct.

10    Q.   Did you remain in place as well?

11    A.   I did.

12    Q.   And then later on you said, on direct examination

13    from Mr. Durham, somebody said, "Excuse me."

14         Do you know who that was?

15    A.   It would be something that Mr. Topor said, within

16    that context following Mr. Santos' remarks.

17    Q.   So is it -- I want to be respectful:  Is it a

18    multiple choice, did he say, "What was that Peter"; or

19    did he say, "Excuse me"; or do you know?

20    A.   I don't recall specifically.  It would be, "What

21    was that, Peter."  He might have said, "Excuse me, what

22    was that Peter."

23    Q.   But you don't know.

24    A.   I don't recall specifically, no.

25    Q.   You also said on direct examination that the

1    comment, although you concede now it could have been

2    directed to you or Mr. Topor, that Mr. Topor took it

3    seriously.

4         What was the physical manifestation of that in the

5    courtroom?

6         Do you know what I mean by that question; it's

7    badly worded.

8    A.   I do not.

9    Q.   I'll try it again.

10        So when you said he took it seriously, is that

11   something that happened afterwards, or did he do

12   something in the courtroom that seemed to indicate to

13   you that he was taking it seriously.

14   A.   Nothing specifically in the courtroom that I could

15   recall.  It was conversations afterwards.

16   Q.   Conversations afterwards between who and who?

17   A.   Me and my supervisor, Mr. Topor.

18   Q.   Did those conversations afterwards take place on

19   the same day, August 31, or were they subsequent to that

20   date?

21   A.   On that date.

22   Q.   Was anyone else present during those conversations,

23   or just you and Mr. Topor?

24   A.   Just me and Mr. Topor.

25   Q.   Without telling the jury what Mr. Topor said to

1   you, what did you say to Mr. Topor in those subsequent

2   conversations on the same day that the alleged threat

3   was made?

4   A.   That those comments should be taken seriously.

5   Q.   That was your position?

6   A.   Correct.

7   Q.   Did you say anything else?

8   A.   I don't recall.

9   Q.   You don't recall, and this had never happened

10  before in your experience?

11  A.   Correct.

12  Q.   Did you make any notes that day contemporaneous

13  with your being present in the court before Judge

14  Arterton about the comments that you think you heard

15  Mr. Santos make?

16  A.   Yes.

17  Q.   Who has possession of those notes, do you know?

18  A.   They are in our files.

19  Q.   They're in your files, meaning the probation office

20  or the government's file?

21  A.   Probation office files.

22  Q.   Did those -- do those notes contain your writings

23  regarding what you think you heard you said?

24  A.   Yes.

25           MR. ROGAN:   Your Honor, can we have a sidebar

```
 1    for a moment with counsel?
 2              MR. DURHAM:  Your Honor, counsel has those.
 3    Those were produced to counsel.
 4              MR. ROGAN:  Excuse me a moment.
 5              MR. DURHAM:  He made a specific request for
 6    them.
 7                   (Off the record.)
 8              MR. ROGAN:  I have it.
 9              THE COURT:  Take your time.
10    BY MR. ROGAN:
11    Q.   Before Mr. Santos left the courtroom after that
12    initial statement, after the revocation hearing, did you
13    hear anyone else besides Mr. Topor direct themselves to
14    Peter Santos?
15         Do you understand what I mean by that question?
16    A.   No, I'm sorry.  I don't understand the question.
17    Q.   Again, it's the end of day and it's a bad question.
18         So after that statement -- and it was either,
19    "Excuse me," or, "What did you say" -- did anyone
20    else -- I'll give you a clue -- did a marshal say
21    anything that you heard in open court, not open as on
22    the record?
23    A.   Yes.
24    Q.   What did you hear?
25    A.   "Oh, come on, man."
```

1    Q.    And what did you take that comment to mean?

2    A.    It's the marshal indicating, "Why did you say

3    that."

4    Q.    Did the marshals, based upon your observations

5    being there -- let me withdraw that question.

6          I assume that you remained standing with Brian

7    Topor in the courtroom until Mr. Santos had fully exited

8    the courtroom?

9    A.    That's correct.

10   Q.    You did not accompany him up -- in the New Haven

11   courthouse it's upstairs to the mezzanine.

12         You did not a company him upstairs to the holding

13   cell in the New Haven courthouse, right?

14   A.    I did not.

15   Q.    So what was it you heard him say?

16   A.    "Oh, come on, man."

17   Q.    Did the marshal say anything else?

18   A.    That is all I heard.

19   Q.    And you took that to mean what, exactly?

20   A.    "Why did you say that?"

21   Q.    Did you hear Mr. Santos -- Peter, my client -- say

22   anything in response to what you think you heard the

23   marshals say?

24   A.    I did not hear anything.

25   Q.    You also, during your prep session with the

1    government, indicated that -- from your perspective that

2    Mr. Santos was not difficult or mouthing off to the

3    marshals, and had no problems cuffing him.

4         Do you remember telling that to Mr. Parker and

5    Mr. Durham?

6    A.   I do.

7    Q.   And that was after Judge Arterton had done exactly

8    what she said she was going to do on the 16th, which

9    was:  Hey, if you don't do this program, I am going to

10   do what actually happened on August 31st, right?

11   A.   Correct.

12   Q.   So even after all of that, the marshals had no

13   difficulty with my client in having him exit the

14   courtroom?

15   A.   I did not witness any difficulty that Mr. Santos

16   was giving the marshals.

17   Q.   You would agree, because we've been in both --

18   Judge Arterton's courtroom, I don't think, is quite as

19   large as this, correct?

20   A.   Correct.

21   Q.   In fact, it's quite a bit smaller maybe?

22   A.   A little bit.

23   Q.   So you would have been in a position to hear if he

24   had done anything, correct?

25   A.   Potentially.

1    Q.    Well, were you keeping an eye on Mr. Santos the

2    entire time as he was leaving the courtroom?

3    A.    I believe I was.

4    Q.    Did the marshals take any extraordinary steps, in

5    light of what you think you heard Mr. Santos say, as

6    from a security standpoint in exiting him out of the

7    courtroom?

8    A.    I did not see any.

9    Q.    And you would have noticed that, right?

10   A.    Possibly, yes.

11   Q.    Well, you were taking very seriously this alleged

12   threat made by my client, right?

13   A.    Yes.

14   Q.    And you didn't take your eyes off him until he left

15   the courtroom, correct?

16   A.    Correct.

17   Q.    Do you recall telling Mr. Parker and Mr. Durham,

18   during the May 19th prep session to prepare your

19   testimony, that Santos looked in the direction of Topor

20   and Leone and said something along the lines, "When I

21   get out, I'm coming for you."

22        Do you remember telling that to Mr. Durham and

23   Mr. Parker?

24   A.    Correct.

25   Q.    Is it fair to say that that phraseology is your

1    best recollection, or are you claiming that that's

2    verbatim, what was said by Mr. Santos back on August 31,

3    2016?

4    A.   Best recollection.

5    Q.   Best recollection.  Fair enough.

6         It could have been that, it could have been

7    something more, it could have been something less; fair

8    to say?

9    A.   Correct.  It was to that effect.

10   Q.   But not necessarily those words that you just

11   testified to.

12   A.   Correct.

13   Q.   Okay.  And in point of fact, during that prep

14   session you told Mr. Durham and Mr. Topor that, in fact,

15   what I'd asked you earlier was true, that Mrs. Santos

16   had called you for purposes of obtaining Brian Topor's

17   cell phone number or phone number, correct?

18   A.   Correct.

19   Q.   Do you recall telling Mr. Parker and Mr. Durham --

20   back on May 19, 11 days ago -- that the reason she'd

21   asked for the number was for an apology to Mr. Topor?

22   A.   Correct.

23   Q.   Do you recall telling Mr. Durham and Mr. Parker

24   that you believe that that phone call from Peter Santos'

25   mother to Brian Topor was the day after the hearing, or

1    on September 1, 2016?

2    A.    Correct.

3    Q.    And do you also recall telling Mr. Parker and

4    Mr. Leone (sic) that you believe the apology was for

5    comments to the judge and not for the comments that were

6    allegedly made to Mr. Topor?

7    A.    Correct.

8    Q.    And what did you base that belief on?

9          If you have to tell me what Topor said, don't tell

10   me, because I'll get that from him.

11   A.    I believe the apology was based on the comments --

12   based on his behavior in the courtroom, which would

13   include the comments made to the judge.  It's my best

14   recollection, Mr. Santos' parents, mother and father,

15   had exited the courtroom prior to the comments that

16   Mr. Santos made to Mr. Topor.

17   Q.    Did you, at any point, hear -- and I'll paraphrase:

18   After the hearing on August 31, 2016, after the hearing

19   was over, before Mr. Santos fully exited the courtroom,

20   did you ever hear him say to anybody something about,

21   "We all meet our maker," or anything like that; did you

22   hear anything like that?

23   A.    I did not.

24   Q.    Do you think you were in a position to hear

25   anything like that if it had been made?

1    A.    I would have, yes.

2    Q.    Because you were in a position to hear, at least

3    paraphrase, what you think you heard from Mr. Santos in

4    regard to the earlier comment, right?

5    A.    Yes.

6                MR. ROGAN:  One second, Your Honor.

7    BY MR. ROGAN:

8    Q.    You testified on direct examination to the jury

9    that, in the beginning, Mr. Santos' demeanor or approach

10   to Judge Arterton was quite respectful.

11       Do you recall that direct testimony?

12   A.    Yes.

13   Q.    Do you recall, though, telling Mr. Parker and

14   Mr. Durham, during the prep session of a few days ago,

15   that, in point of fact -- oh, something along the lines

16   of Santos' remarks at the beginning, and now you're

17   referring to Judge Arterton -- because that's the only

18   person he addressed in the courtroom, correct?

19   A.    Correct.

20   Q.    -- was not entirely respectful, even at the

21   beginning.

22       Do you recall saying that just a couple of days

23   ago?

24   A.    I do.

25   Q.    So that seems to be fair, in contrast with the

1    testimony elicited from you by the government on direct

2    examination that he was fine at the beginning, but it

3    was only at the end, when realized he wasn't going to

4    get the halfway house, that his demeanor changed and it

5    became agitated and disrespectful.

6    A.    Yes.

7    Q.    So your testimony is different from what you told

8    the investigator and the government.

9    A.    His demeanor changed once he was told he was going

10   to go to jail as opposed to the program.

11   Q.    So is it fair to say, then, what you told to the

12   senior inspector, Mr. Parker, and Mr. Durham, that he

13   was, quote -- Santos' remarks at the beginning were not

14   entirely respectful, are you changing your position on

15   what his demeanor was from the outset?

16        I want to give you a fair opportunity to fix it.

17   A.    Yes, he was -- he was respectful at the beginning

18   of the hearing in his communications with Judge

19   Arterton.  There was no nasty comments made towards her

20   or towards anybody else.

21   Q.    Well, why would you tell Mr. Parker and Mr. Durham

22   something else only a couple of days ago?

23   A.    I don't know.

24   Q.    You also indicated that you reviewed the

25   Government's Exhibit 2, which is the full transcript of

1    the actual revocation hearing -- I'm almost done with my

2    questions for you, Mr. Leone -- do you recall that?

3    A.    Yes.

4    Q.    And do you recall Mr. Topor talking about that, in

5    his opinion, Mr. Santos was not a, quote, nasty person?

6    A.    Correct.

7    Q.    And that to the extent that there was any nastiness

8    in Mr. Santos, it was a 50/50 proposition that it was

9    based upon 20 years of drug addiction.

10   A.    I recall that comment, yes.

11   Q.    So even in Mr. Topor's mind, what was going on from

12   Mr. Santos could well be attributed to 20 years of

13   heroin addiction, as to not necessarily getting his way

14   in front of Judge Arterton?

15           MR. DURHAM:   Objection.   I think he asked

16   Mr. Topor what was in Mr. Topor's mind, but not this

17   witness what was in Mr. Topor's mind.

18           THE COURT:   Sustained.

19   BY MR. ROGAN:

20   Q.    I should have just asked.   So you heard the quote

21   anyway of what Mr. Topor said in open court to Judge

22   Arterton, regarding whether my client was a nasty

23   individual or not.

24   A.    I did.

25   Q.    Okay.   Last question for you, and I know you've

1    only been -- let me ask you this:  About how many times

2    have you been up to Wyatt correctional, either to do a

3    presentence report or for some other official business?

4    A.    I've been to Wyatt one time.

5    Q.    Only once?

6    A.    Yes.

7    Q.    I'm going to ask this question, and if you don't

8    know the answer to it, fair enough:  Are you aware of

9    whether or not detained prisoners such as Mr. Santos can

10   obtain illegal drugs while they are detained at Wyatt

11   correctional center?

12   A.    I don't believe I have enough experience.  I don't

13   know.

14   Q.    Has that ever been communicated to you as part of

15   your training, that oftentimes detained prisoners are

16   able to obtain narcotics?

17   A.    Yes.

18   Q.    So something you are aware of?

19   A.    Correct.

20   Q.    Are you aware whether or not -- the hearing was on

21   August 31, 2016 -- I do promise this will be my last

22   question -- on that as recently as August 29, two days

23   before, Mr. Santos was recorded on a phone call

24   indicating that he was high as a kite while he was in

25   Wyatt on August 29th.

1          Did you know that?

2     A.   I did not.

3     Q.   Did you also know -- you know that those phone

4     calls are recorded, right?

5     A.   Yes.

6     Q.   And explain to the ladies and gentlemen of the jury

7     how that works for people who are detained, what calls

8     are recorded, do you know?

9     A.   I don't know the process, no.

10    Q.   But you know that, other than calls between

11    attorneys and their clients, all incoming calls are

12    monitored, correct?

13    A.   Yes.

14    Q.   And they're recorded, so whether between a mother

15    and son, or a dad, or a girlfriend/boyfriend, they are

16    all recorded.

17         Have you ever listened to any recordings in this

18    case?

19    A.   Yes.

20    Q.   Which one did you listen to?

21    A.   I listened to a recording between Mr. Santos and

22    Mr. Clifford Barnes.

23    Q.   You didn't listen to any other ones?

24    A.   I did not.

25              MR. ROGAN:  Hang on a second.

1    BY MR. ROGAN:

2    Q.   And are you -- let me see if you recall this from

3    May 19th, just a few days ago.

4         Do you recall telling Mr. Parker and Mr. Durham

5    that, at some point, Leone became aware of a comment

6    Santos made to Cliff Barnes over the phone, Leone

7    listened to it, Leone's take was more explicit and more

8    direct and obvious than the somewhat more vague comment

9    to Topor.

10        Was that a statement -- the somewhat more vague

11   comment to Topor, was that a statement made by you to

12   Mr. Parker and to Mr. Durham?

13   A.   Yes.

14   Q.   So you did perceive the comment back on August 31

15   as somewhat vague as to its intent?

16            MR. DURHAM:  Objection, Your Honor.  That's

17   not the testimony.  He's comparing it to an explicit

18   telephone conversation.

19            MR. ROGAN:  No.

20            THE COURT:  Are we talking about two different

21   telephone conversations?

22            Why don't you confer with counsel.

23                (Off the record.)

24            MR. DURHAM:  It's the same conversation, the

25   Cliff Barnes conversation.

1    BY MR. ROGAN:

2    Q.    So my question was:  In the session with Mr. Parker

3    and Mr. Durham, was it you who made the statement that

4    the comments Santos made to Cliff Barnes was somewhat --

5    was more explicit than the somewhat more vague comment

6    to Topor?

7    A.    Correct.

8    Q.    So even as late as 11 days ago, you perceived the

9    comment made to Mr. Topor in the courtroom as somewhat

10   vague.

11        Is that a fair characterization?

12              MR. DURHAM:  Objection.  He's comparing

13   against a conversation with Clifford Barnes.  That's the

14   context.  This witness hasn't testified that what Santos

15   said was vague.

16              THE COURT:  That's right.  You need a

17   foundation for that.

18              MR. ROGAN:  Then I'll have to --

19              THE COURT:  Because you're making an absolute

20   characterization as opposed to relative comparison.  And

21   what you have in that statement, I think, is a reference

22   to a relative comparison.

23              MR. ROGAN:  Right.  But the reason I asked the

24   question, Your Honor, and the reason I claim it is

25   because this witness -- sorry, maybe I was wrong.

1    BY MR. ROGAN:

2    Q.   Did you listen to that conversation?  You said you

3    did, right, between Barnes and Santos?

4    A.   I did.

5         MR. ROGAN:  So my question is, I think, a

6    legitimate one, as far as the comparison between

7    whatever was said in that conversation was somewhat more

8    vague than the one problem with --

9         THE COURT:  Whatever was said.

10        MR. ROGAN:  Right.  And we'll need another

11   witness to get that in.

12        So with that, I think I'm done, but let me

13   just check.

14        I have no further questions.

15        Thank you.

16

17                  REDIRECT EXAMINATION

18   BY MR. DURHAM:

19   Q.   Mr. Leone, I'd like to pick up the very last series

20   of questions that were posted to you by counsel.  He

21   made reference to a Clifford Barnes; is that correct?

22   A.   That's correct.

23   Q.   Do you know Clifford Barnes?

24   A.   I do.

25   Q.   How do you know Clifford Barnes?

1    A.   Clifford Barnes requested a transfer of supervision

2    from out of district to the District of Connecticut, and

3    I was the officer assigned to the investigation.

4    Q.   And counsel made reference to a telephone call

5    between Barnes and Santos, correct?

6    A.   That's correct.

7    Q.   And you listened to that call?

8    A.   I did.

9    Q.   Now, in the context, counsel asked the question

10   about the conversation with Barnes, and you said it was

11   somewhat more explicit than the statement that Santos

12   made in the courtroom, or words to that effect, right?

13   A.   Correct.

14   Q.   With respect to the Barnes conversation with

15   Mr. Santos that you listened to, did Mr. Santos make an

16   explicit threat to somebody?

17   A.   He did.

18   Q.   And who was the threat made to?

19   A.   Me.

20   Q.   And what did Mr. Santos say to Mr. Barnes regarding

21   you?

22   A.   He said, Mr. Santos said to Mr. Clifford Barnes,

23   "Tell Daniel, when I come out, I'm going to kill him."

24   Q.   So that's the context of the Barnes/Santos

25   conversation, correct?

1    A.    Correct.

2    Q.    Now let me go back to a couple other matters that

3    counsel asked about.

4          Mr. Rogan had asked you about Mr. Santos and

5    whether he was cordial or nasty for made reference to

6    the word "nasty."

7          Do you remember that?

8    A.    I do.

9          MR. DURHAM:  I want to ask, Your Honor, that

10   Government's Exhibit 2 be pulled up at page 14.  And

11   I'll ask they highlight, starting at line 3, down to

12   line 11.

13   BY MR. DURHAM:

14   Q.    Do you recall Mr. Rogan talking about a 50/50

15   proposition or words to that effect?

16   A.    I recall.

17   Q.    So in this portion of the August 31 transcript, it

18   reads:  "For all intents and purposes, Your Honor,

19   historically in our interactions, my interactions with

20   Mr. Santos have been very cordial up until recently.  We

21   had one interaction that was less than cordial.

22         "Is that part of who Mr. Santos really is?

23         Is it, you know, if he's not getting what he wants,

24   does he get nasty, or is it the effect of the addiction

25   process.  I sort of give it a 50/50 credence."

1          Do you recall that passage or that being said by

2     Mr. Topor on the record in front of Judge Arterton?

3     A.    I do.

4     Q.    And as to that portion where Mr. Topor said, "My

5     interactions with Mr. Santos have been very cordial up

6     until recently," did it ever come to your attention

7     that, very recently, there was some less than cordial

8     engagement on the part of Mr. Santos with Mr. Topor?

9     A.    Yes.

10    Q.    And with respect to yourself, had you had any less

11    than cordial interactions with Mr. Santos?

12    A.    I did not.

13    Q.    This calls for yes or no:  Did you learn at the

14    proceeding that was held in front of Judge Richardson,

15    on August 25th, that any statements had been made by

16    Mr. Santos directed at Mr. Topor?

17    A.    I did.

18    Q.    But you weren't present for that.

19    A.    I was not present.

20    Q.    So whatever knowledge you have about that would

21    come to you by hearsay.

22    A.    Correct.

23    Q.    And who did you talk to -- not what you said, but

24    who did you talk to about that, or how did you learn

25    that?

1    A.    My supervisor, Brian Topor.

2    Q.    Do you know if Mr. Topor is available to testify in

3    these proceedings?

4    A.    Yes.

5    Q.    Let me go back.  Counsel was initially asking you

6    questions relating to your having referred to Mr. Santos

7    as a client.

8          Have you ever heard a reference to the fact that

9    one of the difficulties for probation officers is they

10   sometimes -- well, not sometimes, they have to wear two

11   hats basically?

12   A.    Correct.

13   Q.    In context, explain that to the jurors, what the

14   two hats are that you, as a probation officer, have to

15   wear pretty much at all times.

16   A.    I think we have to wear several hats.  We are a law

17   enforcement officer, order of the court, and we have to

18   enforce conditions by the judge.  However, we also work

19   in collaboration with the offender and in collaboration

20   with community resources in order to work at

21   rehabilitation of the offender.

22         So it's law enforcement and like a social work, we

23   wear both of those hats.

24   Q.    So when you referred to the defendant, Mr. Santos,

25   as a client, which one of those hats would you have on,

1    referring to him as a client?

2    A.    The social worker.

3    Q.    You have been asked questions by Mr. Rogan, on

4    cross-examination, about the underlying crimes with

5    which Mr. Santos was on supervised release.

6          Do you remember that?

7    A.    Yes.

8                MR. DURHAM:  I ask to pull up

9    Government's Exhibit 1, and highlight the top portion of

10   that document, please, the January 21st entry.

11   BY MR. DURHAM:

12   Q.    And those are the offenses that you were referring

13   to, right, in response to questions from counsel:

14   Conspiracy to transport stolen goods, conspiracy to

15   receive stolen goods, conspiracy to commit wire fraud.

16                Accurate statement?

17   A.    Correct.

18   Q.    Those crimes, were those committed here in

19   Connecticut, or were those committed someplace else?

20   A.    He was prosecuted in the Southern District of New

21   York.

22   Q.    With respect to the underlying nature of those

23   crimes, do you know how much money was involved in

24   those?

25                MR. ROGAN:  I'm going to object.  That's

1    outside the scope of my cross-examination.

2            THE COURT:  What was the question you're

3    following up on, Mr. Durham?

4            MR. DURHAM:  Counsel asked questions about

5    these particular offenses.  His focus was on whether

6    this particular part of his criminal history involved

7    violent crimes, and I want to explore what those crimes

8    did involve.

9            THE COURT:  It's allowable.

10           THE WITNESS:  I don't recall the specific

11    number, but in the hundreds of thousands of dollars.

12    BY MR. DURHAM:

13    Q.   Counsel, on at least three occasions, made

14    reference to, You think you heard a threat; and his

15    questions incorporated that, you think you heard a

16    threat or an alleged threat.

17           As you sit here now, is there any doubt in your

18    mind whatsoever that Mr. Santos made a threat in that

19    courtroom directly to Mr. Topor?

20    A.   There's no doubt.

21    Q.   And counsel asked you a series of questions, well,

22    could -- do you know that it was directed at Mr. Topor

23    as opposed to you.

24           As you sit here now, what's your belief concerning

25    who Mr. Santos was talking to?

1    A.    My belief is that the threat in the courtroom was

2    towards Mr. Topor.

3    Q.    And to the best of your recollection, several days

4    earlier you weren't even present for the hearing before

5    Magistrate Judge Richardson, correct?

6    A.    Correct, I was not present.

7    Q.    And so if Mr. Santos had some things to say to

8    Mr. Topor at that time, you would only know that by way

9    of others, hearsay; you don't have personal knowledge of

10   that.

11   A.    Correct.

12   Q.    Counsel asked you a series of questions as to the

13   threat -- let me ask you this:  As to when Mr. Santos

14   made the statement to Mr. Topor, did that happen before

15   or after Mr. Topor had expressed -- had spoken to Judge

16   Arterton?

17   A.    After.

18   Q.    Did the statements made by Mr. Santos occur before

19   or after Judge Arterton had made it clear that she was

20   going to follow through what was going to happen if

21   Mr. Santos didn't comply with the terms and conditions

22   of the drug treatment?

23   A.    After.

24   Q.    And did that occur -- that is, did Santos make the

25   statements before or after Judge Arterton had actually

1    sentenced the defendant to the six months, plus

2    additional supervised release, including halfway-house

3    time?

4    A.   After.

5    Q.   Counsel asked you questions about how far you were

6    located from where Mr. Santos was in the courtroom.

7         Do you remember that?

8    A.   Yes.

9    Q.   I'm bad at distances as well, but maybe from where

10   I am to where you are, is that roughly it?

11   A.   Correct.

12   Q.   Tell the ladies and gentlemen of the jury whether

13   you had any difficulty whatsoever hearing what

14   Mr. Santos said.

15   A.   I did not have any difficulty.

16   Q.   You were asked questions by counsel concerning

17   notes.  Do you remember some reference to notes?

18   A.   I do.

19   Q.   And with regard to notes that were taken in this

20   matter, tell the jurors what, if any, practice you have

21   as a probation officer maintaining notes or recording

22   what had happened.

23   A.   The U.S. probation office has an online database in

24   which we collect all other -- it's an online case file.

25   It's where we put all our case notes, all our documents.

1    It's basically our file.

2            MR. DURHAM:  May I approach the witness, Your

3    Honor?

4            THE COURT:  You may.

5    BY MR. DURHAM:

6    Q.   I show you a document that was provided to counsel

7    in discovery in this case, and ask you if you recognize

8    what that document is.

9    A.   I do recognize it.

10   Q.   What is that document?

11   A.   That is our case notes, our chronological notes.

12   Q.   With respect to those notes, do you recall -- as to

13   those notes, does it reflect what it is -- withdrawn.

14           What's the date of the notes?

15   A.   The one I see here is August 31, 2016.

16   Q.   The day of this hearing before Judge Arterton?

17   A.   Correct.

18   Q.   And do your notes reflect what you recorded as was

19   having been said by Mr. Santos; that is, at the end of

20   the proceeding after the judge had left the bench?

21   A.   Correct.  It is at the end of my note.

22   Q.   So those notes, how close in time to the hearing

23   would those notes have been written?

24   A.   That day.

25   Q.   And what was it that you recorded Mr. Santos as

1    having said?

2    A.    "When I come out, I'm coming for you."

3    Q.    And does it reflect whether or not there was any

4    response from Mr. Topor?

5    A.    Topor responded with, "What was that, Peter?"

6    Q.    Does it indicate whether or not Mr. Santos then

7    said anything to Mr. Topor in response to his inquiry?

8    A.    Yes.   "You heard me."

9    Q.    To the best of your recollection, is that exactly

10   what happened that day?

11   A.    To the best of my recollection, yes.

12   Q.    Counsel also asked you about a conversation you had

13   with Mr. Topor relating to the seriousness of the

14   comment.

15       And I believe you testified, but correct me if I'm

16   wrong, that you told Mr. Topor that Mr. Santos' comments

17   should be taken seriously, correct?

18   A.    Correct.

19   Q.    And in that regard, why did you think that

20   Mr. Santos' comments, statement, to Mr. Topor should be

21   taken seriously?

22   A.    Because, in my view, it was taken as a threat to

23   seriously harm Mr. Topor.

24   Q.    Counsel asked you some questions about whether you

25   heard any -- you alluded to one, did you hear any

1     comments from the marshals.

2          Do you remember?

3     A.   Yes.

4     Q.   You indicated you heard them say something about,

5     "Come on, man," or words to that effect?

6     A.   Correct.

7     Q.   Defense counsel asked you about meeting -- any

8     recollection of having heard anything about meeting

9     one's maker, or words to that effect.

10         Do you recall that?

11    A.   I do.

12    Q.   Let me ask you:  With respect to the defendants

13    when they are taken out of Judge Arterton's courtroom,

14    are they brought out of the rear entrance, or are they

15    brought out some other way?

16    A.   In Judge Arterton's courtroom they are brought out

17    in the front, towards the bench.

18    Q.   So they walk out that corner door, sort of where

19    these doors are located in Judge Thompson's courtroom?

20    A.   Correct.

21    Q.   With respect to yourself, did you follow the

22    marshals out with the defendant?

23    A.   I did not.

24    Q.   To your knowledge, did Mr. Topor follow the

25    marshals out with the defendant?

1    A.    He did not.

2    Q.    Would you have been present, then, near -- let me

3    withdraw this so it makes sense.

4          As to the marshals' facilities in New Haven, where

5    are those located?

6          Let me back up.

7          What floor is Judge Arterton's courtroom located on

8    in New Haven?

9    A.    Judge Arterton is on the first floor.

10   Q.    The marshals' lockup, is that on the first floor or

11   different floor?

12   A.    Different floor.

13   Q.    Do you recall, sir, whether you had any occasion to

14   be near the elevators when the marshals were taking

15   Mr. Santos upstairs?

16   A.    No.

17   Q.    So if Mr. Santos said, in response to a comment

18   from the marshals, "Hey, everybody's got to meet their

19   maker, whether it's me or somebody else," you wouldn't

20   have heard that.

21   A.    Correct.

22   Q.    Counsel asked you questions relating to a phone

23   call from the defendant's mother.

24         Do you recall that?

25   A.    I do.

1    Q.   Do you know what an enabler is?

2    A.   I do.

3    Q.   With respect to Mr. Santos' situation, do you

4    recall, sir, whether or not his mother would try to

5    intervene on his part?

6              MR. ROGAN:   Objection, Your Honor.   Outside

7    the scope of my direct examination.   My question was

8    limited solely to, did he obtain -- did she make a phone

9    call to him asking to obtain Mr. Topor's phone number.

10   I didn't go beyond that.

11             MR. DURHAM:   Fair enough.   Let me withdraw it

12   and ask it this way.

13   BY MR. DURHAM:

14   Q.   The defendant's mother called you, correct?

15   A.   Correct.

16   Q.   And was looking for Mr. Topor's number?

17   A.   Correct.

18   Q.   To the best of your knowledge -- but it was the

19   defendant's mother not the defendant?

20   A.   Correct.

21   Q.   And the defendant's mother wanted Mr. Topor's

22   number, correct?

23   A.   Correct.

24   Q.   And the defendant's mother, it's your

25   understanding, spoke with Mr. Topor?

1    A.   To my understanding, yes.

2    Q.   Okay.  Now, finally I want to ask you, counsel

3    asked you some questions about, at the conclusion of

4    hearing before Judge Arterton, the defendant would have

5    been -- was handcuffed by the marshals, correct?

6    A.   Correct.

7    Q.   And I believe your testimony was that they didn't

8    have a difficult time getting the cuffs on him, correct?

9    A.   Correct.

10   Q.   So I want to ask you about that.

11        The hearing occurred before Judge Arterton, and he

12   was sentenced, as you have testified to, correct?

13   A.   Correct.

14   Q.   The judge leaves the bench, correct?

15   A.   Correct.

16   Q.   And then there was some period of time where people

17   were still in the courtroom, right?

18   A.   Correct.

19   Q.   Was the defendant acting up in any fashion?

20   A.   He was not.

21   Q.   Was the defendant yelling or screaming, to the best

22   of your recollection?

23   A.   He was not.

24   Q.   Did he seem in any way to be out of control at that

25   point?

1    A.    No.

2    Q.    Before making any verbalized concerns or saying

3    anything about Judge Arterton at that point?

4    A.    I'm sorry.  Repeat that.

5    Q.    Did he say anything -- he, Mr. Santos, say anything

6    about Judge Arterton after she had left the bench?

7              MR. ROGAN:  Objection.  Outside the scope of

8    my cross.  I never asked any questions --

9              THE COURT:  That's not where he's going.

10             Overruled.

11             THE WITNESS:  He did not.

12   BY MR. DURHAM:

13   Q.    And he was cuffed in the normal course, correct?

14   A.    I don't know U.S. Marshals' procedure, but it

15   appeared to be.

16   Q.    You didn't see any resistance?

17   A.    I did not, no.

18   Q.    He seemed to be completely -- to your observation,

19   was he under control at that point?

20   A.    Yes.

21   Q.    And when he walked out past the witness stand and

22   looked at Mr. Topor, made the statement, did he appear

23   to be in a rage of any sort?

24   A.    No.

25   Q.    He seemed to know exactly what he was saying, based

1    upon your observations?

2    A.    Correct.

3           MR. DURHAM:   I have nothing further.   Thank

4    you, Your Honor.

5           THE COURT:   Mr. Rogan.

6

7                    RECROSS-EXAMINATION

8    BY MR. ROGAN:

9    Q.    I want to be fair, but you just told the jury ten

10   minutes ago that, in your mind, back on August 31, 2016,

11   that it was possible, based upon what you saw and

12   observed in that courtroom, that that threat could have

13   well have been directed to you as it was to Mr. Topor.

14         Did I not hear you correctly?

15   A.    Correct.

16   Q.    But now you just said, in response to Mr. Durham,

17   that there's no doubt in your mind that the threat was

18   directed -- let me finish -- that the threat was

19   directed to Mr. Topor, right?

20   A.    Correct.   At the time of the hearing, the threat

21   was believed to be in the direction of Mr. Topor.

22   Q.    Again, I don't mean to impolite.   You told me not

23   15 minutes ago, 10 minutes ago, that it could just as

24   well, based upon where you were standing and the

25   circumstances that existed, that it was, quote, possible

1    that that threat was directed to you as much as it could

2    have been directed to Mr. Topor.

3        Did I not hear that?

4    A.    Correct.   Mr. Santos was looking in the direction

5    of me and Mr. Topor.   It was believed to be a threat

6    towards Mr. Topor.

7    Q.    It's believed to be, but you don't know; is that

8    fair to say?

9    A.    Correct.

10   Q.    So when you were asked by Mr. Durham, is there any

11   doubt in your mind that it was directed to Mr. Topor, in

12   point of fact, that's not accurate because you do have

13   doubt in your mind as to whether it was directed to

14   Mr. Topor and/or you?

15   A.    At the time of the hearing, I believe the threat

16   was toward Mr. Topor.   It is possible that it could be

17   towards either of us, but I believe it is towards

18   Mr. Topor.

19   Q.    And, in point of fact, the phone call you heard --

20   and Mr. Durham brought it up, in point of fact, he

21   paraphrased a phone call that was made after the hearing

22   in which there was an explicit threat made, directed to

23   you.

24   A.    Correct.

25   Q.    Right?

1    A.    Correct.

2    Q.    And it said, hey, something along the lines of,

3    "Tell Daniel I'm going to kill him and I love him," and

4    he's laughing on the phone, right?

5         So that would be consistent with your earlier

6    testimony -- and by the way, the indictment only says a

7    threat made against or to Brian Topor.  It doesn't

8    reference you.  So that's not the issue before the jury.

9         So my question to you is --

10             MR. DURHAM:  Your Honor, is there a question

11    here, or are they commentary?

12             THE COURT:  That part was a little commentary.

13             MR. ROGAN:  Your Honor, fair enough.

14    BY MR. ROGAN:

15    Q.    That threat was made explicitly towards you, the

16    phone call --

17    A.    Correct.

18    Q.    -- right?

19    A.    Correct.

20    Q.    And that would be consistent with your testimony to

21    me, 15 minutes ago, that it as well could have been --

22    the comment made in the courtroom after the hearing in

23    the direction of the jury box where you and Mr. Topor

24    were sitting, it could have been made to either one of

25    you.

```
 1          Isn't that fair to say?

 2     A.   Correct.

 3               MR. ROGAN:   Great.   Thank you, nothing else

 4     further.

 5

 6                    FURTHER REDIRECT EXAMINATION

 7     BY MR. DURHAM:

 8     Q.   Do you know if there were other telephone

 9     conversations that Mr. Santos had, with respect to who

10     specifically he was threatening in the courtroom?

11     A.   I do not.

12     Q.   Do you know whether or not he had his mother call

13     Mr. Topor to see if Mr. Topor wouldn't file a complaint?

14     A.   I do not.

15     Q.   So if that happened, it's beyond your knowledge --

16     A.   Correct.

17     Q.   -- but Mr. Topor will be here.

18     A.   Correct.

19     Q.   And if there are such telephone calls, you haven't

20     listened to them.

21     A.   Correct.

22     Q.   You just know the one -- the only one you listened

23     to is when he was talking to --

24               THE COURT:   I think we have a commentary

25     objection.
```

1          MR. ROGAN:  We do, Your Honor, which is

2     outside the scope of my recross.

3          THE COURT:  I think we're ready to let this

4     witness go.

5          MR. DURHAM:  Yes, Your Honor.

6          THE COURT:  You may step down, sir.

7          (Whereupon, the witness was excused.)

8          THE COURT:  I have another hearing that I have

9     to squeeze in.

10          I just want to remind the members of the jury

11     that I gave you instructions earlier today about keeping

12     an open mind throughout the trial; not discussing the

13     case with anyone; not having any contact with the

14     parties, attorneys or witnesses; and not being exposed

15     to anything outside the courtroom concerning this case

16     or any similar matter.

17          Other than that, I'd like to thank you for

18     your hard work today, and see you tomorrow morning

19     at 9:30.

20          (Whereupon, the jury left the courtroom.)

21          THE COURT:  Please be seated, everyone.

22          I'm working on the jury charge.  I'll have it

23     by tomorrow morning unless you need it sooner.

24          MR. DURHAM:  That's fine with the government,

25     Your Honor.

1          MR. ROGAN:  Fine, Your Honor.  Thank you so

2     much.

3          THE COURT:  No surprises.

4          And we have our witnesses lined up.  We know

5     who the government is calling tomorrow.

6          Is the defense going to have witnesses

7     tomorrow?

8          MR. DURHAM:  Your Honor, I advised counsel,

9     but as indicated in the government's opening --

10          THE COURT:  We know who the government's

11     witnesses are.  Does the defense need to notify the

12     government about any witnesses?

13          MR. ROGAN:  I've been waiting to see, but I

14     will --

15          THE COURT:  Okay.  You're waiting to see.

16          I just want to make sure, if Mr. Santos

17     decides not to testify, that we build in time for me to

18     talk with him about making a decision about that.  I

19     have a colloquy that I'll use if he decides not to

20     testify.

21          We don't have to do that now, but I just want

22     to let you all know I will be asking him to make sure he

23     understand his rights.

24          MR. ROGAN:  I can advise the Court now that,

25     having conferred with my client, he will not be taking

1    the stand.

2            THE COURT:  I'll wait until we get to the end

3    of the government's case, just so he's making that

4    decision on a fully informed basis.

5            Any issues that you all can foresee for

6    tomorrow?

7            MR. DURHAM:  I don't think so, Your Honor.

8    Thank you.

9            THE COURT:  It looks like we'll still finish

10   up evidence tomorrow?

11           MR. DURHAM:  Hopefully, Your Honor.  I don't

12   know.  If the defense calls some witnesses, perhaps not,

13   but I think we'll finish the government's case in chief.

14           THE COURT:  What we'll plan on doing if we

15   finish, no matter what time, we'll plan to do the

16   closings and charge on Thursday.  And if it rolls over

17   to Thursday for just a little while, we'll also plan on

18   doing it on Thursday.

19           MR. ROGAN:  I will in candor, to the extent

20   that I have any witnesses, they will be very, very short

21   in duration.

22           THE COURT:  Certainly.

23           Well, thank you both very much.  We'll take a

24   recess.

25                   (A recess followed at 4:37 PM.)

1                    C E R T I F I C A T E

2

3             UNITED STATES VS. PETER J. SANTOS

4                      3:17CR00024(AWT)

5

6

7             I, Corinna F. Thompson, RPR, Official Court

8     Reporter for the United States District Court for the

9     District of Connecticut, do hereby certify that the

10    foregoing pages, pages 1 - 237, are a true and accurate

11    transcription of my shorthand notes taken in the

12    aforementioned matter on May 30, 2017, to the best of my

13    skill and ability.

14

15

16

17

                   /s/_____

18

                      CORINNA F. THOMPSON, RPR
19                     Official Court Reporter
                      450 Main Street, Room #225
20                    Hartford, Connecticut 06103
                         (860) 547-0580
21

22

23

24

25