UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          3:17CR00024(AWT)

       vs.

PETER J. SANTOS
                       HARTFORD, CONNECTICUT
           Defendant     MAY 31, 2017

- - - - - - - - - - - - - - - x

**JURY TRIAL - VOLUME II**

    BEFORE:

        HON. ALVIN W. THOMPSON, U.S.D.J.

           AND A JURY OF 12

APPEARANCES:

      FOR THE GOVERNMENT:

          OFFICE OF THE UNITED STATES ATTORNEY
          157 Church Street, 23rd Floor
          New Haven, Connecticut 06510
          BY:  JOHN H. DURHAM, AUSA

      FOR THE DEFENDANT:

          LAW OFFICE OF NEAL ROGAN
          315  Post Road West
          Westport, Connecticut  06880
          BY:  NEAL PATRICK ROGAN, ESQ.

                    Corinna F. Thompson, RPR
                    Official Court Reporter

1                      **TABLE OF CONTENTS**

2

3    WITNESS            DIRECT    CROSS    REDIRECT    RECROSS

4    BRIAN TOPOR

5       BY MR. DURHAM:   244                 334

6       BY MR. ROGAN:             289                    347

7       BY MR. DURHAM:                       351

8    MICHAEL CURRA

9       BY MR. DURHAM:   353                 380

10      BY MR. ROGAN:             372                    383

11      BY MR. DURHAM:                       385

12   MATTHEW MOORE

13      BY MR. DURHAM:   386

14      BY MR. ROGAN:             403

15   MATTHEW PARKER

16      BY MR. DURHAM:   415                 461

17      BY MR. ROGAN:             448                    466

18      BY MR. DURHAM:                       472

19      BY MR. ROGAN:                                    473

20

21

22

23

24

25

1                          __9:31 AM__

2              THE COURT:  Good morning.  Please be seated,

3     everyone.

4              I think my law clerk e-mailed to you or

5     presented --

6              MR. DURHAM:  We just chatted briefly.  Both

7     sides would like hard copies, which is the most

8     efficacious way at this point.

9              THE COURT:  Anything else before we bring the

10    jury out?

11             MR. DURHAM:  No, Your Honor.  I had spoken

12    with counsel this morning, and I think Your Honor

13    indicated, but I may be misrecollecting this, but with

14    respect to transcripts with audio recordings, what the

15    government has is, we have hard copies of the

16    transcripts, and then we have the monitor that can play

17    the transcripts.

18             I think the Court had indicated, sometimes

19    jurors prefer hard copies or whatever.  We would intend

20    to play it and use the monitor, but we'll also have hard

21    copies.

22             THE COURT:  Whatever you prefer.  I don't know

23    that the jurors have any preference.  I think I was

24    reciting that people have done it both ways.  I don't

25    know that the jurors have a preference.  If you're going

1       to display it on the monitor, if that's your preference,

2       go ahead and do that.

3               MR. DURHAM:  We provided to counsel and to his

4       client all of the transcripts that are clipped together

5       so that if we're to give them to the jurors they would

6       be in sequential order.  And we can provide the Court

7       with a copy so it makes a little more sense as to what

8       I'm saying, where the Court could say, "Don't look at

9       the next transcript until we're finished."

10              I know in some courtrooms jurors are given an

11      alternative.  They can watch the monitor or they have

12      hard copies.  Obviously --

13              THE COURT:  I don't have a preference.  I

14      think whatever the jurors -- we can ask the jurors if

15      they have a preference.

16              MR. DURHAM:  Okay.

17              THE COURT:  Why don't we do that.

18              MR. DURHAM:  We're not going to do that

19      immediately.

20              THE COURT:  When we get to that point we can

21      ask the jurors what they prefer.

22              MR. ROGAN:  Fair enough, Your Honor.

23              THE COURT:  We'll bring the jury in then.

24              And I'll adapt the limiting instruction to

25      whatever happens.

1              (Whereupon, the jury entered the

2     courtroom.)

3              THE COURT:  Good morning, ladies and

4     gentlemen.

5              THE JURY:  Good morning.

6              THE COURT:  Please be seated, everyone.

7              Looks like we're ready for the next witness.

8              MR. DURHAM:  Thank you, Your Honor.  The

9     government's next witness is Brian Topor.

10                      BRIAN TOPOR,

11              called as a witness, having been first duly

12              sworn or affirmed, was examined and testified

13              as follows:

14

15              THE CLERK:  Please state your name and spell

16     your last name for the record.

17              THE WITNESS:  Brian J. Topor, T-O-P-O-R.

18              THE CLERK:  And indicate the town and state in

19     which you live or work.

20              THE WITNESS:  450 Main Street, Suite 735,

21     Hartford, Connecticut.

22              THE CLERK:  Thank you.

23              MR. DURHAM:  May I proceed, Your Honor?

24              THE COURT:  Please do.

25

1                    DIRECT EXAMINATION

2    BY MR. DURHAM:

3    Q.    Mr. Topor, would you indicate to the jurors how

4    you're employed.

5    A.    I'm employed as a supervisory United States

6    Probation Officer for the District of Connecticut.

7    Q.    How long have you worked for the United States

8    Probation Office?

9    A.    It will be 23 years in August or -- yeah, August.

10   Q.    How long have you been a supervisory probation

11   officer?

12   A.    Five years.

13   Q.    Describe, if you would to the jurors, what your

14   general duties and responsibilities are as a supervisory

15   probation officer.

16   A.    As a supervisory probation officer, I comanage the

17   Hartford office here in Connecticut, supervise directly

18   seven officers; three senior officers and four what we

19   consider line officers.

20   Q.    And with respect to the supervision of individual

21   persons who are either on probation or who have finished

22   a prison sentence and are on supervised release, do you

23   have your own caseload that you carry, or do you just

24   assist others in managing their caseloads?

25   A.    I just assist, I don't have a caseload.

1    Q.   Prior to becoming a supervisor, what kind of work

2    did you do with the probation office?

3    A.   I did direct supervision of offenders and

4    defendants, and I wrote presentence reports.

5    Q.   I want to draw your attention to August of last

6    year, August of 2016.  At that point in time you were a

7    supervisory probation officer here in Hartford?

8    A.   Correct.

9    Q.   Do you know an individual by the name of Daniel

10   Leone?

11   A.   Yes.

12   Q.   How do you know Mr. Leone?

13   A.   Mr. Leone is a U.S. probation officer whom I

14   directly supervise.

15   Q.   And if the juror has heard that Mr. Leone became

16   employed as a probation officer with the U.S. Probation

17   Office in or about July of 2015, when would you have

18   started your supervision of Mr. Leone?

19   A.   July of 2015.

20   Q.   So essentially from the time he came in, you've

21   been his supervisor?

22   A.   That's correct.

23   Q.   Do you recall, sir, whether or not Mr. Leone had,

24   in his caseload, an individual by the name of Peter

25   Santos?

1    A.   Yes, sir.

2    Q.   What's the basis of your knowledge that he had

3    Mr. Santos as a person on supervised release?

4    A.   The knowledge is that he was assigned Mr. Santos'

5    direct supervision while in the community.

6    Q.   Who assigned him Mr. Santos?

7    A.   It could be any one of the supervisory probation

8    officers who had case assigning at any given time that

9    Mr. Santos' name came up on the wheel.

10   Q.   Let's assume that Mr. Santos -- the jury has heard

11   Mr. Santos was released from prison sometime in December

12   of 2015.

13   A.   Correct.

14   Q.   When would you personally become involved in

15   Mr. Leone and the supervision of Mr. Santos?

16   A.   There's really no time frame that I would be

17   involved in any one given supervision case.  It all

18   depends on if there's any kind of issues that would

19   warrant some supervisory input, guidance, direction on.

20   Q.   What was the case with Mr. Santos, did it require

21   such supervisory input or guidance?

22   A.   I believe so, yes.

23   Q.   And what was the nature of the issues that required

24   that supervisory input and guidance from Mr. Leone?

25   A.   The nature was Mr. Santos' chronic failure to

1    comply with treatment programs and testing positive for

2    heroin.

3    Q.   So let me ask you this:  With respect, then, to

4    Mr. Santos being on supervised release and his being

5    supervised by the probation officer, that's how you

6    first encountered Mr. Santos yourself?

7    A.   Not necessarily, no.  I actually -- because our

8    office does pretrial supervision as well, so I was aware

9    of Mr. Santos' supervision prior to him being on

10   supervised release.

11   Q.   All right.  Just so the jurors understand,

12   Mr. Santos was convicted in the Southern District of New

13   York, correct?

14   A.   Correct.

15   Q.   He was then placed on supervised release, correct?

16   A.   Correct.

17   Q.   But he lived in Connecticut?

18   A.   Correct.

19   Q.   So when you say that you would have been aware

20   beforehand, tell the jurors how it works.

21        Probation gets notice as to when somebody is going

22   to be released, correct?

23   A.   That is true.

24   Q.   So it came to your attention that Mr. Santos would

25   be coming to Connecticut for supervision, supervised

1    release?

2    A.    Correct.   The way that would work is that while the

3    individual is in the custody of Bureau of Prisons, they

4    will put a release plan in place.   And at that time the

5    plan is forwarded to the district of request, which is

6    Connecticut in this point because the sentencing court

7    was in the Southern District of New York.

8         At that point in time we investigate the plan,

9    which would be where somebody would reside, potential

10   employment.   And given that Mr. Santos' history was in

11   Connecticut, most of his residential history in

12   Connecticut, upon investigation of that plan he was

13   accepted into the District of Connecticut.

14   Q.    And then at some point he was here in Connecticut

15   on supervised release, correct?

16   A.    Correct.

17   Q.    Do you remember when you first encountered

18   Mr. Santos, what the circumstances were?

19   A.    I don't have the exact date, but the circumstances

20   would be fairly consistent because it was about trying

21   to motivate and address Mr. Santos on his -- what we

22   felt his apparent need to engage in a treatment process.

23   Q.    So let me explore that with you for a minute.

24        There was a particular drug of choice, correct?

25   A.    That is correct.

1    Q.    What was Mr. Santos' drug of choice?

2    A.    Heroin.

3    Q.    Now, by way of background or context for the

4    jurors, with respect to Mr. Santos' use of heroin, in

5    your experience, are there different degrees of

6    addiction that people have, particularly relating to

7    heroin?

8    A.    That would be true.

9    Q.    And with respect to some persons who are addicted

10   to heroin, they're essentially on the streets, trying to

11   scrap or do whatever else to get money for the next fix,

12   correct?

13   A.    That's true.

14   Q.    There are other people on the other end of the

15   spectrum that just use heroin --

16   A.    True.

17   Q.    -- and they are addicted to it.

18   A.    True.

19   Q.    With respect to Mr. Santos, how much interaction

20   did you have with Mr. Leone and Mr. Santos concerning

21   the type of addiction he had?

22   A.    I had quite a bit of contact with certainly

23   Mr. Leone, being his direct supervisor; but also having

24   met with Mr. Leone, Mr. Santos on several occasions.

25   Q.    And separate and apart from meeting with Mr. Santos

1      and Mr. Leone, how about any other members of

2      Mr. Santos' family, have you met with them?

3      A.    Yes.   On at least two occasions I met with both

4      parents of Mr. Santos.

5      Q.    With respect to Mr. Santos, to your knowledge,

6      while he was on supervised release, was he living on the

7      streets?

8      A.    He was not.

9      Q.    To the best of your knowledge and recollection with

10     respect to Mr. Santos, was he without funds?

11            MR. ROGAN:   Objection, Your Honor.   Relevance.

12            THE COURT:   Overruled.

13            THE WITNESS:   To my knowledge he was not

14     without funds.

15     BY MR. DURHAM:

16     Q.    To your knowledge, based on your participation and

17     supervision, was he employed?

18     A.    That is correct.

19     Q.    And who employed him?

20     A.    He was employed by his father's HVAC company.

21     Q.    Based on your personal involvement with his

22     supervision, did he have someplace to live?

23     A.    He did.

24     Q.    Where was he living?

25     A.    With his family.

1    Q.   In terms of the degree of somebody's addiction to

2    heroin in particular, with respect to people who are

3    down-and-out heroin addicts, what kinds of quantities of

4    heroin are you familiar with; people who are on the

5    streets, living fix to fix, what kinds of quantities of

6    heroin are used by those people?

7                MR. ROGAN:  Your Honor, objection to the use

8    of the term "down and out, people on the street."  I'm

9    not quite sure what that means to anybody.

10               THE COURT:  We'll let Mr. Durham make sure

11   everybody understands what that means.

12   BY MR. DURHAM:

13   Q.   With respect to persons who are homeless, who have

14   no job and who are living from fix to fix, in your

15   experience -- what, you've been a federal probation

16   officer 23 years?

17   A.   That's correct.

18   Q.   Any estimate as to how many defendants or

19   supervisees that you've dealt with who have drug

20   problems, drug addictions?

21   A.   A vast amount.

22   Q.   With respect, then, to people who are living on the

23   street who have no job, who have no house to live in,

24   and are living from fix to fix, what kind of quantities

25   of heroin are you familiar those people are using on a

1    daily basis?

2    A.   That could vary anywhere from a few bags to several

3    bundles, and a bundle being ten bags of heroin per

4    bundle.   It could vary dramatically depending on where

5    their addiction takes them.

6    Q.   And how much money they have.

7    A.   How much money they have or how they can get a hold

8    of money, that's correct.

9    Q.   With respect to Mr. Santos and this sort of

10   spectrum, you say he had a house and had a job, with

11   respect to the quantity of heroin that he was using, do

12   you have -- maybe you don't and maybe you don't -- do

13   you recall what quantity of heroin he was using?

14          MR. ROGAN:   Your Honor, I'm going to object.

15   Truly calls for -- going to object to, calls for expert

16   testimony.   He's not qualified as an expert.

17          MR. DURHAM:   I don't think it calls for expert

18   testimony.   Santos told him how much heroin he was

19   using.

20          THE COURT:   It's not expert testimony but lay

21   a foundation.

22   BY MR. DURHAM:

23   Q.   Do you recall, sir, whether or not, in any of your

24   encounters of Mr. Santos and his family, there being

25   discussions about the quantity of heroin that he was

1    using?

2                    MR. ROGAN:  Your Honor --

3                    THE WITNESS:  I can't recall.

4    BY MR. DURHAM:

5    Q.   You don't recall?

6    A.   No.

7    Q.   In any event, based on the entire period of time

8    that you were involved in supervising Mr. Leone, and

9    then some personal involvement with Mr. Santos, do you

10   know whether that entire period of time he had a house,

11   he had someplace he was staying?

12   A.   Yeah, he had a residence with his family.

13   Q.   For that whole period of time was he employed?

14   A.   That's my understanding, yes.

15   Q.   Let me ask you about, with respect to your

16   situation, you were a federal probation officer in

17   August of 2016, correct?

18   A.   That is correct.

19   Q.   With regard to Mr. Santos, other than that

20   professional relationship -- that is, you're a probation

21   officer of somebody who was on supervised release -- any

22   other contact with Mr. Santos?

23   A.   No.

24   Q.   You didn't know him from the neighborhood or some

25   other situation?

1    A.    I did not.

2    Q.    Is that strict probation officer, supervised

3    releasee relationship that existed; is that correct?

4    A.    That's correct.

5    Q.    And let me proceed a little further here.

6          Describe to the jurors, if you would, during the

7    period of time that you were involved with Mr. Santos

8    while he was on supervised release, describe to the

9    jurors, if you would, how his treatment progressed, if

10   at all.

11   A.    Treatment was the, really the main cause of my

12   interactions with Officer Leone and with Mr. Santos.  I

13   would have to say the struggles that Mr. Santos was

14   having, remaining in treatment, and I guess sort of

15   buying into the need for the treatment that we, as

16   probation officers, as well as his clinical team, who he

17   was meeting with at the time, felt that he was in need

18   of.

19         Mr. Santos, we believe, was in need of a very

20   structured treatment regime, mainly inpatient or

21   residential, longer term, that would allow him housing,

22   that would allow him immediate access to clinicians,

23   24-hour care.

24         This was really the main conversation that we would

25   have on a continuous basis, is that his lack of

1   follow-through with such referrals and recommendations.

2   Q.   And would you describe or explain to the jurors,

3   sir, whether or not there was one or more than one

4   program, treatment program, that probation had made

5   available to Mr. Santos?

6   A.   Yes.   There were several since the commencement of

7   his supervised release, or several inpatient programs

8   that were directly made available to Mr. Santos through

9   our vendorship process.

10       Just to explain that a little bit, the

11  U.S. Probation Office has contractual vendors for

12  treatment for substance abuse needs.   And what that

13  allows us to do is really to get our supervisees into

14  treatment sooner rather than later.   So we had provided

15  Mr. Santos with the opportunity to engage in a treatment

16  process with our vendors.

17       When he left those programs -- and again, we would

18  address with him continued need for treatment -- there

19  were other referrals that were provided to him

20  throughout the community.   We provided him with

21  assistance making the intake assessment appointments

22  from within our office.   So there were several referrals

23  and several efforts to get him engaged in longterm

24  inpatient treatment.

25  Q.   Prior to August 31st of 2016, do you remember how

1    many different programs there were that you had made

2    available for Mr. Santos?

3    A.   I believe there were seven at that point in time

4    that he had actually had some direct contact with.

5    However, there were other programs that were suggested

6    or referred to him that I don't believe were accessed.

7    Q.   Now, I want to just ask you sort of a related

8    question.  Again, in this time frame we are talking

9    about, principally August of 2016, I'm going to skip a

10   ahead for a moment.

11        Do you remember addressing Judge Arterton, on

12   August 31st, about Mr. Santos' situation?

13   A.   I do.

14   Q.   Do you recall your making some comments to the

15   court regarding the number of deaths in Connecticut

16   occurring from heroin and related drugs?

17   A.   Yes.  Fentanyl; yes, I do.

18   Q.   So the jury heard something, a reference to

19   200 people here being killed or dying of overdoses and

20   fentanyl being a particular problem.  Explain to this

21   jury what it is that probation was concerned about

22   relating to, whether Santos or anybody else, using

23   heroin while on supervised release?

24   A.   Well, the concern was that Mr. Santos -- I'll keep

25   it specific because that's why I'm here -- is that he

1   was going to some day ingest the -- either a dangerous

2   dose of heroin or a dose of the fentanyl that has really

3   kind of become an epidemic within our communities here

4   in Connecticut; and that his family would no longer have

5   to come here to pick up his belongings but would have to

6   go and identify him because he would have overdosed and

7   passed away.

8   Q.   In context, in August of 2016, and today, heroin

9   users sometimes get fentanyl instead of heroin, right?

10  A.   That is my understanding.

11  Q.   What happens if somebody ingests fentanyl?

12          MR. ROGAN:   Your Honor, I'm going to object on

13  relevance.

14          MR. DURHAM:   Withdrawn.

15  BY MR. DURHAM:

16  Q.   That was what you were talking to Judge Arterton

17  about, or referring to Judge Arterton in August of 2016,

18  about your concerns relating to Mr. Santos, correct?

19  A.   Absolutely.

20  Q.   The jury has heard testimony that probation

21  officers wear two hats, one being something of a law

22  enforcement officer, and the second hat being that of a

23  social worker.

24          Would you generally agree with that description?

25  A.   Just two hats?  Yes, I would.

1    Q.    At least two hats that you wear.

2          With respect to your involvement with -- direct

3    involvement with Mr. Santos, is there one of those hats

4    that you feel that you were primarily wearing?

5    A.    I do.

6    Q.    And what hat were you wearing in trying to deal

7    with Mr. Santos' situation?

8    A.    I would say social-work hat, rehabilitative

9    viewpoint, focus.

10   Q.    So prior to August of 2016, do you recall having

11   any confrontations of any sort with Mr. Santos?

12   A.    No, none.

13   Q.    Prior to August of 2016, this is when Mr. Santos is

14   given the opportunity to go into a number of these

15   treatment programs, correct?

16   A.    Correct.

17   Q.    Do you recall whether or not Judge Arterton was

18   being kept apprized of what was occurring with

19   Mr. Santos in his supervised release?

20   A.    She was.

21   Q.    And what's the basis of your knowledge that she was

22   being kept apprized of what was happening with the

23   supervised release?

24   A.    I have firsthand knowledge because there's a couple

25   different methods on how we communicate to the court and

1    keep them updated on our cases, one of which is what we

2    call a petition with the court, which outlines alleged

3    violation conduct, and what our recommendations and what

4    our follow-through has been up to that point in time.

5         I believe several petitions were filed to Judge

6    Arterton, advising of Mr. Santos' referrals to treatment

7    programs, with our recommendation that we continue to

8    keep working with him and try to sort of fight -- help

9    him fight his addiction.

10        And then also there was a conference call that we

11   did have on one occasion between myself, Officer Leone,

12   his defense counsel, and the government prior to the

13   August 31st hearing in order to update Judge Arterton.

14   Q.   Now, I want to move in, then, to August of 2016.

15        Do you recall, sir, learning in your capacity as a

16   supervisory probation officer for Mr. Santos and working

17   with Probation Officer Leone, whether in the middle of

18   August, August 16th, there was a hearing before Judge

19   Arterton regarding Mr. Santos and his supervised

20   release?

21   A.   I'm aware that there was a hearing.

22   Q.   And my next question is, did you attend that

23   hearing?

24   A.   I did not.

25   Q.   Okay.  Did you at some point learn from that

1    August 16th hearing what the plan was, going forward

2    with Mr. Santos?

3    A.    I did.

4    Q.    What was supposed to happen as a result of the

5    August 16th hearing before Judge Arterton on Mr. Santos'

6    supervised release?

7    A.    Judge Arterton, at that point in time, ordered what

8    we call a special condition, ordering Mr. Santos to

9    engage in further treatment.

10   Q.    Do you recall, sir, whether or not there was any

11   other action that the probation office took after

12   August 16th, and after Judge Arterton had imposed that

13   special condition?

14   A.    Yes.

15   Q.    And what happened next?

16   A.    The information that we received was that

17   Mr. Santos failed to comply with that special condition

18   and, as a result, Officer Leone sought a warrant from

19   Judge Arterton, and Judge Arterton signed off on a

20   warrant to take Mr. Santos into custody.

21   Q.    So the jurors have some sense of this, when

22   somebody like, in this instance, Probation Officer

23   Leone, who has at that point maybe a year or so on the

24   job, does he do that on his own, or is there some

25   protocol followed in your office?

1    A.    No.   The protocol is, the petition or the warrant

2    would go directly -- be reviewed directly by the

3    supervisor, and in that case it was myself.

4    Q.    Did you then authorize the application to be made

5    or submitted to Judge Arterton?

6    A.    I reviewed it and approved it, that's correct.

7    Q.    To your knowledge, was the warrant issued?

8    A.    It was.

9    Q.    Do you recall, sir, whether or not at any point in

10   time Mr. Santos was taken into custody based on the

11   strength of the warrant that had been issued by Judge

12   Arterton?

13   A.    Yes, he was.

14   Q.    And explain to the jurors, if you would, what you

15   know about that.

16   A.    The warrant was issued by Judge Arterton.   It was

17   then delivered to the U.S. Marshal's Service, who

18   exercises or executes our warrants.

19   Q.    Let me stop you there.

20         So the jurors know, probation officers, they make

21   their own arrests or no?

22   A.    We do not.

23   Q.    So Judge Arterton issues an arrest warrant for

24   Mr. Santos, and you said you bring him to the marshals,

25   right?

1    A.    Correct.

2    Q.    And then the marshals actually effect the arrest.

3    A.    That is accurate.

4    Q.    As to Mr. Santos, once the warrant had issued and

5    you had given it to the marshals, what happened next?

6    A.    Then Mr. Santos was contacted, I believe, by

7    Officer Leone, and an office visit was scheduled.  My

8    recollection is that Officer Leone had said to

9    Mr. Santos that he would not be in that day because -- I

10   don't know if he had training or some other events, but

11   that he would be meeting with me.

12   Q.    Do you remember what that date was?

13   A.    Twenty-fifth of August, I believe.

14   Q.    And so did Mr. Santos show up that day?

15   A.    He did.

16   Q.    And what happened once he showed up at the

17   probation office?

18   A.    The marshals were notified.  They executed the

19   arrest warrant for Mr. Santos, took him into custody,

20   and later that afternoon or morning he was presented

21   before Magistrate Judge Richardson for his initial

22   presentment on the arrest.

23   Q.    Again just for context, your office is in this

24   building, correct?

25   A.    That is correct.

1    Q.   And that's where Mr. Santos had gone when he was

2    arrested by the marshals?

3    A.   That's correct.

4    Q.   And what about Judge Richardson, Magistrate Judge

5    Richardson, where is he located?

6    A.   Same building.

7    Q.   His courtroom is on this floor, correct?

8    A.   That's correct.

9    Q.   Do you have any personal knowledge as to whether or

10   not Mr. Santos was, in fact, presented before Judge

11   Richardson on August 25th?

12   A.   I do.

13   Q.   And what's the basis of your knowledge; what's your

14   personal knowledge based on?

15   A.   I was there.

16   Q.   Oh.  Now, you've indicated that on at least one

17   occasion you, Mr. Leone, defense counsel, and government

18   counsel had spoken with Judge Arterton about these

19   circumstances, correct?

20   A.   Correct.

21   Q.   Now, again, just for the context for the jurors

22   here, when somebody is taken into custody, such as

23   Mr. Santos, is there some general informal process

24   that's followed, personal involvement between the

25   government lawyer, defense lawyer, and probation on

1    questions of release or detention?

2    A.    On occasion, yes.

3    Q.    What was -- in Mr. Santos' situation, do you recall

4    whether or not there was any discussion between and

5    amongst yourself, government counsel, and defense

6    counsel as to what to ought to happen to Mr. Santos

7    being held or released on August 25th of 2016?

8             MR. ROGAN:  This is actually kind of a

9    preparatory objection.  Mr. Santos has not waived the

10   attorney/client privilege.  I want to make sure this

11   witness does not tell the jury anything about any

12   conversation that has happened with his counsel.

13            MR. DURHAM:  I'm not asking about a

14   conversation Mr. Santos had with his lawyer.

15            MR. ROGAN:  Any representation that was made

16   by Mr. Ward or whoever was appointed.  I don't think

17   that's -- that's covered by the attorney/client

18   privilege if he was having discussions on behalf of his

19   client as to what should happen with Mr. Santos.

20            That's clearly a privileged issue, and I want

21   to make sure that this witness doesn't breach that

22   privilege on behalf my client.

23            MR. DURHAM:  The attorney/client privilege in

24   no way reaches conversations the defense counsel and

25   government counsel have with probation.

```
 1              THE COURT:  If that's where we are, the

 2     objection is overruled.

 3     BY MR. DURHAM:

 4     Q.   Was there some discussion that took place before

 5     the proceedings started in front of Judge Richardson?

 6     A.   Yes.

 7     Q.   And in that regard, what was your understanding as

 8     to what was going to happen with respect to Mr. Santos

 9     either being held or released on bond that day?

10     A.   Given that we had -- I had received a date from

11     Judge Arterton for a violation hearing for the 31st of

12     August, the recommendation and plan was to detain

13     Mr. Santos until that point in time.

14     Q.   And I should ask that question.

15          Again, just sort of preliminary to the hearing such

16     as the one before Judge Richardson, Judge Arterton had

17     issued the arrest warrant, correct?

18     A.   Correct.

19     Q.   Mr. Santos, his supervision was being overseen by

20     what judge?

21     A.   Judge Arterton.

22     Q.   So prior to the hearing even starting in front of

23     Judge Richardson, does probation do anything, in terms

24     of contact with Judge Arterton's chambers, relating to

25     hearings?
```

1    A.   Yes.  We contact the presiding judge, advise them

2    that the warrant was executed on the offender, and then

3    we seek a date so that we can provide that to the

4    magistrate judge at the hearing.

5    Q.   So going into the hearing before Judge Richardson,

6    you knew that Judge Arterton wanted to hear this matter

7    on the 31st; fair statement?

8    A.   Yes.

9    Q.   When you got to the hearing -- did the hearing go

10   forward that day, August 25th?

11   A.   It did.

12   Q.   And were you present?

13   A.   I was.

14   Q.   And who were the other players who were in the

15   courtroom, if you recall.

16        The judge was there, correct?

17   A.   Yes, he was.  Attorney Ward was not there.  I

18   believe it was Assistant Federal Defender Tracy Hayes

19   that represented Mr. Santos at the time.  And for the

20   government -- I can't recall.

21   Q.   You don't remember who -- the Assistant United

22   States Attorney who was there that day?

23   A.   Correct.

24   Q.   And the hearing went forward?

25   A.   It did.

1    Q.   Now, in connection with probation's role when

2    somebody's been arrested and taken into custody, would

3    you explain to the jurors whether or not the court will

4    typically ask probation for its view on the question of

5    release or detention?

6    A.   Sure.  Given our role as officers of the court,

7    more often than not we will advise the court of

8    information regarding our recommendation, whether

9    somebody should be taken into custody, remain in

10   custody, or released with conditions.

11   Q.   And in this instance, if you recall, did the court

12   ask for probation's view on whether Mr. Santos should be

13   released on bond or held?

14   A.   I think the question was whether or not the

15   probation officer had anything to add to the record at

16   that point in time, at which point in time I said that I

17   did.

18   Q.   And what did you add to the record for Judge

19   Richardson?

20   A.   Briefly, I added recent historical data regarding

21   the involvement that Mr. Santos had with Judge Arterton,

22   I believe, and then his recent failures to comply with

23   special conditions of treatment, and information that he

24   had recently used heroin.

25   Q.   And ultimately what position -- or what was Judge

1    Richardson's decision as to whether Mr. Santos was going

2    to be released on bond or held; what was his decision?

3    A.    He remanded him.  He kept him in custody until the

4    hearing date for August 31.

5    Q.    Were you in the courtroom for that entire

6    proceeding?

7    A.    I was.

8    Q.    Do you recall, sir, whether or not anything

9    occurred in the courtroom regarding Mr. Santos, at any

10   time, that was significant to you?

11   A.    It was actually two things.

12          One, initially it appeared that everybody was in

13   agreement that Mr. Santos would remain in custody until

14   the August 31st hearing date.  But then it became

15   clear there was some discussion with Mr. Santos and his

16   representing counsel that he did not -- he no longer

17   agreed with that plan.

18          At that point in time, defense counsel presented

19   that they -- topics or their argument to release

20   Mr. Santos pending the hearing.

21   Q.    Based on what you've said, did that argument

22   prevail, or was he held at that point?

23   A.    He was held.

24   Q.    So that was one significant event, and you said

25   there was a second one?

```
 1    A.    I did.

 2    Q.    What was the second significant event?

 3    A.    At the conclusion of the hearing, when Mr. Santos

 4    was being taken into custody, I attempted to approach

 5    him to engage in conversation.  At that point in time

 6    Mr. Santos responded to me in a less than favorable

 7    manner.

 8    Q.    All right.  Did this happen before or after Judge

 9    Richardson had left the courtroom?

10    A.    After.

11    Q.    So whatever happened, Mr. Santos -- this happened

12    after the judge had left the bench and left the

13    courtroom.

14    A.    That is correct.

15    Q.    And do you remember if the court reporter was

16    taking this down?

17    A.    I don't recall.

18    Q.    So the judge is off the bench, Mr. Santos is being

19    taken into custody --

20    A.    Uh-huh.

21    Q.    -- and you approached him, and you say he spoke in

22    less than a favorable way?

23    A.    That is correct.

24    Q.    Tell the jury, as best you recall, what it is that

25    Mr. Santos said to you at that point, on August 25th
```

1    of 2016.

2    A.    He said, "Just give me the six months and go F

3    yourself."

4    Q.    With respect to what he actually said, although

5    we're in a federal courtroom with a jury of civil people

6    here, did he say, "F yourself," or did he use the actual

7    vulgarity?

8    A.    The actual vulgarity.

9    Q.    Now, up until August 25th of 2016, when

10   Mr. Santos had been given the opportunity to go into --

11   what did you say, seven different drug treatment

12   programs?

13   A.    That's correct.

14   Q.    -- had he ever spoken to you that way?

15   A.    No.

16   Q.    To your knowledge, had he ever spoken to anybody in

17   your office that way?

18   A.    Not that I'm aware of, no.

19   Q.    But on August 25th of 2016, he didn't get his way

20   concerning release; would that be a fair statement?

21   A.    Twenty-sixth or the twenty-fifth.

22   Q.    On August 25th, he didn't get his way concerning

23   release, correct?

24   A.    That is correct.

25   Q.    The jury has seen the transcript of the proceeding

 1    before Judge Arterton on August 31st, so let me do

 2    this:

 3              MR. DURHAM:  Your Honor, I'd ask that

 4    Government's Exhibit 2, page 14, be brought up?

 5    BY MR. DURHAM:

 6    Q.    And if we could start at line -- just highlight,

 7    zoom in on line 3, through about 13.

 8              MR. ROGAN:  What page, Counsel?

 9              MR. DURHAM:  Fourteen.

10              MR. ROGAN:  Thank you.

11    BY MR. DURHAM:

12    Q.    Beginning on line 3, this is you speaking, "For all

13    intents and purposes, Your Honor, historically in our

14    interactions, my interactions with Mr. Santos have been

15    very cordial up until recently.  We had one interaction

16    that was less than cordial."

17          When you were making those remarks to Judge

18    Arterton, on August 31st of 2016, what were you

19    referring to?

20    A.    The interaction that I had with Mr. Santos on the

21    25th of August.

22    Q.    Where he told you to go F yourself because he was

23    being held?

24    A.    That was my impression, yes.

25    Q.    And then you went on with Judge Arterton to say,

1    "Is that part of who Mr. Santos really is?  Is it, you

2    know, if he's not getting what he wants, does he get

3    nasty, or is it the effect of the addiction process?  I

4    sort of give it a 50/50 credence."

5         Do you recall saying that to Judge Arterton?

6    A.   I do.

7    Q.   Was that your view on August 31, 2016, prior to the

8    time that Mr. Santos was sentenced by Judge Arterton?

9    A.   Correct.

10   Q.   Let me ask you this question:  After Judge Arterton

11   had sentenced Mr. Santos on August 31st of 2016, how

12   did those proportions of 50/50 credence go with respect

13   to who Mr. Santos really was?

14   A.   They changed in my mind significantly.

15   Q.   And what was it that caused you to change your mind

16   as to who Mr. Santos really was?

17   A.   I think it was probably two factors:  One, the way

18   he addressed Judge Arterton; and then two, the way he

19   addressed me.

20   Q.   And let me address the first one first, the way he

21   addressed Judge Arterton.

22        Do you recall, sir, where you were -- withdrawn.

23        Were you in the courtroom for the entire proceeding

24   before Judge Arterton on August 31st?

25   A.   I was.

1    Q.   And do you recall where in that courtroom you were?

2    A.   I was sitting in the jury box.

3              MR. DURHAM:   If we can just bring up 4A, Your

4    Honor?

5    BY MR. DURHAM

6    Q.   Is your monitor working, sir?

7    A.   It is.

8    Q.   And so you can see that picture.

9         Do you recognize who you are in that picture?

10   A.   Yes.

11   Q.   You said you were in the jury box.

12        Is that depicted in this photograph?

13   A.   It is.

14   Q.   Two people there; are you the person, as you look

15   at the photograph, on the left or right?

16   A.   As I look at the photograph, on the left.

17   Q.   So that's where you were seated.

18        Do you recall, did you get into the courtroom prior

19   to the time the judge took the bench or came in part way

20   through?

21   A.   Prior to.

22   Q.   And so when Mr. Santos came into the courtroom, do

23   you recall, sir, whether you were already there or he

24   was in the courtroom first?

25   A.   I was already there.

1    Q.   I want to ask you:  Between August 25th and

2    August 31st, had you had any contact, direct or

3    indirect, with Mr. Santos?

4    A.   No.

5    Q.   And when you were in the courtroom on

6    August 31st, prior to the time the judge had taken the

7    bench, any contact with Mr. Santos?

8    A.   No.

9    Q.   Now, you've indicated and the transcript indicates

10   that, at a particular point in time, Judge Arterton asks

11   for probation to be heard, correct?

12   A.   That is correct.

13   Q.   Do you remember her saying, "Who's going to speak,

14   Mr. Leone or Mr. Topor"?

15   A.   "Would probation like to be heard," something to

16   that effect.

17   Q.   And did Mr. Leone speak at all?

18   A.   He did not.

19   Q.   But you did.

20   A.   I did.

21   Q.   And then with respect to your remarks on the record

22   before Judge Arterton, you went through the history,

23   essentially, of Mr. Santos on supervised release and the

24   like, correct?

25   A.   Correct.

1    Q.   Do you recall, sir, whether or not the defendant

2    was given an opportunity, that is, Mr. Santos was given

3    an opportunity, to speak before Judge Arterton?

4    A.   I don't recall the specifics, but would I have

5    to -- I would say yes, just with my experience of being

6    an officer of the court, that that's protocol.

7    Q.   Okay.  And do you remember Mr. Santos -- withdrawn.

8         With regard to the defendant, do you remember what

9    it is that Mr. Santos was asking the court to let him

10   do?

11   A.   Yes.  He wanted to engage in another treatment

12   facility.  I believe it was called Youth Challenge, a

13   program that is here locally in Hartford, that was

14   researched by our office prior to the hearing, if there

15   was a likelihood of him being granted that opportunity.

16   Q.   Now, in the sequencing of this, do you recall

17   whether probation spoke before Mr. Santos spoke to the

18   judge?

19        If you remember, great; if not, I can show you the

20   transcript.

21   A.   No, I would have to say I spoke prior to

22   Mr. Santos.

23   Q.   And probation's position on August 31st of 2016

24   was what, regarding the consequences to Mr. Santos for

25   having failed to comply with the special condition

1    imposed on August 16th; what was your position?

2    A.    At that point in time, on the 25th --

3    Q.    On August 31st.

4    A.    On August 31st, that's correct, was that

5    Mr. Santos' supervision be revoked --

6    Q.    Okay.

7    A.    -- and the imposition of sentence as articulated by

8    Judge Arterton in a previous hearing be imposed.

9    Q.    Okay.  And then the defendant was heard, right?

10   A.    Correct.

11   Q.    Now, in addressing the judge, do you recall whether

12   Mr. Santos' comments to the judge remained constant or

13   his remarks changed in tone and nature?

14   A.    My recollection was that, once the dialogue was

15   going in a direction that the judge was actually going

16   to follow through with revocation and imposition of

17   sentence, that Mr. Santos had had enough for that

18   hearing.

19   Q.    And when you say that Mr. Santos had had enough,

20   what are you referring to?

21   A.    In no specific order, I recall him just saying,

22   "Just put the cuffs on me, take me now," that -- yeah,

23   that he was done.

24   Q.    And do you recall whether his tone of voice to the

25   judge remained constant or it too changed?

1    A.    It was more of an agitation, an agitated demeanor.

2    Q.    And do you recall, sir, whether or not -- well, do

3    you recall anything else about what Mr. Santos had to

4    say to Judge Arterton on August 31st?

5    A.    Yes.

6    Q.    What else do you remember him telling or saying to

7    the judge?

8    A.    The judge had used a metaphor about the struggles

9    of addiction and treating addiction of rowing a boat,

10   and that it's at times difficult to row the boat.  And

11   Mr. Santos, in my opinion, after she was finished with

12   her metaphor, indicated that he didn't care for it and

13   told her where that boat could go.

14   Q.    Did the court then follow through -- withdrawn.

15         What, if anything, did the judge ultimately decide

16   to do in terms of consequences for the violation of

17   supervised release?

18   A.    Well, I think she remained steadfast on what she

19   had placed on the record prior to, is that if he didn't

20   follow through with the special conditions as imposed on

21   the previous hearing, that she was going to revoke him

22   and give him a term of imprisonment of six months, with

23   the first six months of that on supervised release to be

24   served in a halfway house.

25              MR. DURHAM:  I'd ask that page 25 of

1      Government's Exhibit 2 be brought up, Your Honor.

2               And if we could highlight the first paragraph,

3      please.

4      BY MR. DURHAM:

5      Q.    Sir, again, your monitor is still working, correct?

6      A.    It is.

7      Q.    Do you remember the court then saying, "All right.

8      Now that we see the real Mr. Santos, he is remanded to

9      the Attorney General for a period of six months.

10     Following that period of incarceration, he will be on

11     supervised release for 24 months, the first 6 months of

12     which will be spent in a halfway house"?

13              Do you recall the judge saying that?

14     A.    I do.

15     Q.    Now I want to harken back to, earlier in the

16     transcript you had said that you had an experience, a

17     recent experience of Mr. Santos, and you were 50/50 as

18     to whether -- who the real Mr. Santos was exactly.

19              By the time you got to the judge imposing sentence

20     here, as reflected on page 25 of Government's Exhibit 2,

21     what was your own view as to who the real Mr. Santos

22     was?

23     A.    Well, I'd have to say my view is, this is

24     Mr. Santos when he doesn't get his way.

25     Q.    Now, you told the jury that that was one event that

1    changed your view on things.

2         And then there was a second one about -- what was

3    the second event?

4    A.   The second event was, after the imposition of

5    sentence and after Judge Arterton had left the bench,

6    Mr. Santos was taken into custody by the U.S. Marshals

7    Service.  As he was being walked out of the courtroom,

8    he turned directly towards me and made a statement,

9    again in a less favorable manner.

10   Q.   So again, just to set this scene, to the best of

11   your recollection, where was Judge Arterton at this

12   point?

13   A.   I would presume she was in chambers; off the bench,

14   out of the courtroom.

15   Q.   And you were located where?

16   A.   Standing in the jury box.

17   Q.   And where is Mr. Leone?

18   A.   Standing next to me.

19   Q.   Do you recall, sir, approximately how much time had

20   passed between the point that Judge Arterton had imposed

21   sentence, court had recessed, she had left the bench and

22   gone into chambers; can you give us an estimate?

23   A.   Seconds.

24   Q.   So she's left the bench.

25        Do you recall whether or not Mr. Santos was

1    handcuffed for the proceedings or not?

2    A.    Throughout the proceeding he was not handcuffed.

3    Q.    Do you remember, when he was being led out of the

4    courtroom, if he was handcuffed?

5    A.    Yes, he was at that time.

6    Q.    Now you're in the jury box, Mr. Leone is with you;

7    is that correct?

8    A.    That's correct.

9    Q.    Describe, if you would, or explain again, where was

10   Mr. Santos, as best you recall, when he directed some

11   remarks?

12   A.    He was -- if this is the jury box that I was

13   sitting in, he was directly across the courtroom.

14   Q.    As to the courtroom that Judge Arterton uses in New

15   Haven, as compared to this courtroom, same size, bigger,

16   smaller?

17   A.    Comparable.  Maybe a little bit smaller.  I don't

18   know square footage.

19   Q.    Not any bigger than this courtroom?

20   A.    Excuse me.

21   Q.    Not any larger?

22   A.    I would say no.

23   Q.    As he's being walked down, you say he then made a

24   comment or a statement.  I want to walk you through

25   that.

1          You're with Mr. Leone.  He's being walked out.

2          Is he cuffed at this point?

3     A.   He is.

4               MR. DURHAM:  If we could pull up

5     Government's Exhibit 3A, please.

6     BY MR. DURHAM:

7     Q.   You can see that photograph on your monitor?

8     A.   Yes.

9     Q.   I think you said he was going by the witness box.

10         In this particular picture,

11    Government's Exhibit 3A, you see the witness box you're

12    talking about?

13    A.   Yes.

14    Q.   And so he's in that general area as he's walking

15    out?

16    A.   Correct.

17    Q.   And tell the jury what it is that Mr. Santos said

18    to you as he was being walked out of the courtroom in

19    that general area.

20    A.   He turned and looked at me and says, "When I get

21    out, I'm coming for you."

22    Q.   Let me ask you this:  Was he -- what was the tone

23    of voice that Mr. Santos used when he said to you, "When

24    I get out, I'm coming for you"?

25    A.   Firm.

1    Q.    Do you recall whether there was anything about his

2    demeanor which suggested that it was a joke?

3    A.    Not at all.

4    Q.    Do you recall, as he was walking out, whether the

5    remark was directed just to the general area of the jury

6    box or, based on your personal observation, it was

7    directed at you?

8    A.    My personal observation, it was my belief it was

9    solely directed at me.

10    Q.    Do you recall who he was looking at, if anybody,

11    when he said, "When I get out, I'm coming for you"?

12    A.    Me.

13    Q.    And how clear in your mind is it that he was

14    looking at you and said that to you?

15              MR. ROGAN:  Objection, leading.

16              THE COURT:  I'll allow it.

17              MR. DURHAM:  I don't think it was leading.

18    BY MR. DURHAM:

19    Q.    How clear in your mind is it, as you sit here

20    today, when he made that statement that he was looking

21    at you?

22    A.    Very clear.  No doubt.

23    Q.    With respect to the words that he used, "When I

24    come out, I'm coming for you," how certain are you that

25    those are the words that he used?

1    A.   I'm very certain.

2    Q.   What's the basis of your certainty that those are

3    the words that he said?

4    A.   After he said what he said, I wrote them down

5    immediately.

6    Q.   And with respect to the words having been written

7    down, are they cataloged and memorialized in any

8    particular fashion?

9    A.   They are.

10   Q.   How are they memorialized?

11   A.   We have what we call a chronological note-keeping

12   system.  So once I returned to the office, I entered

13   that data into our system.

14           MR. DURHAM:  May I approach, Your Honor?

15           THE COURT:  You may.

16   BY MR. DURHAM:

17   Q.   I want to show you this document and ask you, do

18   you recognize what that document is?

19   A.   Yes.

20   Q.   What is that document?

21   A.   This is what I would call a chronological entry --

22   Q.   All right.

23   A.   -- or an example of.

24   Q.   Okay.  So you wrote those words down, how close in

25   time to the hearing before Judge Arterton?

1    A.    Can you repeat that, please.

2    Q.    Sure.

3          How close in time to the conclusion of the hearing

4    before Judge Arterton did you write the words down that

5    he, Mr. Santos, said, "When I get out, I'm coming for

6    you"?

7    A.    Immediately after -- after he was walked out, I

8    immediately wrote them down on my notepad.

9    Q.    Okay.  And do you recall, sir, whether you or

10   anybody else said anything at that point in response to

11   Mr. Santos telling you that when he got out he was

12   coming for you?

13   A.    Yes.  I responded back to him.

14   Q.    What did you say, as best you recall?

15   A.    I said, "Excuse me?"

16   Q.    And was there any response from Mr. Santos?

17   A.    "You heard me."

18   Q.    Was there any further commentary or comment by

19   Mr. Santos as he left the courtroom, to your

20   recollection?

21   A.    Not that I'm aware of, no.

22   Q.    How about from you to Mr. Santos?

23   A.    No.

24   Q.    And after he had left the courtroom that day, did

25   you have any contact with Mr. Santos himself on the

1    31st of August or any time thereafter?

2    A.    Not directly, no.

3    Q.    When Mr. Santos said to you, "When I get out, I'm

4    coming for you," did you take that seriously?

5    A.    Absolutely.

6    Q.    What did you understand him -- let me see.

7          You've been a probation officer for some 23 years,

8    did you say?

9    A.    That's correct.

10   Q.    What do you understand him to be saying to you when

11   he said, "When I get out, I'm coming for you"?

12   A.    For lack of a better way -- because personally and

13   professionally, I'd never experienced that before -- is

14   that he was coming to cause me some bodily harm, coming

15   to do me in.

16   Q.    And with respect to a situation where you thought

17   he was coming to do you harm or do you in, did you

18   report that to anybody?

19   A.    Yes.

20   Q.    Who did you report it to?

21   A.    Reported it to the U.S. Attorney that was -- the

22   Assistant United States Attorney that was in court at

23   that hearing.  And then that sparked an investigation by

24   the U.S. Marshals Service, so then I was interviewed by

25   the U.S. Marshals Service.

1    Q.   With respect to the interview that was done by the

2    United States Marshals Service, do you recall when that

3    was done, how close in time?

4    A.   I don't know if it was the day after or -- it was

5    fairly soon after.

6              MR. DURHAM:  May I approach, Your Honor?

7              THE COURT:  Yes.

8    BY MR. DURHAM:

9    Q.   I ask you to take a look at this document to see if

10   that may refresh your recollection as to when it was

11   that the United States Marshals Service came to

12   interview you.

13             MR. ROGAN:  I know it's only being used to

14   refresh his recollection, but I can't recall if it's

15   been marked for identification purposes.

16             MR. DURHAM:  We can.

17             THE COURT:  We can if you'd like.

18             MR. DURHAM:  I think that would be 13, for

19   identification, Your Honor.

20             THE COURT:  Is that our next number?

21   BY MR. DURHAM:

22   Q.   Having looked at that document, 13 for

23   identification, when was it that you were interviewed

24   about this matter by the United States Marshals Service?

25   A.   Same day.  I recall that now because drove back to

```
 1    Hartford, I received the call from the U.S. Marshal's
 2    Service.  They wanted to interview me.
 3        I didn't want to delay anything that they wanted to
 4    do, so I drove back down to U.S. Marshals Service in New
 5    Haven for my interview.
 6    Q.   You told the jury that you had no direct contact
 7    with Mr. Santos after that, correct?
 8    A.   No direct contact, that's correct.
 9    Q.   How about any indirect contact, do you remember any
10    indirect contact on or after August 31st of 2016?
11    A.   I do.
12    Q.   What can you tell the jurors about that?
13    A.   On September 1st, I received a telephone call from
14    Mr. Santos' mother.
15    Q.   So the very next day?
16    A.   Correct.
17    Q.   And with respect to Mr. Santos' mother calling, can
18    you tell the jurors what it is that his mother had to
19    say?
20    A.   She said that, on behalf of her son, that she was
21    calling to apologize for his actions in court the
22    previous day.
23    Q.   And what did you, in context, understand her to be
24    talking about?
25    A.   My belief was that he was apologizing to the judge,
```

1   to Judge Arterton, for how he addressed her.

2   Q.   And why did you think that's what she was talking

3   about?

4   A.   Because his parents were in court for that, and I

5   know that Judge Arterton directly referenced his parents

6   being in court at that point in time, asking him if he

7   was ashamed of how he was behaving at that point in

8   time, and I am aware that his parents were not in the

9   courtroom when he addressed me as he was walking out.

10  Q.   So his mother called you, but you didn't have any

11  contact with him.

12  A.   I did not.

13  Q.   Now, with respect to the statement that Mr. Santos

14  had made to you in the courtroom as he was walking out,

15  did you indicate that was a unique situation, unique to

16  your experience?

17  A.   Extremely so.

18  Q.   That had never happened before?

19  A.   Never.

20  Q.   And with respect to his having said, "When I come

21  out, I'm coming after you," you indicate you took that

22  seriously?

23  A.   Absolutely.

24  Q.   Okay.

25           MR. DURHAM:   Thank you, Your Honor.

1

2                          CROSS-EXAMINATION

3     BY MR. ROGAN:

4     Q.    Good morning, Mr. Topor.

5           You and I have not met professionally; is that fair

6     to say?

7     A.    That is accurate.

8     Q.    Let me start with the last question that you were

9     asked by Mr. Durham, and see if this might refresh your

10    recollection.

11          It's your testimony before this jury that the phone

12    call you received from Sandy Santos -- and you know that

13    name, right?

14    A.    Yes.

15    Q.    That's Peter's mom, correct?

16    A.    Correct.

17    Q.    And it's your testimony before this jury that that

18    phone call that was made to apologize was made not to

19    apologize for any statements he made to you, but for his

20    conduct during the course of the hearing?

21    A.    That's my belief, yes.

22    Q.    And what is that belief based on?

23    A.    Based on -- my recollection was that Mr. Santos'

24    parents were not in the courtroom when he made his

25    comment to me at the end; and that they were in the

1    courtroom, listening to testimony from myself as well as

2    from Mr. Santos himself; and the judge addressing him at

3    that point in time on his dialogue with her and asking

4    him if he was ashamed for what -- how he was behaving

5    because his parents were in the courtroom, at which time

6    he said that he was not ashamed.

7    Q.   Do you recall being prepped by Matthew Parker, the

8    gentleman seated behind me, regarding your testimony

9    here today?

10   A.   Can you tell me what you mean by "prepped"?

11   Q.   Yeah.  Were you reviewed what you were going to

12   tell the jury today.

13   A.   I recall meeting with Attorney Durham, with

14   Mr. Parker, on one occasion.

15   Q.   Only -- how about May 19th of this year, do you

16   recall being prepared for your testimony before this

17   jury with Mr. Durham and Mr. Parker?

18   A.   Right.  In New Haven, that's correct.

19   Q.   Right.  And it was to prepare what you were going

20   to say in front of the jury, right?

21   A.   Uh-huh.

22   Q.   Do you recall telling Mr. Durham and Mr. Parker

23   that that phone call that we're talking about, that you

24   did tell these two gentlemen that Peter's mom did call

25   you, and you just accepted her call; she attempted to

1    apologize on his behalf; and you, quote, no assurances?

2    A.   Correct.

3    Q.   What were you giving her no assurances about,

4    Mr. Topor?

5    A.   "No assurances" is that whatever I would say at

6    that point in time would have any kind of effect or

7    benefit from whatever the government was pursuing.

8    Q.   In fact, the apology was about the conduct that was

9    alleged to have been directed to you, right, and you

10   knew that.

11   A.   I did not know that.

12   Q.   Well, sure, let me walk you through it.

13        By the time the hearing was over, your interaction

14   with Mr. Santos was done.  He had been sentenced by

15   Judge Arterton to 6 months, followed by 24 months of

16   supervised release, correct?

17   A.   Correct.

18   Q.   And then on September 1, you receive a phone call

19   from Ms. Santos, a day later, right --

20   A.   Correct.

21   Q.   -- in which she's attempting to apologize, and you

22   offer her no assurances.

23        It had to be no assurances about whether or not

24   there was going to be additional criminal charges laid

25   against Mr. Santos, correct?

1   A.   I don't think it had to be anything.

2   Q.   Well, what were you offering her no assurances

3   about?

4   A.   That there wouldn't be any ramifications.

5   Q.   Criminal ramifications, correct?

6   A.   Ramifications.

7   Q.   What other ramifications could there be, he was

8   already incarcerated?

9   A.   Well, he would be coming back out on supervised

10   release after the six-month sentence.

11   Q.   Mr. Topor, your testimony under oath is that you

12   offered Mom no assurances about, quote, ramifications in

13   general and not about the issue of charges?

14   A.   I was not aware of where the government was going

15   with it.  Even if they were going to be -- I know they

16   were looking into it.  But yeah, no, I --

17   Q.   You already knew there was a criminal investigation

18   underway.  You knew it the day of the hearing.

19   A.   Well, I wouldn't say that's accurate.  Because I

20   knew there was an investigation, but not having been a

21   part of that system -- I've been a part of the system

22   but not personally being part of the system at that

23   point -- at that point in time, I had no idea on the

24   extent where we're at today.  I had no idea we were

25   going to end up here today at that time.

1    Q.    Back on August 31 and September 1, you had no idea

2    where this was going?

3    A.    Absolutely not.

4    Q.    What did Mr. Parker tell you was the purpose of the

5    interview?

6    A.    Gain information.

7    Q.    About what?

8    A.    About the statement that Mr. Santos made towards

9    me.

10   Q.    And Mr. Parker didn't tell you where the

11   investigation was going and what they were going to do?

12   A.    He had said that it would be referred; after their

13   investigation was complete, it would be referred to the

14   U.S. Attorney's Office, and with their recommendation at

15   that time.  So at that time, I did not know, that's

16   correct.

17   Q.    Mr. Topor, again, I want -- I have a great deal of

18   respect for the work that you do, but in fairness, you

19   knew as of August 31, and you knew as of September 1,

20   when you got that phone call from Peter Santos' mom, you

21   knew there was a criminal investigation underway, and

22   that it was going to be referred to the Office of the

23   U.S. Attorney, yes or no?

24   A.    I knew there was an investigation.  But I did not

25   know that it would end up here today.

1    Q.   But you just told the jury that you knew it was

2    going to be referred to the U.S. Attorney's Office.

3    A.   With a recommendation --

4    Q.   Correct.  That's a criminal investigation.

5    A.   -- and not nothing if that recommendation was to

6    proceed with charges or not to proceed with charges --

7    Q.   Right.

8    A.   -- so on that date, that's where I was at.

9    Q.   So on that date, August 31, that's where you were

10   at, you already knew you had all that information.  So

11   now I'm going to take you back to my earlier statement

12   and the last question that was asked to you by

13   Mr. Durham.

14        So when Mrs. Santos called you to apologize for

15   Peter's conduct, the day after, it had nothing to do

16   with what happened in Judge Arterton's courtroom, it had

17   everything to do with the perception that a threat was

18   made against you, correct?

19   A.   I would disagree with you, Counsel.

20   Q.   Again, I'll ask you the question, what were you

21   offering her assurances about?

22   A.   Again, that she was calling to apologize for his

23   actions in court, and the assurances were -- there were

24   no assurances in that we would still need to work with

25   Peter when he came out.

 1          Let me back up a little bit.

 2          As probation officers, when we engage in violation

 3     proceedings with our offenders and defendants, we still

 4     want to maintain a relationship with those individuals

 5     because they will be coming back out on our supervision.

 6          So at that point in time, or at any point in time,

 7     we still maintain a cordial -- a genuine cordial

 8     relationship with individuals.  There's no disparagies

 9     (sic), there's no hard feelings, so to speak.  It's not

10     taken personally.

11          So in order to maintain a relationship, not only

12     for myself, my and Mr. Santos' relationship, I wouldn't

13     be supervising him.  However, we have officers that,

14     when he comes out, are going to have to.

15          So by representing to his mother at that point in

16     time that there was no assurances is that, in my mind,

17     is that we're still going to treat her son in the same

18     manner that we treated him prior to, in getting him what

19     he needs or what we believe that he needs.

20          So that's where I'm coming from, Counsel.

21     Q.   Okay.  We'll come back to that in a minute.

22          Twenty-three years, you know that -- question

23     withdrawn.

24          Do you know where Mr. Santos was transported to,

25     immediately after he was sentenced by Judge Arterton, on

1    August 31, 2016?

2    A.    I don't.  I would just presume that it would be at

3    one of our -- at the Marshals' detention facility that

4    they contract with, down in Rhode Island.

5    Q.    There's only one in Rhode Island, and that's Wyatt,

6    correct?

7    A.    Yes, correct.

8    Q.    You've been to Wyatt many times, I assume?

9    A.    I have.

10   Q.    To conduct PSR reports -- and for the ladies and

11   gentlemen of the jury, that means a presentence

12   investigation report -- and for various other

13   responsibilities that you have as a probation officer.

14   A.    Correct.

15   Q.    You're aware that -- as part of that 23 years on

16   the job, you're also aware that detainees or convicted

17   prisoners have access to telephones, right?

18   A.    It's my understanding, yes.

19   Q.    And would it surprise you to learn that there's a

20   recorded telephone call on September 1, between

21   Mr. Santos and his mother, in which he asks her to call

22   you directly to apologize for what he said?

23   A.    It would not surprise me.

24   Q.    With that in mind, the no assurances, your position

25   still is that he was calling to apologize for his -- by

1    any standard, and let me be clear with you -- impossibly

2    rude conduct in front of Judge Arterton.  But your

3    testimony before this jury is, is that was what he was

4    calling about.

5              MR. DURHAM:  Your Honor, the government is

6    going to object.  That's an unfair question.  The

7    witness doesn't know about a telephone conversation, so

8    the question as posed is completely unfair.

9              THE COURT:  Sustained.

10             MR. ROGAN:  I can certainly ask him, Your

11   Honor, to assume that that phone call was made, similar

12   to what counsel did in regards with what the last

13   question was.

14             THE COURT:  If you want another question, ask

15   another question.

16   BY MR. ROGAN:

17   Q.   Would your position regarding the nature of the

18   apology that was directed to you by Sandy Santos change

19   if you knew that there was a recorded call from Peter

20   and his mother, asking to apologize to you, to you, for

21   his behavior towards you?

22   A.   I would have to then ask why he was apologizing

23   specifically to me, in order to make a reference to

24   that.

25   Q.   So you can't answer that question?

1    A.   No, sir.

2    Q.   Let's also start at the beginning of your testimony

3    with Attorney Durham.   I want to make sure I didn't

4    misunderstand you.

5         You don't draw a distinction -- as someone who's

6    been in the U.S. probation office for 25 years, five

7    years in a supervisory capacity -- between street-level

8    heroin addicts and white-collar heroin addicts, do you?

9    A.   I don't understand the question.

10   Q.   You were asked a line of questions from Mr. Durham

11   about street people -- as he called them, whatever that

12   term means -- and what do you understand that to mean,

13   "street-people heroin addicts"?

14   A.   What I was gathering from Attorney Durham was.

15   Individuals who didn't have jobs, didn't have a place to

16   live, didn't have a support system; somebody who's

17   living day by day.   I guess the stereotypical, what you

18   would see on TV, somebody on the streets without that

19   support.

20   Q.   You told the jury that over 80 percent of the

21   people that you supervise have a substance-abuse

22   problem, right?

23   A.   I don't believe I gave a number, but I said a vast

24   majority of.

25   Q.   I stand corrected.   You did say a vast majority.

1          Give me a percentage, if you can.

2     A.    I wouldn't be comfortable giving a description on

3     that.  I don't have those facts, those hard facts.

4     Q.    Of that vast majority, estimate for the jury how

5     many people are drug addicts.

6     A.    A lot.

7     Q.    And those drug addicts that you supervise, they

8     look like me, they look like Peter Santos.  There's no

9     stereotype.  They could look like anyone in this room.

10         There's no stereotype in Connecticut for the

11    epidemic of heroin addiction we have, is there?

12    A.    I agree with you.

13    Q.    So all of that testimony about support systems and

14    access to money, any doubt in your mind, by the way, as

15    a professional, that Mr. Santos is a stone-cold heroin

16    addict?

17    A.    No, there's no doubt.

18    Q.    And in fact, you testified at the hearing before

19    Judge Arterton that he's been a stone-cold heroin addict

20    for 20 years.

21         So when you referred to his drug of choice, in

22    response to a question from Mr. Durham, as being heroin,

23    there is no choice involved when you're a heroin addict;

24    would you agree with that, based upon your experience?

25    A.    No.  I think that there's a choice to include other

1     drugs into one's repertoire of abusing illegal

2     substances, but that heroin for Mr. Santos is

3     specifically and primarily his drug of choice.

4          So the population that I've dealt with over the

5     past 23 years, in treating substance abuse addiction,

6     it's not just treating one drug, that drug of choice.

7     It can be cocaine, PCP, marijuana, alcohol, et cetera,

8     et cetera.

9     Q.   Fair enough.

10         So when you were asked a question, drug of choice,

11    you weren't suggesting that it was a choice to be a

12    heroin addict.

13    A.   No, no, no.

14    Q.   Fair enough.  I just wanted to make sure I didn't

15    misunderstand either the question or the answer.

16         You also talked about his treatment progression,

17    and there's no question there's been testimony from you

18    and many others -- including your colleague Mr. Leone,

19    who we'll get to in a minute -- that Mr. Santos has had

20    multiple, repeated failures to get his addiction under

21    control, right?

22    A.   Correct.

23    Q.   And including from the date of his release -- which

24    I think was December 31, 2015, I think he first reported

25    to you guys on January 4, 2016 -- he no sooner got out

1    of jail and he began using heroin, correct?

2    A.    That's my understanding, yes.

3    Q.    And in that short period of time.  From January 1,

4    2016, to when he was ultimately sentenced by Judge

5    Arterton on August 31, 2016, he had 7 different attempts

6    and failures at getting his addiction under control,

7    correct?

8    A.    At least, yes.

9    Q.    At least that.

10         Not uncommon to see multiple failures on the part

11   of a drug addict, particularly a heroin drug addict,

12   based upon your experience, would you agree?

13   A.    Yes.  That's why we continue to support Mr. Santos,

14   bring his family in.  We try to provide interventions,

15   so to speak, for us to provide assistance that we felt

16   was needed.

17   Q.    Mr. Topor, to be fair to you, no one was suggesting

18   that what you were ultimately trying to do, what I was

19   trying to elicit from you for the jury, is that these

20   addictions are fears.  In fact, you called you it a

21   demon that gripped Mr. Santos.

22         Do you remember that from the hearing with Judge

23   Arterton?

24   A.    Absolutely.

25   Q.    And that demon grips him still today.

1    A.   I don't know.  I haven't had any follow-up with

2    Mr. Santos since the 31st.

3    Q.   Would you agree, based upon your 23 years with the

4    U.S. Probation Office, that heroin addicts and drug

5    addicts -- whatever their drug of choice is to be

6    addicted to, or alcohol or whatever substance abuse --

7    do and say dumb stuff?

8    A.   I think we all can say dumb stuff, so I don't think

9    that excludes anybody that's addicted to narcotics.

10   Q.   But would you agree with me that -- let's stay on

11   the example you gave -- someone who's addicted to

12   narcotics, such as Peter Santos, you've had drug addicts

13   come into your office, look you in the eye, and

14   absolutely lie to you.

15        Any doubt in your mind about that?

16   A.   Daily.

17   Q.   And the reason they lie is because they're addicted

18   to drugs, right, and they know they're going to get

19   jammed up.

20   A.   Not necessarily so.  I mean, that is a factor of

21   addiction, is protecting the drug that they're using and

22   their methods, et cetera.  But that's not the only

23   reason that people lie.

24   Q.   That, I absolutely will agree with you on.  There's

25   many reasons.

1        But to be serious, because this is a serious

2    matter, but drug addicts, because of that thing that

3    grips them for whatever reason, you know from your

4    23 years of experience, the vast majority of people on

5    supervised release have some form of substance-abuse

6    problem, they lie, they exaggerate, because they are

7    either under the influence of drugs or they don't want

8    to get caught.

9        Would you agree with that statement?

10       And I'm just focusing on drug addicts for now.

11   A.   Right.  I agree with the statement that people make

12   statements while they are under the influence that they

13   may later regret.  But also, I believe also that people

14   make statements on how they actually feel when they're

15   under the influence.

16           THE COURT:  Mr. Rogan, when you're at the end

17   of this line of questioning, we'll take our morning

18   break.

19           MR. ROGAN:  I'll ask one more follow-up, and

20   then we'll break.

21   BY MR. ROGAN:

22   Q.   Would you agree -- and we'll just focus this

23   question on people who are narcotics addicts -- again,

24   two questions quickly.

25       Just an estimate -- being in the probation office,

1    first of all, for 23 years is laudable -- how many

2    people do you estimate that you've supervised in some

3    way, direct or indirect, thousands?

4    A.    I would have to say yes.

5    Q.    Would you agree with me that people who are

6    narcotics addicts also tend to exaggerate things when

7    they come before the office of adult probation?

8    A.    Well, it can go either way.  I think sometimes they

9    exaggerate and sometimes they minimize.

10                  MR. ROGAN:  I think, Your Honor, with your

11   permission, I'll stop there.

12                  THE COURT:  Sure.

13                  We'll take our morning break, ladies and

14   gentlemen -- really recess.

15                       (Whereupon, a recess followed.)

16                       (Whereupon, the jury left the courtroom.)

17                  THE COURT:  Ready for the jury?

18                  MR. ROGAN:  Yes, Your Honor.

19                       (Whereupon, the jury entered the

20   courtroom.)

21                  THE COURT:  Please be seated, everyone.

22                  Looks like we're all set.

23                  MR. ROGAN:  Thank you, your Honor, may I

24   resume?

25                  THE COURT:  Please do.

```
 1    BY MR. ROGAN:

 2    Q.   Mr. Topor, right before the break, I think you also

 3    said this, in response on direct examination, that you

 4    didn't think we'd end up here today.

 5         Do you recall that testimony?

 6    A.   I do.

 7    Q.   But back on August 31, you'd agree with me that you

 8    knew there was an investigation underway, and that there

 9    may be a referral to the U. S. Attorney's Office,

10    correct?

11    A.   I knew that there would be a referral one way or

12    the other, correct.

13    Q.   So if you didn't think we'd end up here today, why

14    did you view what Mr. Santos, you claim, he said, why

15    did you view it as a threat?

16    A.   I found the experience to be very surreal,

17    something that you read about happens to other people.

18    And I think, over time and this process kind of

19    unfolding, it really has become a personal experience

20    that is beyond, initially, my comprehension that I would

21    end up in a very court that I serve, at a jury trial,

22    because somebody had threatened me.

23         So it really, to me, was -- it didn't connect.  As

24    you said, 23 years on the job, helping individuals, give

25    them opportunities they may not be provided by anybody
```

1    else, perfect strangers, this doesn't happen.

2         So that's where that comes from.  It was like -- it

3    was more of a totality of, really, this is going

4    forward, this is a trial that I'm involved with after my

5    belief of trying to assist somebody.

6         That's where that came from.

7    Q.   So let me make sure I understand your question

8    (sic).

9         So when you told the jury you didn't think we'd end

10   up here, it wasn't because you didn't view it as a

11   threat, you just found the experience to be surreal?

12   A.   Accurate.

13   Q.   But you've been in courts throughout this district

14   for years and years, correct?

15   A.   Twenty-three.

16   Q.   Twenty-three.

17        And you've seen a lot and done a lot; is that fair

18   to say?

19   A.   I have, but nothing like this.

20   Q.   And you also indicated just now, in response to my

21   question, that trying to help someone.

22        And by that, I assume, you're referring to someone

23   like Peter?

24   A.   Specifically Peter.

25   Q.   And you were asked by Attorney Durham, did you wear

1    a social-worker hat and a law-enforcement hat.  And you

2    had a funny response, which was, "Just two," right, to

3    the jury.

4         Do you remember that answer?

5    A.   Yeah.

6    Q.   But in point of fact, come August, the beginning of

7    August of 2016, any doubt in your mind that your hat,

8    relative to Mr. Santos, had changed to a law-enforcement

9    hat?

10   A.   No.  The hats - they're actually worn at the same

11   time, if I can explain that a little bit to folks.

12   Q.   I'm not asking for an explanation.  I just have a

13   follow-up question for you.

14        Let's go through the time line.  So he's given an

15   opportunity to try once more at a treatment facility,

16   right, with Judge Arterton.

17   A.   Correct.

18   Q.   That fails, correct?

19   A.   Yes.

20   Q.   He walks in and he walks out, right?

21   A.   Pretty much.

22   Q.   And then the next steps that your office took --

23   and I'll include you and Mr. Leone in that process

24   because you were his supervisor, he was relatively new

25   on the job -- the next thing that happened was a

1    law-enforcement action.  Understanding that you're not

2    the individual that actually makes the arrest, but

3    Mr. Leone filled out a summons to have Mr. Santos

4    arrested, correct, and presented before the Court.

5    A.   Right.  Because he failed to follow the special

6    conditions as set forth by Judge Arterton, so law

7    enforcement at that point in time, which actually kind

8    of translates into enforcing the order of the court.  So

9    the order of the court failed, so that's where the

10   petition for the warrant came into play.

11   Q.   And once the petition for the warrant came into

12   play, that's when the law-enforcement aspect kicked in,

13   right, because now he was going to be brought before, in

14   this case, Judge Richardson for the initial presentment,

15   right?

16   A.   No.  I disagree with that, Counsel.

17   Q.   Why would you disagree?

18   A.   Because we were still investigating avenues for

19   Mr. Santos at that point in time, namely Youth

20   Challenge.

21        Mr. Santos had conveyed to us that he had looked

22   into the Youth Challenge program for admission but

23   needed some medical -- needed a TB test.  I believe he

24   may have even gotten a TB test, but it -- and the

25   concern was that it couldn't have been read.

1          So despite him being remanded -- the hat never

2     comes off, as far as the rehabilitative social-work type

3     of hat, because we're always thinking of ways and

4     avenues in order to assist the population that we serve.

5          So even going into the hearing before Judge

6     Arterton, that information was conveyed to Judge

7     Arterton that, in fact, we -- because we didn't have a

8     release of information, Youth Challenge was unable to

9     confirm or deny whether or not they had a bed.

10         However, at that hearing I did get a release signed

11    from Mr. Santos.  We were able to follow up with one of

12    their clinical personnel to confirm that a bed was

13    actually available.

14         We indicated that, after the hearing before

15    Magistrate Judge Richardson, that Mr. Santos was being

16    detained temporarily or not, and that should Judge

17    Arterton agree to give Mr. Santos another chance on the

18    August 31st hearing, would they still maintain that

19    bed availability for Mr. Santos, which they did.

20         So --

21    Q.   Mr. Topor, while I appreciate your answer, I'm

22    going to ask a yes-or-no question.

23         At the August 31 hearing, where you testified,

24    right, in front of Judge Arterton --

25    A.   Yes.

1   Q.   -- under oath, before you walked in that door, you

2   knew that your recommendation to Judge Arterton was not

3   going to be an alternative treatment program, it was

4   going to be incarceration; correct, yes or no?

5   A.   No.

6   Q.   Are you telling this jury that, before that

7   hearing, you had not made a determination as to -- that

8   you were going to recommend to Judge Arterton that he be

9   incarcerated, yes or no?

10  A.   No, we did not make a recommendation.

11  Q.   You did not make a recommendation to Judge

12  Arterton?

13  A.   No.  Judge Arterton had said previously at a

14  hearing that if he were to fail with her order, that she

15  would sentence him to the six months of incarceration,

16  followed by the six months of halfway-house placement.

17  We concurred with that -- at that time, we concurred

18  with that process.

19  Q.   Right.  And when you were asked if you wanted to be

20  heard.  If probation wanted to be heard at the Arterton

21  hearing on August 31, 2016, you said yes, and you stood

22  up, and you recommended incarceration, correct?

23  A.   I don't believe I recommended incarceration at that

24  time --

25  Q.   Sure.  Why don't we pull up --

1    A.    -- but what I did do is, I offered a summary of

2    where I thought Mr. Santos --

3    Q.    You've answered the question, and we'll pull up the

4    transcript, and we'll let the jury hear what you said on

5    August 31.

6    A.    That's fine.

7            MR. ROGAN:  If I could ask for Government's 2

8    to be pulled up.

9            Let me bring you to the page.

10            If we could start at page 11 of the

11    transcript, please.

12            Can everyone see that on their monitor?

13    BY MR. ROGAN:

14    Q.    This is where you indicate, right at the very

15    beginning, you told the court that he has a long-term

16    addiction of 20-plus years, correct?

17    A.    I can't see that yet.

18    Q.    Can you see it now?

19    A.    I can.

20    Q.    It starts at line 6, and ends at line 12.

21            Do you recall that testimony?

22    A.    I do.

23    Q.    If we could turn to page 14, beginning at line 21,

24    if you would read that, sir, out loud.

25    A.    Line 21:  "So at this point in time, Mr. Santos is

1    very clear as to Your Honor's message.  He's been very

2    clear as to the messages that I believe the probation

3    office has been giving him, his defense counsel has been

4    giving him, his family has been giving him, and it

5    really has been a concern, and not so much as an

6    adversarial message, but, quote, you have a demon, you

7    need to be part of shedding that demon, end quote.  And

8    I think at this point in time, Mr. Santos is not ready

9    to get on that train."

10   Q.   And if you would continue, sir?

11   A.   "So, therefore, I believe that being taken out of

12   an environment where he has readily accessible access to

13   heroin is in his best interests; in the best interests

14   of getting him clean, getting him to a point where he

15   can hopefully think clearly, getting him to a point

16   where he understands that people are not out to harm him

17   in the system but really want to provide him with as

18   much structure and as much support as possible."

19   Q.   If you could stop there for a minute.

20        So when you said to the court, "So, therefore, I

21   believe that being taken out of an environment where he

22   has readily accessible access to heroin is in his best

23   interest," you were talking about incarceration,

24   correct?

25   A.   Yes, probably yes.

1    Q.    Probably, or yes or no, sir?

2    A.    Well, it's -- he has indicated to us in the past

3    that he's had access to heroin while incarcerated, so --

4    but that would be the general message, yes.

5    Q.    That's the clear message what you're talking about,

6    not the general message.  You're telling the court that,

7    in your opinion, incarceration is what's necessary here,

8    right?

9    A.    I would say here, probably that was the message,

10   correct.

11   Q.    Probably.  Okay.

12         I also want to take you back, if we could, to

13   paragraph --

14              MR. ROGAN:  If I could please have page 14 of

15   the transcript brought up so everyone can see.

16              Thank you so much for assisting.  I appreciate

17   it.

18   BY MR. ROGAN:

19   Q.    I want to talk to you about your direct testimony

20   that appears on page 14, about this issue of, is it the

21   effect -- when talking about Mr. Santos getting nasty.

22         What you were referring to is at the earlier

23   hearing in front of Judge Richardson, when he was less

24   than cordial, where he said, "Go F yourself," correct?

25   A.    Correct.

1    Q.    And then you're asking this rhetorical question,

2    "Is it, you know, is he not getting what he wants, does

3    he get nasty, or is it the effect of the addiction

4    process?  I sort of give it a 50/50 credence."

5    A.    Correct.

6    Q.    Do you recall what your response to Mr. Durham was,

7    what your position is now on that 50/50 credence?

8    A.    Yeah.  It's no longer 50/50.

9    Q.    What is it?

10   A.    I don't recall what the percentage that I gave, but

11   I would say would be a higher percentage that the

12   behavior that was exhibited by Mr. Santos is the true

13   Mr. Santos.

14         Is it Mr. Santos at all occasions; no.  But is it a

15   behavior that he engaged in, is capable of, is out of

16   character for him; out of character maybe, because I've

17   never seen that before --

18   Q.    Right.

19   A.    -- but not out of the realm of his capability and,

20   therefore, part of his character.

21         So it wasn't a -- my belief is, when Mr. Santos, in

22   these instances, didn't get his way, his behavior became

23   nasty.

24   Q.    Right.  Which is what addicts do, right, when they

25   don't get what they want?

1    A.    Some.

2    Q.    Some.

3          And he would be one of the some, right?

4          It's evident by what you claim that happened during

5    the hearing.

6    A.    Well, I can say that --

7    Q.    I just want an answer to my question.

8    A.    I'm not sure what the question is.

9          MR. DURHAM:  I ask that the witness be

10   permitted to answer the question.

11         MR. ROGAN:  He did answer the question, and he

12   went on, and I'm not going to allow him to do that.

13   This is cross-examination.  I'm allowed to follow up.

14         MR. DURHAM:  Actually, I think this is a

15   decision for the Court.

16         THE COURT:  It is.

17         Had you finished your answer?

18         THE WITNESS:  I would ask that you repeat the

19   question, please.

20   BY MR. ROGAN:

21   Q.    I asked you the question, when addicts don't get

22   their way, they get nasty.

23         Your response was, "Some."

24         And then I asked you, And Peter would be one of

25   those some, yes or no?

1    A.   It appears at this point in time, yes.

2    Q.   And that's uncommon behavior for addicts, yes or

3    no?

4    A.   No.  If we're talking nasty, that's the behavior we

5    are talking at this point in time, nasty.

6    Q.   Nasty or threatening?

7    A.   Either/or.  I mean, I've --

8    Q.   Hold on.  So the nasty behavior could be just nasty

9    behavior or either/or threatening?

10   A.   You threw threatening in there as an another

11   example.

12   Q.   And you said, "either/or."

13   A.   So my response is that you can have an addict who

14   doesn't get their way that's not nasty, nor are they

15   threatening.

16   Q.   But in this particular circumstance as it relates

17   to Mr. Santos -- now I'm going to ask you the question

18   again, if your opinion has been changed, whether his

19   out-of-character behavior, which you just described it

20   was out of character for him to exhibit that nasty

21   behavior, you said, you don't know whether it was 50/50,

22   if it was his character or the addiction.

23        Now I'm going to ask you -- using that same number

24   of 50/50 -- 60/40, 70/30, what is it?

25   A.   I would have to say it's part of who he is.  I

1    can't throw a number on that, Counsel.

2    Q.   Well, you did here, so I'm going to ask you to do

3    it again.

4    A.   I did.  Well, in some ways it remains 50/50 --

5    Q.   Thank you.

6    A.   -- if he gets his way, he's happy.  If he doesn't

7    get his way, he's nasty.  So it's either/or.

8    Q.   And that's, if you go back to -- let's look again

9    at page 14 of the testimony.  So it's still 50/50 in

10   your mind, whether his nastiness or the things he did in

11   court or out of court are a part of his addiction or a

12   part of his character, right, that's what you just told

13   the jury.

14   A.   Correct.

15   Q.   So you don't know, in fact, whether it was the

16   addiction that was speaking to you when you claim he

17   said what he said to you after the hearing or his

18   character, based upon what you just told this jury.

19   A.   I just know that it was Peter Santos who said it to

20   me.

21   Q.   Are you aware that Mr. Leone testified -- question

22   withdrawn.

23        Yesterday, did you speak to Mr. Leone?

24   A.   Of course I did.

25   Q.   You did.

1          Did you talk about his testimony in court?

2     A.    Absolutely not.

3     Q.    What did you talk about?

4     A.    I asked how he was doing.

5     Q.    How he was doing in general, or how he was doing in

6     regards to his appearance in court?

7     A.    He didn't get to come down and testify until late

8     in the afternoon.  So being his direct supervisor, I was

9     constantly checking in on him to make sure that he was

10    okay.  He's been on the job a little less than I have

11    been.  He's under my direct supervision.  He's never

12    experienced this in his career.  So my conversations

13    with him were just to kind of reassure him and to be

14    supportive of him.

15    Q.    Did you talk to anyone else last night -- let me

16    limit the question -- besides a family member; just yes

17    or no.

18    A.    Yes.

19    Q.    Did you speak with Mr. Durham?

20    A.    Last night, no.

21    Q.    Mr. Parker?

22    A.    Only -- I had a brief introduction with Mr. Parker

23    when walking Officer Leone out of the courtroom, and

24    then just sort of passing him off.  I was being -- I sat

25    outside and prepped for coming in to testify, but I

1    wasn't called.

2         So after Officer Leone testified, he was walked out

3    by Deputy Marshal Parker, and there was just a cordial

4    hello, and I took the elevator upstairs with Officer

5    Leone.

6    Q.   When you were sitting outside, prepping to testify,

7    what were you doing?

8    A.   Just sitting and thinking.

9    Q.   Sitting and thinking.

10        Not looking at any documents?

11   A.   Not at that time, no.

12   Q.   I want to go back to the session that you had on

13   May 19th, just -- I'm terrible at math -- 12 days

14   ago --

15            THE COURT:  Close enough.

16   BY MR. ROGAN:

17   Q.   -- close enough, 12 days ago, with Mr. Durham and

18   Mr. Parker, who represent the federal government.

19        Do you recall telling them, back about 12 days ago,

20   that you had bet Mr. Leone that Santos would apologize

21   on the day of the Janet Bond Arterton hearing?

22   A.   I do.

23   Q.   What did you think Mr. Santos was going to

24   apologize for?

25   A.   His comment to me as he left his initial

```
 1    presentment after Magistrate Judge Richardson's hearing.
 2    Q.   Where he said, "Go F yourself."
 3    A.   Correct.
 4    Q.   And you made that bet with Mr. Leone because you
 5    knew Mr. Santos' character, and you thought he was going
 6    to step up to the plate and apologize, yes?
 7    A.   No.
 8    Q.   Okay.  Well, wait, you just said you bet that he
 9    would apologize.
10    A.   Correct.
11    Q.   But what did you make that bet based on?
12    A.   Historical perspective of being on the job 23 years
13    and never heard something like that in court before.
14    Q.   You've never heard anyone use foul language in a
15    courtroom?
16    A.   I've never heard anybody use foul language towards
17    me in the courtroom.
18    Q.   In 23 years?
19    A.   That's correct.
20    Q.   How about in your office?
21    A.   No.
22    Q.   Never?
23    A.   Never.
24    Q.   Thousands of people who are on supervised release?
25    A.   Absolutely.
```

1   Q.   No one has ever cursed you like that?

2   A.   Not quite like that, no.  No, Counsel.

3   Q.   Different vulgarity?

4   A.   Not towards me.  In the heat of a moment they may.

5   Q.   I want to talk about the heat of the moment,

6   because during your -- you also recall, at that May 19

7   prep session with the federal government who's seated

8   behind me, that you didn't know at the time that

9   Mr. Santos said what he said to you, if it was, quote,

10  don't know in the heat of the moment type of deal, but

11  even so, it's still inappropriate, can express

12  frustration in a different manner.

13      You said that 12 days ago, right?

14  A.   Sure.  Yes.

15  Q.   So as you sit here today, less than 12 days later,

16  you don't know if that was a threat or not because you

17  said, I don't know if it was the heat of the moment type

18  deal or if he was just expressing his frustration.

19           MR. DURHAM:  The government is going to object

20  to the form of the question.

21           THE COURT:  Sustained.

22           You have to lay a foundation for that.

23           MR. ROGAN:  Sure.

24  BY MR. ROGAN:

25  Q.   Here's the foundation.

1          You've been interviewed by the federal government,

2     and then you specifically had a prep session on May 19,

3     2017.

4          Do you remember that?

5     A.   I do.

6     Q.   And who was present in the room?

7     A.   Assistant United States Attorney Durham, Deputy

8     Marshal Parker, and their associate, who's sitting to my

9     left at the table.

10    Q.   Ms. Arsenault?

11    A.   Yes.

12    Q.   During that prep session, did the conversation turn

13    to what you recalled happened on August 31, 2017 (sic)?

14    A.   Yes.

15    Q.   And during the course of that conversation, and I'm

16    talking about what you said, did you say that the

17    statement made by Mr. Santos, in your mind, you didn't

18    know if it was a heat of the moment type of deal?

19    A.   If it's in a transcript, I said it, yes,

20    absolutely.

21    Q.   I have to be fair to you.  This is not a

22    transcript.  I'm just trying to get to see --

23    A.   I'm not disagreeing with you Counsel.  I just, I

24    don't have the recollection of that.  But it wouldn't be

25    beyond what I would say because I think, at that time --

1    again, I think it's important to put everything in

2    perspective, from my point of view, is that what just

3    happened?

4    Q.   This isn't what just happened.  We're only talking

5    about 12 days ago.

6    A.   No, I know, but that's the mindset I was back then

7    versus, you know, and then as we continued to move along

8    in this process.

9    Q.   And is it fair to say, from 12 days ago, and going

10   back to August 31, whatever it is you believe Mr. Santos

11   said to you in the courtroom, that you don't know if it

12   was, quote, a heat of the moment type deal or was a

13   genuine threat.

14              MR. DURHAM:  Your Honor, the government is

15   going to object to that.  First of all, counsel is

16   taking the notes out of context.  But separate from

17   that, that's a compound question.

18              THE COURT:  Sustained.  I can explain at the

19   sidebar.  Let me just expedite things here.

20

21              (Discussion at sidebar off the record.).

22   BY MR. ROGAN:

23   Q.   On May 19th, did you describe Mr. Santos' comment

24   that he made to you as inappropriate?

25   A.   I could have.  I don't recall, but I could have.

1    Q.    You don't recall from 12 days ago?

2    A.    I do not.

3    Q.    Okay.  Do you recall, from 12 days ago, that you

4    said he could express his frustration in a different

5    way?

6    A.    I said he could have, yes.

7    Q.    Okay.  Instead of saying what he said to you,

8    correct?

9    A.    Correct.

10   Q.    And what is it, the direct quote that you said

11   Mr. Santos made -- and I'm only referring to after Judge

12   Arterton left the courtroom?

13   A.    "When I get out, I'm coming for you."

14   Q.    And the reason you have such clarity on that is

15   because you wrote it down, correct?

16   A.    I did.  Correct.

17   Q.    Did you write down the notes of the phone

18   conversation that you had with Sandy Santos regarding

19   the apology?

20   A.    No.  Because I took the phone call from my office,

21   and I pulled it up on my screen and documented it in the

22   notes that I disclosed.

23   Q.    So is it fair to say that you don't have an exact

24   recollection of exactly what transpired in that phone

25   call between you and Ms. Santos?

1    A.    The only recollection that I would be able to is --
2    referred to is the note that I wrote down in our
3    chronological entry that indicates that she was calling
4    on behalf of her son to apologize for the actions the
5    previous day.
6    Q.    Exactly.  And you took that only to mean the
7    actions as directed towards Judge Arterton and not
8    towards you?
9    A.    That's correct.
10   Q.    Do you recall on May 19, 12 days ago, that you
11   don't recall -- you didn't recall the mom inquiring
12   about additional charges?
13   A.    Right.  I did not read my notes prior to that
14   meeting.  I knew Mom had called, but I wasn't
15   comfortable reflecting back on any part of the
16   conversation at that time.
17   Q.    You weren't comfortable about --
18   A.    -- commenting --
19   Q.    -- on that part of the conversation --
20   A.    Yeah.
21   Q.    -- because you couldn't recall it; fair to say?
22   A.    I think that's fair.
23   Q.    As someone who's spent 23 years in the business and
24   dealt with a vast amount of people on supervised release
25   who have substance abuse problems, are you familiar at

1     all, based upon your experience, with the effects of

2     someone who's detoxing from narcotics?

3     A.    Yes.

4     Q.    And can you explain to the jury generally what

5     those effects are?

6     A.    I would presume that you're talking about detoxing

7     off of heroin.

8     Q.    Yes, to be specific, yes.

9     A.    Irritable, nauseous, diarrhea, sweats, other

10    itching of -- picking at one's skin.

11    Q.    And have you actually ever spoken with someone

12    who's been going through the effects of detox as you're

13    speaking to them?

14    A.    I have.

15    Q.    When you say "irritable," describe to the jury what

16    you mean by irritable.

17    A.    Lack of concentration, difficulty focusing on a

18    conversation.

19    Q.    Okay.  I want to talk about the arrest of

20    Mr. Santos, which took place in your office, correct?

21    A.    Correct.

22    Q.    And that happened on what date?

23    A.    August 25th, I believe.

24    Q.    Sorry.  It wasn't a trick question.  I could have

25    given you the date.

1        You testified on direct that there was a scheduled

2   meeting; and when Mr. Santos showed up, you notified the

3   marshals, right?

4   A.   Correct.

5   Q.   And the meeting was initially scheduled with your

6   colleague Mr. Leone, right?

7   A.   I think it was scheduled by him, but with the

8   understanding that the meeting would be held with me

9   because he was not going to be available.

10  Q.   And you knew before the meeting took place that you

11  were going to have the marshals there to arrest him,

12  correct?

13  A.   Absolutely, yes.

14  Q.   So that was actually, when the meeting was set up,

15  it wasn't to have a meeting.  It was so that you

16  wouldn't have to go find him but get him arrested right

17  in your office, correct?

18  A.   Correct.

19  Q.   So your testimony earlier that you notified the

20  marshals afterwards is not, in fact, accurate, correct?

21       That's what you said on direct exam.

22  A.   After what?

23  Q.   You said, after Mr. Santos arrived, on direct

24  examination, that you then notified the marshals.

25  A.   Well, that's accurate.

1            Our office's protocol is to give a heads-up to the

2     marshal service if we are expecting somebody in so they

3     can execute the warrant.  So the phone call would be

4     placed prior to, just to give them a heads-up, because

5     there are many times that people don't show up.

6            So it would only make sense to me that I would call

7     the marshals after Mr. Santos shows up so that then they

8     can come down and execute that warrant.

9     Q.    But you also notified them before, that he was

10    scheduled to be at your office at a particular time,

11    right?

12    A.    Absolutely.  That's safety protocol.

13    Q.    That's not what you told the jury, though.  You

14    told the jury that you notified them after he arrived,

15    but you already knew that he was going to be arrested.

16    A.    I knew that he was going to be arrested if he

17    showed up.  The marshals knew that there was a warrant

18    because they are the ones who execute our warrants.  So

19    I'm not understanding.

20    Q.    Let me ask it this way:  Between you and Mr. Leone,

21    the phone call that was placed to my client setting up

22    the meeting, it wasn't to have a meeting, it was to have

23    an arrest, yes or no?

24    A.    Yes.

25    Q.    There was no other purpose for it.

1    A.    Not at that time, correct.

2    Q.    When you say, "not at that time," the purpose of

3    the meeting was to have him arrested, yes?

4    A.    Yes.

5    Q.    You were asked on direct examination in the

6    transcript -- and we're not going over it again -- about

7    the real Mr. Santos, and the comment that Judge Arterton

8    made, we don't know what was in her mind, but a comment

9    that you made.

10         Any doubt in your mind, Mr. Topor, at you sit here

11   today, that the real Peter Santos is a heroin addict of

12   some 20-odd years?

13   A.    No doubt.

14   Q.    And any doubt in your mind that that addiction has

15   been an ongoing problem for Mr. Santos for that period

16   of time?

17   A.    I'm not sure his addiction has been an issue as far

18   as his functioning for the whole 20 years.

19   Q.    I understand.  I don't dispute that -- his ability

20   to be employed through his family's business.  I'm

21   talking about that that addiction has been unrelenting

22   for 20 years, and that he hasn't had extended periods of

23   sobriety, to the best of your knowledge.

24   A.    That's my understanding, correct.

25   Q.    Also, as part of your job as a supervisor, you also

1    review someone's past criminal history, correct?

2    A.   I do.

3    Q.   I'm going to show you --

4         MR. ROGAN:   If I can perhaps again ask,

5    Government's Exhibit Number 1 to be put up on the

6    monitor?

7         Thank you so much.

8    BY MR. ROGAN:

9    Q.   If you would just read the first bulleted point to

10   yourself, and then I'm going to ask you a question about

11   that, Mr. Topor.

12        (Pause.)

13   A.   Okay.

14   Q.   Based upon your experience, are any of the

15   underlying enumerated crimes dated January 21, 2014,

16   involve crimes of violence?

17   A.   Based on the information presented before me, it

18   does not appear to be an element of violence in the

19   count of conviction.

20   Q.   These would generally be described as white-collar

21   crimes, as you would understand that term?

22   A.   Most of them or some of them.

23   Q.   At any time during your interactions with

24   Mr. Santos, has he ever been physically violent with

25   you?

1    A.   No.

2    Q.   At any time on August 31, 2014, either during the

3    hearing or after the hearing with Judge Arterton, did he

4    ever get physical with you?

5              THE COURT:  What date did you say?

6              MR. ROGAN:  I misstated the year.  August 31,

7    2016.

8              Thank you, Judge.

9              THE WITNESS:  Physically, no.

10   BY MR. ROGAN:

11   Q.   I know you haven't heard the testimony of the other

12   witnesses, and I know that you've testified before the

13   jury as to what you recall Mr. Santos saying and what

14   you did.

15        Do you have -- assume for a moment that other

16   witnesses have provided different versions of what they

17   believe they heard; do you have any explanation for

18   that?

19              MR. DURHAM:  The government is going to object

20   to that.

21              Number 1, Counsel, you got to know you're not

22   supposed to comment on somebody else's testimony;

23   particularly, if you don't know what the testimony was,

24   how do you comment on it.

25              THE COURT:  Sustained.

1            MR. ROGAN:  I'll move on, Your Honor.

2    BY MR. ROGAN:

3    Q.   Let me ask you this question:

4         On August 31, 2016, can you recall the names or the

5    functions of the individuals that remained in the room

6    after Judge Arterton left the bench?

7    A.   The names?  Not all of them.  The functions, Patty

8    Villano, who's the courtroom deputy.  You had a

9    stenographer there, that I believe was there.  You had

10   Assistant United States Attorney Christopher Schmeisser.

11   You had federal defender, Terence Ward; the defendant,

12   Peter Santos; Daniel Leone; myself.  And I want to say

13   there was two deputy U.S. Marshals there.  I don't

14   recall their names.

15   Q.   Fair enough.

16        And other than what you testified to, do you recall

17   any other verbal interaction between you and Mr. Santos

18   on that day?

19        I'm only referring to after the hearing had

20   concluded.

21   A.   No, sir.

22   Q.   Okay.  And you were asked a question -- and I think

23   I know the answer to it, but just to clarify for the

24   jury, you were asked by Mr. Durham if, after the

25   August 31 proceeding, if you had had any further contact

1    with Mr. Santos.

2         And I think your response was no, not directly.

3         Do you recall that response?

4    A.   Yes.

5    Q.   And was that in regard to the contact with Mom?

6    A.   Correct.

7    Q.   And other than that one phone-call contact with the

8    mother, no other contact with Mr. Santos, correct?

9    A.   With him, there had been some contact about him.

10   Q.   If I framed it badly, I'm only asking -- I know you

11   had conversations with other people about Mr. Santos --

12   A.   Okay.

13   Q.   -- but I'm talking about, no other direct contact

14   or indirect contact with Mr. Santos or members of his

15   family other than what you've told this jury.

16   A.   That's correct.

17        MR. ROGAN:   If I can just have one moment,

18   Your Honor?

19        THE COURT:   Certainly.

20             (Pause.)

21   BY MR. ROGAN:

22   Q.   Just a few follow-up questions.

23        I think you said the courtroom is roughly the same

24   size, and no one is going to ask for an exact

25   measurement, you were on one side of the room,

1    Mr. Santos was on the other side of the room; fair to

2    say?

3    A.    Pretty much.  I think with the depiction -- the

4    picture that was shown previously, you notice that it

5    moves over because where the jury box is and how the

6    courtroom is set up.  So we were closer than where we

7    are if you were to go from here over there.  But we're

8    looking at a couple of feet.

9    Q.    I'm not looking for a precise measurement.

10          What was your response to the alleged threat other

11   than the statement, I think you said, "Excuse me"; did

12   you have any other response?

13   A.    No, sir.

14   Q.    Any other reaction -- physical, emotional -- at

15   that time?

16   A.    My reaction was -- well, it was twofold.  It was

17   internal as to what just occurred here; and kind of

18   hoping that other people heard it, not just myself.

19   Q.    Were you surprised?

20   A.    Extremely.

21          MR. ROGAN:  Thank you, I have nothing else.

22

23                    REDIRECT EXAMINATION

24   BY MR. DURHAM:

25   Q.    Mr. Topor, I just want to go over a few of the

1    things that counsel just asked you, and just to see if

2    we can address a couple of them.

3         You were asked questions about notes that you had

4    taken; do you recall that?

5    A.   Yes.

6    Q.   And you were asked about a prep session for

7    testifying here today.

8    A.   Correct.

9    Q.   So there's no mystery about this, when you're

10   talking about the prep session to prepare to testify,

11   explain to the jurors what that involved.

12   A.   It involved basically being asked questions that

13   are being -- what my recollection was.  And that's when

14   I had asked counsel what he meant by "prep," because I

15   was expecting prep.  I was expecting to have some

16   direction, but that wasn't the case.  I didn't know what

17   to expect, but I was just asked questions as to my

18   recollection of that day and interactions.

19   Q.   So let focus on that.

20        Counsel was talking to you about some notes from

21   when you met back on 19th, in anticipation of your

22   testifying today; do you recall that?

23   A.   Yes.

24   Q.   And did counsel show you the notes?

25   A.   No.

1    Q.   Let me show you what we have marked as

2    Government's Exhibit 14 for identification.  There are a

3    couple of different things I want to ask you about.

4         I ask you to look at the top portion of the notes

5    and see whether or not the questions that counsel asked

6    you from those notes incorporate the whole notes or just

7    part of the notes.

8                   (Pause.)

9              MR. ROGAN:  Your Honor, I'm going to object on

10   the basis that I don't think this witness is qualified

11   to answer unless he can testify that he took the notes.

12             THE COURT:  Why don't you explain what you're

13   asking so we're clear.

14   BY MR. DURHAM:

15   Q.   With respect to what counsel asked you on

16   cross-examination about the notes, did it include all

17   the notes on that subject matter or just part of the

18   notes?

19             THE COURT:  Based on him looking at the

20   document that he has in front of him.

21             MR. DURHAM:  Yes.

22             THE WITNESS:  Just part of the notes.

23   BY MR. DURHAM:

24   Q.   So if you look at the -- the first section deals

25   with what subject matter?

```
 1    A.    The subject matter was whether or not I considered
 2    the comment a threat.
 3              MR. ROGAN:   Your Honor, I'm going to object.
 4    If he's going to testify from the document, it needs to
 5    come in as a full exhibit not an ID document.
 6              MR. DURHAM:   I can do either.
 7    BY MR. DURHAM:
 8    Q.    Let me ask you the question this way:   Do you
 9    recall, sir, whether or not you were specifically asked,
10    when you came in to be prepped to testify in this case,
11    whether you received a threat, it was a threat from
12    Mr. Santos.
13    A.    Yes.
14    Q.    And what did you say when you -- how did you
15    characterize what Santos said to you?
16    A.    That I had no doubt that it was a threat.
17    Q.    So then in context, when counsel is asking you a
18    question about, it may have been in the heat of the
19    moment or, in any event, it was inappropriate, that's
20    true, correct, you said that?
21    A.    I did.
22    Q.    But the premise of that was, you did and do
23    consider it a threat.
24    A.    That's correct.
25    Q.    Do you know, sir, is there anything -- whether
```

1    somebody is angry or not angry, does that affect whether

2    something is a threat or not?

3    A.    I don't believe so.

4    Q.    If somebody is angry, they very well issue a

5    threat, correct?

6    A.    Correct.

7    Q.    Now, in this instance, based on your recollection

8    of having been in the courtroom on August 31st of

9    2016, after Judge Arterton left the courtroom, was

10   Mr. Santos yelling at you?

11   A.    No.

12   Q.    Was he waving his arms at you?

13   A.    No.

14   Q.    Was he doing anything that physically suggested to

15   you that he was angry?

16   A.    No.

17   Q.    Do you know what was his in head, other than the

18   words that he said to you?

19   A.    I do not.

20   Q.    With respect to the words that he said to you,

21   "When I get out, I'm coming for you," did you consider

22   it a threat then?

23   A.    Absolutely.

24   Q.    And do you consider it a threat now?

25   A.    Yes, sir.

1    Q.    As you look a little further down on those notes

2    that counsel referred to, he asked you a number of

3    questions about a telephone conversation with the

4    defendant's mother.

5         Do you remember that?

6    A.    Yes.

7              MR. ROGAN:  Your Honor, again --

8              THE COURT:  Yes.

9              MR. ROGAN:  -- I'm going to object.  The

10   witness is looking at the document.  It's either for

11   identification purposes or in as a full exhibit, but he

12   can't --

13             THE COURT:  Is this Government ID 14?

14             MR. DURHAM:  It's for ID.  I'll move it as a

15   full exhibit, put it as a full exhibit.  Counsel may

16   want to read it a little more closely before it comes

17   in, but I'm perfectly willing to put it in as a full

18   exhibit.

19             MR. ROGAN:  Obviously, Your Honor, I would

20   object to it coming in as a full exhibit, based on the

21   fact that it isn't the entirety of the notes.

22             THE COURT:  I think Mr. Durham is offering to

23   put in the entire notes as an exhibit.

24             MR. ROGAN:  And I object, Your Honor.

25             THE COURT:  Okay.  Fine.

1    BY MR. DURHAM:

2    Q.   Let me ask this -- you have a document in front of

3    you for identification, there is objection to it coming

4    in as a full exhibit, okay?

5         So that means you can use the document to refresh

6    your recollection, but you can't read from the document,

7    okay?

8    A.   Okay.

9    Q.   So just put the document down, and let me ask you

10   this:

11        Do you recall Mr. Rogan asking you questions about

12   a conversation with the defendant's mother?

13   A.   I do.

14   Q.   With respect to the conversation with the

15   defendant's mother, do you remember specifically

16   everything that she said to you?

17   A.   I don't.

18   Q.   If you looked at the notes, would that at least

19   provide some -- perhaps refresh your recollection to

20   some extent?

21   A.   Yes.

22   Q.   So I ask you to look at the next-to-the-last entry

23   on the second page of the notes, okay?

24                  (Pause.)

25   A.   Okay.

1    Q.    If you put that down, because you can't read from

2    the document, tell the ladies and gentlemen of the jury

3    whether you have any recollection at all of the

4    defendant's mother saying anything to you about

5    additional charges being brought.

6    A.    I don't believe so.

7    Q.    And then counsel asked some questions, and you

8    talked about your chronology notes, your chron notes,

9    correct?

10   A.    Correct.

11   Q.    Do you recall whether or not you had entered

12   anything into your chronology notes on the date that the

13   mother called you?

14   A.    Yes, sir.

15   Q.    And do you remember what you had entered into the

16   notes?

17   A.    I believe so, yes.

18   Q.    What -- let me show you what we I've marked as

19   Government's Exhibit 15 for identification.  I'll ask

20   you -- let me turn it over.  Don't read from the

21   document.

22       What is it you recall from the mother calling you

23   about, on September 1st?

24   A.    I remember it was a very brief conversation; that

25   she indicated to me that she was calling at the request

1    of her son Peter; that she apologized for him for his

2    actions in court.

3    Q.   Was it any more specific than that?

4    A.   No.

5    Q.   And then counsel asked you a question, said, would

6    it surprise you to know that the defendant asked his

7    mother to call you?

8         I think you said, no, that wouldn't surprise you.

9         Do you remember questions and answer along those

10   lines?

11   A.   Yes.

12   Q.   Why wouldn't it surprise you that the defendant

13   would have his mother call you?

14   A.   Because historically, Mr. Santos has a very strong

15   relationship with his mother; and I think that, if asked

16   to do anything, that she would go forward and do

17   something like that for him.

18   Q.   Did the defendant ever call you and apologize to

19   you for either his comments in Judge Richardson's

20   courtroom or following the proceeding before Judge

21   Arterton?

22   A.   No.

23   Q.   He never did?

24   A.   No.

25   Q.   Counsel asked you questions on cross-examination

1    relating to events in August of 2016.  This again has to

2    do with your dual function, law-enforcement function and

3    social-worker function.

4        I want to ask you this:  Prior to the defendant

5    being detained on August 25th by Judge Richardson,

6    based on a warrant issued by Judge Arterton, did you

7    have a hostile or a nonhostile relationship with the

8    defendant?

9    A.   A nonhostile.

10   Q.   Up until August 25th of 2016, would you agree

11   that the defendant was pretty much getting what he

12   wanted in connection with treatment programs, not being

13   detained and so forth?

14   A.   Yes.

15   Q.   Counsel asked you questions at the end --

16          MR. DURHAM:  If we can pull up

17   Government's Exhibit 1 and highlight the first

18   paragraph.

19   BY MR. DURHAM:

20   Q.   Do you remember, counsel asked you questions

21   relating to this portion of Government's Exhibit 1, and

22   asked whether or not that was a white-collar crime?

23   A.   Yes.

24   Q.   With respect to this matter, you're familiar --

25   withdrawn.

1          Are you familiar with the underlying facts in these

2     convictions?

3     A.    Yes.

4     Q.    And with respect to the nature of the offenses, can

5     you tell the ladies and gentlemen of the jury how much

6     money was involved in the conspiracy to transport stolen

7     goods?

8               MR. ROGAN:   Objection, Your Honor.   Outside

9     the scope and relevance.

10              MR. DURHAM:   Counsel, in cross-examination,

11    went into these offenses, wanted to inquire about the

12    nature of the offenses, and that would be within the

13    scope of that cross.

14              THE COURT:   Overruled.

15              THE WITNESS:   Can I answer?

16    BY MR. DURHAM:

17    Q.    Yes, you can answer.

18    A.    The amount that is -- it's sort of twofold:   The

19    amount attributed to Mr. Santos' involvement in this,

20    for sentencing purposes, was between 1 million to either

21    1.2 or 1.5 million.

22          I believe that the amount attributed to him in

23    restitution was in excess of $700,000.

24    Q.    Now, counsel finally was asking you questions about

25    indications that a person is withdrawing from heroin.

1      Do you remember questions along these lines?

2   A.   I do.

3   Q.   You said sweats, itching, picking at one's skin;

4   and then I think subsequently, you also added in

5   response to another question, lack of concentration,

6   difficulty focusing on a conversation.

7      Did I get that right?

8   A.   Yes.

9   Q.   On August 31st of 2016, did you notice whether

10  the defendant was sweating or not, in the courtroom?

11  A.   I did not notice.

12  Q.   Was he itching that you observed?

13  A.   I did not.

14  Q.   Was he picking at himself?

15  A.   Not that I'm aware of.

16  Q.   Based on your being in the courtroom and listening

17  to the defendant's remarks to Judge Arterton, both

18  before and after the judge made it clear that she was

19  going to sentence him to a period of incarceration, did

20  you notice any lack of concentration on his part?

21  A.   I did not.

22  Q.   Did you witness or notice any difficulty that

23  Mr. Santos was having, focusing on the proceedings that

24  were going on?

25  A.   No, sir.

1    Q.   Do you recall, sir, whether or not the defendant,

2    in fact, said to Judge Arterton at that hearing that he

3    was sober that day?

4    A.   I do believe that there is information to that

5    effect, yes.

6    Q.   And do you recall whether or not -- the jury has

7    read the transcript, do you recall whether or not that

8    he said he was sober not only that day, but he

9    essentially had seven days to dry out, and now he's

10   thinking more clearly, et cetera?

11   A.   Correct.

12   Q.   Was there anything about the defendant's

13   appearance -- let me focus on appearance -- anything

14   about his appearance that day that suggested to you that

15   he was in withdrawals?

16   A.   No.

17   Q.   With respect to thought process, that is his

18   ability to communicate with the court, anything about

19   his comments to Judge Arterton, aside from maybe the

20   change in tone and demeanor, but were they disorganized

21   in some fashion?

22   A.   No.

23   Q.   And when he said to you, as he's walking out of the

24   courtroom, "When I get out, I'm coming for you," did

25   that come out loud and clear?

1    A.   Yes.

2         MR. DURHAM:  Nothing further.  Thank you, Your

3    Honor.

4

5                    RECROSS-EXAMINATION

6    BY MR. ROGAN:

7    Q.   You'd agree with me, Topor, that -- I apologize.  I

8    did not mean that.

9         You would agree with me, Mr. Topor, that on

10   August 31, 2016, Peter Santos sure was irritable.

11   A.   I think he was irritated.

12   Q.   And irritable.  I mean, he was wildly inappropriate

13   by any measure, as far as his conduct goes in the

14   courtroom before Judge Arterton.

15        Would you agree with me on that statement?

16   A.   I'm hanging on the term "wildly."  Certainly

17   significantly.

18   Q.   I'll withdraw the "wildly" part, but in your 23

19   years of experience, you've never heard, I think you

20   told us, an individual speak to a United States district

21   court judge in that manner.

22   A.   That's accurate.

23   Q.   That would be an indication that someone was pretty

24   irritable with how things were going; fair to say?

25   A.   Yes.

1    Q.    And is it fair to say that he was also pretty

2    irritable as soon as Judge Arterton imposed the sentence

3    that he knew was going to be imposed, of six months

4    followed by 24 months of supervised release?

5    A.    Again, I'm kind of hung up on the word "irritable."

6    He was irritated.  So maybe I'm splitting hairs here a

7    little bit.  I don't mean to.  But I don't want to be

8    misconstrued either, as to my recollection or my

9    impression.

10          What I will say is that, prior to that, he was

11    calm.

12    Q.    Prior to what, the imposition of the sentence?

13    A.    No.  Prior to realizing that he was not going to be

14    going to a program that day.

15    Q.    Because he was making his -- because he spoke at

16    the hearing.  The jury has it.  He was trying one more

17    time to see if the court would allow him to go into

18    another outpatient facility, right?

19    A.    Yes.

20    Q.    And you don't know whether or not -- despite what

21    he said to the judge, you don't know whether he was

22    seven days' sober, seven hours' sober.

23          You have no way of knowing that, other than what's

24    in the transcript, right?

25    A.    Correct.

1    Q.    You don't know if he was using when he was at

2    Wyatt, do you?

3    A.    Not that I can assure and comment on, but my

4    recollection is that he was not.

5    Q.    He was not.  Okay.

6          So this -- and again, splitting hairs is fine,

7    irritable, irritated.  Just a couple more questions.

8          When you were asked on redirect by Mr. Durham, that

9    he was pretty much getting everything he wanted up until

10   that August 31, 2016, hearing, that's not quite a fair

11   characterization, in that every time -- and here's the

12   question -- that those programs were recommended, they

13   were endorsed by your offices, right?

14   A.    What do you mean by "endorsed"?

15   Q.    You recommended, "Okay, let's try to get him into

16   an outpatient program."  I think you told us, you

17   continued to try and work with him.

18   A.    I think in some cases he actually made the phone

19   calls to get in on his own volition as well.

20   Q.    It's not quite a fair characterization to say that

21   he was always getting what he wanted.  He was working

22   then, in conjunction with your office, to try and get

23   treatment; is that fair to say?

24   A.    Well, I think my take on that was, what he was

25   getting was, he was remaining out so that he can

1      continue to use heroin.  So that's what he was getting.

2             And no matter, to me, what hoops, so to speak, he

3      may have had to jump through by placating the system by

4      going into a program and leaving after a couple of days,

5      he was getting what he wanted, meaning that he remained

6      in the community, which then allowed him to continue his

7      use of heroin.

8      Q.    And to remain addicted.

9      A.    Right.

10     Q.    To be fair, the statement, and I think this is my

11     last question, "I'm coming to get you," right, that was

12     what you said that you recall Mr. Santos saying?

13     A.    Right.

14     Q.    You would agree with me that within that statement

15     is not an explicit statement of, "I'm going to do you

16     some type of bodily harm," the language itself.

17     A.    Explicitly, no.  And but inferential, yes.

18     Q.    That's what I want to get to.

19            You would agree with me that it's possible that

20     it's subject to two different interpretations.  I know

21     what yours is, but you would agree with me that it's

22     subject to more than one interpretation.

23     A.    I don't believe so, no.

24     Q.    And is that in the context of the hearing that was

25     going on?

1    A.   No.   That's in the context of an individual who was

2    looking at a federal officer, making a comment that,

3    that's how I took it.   I don't think there's any other

4    way to have taken it.

5    Q.   And that's your opinion.   That's how you took it,

6    and that's fair enough.

7    A.   Right.

8         MR. ROGAN:   Thank you.

9

10                    FURTHER REDIRECT EXAMINATION

11   BY MR. DURHAM:

12   Q.   So somebody who's in a federal courtroom that says

13   to you, as a federal probation officer, "When I get out,

14   I'm coming for you," do you consider that to be explicit

15   threat to you?

16   A.   Yes.

17   Q.   Right.   And with respect to the nature of the

18   threat, are you privy to all of the evidence in this

19   case?

20   A.   No.

21   Q.   Counsel had asked you about some telephone calls.

22        You don't have any of the telephone calls, right?

23   A.   Just one.

24   Q.   That one telephone call?

25   A.   I had nothing to do with me.

1    Q.    Who did it have to do with?

2    A.    Officer Leone.

3    Q.    But other than that, you don't know what's in any

4    of the telephone calls.

5    A.    That's correct.

6    Q.    But with respect to what was said to you, do you

7    consider that to be have been an explicit threat to you?

8    A.    Yes.

9              MR. DURHAM:  Thank you, sir.

10             MR. ROGAN:  No further redirect, Your Honor.

11             THE COURT:  Thank you, sir.  You may step

12   down.

13                  (Whereupon, the witness was excused.)

14             MR. DURHAM:  Mike Curra, Your Honor.

15

16

17

18

19

20

21

22

23

24

25

```
 1                        MICHAEL CURRA,

 2              called as a witness, having been first duly

 3              sworn or affirmed, was examined and testified

 4              as follows:

 5

 6              THE CLERK:  Please state your name and spell

 7   your last name for the record.

 8              THE WITNESS:  Michael Curra, C-U-R-R-A.

 9              THE CLERK:  And indicate the town and state in

10   which you live or work.

11              THE WITNESS:  New Haven, Connecticut.

12

13                      DIRECT EXAMINATION

14   BY MR. DURHAM:

15   Q.   Sir, would you tell the ladies and gentlemen of the

16   jury how you're employed?

17   A.   I'm a deputy with the U.S. Marshal Service.

18   Q.   And for approximately how long have you been a

19   deputy?

20   A.   Five years.

21   Q.   And prior to becoming a deputy with the marshal

22   service, what were you doing?

23   A.   I worked a year on the admin side.

24   Q.   Did you receive any particular training in order to

25   become a deputy United States Marshal?
```

1    A.    Yes.  We're sent down to Georgia, where our

2    training academy is, which is approximately 17 weeks.

3    Q.    And would you describe what your general duties and

4    responsibilities were in August of last year, that is

5    August of 2016?

6    A.    I was assigned what our agency calls "prisoner

7    operations."  So we handle care and custody of

8    prisoners, and making sure they're produced for court,

9    and transporting them.

10   Q.    I want to focus your attention specifically on the

11   date of August 31st, 2016.

12         First of all, which seat of court were you working

13   in, in August of 2016?

14   A.    New Haven courthouse.

15   Q.    And do you remember, sir, whether or not you had

16   occasion to be present on August 31st of 2016 in a

17   courtroom belonging to Judge Janet Bond Arterton, when a

18   proceeding called United States versus Peter Santos was

19   going forward?

20   A.    Yes, I was present.

21   Q.    Describe, if you would, to the jurors what you were

22   responsible for that day; that is August 31st of 2016?

23   A.    Myself and my partner were assigned to bring

24   Mr. Santos to court and maintain the overall safety in

25   the courtroom.

1    Q.   And your partner that day was who?

2    A.   Matthew Moore.

3    Q.   Would you indicate to the jurors whether or not, on

4    that particular day, whether you were present for all

5    of, or just part of, the proceedings before Judge

6    Arterton?

7    A.   I was present for all of it.

8              MR. DURHAM:  I'm going to ask that

9    Government's Exhibit 3A be brought up, please.

10   BY MR. DURHAM

11   Q.   Can you see that photograph; your monitor is

12   working, hey?

13   A.   Yes.

14   Q.   And looking at Government's Exhibit 3A, do you

15   recognize the persons who are in that courtroom, at

16   least some of them?

17   A.   Yes.

18   Q.   Are you depicted someplace in there?

19   A.   Yes.

20   Q.   And where are you?

21   A.   I am sitting to the left of the witness chair.

22             MR. DURHAM:  I would ask you to circle that,

23   if you would.

24   BY MR. DURHAM:

25   Q.   So that's you?

1    A.    Yes.

2    Q.    And the person who's standing up in the khaki

3    clothing is who?

4    A.    That is Mr. Santos.

5    Q.    And then, as you look at Government's Exhibit 3A,

6    you can see kind of the top of a head behind Mr. Santos'

7    right shoulder, correct?

8    A.    Yes.

9          MR. DURHAM:    If you could circle that, please.

10   BY MR. DURHAM:

11   Q.    Do you remember who that was?

12   A.    That would be Deputy Matthew Moore.

13   Q.    And again, just in context, when you're providing

14   security in the federal courtroom, in this instance for

15   Mr. Santos, do you guys always position yourselves

16   essentially on either side as is reflected here?

17   A.    Typically, yes.

18   Q.    And you're both seated at this juncture of the

19   proceeding, correct?

20   A.    Yes.

21   Q.    Would you tell the ladies and gentlemen of the

22   jury, when Mr. Santos was being brought to the

23   courtroom, was he cuffed or uncuffed?

24   A.    We brought in him cuffed, and we uncuff them when

25   they get in the courtroom.

1    Q.    And then at the conclusion of the proceedings, do

2    you remember whether he was cuffed or uncuffed?

3    A.    He would be cuffed.

4    Q.    And then brought out?

5    A.    And then brought out, yes.

6    Q.    Looking at this photograph,

7    Government's Exhibit 3A, when you brought in Santos into

8    the courtroom, through what door or set of doors would

9    that have happened?

10   A.    Well, you can't see it in this picture, but it

11   would be, I guess, to the right of where the witness

12   chair is.  If you go down that way, there is a back door

13   that we go in.

14   Q.    Then once you leave that door, where are you; that

15   is, you leave the door of the courtroom at the back of

16   the courtroom, then where do you find yourself?

17   A.    We're in the back hallway near chambers.

18   Q.    And in that connection, where was Mr. Santos being

19   taken within the courthouse?

20   A.    He was taken to the elevator which would go up to

21   our cell block.

22   Q.    And your cell block was located on what floor?

23   A.    It is in between the first and second floor.

24   Q.    The mezzanine in the New Haven courthouse?

25   A.    Yes.

1    Q.   Then focusing your attention on the proceedings

2    before Judge Arterton on this date, you indicated that

3    you were there the entire time?

4    A.   Yes.

5    Q.   And what about your partner, Deputy Moore, is he

6    there for part of it or for the whole?

7    A.   He was there for all of it.

8    Q.   Do you recall, sir, during the course of the

9    proceedings, whether or not the defendant had occasion

10   to address or speak to Judge Arterton?

11   A.   Yes, he had.

12   Q.   And I want to ask you a couple things.

13        On the way down, bringing him to the court -- would

14   you tell the ladies and gentlemen of the jury whether or

15   not Mr. Santos was exhibiting anything that suggested to

16   you that he was under the influence of drugs?

17   A.   No.  He seemed normal.

18   Q.   Do you remember him sweating, for example?

19   A.   No.

20   Q.   Or picking at himself?

21   A.   No.

22   Q.   Do you recall whether he was able to converse or

23   not, that is to talk to you and Deputy Moore as you were

24   coming downstairs?

25   A.   Yes.

1    Q.   Any recollection of him having any difficulty in

2    articulating what he wanted to tell you or anything of

3    that sort?

4    A.   No.

5    Q.   Any evidence of confused thought on his part?

6    A.   No.

7    Q.   When he was in the courtroom and he was addressing

8    Judge Arterton, would you describe what his demeanor

9    was, in talking with Judge Arterton?

10    A.   He was initially -- he was initially pretty calm,

11    normal, with answering her line of questioning at the

12    time.  And then it progressed to a more aggressive,

13    agitated tone.

14    Q.   In that regard, when you were coming downstairs

15    with Mr. Santos, do you recall -- this just calls or a

16    yes or no -- do you recall whether or not there was any

17    discussion about what Mr. Santos' expectations were, or

18    what he thought would happen as a result of the

19    proceeding before Judge Arterton?

20    A.   Yes.

21    Q.   What can you tell the ladies and gentlemen of the

22    jury the defendant, Mr. Santos, had said concerning what

23    he thought was going to happen?

24    A.   He was hoping to be sent to some sort of rehab

25    facility as part of his sentence in lieu of jail time.

1   Q.   He had come into the courtroom as you say, he's

2   addressing the judge, and initially he was normal.

3   A.   Yes.

4   Q.   At some point in time that changed.

5   A.   Yes.

6   Q.   Do you have any recollection today as to what, if

7   anything, happened that caused him to change how he was

8   addressing the court?

9   A.   Yes.  When the judge basically told him she

10  wasn't -- didn't feel that a rehab sentence would be

11  appropriate, and that she wanted him to serve an

12  additional time in prison.

13  Q.   And once the judge had indicated that was her

14  intention, what do you recall the defendant saying or

15  dog?

16  A.   He would get very fidgety.  He was agitated, kind

17  of talking under his breath, rolling his eyes.

18  Q.   And do you recall him saying anything to the judge

19  after it had been clear -- because she'd made clear that

20  she was going to send him for a period of incarceration?

21  A.   Yes.

22  Q.   What do you recall him saying?

23  A.   Well, the judge in her monologue, more or less

24  making metaphors, saying like, "You're paddling

25  upstream," that sort of thing.

 1          And Santos basically cut her off and said, "You can

 2      shove that paddle up your you know where."

 3      Q.    That sticks out in your mind.

 4      A.    Yes.

 5      Q.    Did the judge, in fact, impose a sentence?

 6      A.    She did.

 7      Q.    Do you recall whether it involved a period of

 8      incarceration or not?

 9      A.    It was incarceration.

10      Q.    Do you recall, sir, after the sentence had been

11      imposed, did the judge remain in the courtroom, or did

12      she leave the courtroom?

13      A.    The judge left the courtroom.

14      Q.    And after the judge had left the courtroom, do you

15      recall whether or not something occurred involving

16      Mr. Santos making a statement to anybody?

17      A.    Yes.

18      Q.    Tell the jurors what you recall about that.

19      A.    So as we were preparing to bring Mr. Santos back up

20      to our cell block, there was an exchange of words

21      between him and his probation officer, Brian Topor.

22          Brian Topor more or less said, "Look, Peter, we're

23      trying to look out for you, we're trying to help you out

24      here.

25          And Mr. Santos replied, "When I get out, I'm coming

1   for you."

2   Q.   And did you hear that?

3   A.   Yes.

4   Q.   And did you have any difficulty hearing that?

5   A.   No.

6   Q.   And with respect to your observations of the

7   courtroom, Mr. Santos' comment, who was that directed

8   at?

9   A.   Brian Topor.

10  Q.   Is there any question in your mind about that?

11  A.   No.

12  Q.   And what, if anything, did Mr. Topor say in

13  response to Mr. Santos saying, "When I get out, I'm

14  coming for you"?

15  A.   He didn't say anything.  He looked pretty taken

16  aback by the comment.

17  Q.   What, if anything, did you say or do?

18  A.   We quickly handcuffed him and brought him out.

19       MR. DURHAM:  May I approach the witness, Your

20  Honor?

21       THE COURT:  You may.

22  BY MR. DURHAM:

23  Q.   I want to show you what we've premarked in the

24  matter as Government's Exhibit 3B, 3C and 3D, okay?

25       I'd ask you to look at those photographs and tell

1    us if you recognize what they show.

2    A.    They show my partner and I escorting Mr. Santos out

3    of the courtroom.

4    Q.    With respect to Mr. Santos, do you remember whether

5    you were in the courtroom once or more than once, Judge

6    Arterton's courtroom with Mr. Santos?

7    A.    I'm sorry, can you repeat that.

8    Q.    Sure.

9         Was this the only time that you were in the

10   courtroom with Mr. Santos, as best you can recall?

11   A.    Yes, as best I can recall.

12   Q.    And as to those photographs, 3B, C and D, do those

13   accurately depict you and your partner taking Mr. Santos

14   on the route he would follow to get out of the

15   courtroom?

16   A.    Yes.

17              MR. DURHAM:  We would offer 3B, C and D as

18   full exhibits, Your Honor?

19              MR. ROGAN:  No objection.

20              THE COURT:  Government Exhibits 3B, 3C and 3D

21   are admitted.

22              Let me know when you want to take the lunch

23   break.

24              MR. DURHAM:  Yes, Your Honor.  Sure.

25              THE COURT:  When you're at a good transition

1    point.

2              MR. DURHAM:  Why don't we do it now, and we

3    can just pick up.

4              THE COURT:  All right.  We'll take our lunch

5    break, ladies and gentlemen.

6                   (Whereupon, the jury left the courtroom.)

7                   (Whereupon, a recess followed.)

8              THE COURT:  Looks like we're ready for the

9    jury?

10             MR. DURHAM:  Yes, Your Honor.

11             THE COURT:  We'll bring them in.

12                  (Whereupon, the jury entered the

13   courtroom.)

14             THE COURT:  Please be seated, everyone.

15             Looks like we're ready.

16             MR. DURHAM:  Thank you, Your Honor.

17   BY MR. DURHAM:

18   Q.   Sir, when we recessed we had just marked as full

19   exhibits Government Exhibits 3B, 3C and 3D.  I want to

20   just go through those quickly with you.

21        I will start in the sequence, 3A was already

22   marked, and I think you looked at it.

23             MR. DURHAM:  If we could pull up 3A quickly,

24   please.

25

```
 1   BY MR. DURHAM:

 2   Q.   Okay.  So you identified yourself in this picture,

 3   correct?

 4   A.   Yes.

 5   Q.   And this is the inside of Judge Arterton's

 6   courtroom?

 7   A.   Yes.

 8              MR. DURHAM:  So if we could then pull up 3B,

 9   please.

10   BY MR. DURHAM

11   Q.   At this point you remained in position at the

12   witness stand, correct?

13   A.   Yes.

14   Q.   And your colleague, Deputy United States Marshal

15   Moore, is now standing?

16   A.   Yes.

17   Q.   If we go to 3C.

18        Looking at that photograph, at this point in

19   time -- you recognize yourself?

20   A.   Yes.

21   Q.   At this point in time, would Judge Arterton have

22   been in the courtroom, or she's already cleared the

23   courtroom?

24   A.   She would have been out of the courtroom.

25   Q.   And explain to the jurors -- I asked you this
```

1      before the break, but if you would -- when is it that

2      you -- when you're transporting or moving a prisoner,

3      when is it that you do that in relation to when the

4      judge is in the courtroom?

5      A.    We always, when we leave the courtroom, we make

6      sure the judge is out of the courtroom first.  We wait

7      until the judge has left before we move the prisoner.

8      Q.    And in this instance did you follow that procedure,

9      as best you recall?

10     A.    Yes.

11     Q.    And then 3D, please.

12           And this particular photograph,

13     Government's Exhibit 3D, the individual who's behind

14     Mr. Santos, who's that?

15     A.    Matthew Moore.

16     Q.    You can see him earlier, but that's Matt Moore.

17     A.    Yes.

18     Q.    With respect to where Mr. Santos is looking in that

19     picture, what's over in that direction to which he's

20     looking?

21     A.    He's looking towards the jury box, which is where

22     probation usually sits.

23     Q.    In this instance do you recall, is that where

24     probation was sitting?

25     A.    Yes.

1    Q.   Describe to the jurors, if you would, what, if

2    anything, you observed with respect to Mr. Santos making

3    any statement to Mr. Topor; that is, where was he in the

4    courtroom when this occurred, as best you can recall

5    now?

6    A.   When he had the exchange with Mr. Topor, Topor was

7    still towards the jury box.

8    Q.   So you've indicated that, as he was walking out, he

9    made this statement to Mr. Topor, correct?

10   A.   Yes.

11   Q.   And did you yourself have any conversation with

12   Mr. Santos at that point, in the courtroom, as best you

13   can recall?

14   A.   No, not in the courtroom.

15   Q.   And did you proceed out of the courtroom, or did

16   you remain in the courtroom with Mr. Santos?

17   A.   No.  We proceeded to leave the courtroom.

18   Q.   And when you get out of the courtroom, again, what

19   do you -- where do you go when you get outside the

20   courtroom?

21        You go out the back door of Judge Arterton's

22   courtroom, and then where are you?

23   A.   We're in the hallway in the chamber's area where

24   the judge's offices are.  And then from there, we go out

25   into hallway where the elevator is, which brings us back

1    up to our cell block.

2    Q.   You described that generally to the jurors earlier,

3    correct --

4    A.   Yes.

5    Q.   -- you have to make turns, but then you get to an

6    elevator.

7         Let me then turn your attention to the walk from

8    the hallway, and then while you're at the elevator.

9         Do you recall, you went all the way to the

10   elevator, yes or no.

11   A.   Yes.

12   Q.   Who else was at the elevator with you?

13   A.   Myself, Mr. Santos, and Matthew Moore.

14   Q.   And in that regard, can you tell the ladies and

15   gentlemen of the jury whether or not anything was said

16   by you to Mr. Santos?

17   A.   Yes.

18   Q.   Tell the jurors what happened there.

19   A.   So we tried -- myself and my partner tried calming

20   him down, telling him more or less, It's not a big deal,

21   it's not the end of the world, you shouldn't make

22   outbursts like that in the courtroom.

23        Mr. Santos replied, "Well, we all have to meet our

24   maker at some point."

25   Q.   And in addition to saying, "Well, we all have to

1    meet our maker at some point," do you remember if he

2    said something beyond that?

3    A.   He said, "We all have to meet our maker at some

4    point, whether it's by me or someone else."

5    Q.   Did you have any further conversation with

6    Mister -- conversation, did you say anything to

7    Mr. Santos in response to his saying, "We all have to

8    meet our maker, whether it's by me or someone else"?

9    A.   No.  We basically stopped trying to calm him down

10   at that point.  We felt it was pretty much useless at

11   that moment.

12   Q.   Now, in your experience -- you've indicated you've

13   been a marshal for approximately five years?

14   A.   Yes.

15   Q.   How common -- in your experience, how common is it

16   for a defendant that you have been transporting to make

17   a statement or comment like that?

18   A.   I'd say pretty uncommon, because this was the first

19   time this has ever happened.

20   Q.   With respect to Mr. Santos' demeanor when he made

21   the statement to Mr. Topor, that you referred to, in the

22   courtroom, would you tell the jurors, based on your

23   observations, did he appear to be doing it or saying

24   that in a joking fashion?

25   A.   No.

1    Q.    How would you describe his demeanor or the fashion

2    in which he made the statement to Mr. Topor?

3    A.    He was loud, agitated, shaky body movements.

4    Q.    When you were at the elevator, and let me ask you

5    this, you said, "Hey, it's not such a big deal," and so

6    forth and so on.

7          Was that something unique to this situation; that

8    is, that you were saying this to Mr. Santos, or is that

9    a common practice?

10   A.    Typically, if a defendant, we see that they get

11   upset in court because they just got a lengthy sentence,

12   we'll try to calm them down a little bit by saying, "It

13   could always be worse, instead of 10 years, you could

14   have got 20 years," to keep them calm when they're back

15   upstairs.

16   Q.    So when you get to the elevator and Mr. Santos

17   says, "Everybody's got to meet their maker," et cetera,

18   would you tell the jurors whether or not, to your

19   recollection, he appeared to be joking when he said

20   that?

21   A.    No.

22   Q.    Was he laughing about it?

23   A.    No.

24   Q.    Based on how he -- what he said and how he said it,

25   did you take it seriously?

1    A.    I did, yes.

2    Q.    And as a result of taking it seriously, did you

3    take any action thereafter?

4    A.    Yes.

5    Q.    Tell the ladies and gentlemen of the jury what you

6    did thereafter?

7    A.    I notified my superiors, and I notified Matthew

8    Parker, who's our district's protective intelligence

9    inspector.

10   Q.    All right.  And based on -- you reported it

11   directly to Inspector Parker?

12   A.    Yes.

13   Q.    What was your understanding, in August of 2016, as

14   to what Inspector Parker's principal duties and

15   responsibilities were?

16   A.    So his role is to investigate any threatening

17   matters that may occur against the courts, whether it's

18   attorneys, judges, clerks, any court staff.

19   Q.    All right.  And that's what you did in this

20   instance?

21   A.    Yes.

22   Q.    Do you recall how soon after the comments had been

23   made by Mr. Santos, that was reported to Inspector

24   Parker?

25   A.    Basically as soon as we got him back up in the cell

1    block, I let him know and my superiors know.

2    Q.   Okay.   Thereafter, were you interviewed in

3    connection with that matter?

4    A.   Yes.

5    Q.   And was that on the same day or some different day,

6    if you recall?

7    A.   I believe it was the same day.

8    Q.   And did you tell him what you just told the jury?

9    A.   Yes.

10           MR. DURHAM:   Thank you, Your Honor.   I have no

11    further questions.

12

13                    CROSS-EXAMINATION

14   BY MR. ROGAN:

15   Q.   Good afternoon, Mr. Curra, how are you?

16   A.   Good.   How are you?

17   Q.   Again, in the spirit of full disclosure, you and I

18   have had professional interaction before, right?

19   A.   Yes.

20   Q.   Okay.   I just want to ask you some questions.   I

21   want to focus on the time frame after Judge Arterton

22   left the courtroom.

23           You indicated on direct examination that

24   Officer Topor said something like, "We're trying to help

25   you out here."

1      Do you remember that?

2  A.  Yes.

3  Q.  When did Officer Topor make that comment; was it

4  before Mr. Santos said anything to him, and as he was

5  being led out?

6  A.  That I can't recall.  I can't recall offhand if

7  Mr. Santos said something to him beforehand.

8  Q.  So, but no doubt in your mind, Marshal, that

9  Mr. Topor either initiated a conversation or responded

10  to a statement from Mr. Santos by saying something along

11  the lines of, "Peter, we're trying to help you, we're

12  trying to help you out here."

13  A.  Yes.

14  Q.  That you recall.  Fair enough.

15      And I think you also testified on direct

16  examination that when Mr. Santos made the alleged

17  comment, was there a response that you could hear from

18  Mr. Topor back to Mr. Santos?

19  A.  I'm sorry.  Can you repeat that?

20  Q.  Sure.  That was a badly framed question.

21      I think you testified on direct examination that,

22  after Mr. Santos made his comment, you don't recall if

23  Mr. Topor made any response back.

24      Is that fair to say?

25  A.  Yes.

1    Q.   So you don't recall him saying anything like,

2    "Excuse me," or anything like that?

3    A.   I don't recall, no.

4    Q.   And you're not certain who initiated that

5    conversation between Mr. Santos and Mr. Topor.

6    A.   No.

7    Q.   But no doubt in your mind that Mr. Topor said in

8    that courtroom on that day, after Judge Arterton left

9    the bench, something along the lines of, "Peter, we're

10   trying to help you out here."

11   A.   Yes.

12   Q.   Fair enough.

13        You also said, in response to a question from

14   Mr. Durham, that Officer Topor was still towards the

15   jury box.

16        Do you recall whether or not Mr. Topor was in the

17   jury box or in the vicinity of the jury box?

18   A.   I can't recall directly where he was positioned at

19   the time, but it was -- for example, if the jury box was

20   on that side of the courtroom, he would be on your side

21   of the courtroom, like by your table and where the jury

22   box would be.

23   Q.   In Judge Arterton's courtroom.

24   A.   Yes.

25   Q.   Fair enough.

1      Do you recall if anyone was standing next to or in

2   the vicinity of Mr. Topor towards the jury box?

3   A.    Yes.  I believe it was -- it was Mr. Topor and a

4   probation trainee.

5   Q.    Does the name Mr. Leone ring a bell, or

6   Officer Leone ring a bell?

7   A.    Yes.

8   Q.    You indicated that also on the way out, my client,

9   Peter Santos, appeared loud, agitated, shaky body

10  movements.  I think the jury knows what "loud, agitated"

11  means, but can you describe in your own words what you

12  recall about shaky body movements?

13  A.    Eye rolls, constant head turns, shoulder shrugs, a

14  little fidgety.

15  Q.    Fidgety.  Okay.

16      Was that throughout the course of the proceedings

17  or only after Judge Arterton had left the bench?

18  A.    Once the judge kind of shot down his request for

19  the rehab treatment, that's when it started.

20  Q.    Fair enough.

21      Did you observe any visible reaction on the part of

22  Mr. Topor as to the comment that was directed towards

23  him allegedly by my client?

24  A.    Mr. Topor appeared taken aback.  I didn't hear him

25  say anything.  He kind of just stood there.

1    Q.    And again, he didn't say anything other than the

2    part about, "Peter, we're trying to help you out here,"

3    but in fairness to you, I'm not trying to be difficult,

4    you just don't know where that fell in the sequence --

5    A.    No.

6    Q.    -- of who said what first.

7    A.    No.

8    Q.    Fair enough.

9          If you can fairly estimate, because I've seen your

10   work before, once the judge leaves the bench, regardless

11   of the circumstances, how quickly do the marshals move

12   to take the then-sentenced individual out of the

13   courtroom and back upstairs to -- in this case it would

14   have been downstairs to the mezzanine level?

15   A.    Depending on the judge, it's usually as soon as

16   possible.

17   Q.    And can you make an estimate here, how quickly

18   after Judge Arterton left the bench had you and your

19   partner cleared Mr. Santos out of the courtroom?

20   A.    As soon as she walked out that door, we proceeded

21   to follow her out.

22   Q.    With him in tow, so to speak.

23   A.    Yes.

24   Q.    So fairly instantan- --

25   A.    Seconds.

1    Q.    -- instantaneously?

2    A.    Yes.

3    Q.    When the other comment was made -- you said -- I

4    know the marshals do this, you guys were trying to calm

5    him down because people don't like when they get

6    sentenced, right?

7    A.    No.

8    Q.    Who does.

9    A.    Nobody.

10   Q.    Sp you're trying to do that, and this comment, "We

11   all have to meet our maker, either by me or someone

12   else," is that a paraphrase or an exact quote?

13   A.    That would be a paraphrase.  I can't recall word by

14   word exactly what he said.

15   Q.    And that's fair enough.

16         Is that also true of what you recall was said or

17   directed to Mr. Topor in the courtroom?

18   A.    Yes.

19   Q.    So the statement that you made, that's your best

20   recollection, but it's not a direct quote; fair to say?

21   A.    Yes.  Word for word, I can't specifically say what

22   he said.

23   Q.    And I understand that.

24         And to be clear for the jury, when a then-sentenced

25   individual is being taken back down, probation is not

1    with him, right?

2    A.    No.   It's just us, the marshals and the prisoner.

3    Q.    So this statement about, "We all meet our maker,"

4    wasn't made in the presence of Mr. Topor.

5    A.    No, it was not.

6    Q.    It was just made to you and your partner, Mr. Matt

7    Parker (sic)?

8    A.    Matt Moore.

9    Q.    I'm sorry.   Matt Moore.   I got him mixed up with

10   your supervisor.

11        And at any point do you recall yourself saying,

12   "Hey, come on man," or something like that, "That's not

13   going to help," or anything like that.

14   A.    That's what my partner said.   I just said, "Hey, it

15   could be worse."

16   Q.    And I'll ask your partner when he comes in, but the

17   comment that your partner made, was that made in the

18   courtroom or once Mr. Santos was out of that courtroom?

19   A.    We were outside the courtroom.

20   Q.    Okay.   So that was, again, just in the presence of

21   you and your partner.

22   A.    Yes.

23   Q.    I know you immediately notified your supervisor,

24   but I wanted to ask you:   Do you recall being either

25   interviewed or prepared for your testimony here today,

1    back on May 18th?

2    A.   Yes.

3    Q.   I just want to ask you a couple questions about

4    that.

5         Do you recall -- who was present at that meeting to

6    prepare you for your testimony here today?

7    A.   The AUSA John Durham, Matt Parker.

8    Q.   Do you recall saying something like -- that when

9    Topor -- and I'm paraphrasing -- when Officer Topor said

10   something like, "Hey, we're just trying to help,"

11   Mr. Santos was turning his back to him, brushing his

12   shoulder to Topor, and had a snotty attitude?

13        Do you recall saying something like that?

14   A.   Yes.

15   Q.   I just want to be clear because it just may be how

16   I'm badly reading it, but you're not saying, when he was

17   brushing his shoulder towards him, there was no contact

18   between -- there could not have been any contact in that

19   courtroom between Mr. Santos and Officer Topor, right?

20   A.   No physical contact, no.

21   Q.   He was just turning away from him?

22   A.   Yes.

23   Q.   And I think a snotty attitude is pretty

24   self-explanatory.

25        He was upset; fair to say?

1    A.    Yes.

2    Q.    Do you recall, once you brought him to the

3    mezzanine level in the New Haven district courthouse,

4    was he immediately placed in a holding cell, or do you

5    recall if he met or saw anyone?

6    A.    That I can't recall.  I wasn't the one who -- when

7    we get up to the cell-block level, I wasn't the one who

8    actually went into the cell block with him to uncuff

9    him, so I can't recall if he went back to a cell or an

10   attorney room.

11   Q.    That's what I was going to ask you about.

12        Would that have been your -- would you have

13   transferred that over to your partner or to another

14   marshal?

15   A.    My partner would have been the one that actually

16   went into the cell block with him.

17            MR. ROGAN:  Great.  With that, I have no

18   further questions.  Thank you, sir.

19

20                    REDIRECT EXAMINATION

21   BY MR. DURHAM:

22   Q.    Just briefly, counsel asked you a question about

23   where Mr. Topor was located as the defendant was being

24   taken out of the courtroom.

25        Do you remember that?

1    A.   Yes.

2    Q.   You said you don't remember.

3         Do you have a specific recollection he was near the

4    box or in the box?

5    A.   Yes.

6              MR. DURHAM:   If we might pull up quickly

7    Government's Exhibit 4D or 4E, either one.

8    BY MR. DURHAM:

9    Q.   Now, looking at full exhibit

10   Government's Exhibit 4D, does that refresh your

11   recollection as to where Mr. Topor was located when the

12   defendant was being taken out of the courtroom?

13   A.   Yes.

14   Q.   And where was he?

15   A.   He was in the box, appears to be to the -- well,

16   the left, the person standing on the left.

17   Q.   As you look at the photograph, he's the one on the

18   left.

19   A.   Yes.

20   Q.   And then counsel asked you about how soon after

21   Judge Arterton left the courtroom did you take the

22   defendant out.

23        And you said it would have been immediately, right?

24   A.   Yes.

25   Q.   Just to give the jurors a sense of things, when you

1    walk out of that courtroom, that is being Judge

2    Arterton's courtroom, where are Judge Arterton's

3    chambers located?

4    A.    So when you walk out the door that we come out of,

5    it's basically right across.

6    Q.    So when you came out with Mr. Santos, was the judge

7    in the hallway or chambers, or she was already in

8    chambers?

9    A.    I didn't see her in the hallway, so I'm going to

10   take a guess that she was probably in her chambers.

11   Q.    Okay.  And then counsel made reference several

12   times to alleged comment.

13        As you sit here today, with respect to Mister --

14   the comment that Mr. Santos made, a statement he made to

15   Mr. Topor, did that in fact occur; or is that, in your

16   mind, just some allegation?

17   A.    No, that did occur.

18   Q.    All right.  And counsel then asked you a question

19   relating to Mr. Santos saying, "Everyone's got to meet

20   their maker, whether it's by me," or however or

21   whatever.

22        Do you remember him asking you a question about

23   that?

24   A.    Yes.

25   Q.    And he said, "Do you remember the exact words?"

1          And I think you said that that would be a

2     paraphrase?

3     A.   Yes.

4     Q.   But with respect to the gist of that, that is the

5     crux of it, saying, "Everybody's got to meet their

6     maker," do you remember that having been said?

7     A.   Yes.

8     Q.   Is that a paraphrase; or did he, Mr. Santos, in

9     fact, use those words, "Everybody's got to meet" --

10    A.   He used those words, the words before and after.  I

11    would have remembered specifically.

12              MR. DURHAM:  Thank you, sir.

13              I have no further questions, Your Honor.

14

15                   RECROSS-EXAMINATION

16    BY MR. ROGAN:

17    Q.   Just briefly, Marshal Curra.

18         To follow up on the last question, "Everybody's got

19    to meet their maker," the part about, "Whether it's by

20    me or someone else," you don't have a precise recall of

21    that statement being made; is that fair to say?

22    A.   Yes.

23    Q.   And again, I don't want to revisit the issue, but

24    when I used the word "alleged comment," I didn't mean it

25    in the sense of -- what you heard in the courtroom, as

1     well as what you heard in the courthouse, in fairness to

2     you -- or in the courtroom, after Judge Arterton left

3     the bench, it's your best recollection, it's not a

4     direct quote; is that fair to say?

5     A.   Yes.

6     Q.   Okay.  And the last question, since we still have

7     it up, if you would take a look at what we have on the

8     monitor, Government's Exhibit 4D, you now see that, at

9     the time, you recognize Officer Topor and Officer Leone

10    being in the jury box?

11    A.   Yes.

12    Q.   And do you see my client's head turned in that

13    general direction?

14    A.   Yes.

15    Q.   When he made the statement, as best you can recall

16    it, it was directed towards directly towards the jury

17    box where those two individuals were standing --

18    A.   Yes.

19    Q.   -- side by side; is that fair to say?

20    A.   Yes.

21    Q.   So you don't know whether the comment was directed

22    to Mr. Topor, Mr. Leone, or both.

23         That's assumption on your part; is that fair to

24    say?

25    A.   Yes.

1           MR. ROGAN:  Thank you, nothing else.

2

3                 FURTHER REDIRECT EXAMINATION

4     BY MR. DURHAM:

5     Q.   Had Mr. Leone had any kind of exchange with

6     Mr. Santos that day?

7     A.   No.

8     Q.   Had Mr. Leone even said anything to the judge that

9     day?

10    A.   No.

11    Q.   To your knowledge, had Mr. Leone been in the

12    courtroom on August 25th, when Mr. Santos was

13    detained?

14          MR. ROGAN:  Objection, Your Honor, outside the

15    scope of my redirect.

16          THE COURT:  The first two were not, but we'll

17    finish up.

18    BY MR. DURHAM:

19    Q.   Finally, with respect to counsel's question about

20    looking at the jury box, you testified that the

21    statement -- your observation was made to Mr. Topor,

22    right?

23    A.   Yes.

24    Q.   As you sit here now, having been in the courtroom

25    that day and heard the statement by Mr. Santos, is there

1    any doubt in your mind, whatsoever, that he was talking

2    to Brian Topor, he was directing his comment to Topor?

3    A.   There is no doubt.

4            MR. DURHAM:  Thank you, sir.

5            Nothing further, Your Honor.

6            THE COURT:  Thank you, sir.  You may step

7    down.

8                (Whereupon, the witness was excused.)

9            MR. DURHAM:  Matt Moore, Your Honor.

10                     MATTHEW MOORE,

11            called as a witness, having been first duly

12            sworn or affirmed, was examined and testified

13            as follows:

14

15            THE CLERK:  Please state your name and spell

16   your last name for the record.

17            THE WITNESS:  Matthew Moore, M-O-O-R-E.

18            THE CLERK:  And indicate the town and state in

19   which you live or work.

20            THE WITNESS:  New Haven, Connecticut.

21            THE CLERK:  Thank you.

22            MR. DURHAM:  Thank you, Your Honor.

23                     DIRECT EXAMINATION

24   BY MR. DURHAM:

25   Q.   Sir, would you tell the jurors how you're employed.

1    A.    I'm a Deputy United States Marshal.

2    Q.    For how long have you been a Deputy United States

3    Marshal?

4    A.    Approximately six years.

5    Q.    Is there a particular courthouse in the district of

6    Connecticut or the state of Connecticut where you

7    typically operate?

8    A.    I do.  I work out of the New Haven office usually.

9    Q.    And in that connection, describe, if you would, to

10   the jurors what your general duties and responsibilities

11   are, as a United States -- Deputy United States Marshal?

12   A.    Sure.

13         We have a lot of different functions, but our two

14   main functions are fugitive investigations and also

15   courthouse security, to include protecting the court

16   staff, as well as producing prisoners and making sure

17   court matters proceed without any security risks.

18   Q.    In this regard, I want to ask you if you recall if

19   you had occasion to be present in Judge Arterton's

20   courtroom in New Haven on August 31st of 2016.

21   A.    I was.

22   Q.    What brought you to Judge Arterton's courtroom that

23   day?

24   A.    We were there for a supervised-release violation

25   sentencing for Peter Santos.

1   Q.   And with respect to Mr. Santos, who were you with?

2   A.   I went with my partner, Deputy Michael Curra.

3   Q.   And did you see him leaving?

4   A.   I saw him on the way in.

5   Q.   So you two have responsibility for bringing

6   Mr. Santos to the courtroom that day?

7   A.   That's correct.

8   Q.   Would you tell the ladies and gentlemen of the jury

9   whether you yourself were present for the entire

10  proceeding before Judge Arterton on that date?

11  A.   I was present for the whole thing.

12  Q.   Now, the jury has seen some photographs.

13       MR. DURHAM:   I'm going to ask quickly that

14  Government's Exhibit 3A be brought up.

15  BY MR. DURHAM:

16  Q.   Do you see that; your monitor is working, hey?

17  A.   I do.

18  Q.   The jury knows this, but do you see yourself

19  positioned at a particular place in that courtroom?

20  A.   I do.

21  Q.   Where were you located during these proceedings?

22  A.   Directly behind Mr. Santos.

23  Q.   Explain to the jurors, if you would, whether

24  typically, in a situation such as this, the deputy

25  marshals position themselves in a particular fashion.

1    A.    We generally do, yes.  One of us will be positioned

2    behind the defendant.  The other one, because we know

3    Judge Arterton will frequently use the middle pulpit

4    there, one of the other deputies will be positioned

5    there, next to the witness box.

6    Q.    And if we could then go quickly to 3B, please?

7          As you look at Government's Exhibit 3B, have you

8    changed positions?

9    A.    Yes, I have.

10   Q.    And for the written record, describe where you are

11   now, in the courtroom.

12   A.    Sure.

13         I am off to Mr. Santos' right, standing with my

14   arms up across my body.

15   Q.    Do you recall, as you sit here now, sir, whether

16   there was anything in particular occurring in the

17   courtroom that caused you to get up?

18   A.    I do, yes.

19   Q.    Describe to the jurors what that was.

20   A.    Sure.

21         During the sentencing proceeding, Mr. Santos had

22   made some remarks, asking for the judge to impose a

23   sentence of just going to a drug treatment facility.

24   When it became clear that Judge Arterton was not going

25   to do that, that she was going to impose a jail

1    sentence, Mr. Santos became rather animated, agitated.

2        There were quite a few exchanges back and forth

3    between the judge and the defendant, at which point I

4    perceived it to be a greater risk to security, and I

5    stood up to make sure I was prepared in case something

6    did happen.

7    Q.   In that regard, do you recall whether there was any

8    kind of change in Mr. Santos' demeanor between the time

9    he first came into the courtroom and when you believed

10   it was appropriate for you to get up and move to the

11   position that you were in, in Government's Exhibit 3B?

12   A.   I do, yeah.

13   Q.   Explain to the jurors, you came down with him,

14   correct, from lockup.

15   A.   I did.

16   Q.   What was his demeanor and attitude at that point?

17   A.   He was pretty calm.  It wasn't unlike any other

18   court proceeding we've done.  Everything was very calm,

19   and he seemed pretty confident that he was going to be

20   released to a drug treatment facility, which is what he

21   wanted.

22       It was at the point when she started to -- it

23   started to become clear from her comments that she was

24   not leaning that way that Mr. Santos basically started

25   to have a back-and-forth with the judge saying, "Forget

1    it, get this over with, just sentence me, I don't want

2    to be here anymore, you're not going to give me what I

3    want, so I want to go."

4        I remember, as a matter of fact, he even put his

5    hands behind his back and looked at me and said, "Take

6    me out of here," putting his hands behind his back

7    because that's the way we normally cuff defendants when

8    we go to and from the courtroom.  He looked at me and

9    said, "Let's go.  I don't want to be here anymore."

10       I didn't react.  At that point, that's when I stood

11   up and started to actually pay very close attention to

12   Mr. Santos' body language and demeanor.

13   Q.   Do you recall, sir, whether or not at that

14   proceeding on August 31st, if Judge Arterton did, in

15   fact, impose a sentence on Mr. Santos?

16   A.   She did.  It was not to a drug treatment facility.

17   I do not recall the exact sentence off the top of my

18   head, but I believe it was 6 months, but I'm not

19   100 percent certain about that.

20   Q.   After the court had imposed sentence, what, if

21   anything, did the court do; that is, the judge, what did

22   the judge do after the sentence had been imposed?

23   A.   The judge -- there was a little bit more of a

24   back-and-forth between Mr. Santos and the judge.  I

25   don't recall if it was at that point in the proceeding

1    or if it was slightly earlier, but Mr. Santos had

2    interrupted the judge and -- she was using a lot of

3    nautical references, saying like, something to the

4    effect of, "You're on a ship with no paddle going up the

5    river upstream, a captain-less ship." something of that

6    nature.

7        He basically interrupted her and said, "You can

8    take that paddle and shove it up your you-know-what."

9        The judge was not happy with this, obviously.

10       Once she was done imposing sentence, the judge --

11   we know Judge Arterton to quickly get up and leave the

12   courtroom, and she followed her normal routine of

13   getting up and leaving the courtroom.

14   Q.   At the point in time when the judge is on the bench

15   and then left the courtroom, was Mr. Santos handcuffed

16   or not handcuffed?

17   A.   It would have been almost simultaneously.  As the

18   courtroom deputy says, "All rise," and recesses the

19   court matter, I would have been right there, in order to

20   cuff up Mr. Santos.  Like I said, Judge Arterton is

21   usually pretty quick to leave the courtroom.

22   Q.   In that regard do you remember, after the judge had

23   left the bench and left the courtroom, whether anything

24   of significance occurred, in your mind anything of

25   significance?

1    A.    Yes.

2    Q.    Describe to the jurors what you recall that was

3    significant occurred once the judge had left the

4    courtroom.

5    A.    Sure.

6          So once the matter had concluded, I moved forward

7    to put the handcuffs on Mr. Santos.  As I was doing

8    that, he looked over across towards the jury box area,

9    which is where the probation officers normally sit

10   during the proceedings.  He looked over at Probation

11   Officer Brian Topor, and he said, "You know, this isn't

12   going to help me, Brian."

13         I caught a glimpse out of my peripheral.  Probation

14   Officer Topor basically shrugged his shoulders like, you

15   know, one of those things.  He said, "I'm doing the best

16   I can, Peter."

17         At that point we started to move to exit the

18   courtroom.  Mr. Santos kind of had a beeline right

19   towards staring at Probation Officer Topor, and he said,

20   "Well, when I get out, I'm coming for you."

21   Q.    And you heard that?

22   A.    I did.

23   Q.    Any doubt in your mind, as you sit here now, that

24   he said -- that Mr. Santos said to Mr. Topor words to

25   the effect that you've just given to the jury?

1    A.   No, no doubt in my mind.  As a matter of fact, I

2    don't -- I don't know if you have the video or if you've

3    seen it, but you can actually see in the video, at some

4    point my head even drops a little bit as I'm walking out

5    behind the defendant, my head kind of drops because now

6    I've just heard this, and I'm concerned there's going to

7    be a security threat now, getting Mr. Santos back up to

8    lockup.

9    Q.   We can quickly go through the series of photographs

10   as you're walking out.

11             MR. DURHAM:  I would ask that

12   Government's Exhibit 3C be put on the monitors.

13   BY MR. DURHAM:

14   Q.   As you look at this photograph, this exhibit, based

15   on your having been in the courtroom, where is

16   Mr. Santos looking at this point?

17   A.   He's looking directly over at the probation

18   officer, Brian Topor.

19             MR. DURHAM:  And then 3D, please?

20   BY MR. DURHAM:

21   Q.   And similarly, just again for the written record,

22   who's standing behind Mr. Santos?

23   A.   That's me.

24   Q.   And after this sequence, you took him out of the

25   courtroom?

1    A.    We did, yes.

2    Q.    Do you remember, sir, when Mr. Santos made the

3    statement to Mr. Topor, did Mr. Topor say anything in

4    response?

5    A.    His first response was, "Excuse me," as if he

6    didn't hear him or he wanted to repeat it.

7          And Santos replied, "You heard me."

8    Q.    Let me ask you about the defendant's, Mr. Santos',

9    demeanor at the time he said this.

10   A.    Sure.

11   Q.    You were personally present, can you describe for

12   the jurors whether or not, from your perspective, what

13   Mr. Santos said to Mr. Topor was said seriously or in a

14   joking fashion?

15   A.    Oh, it was definitely serious.  I perceived it as a

16   threat.

17   Q.    Is there any doubt in your mind that it was

18   directed to him in a serious fashion?

19   A.    No doubt whatsoever.

20   Q.    Do you remember what Mr. Topor's reaction was?

21   A.    I was more focused on the defendant.  I don't think

22   I looked over at Brian Topor in order to ascertain his

23   reaction to it at that point.  I was more focused on the

24   defendant.

25              MR. DURHAM:  If we could pull up

1    Government's Exhibit, 4D please.

2    BY MR. DURHAM:

3    Q.    Looking at 4D, the person in the foreground is who,

4    the person wearing a white shirt and tie and jacket?

5    A.    That's Deputy Michael Curra.

6    Q.    Again, for purposes of the written record, the

7    jurors can obviously see it, the person in the bottom

8    left-hand corner is who?

9    A.    That's Peter Santos.

10   Q.    Looking across to the jury box, there are two

11   individuals, correct?

12   A.    Correct.

13   Q.    Who are those two people?

14   A.    Those are Probation Officer Brian Topor and

15   Probation Officer Danny Leone.

16   Q.    You told the jury that Santos was talking to

17   Mr. Topor, directing his remarks at Topor.

18         What can you tell the jury about that; that is, how

19   do you know -- why do you believe he was directing his

20   remarks specifically to Mr. Topor, as opposed to just in

21   general to the jury box?

22   A.    Well, first off, I know Brian spoke during the

23   hearing, so he certainly had a part in the hearing; not

24   to mention, when Santos stood up, he looked right at

25   him, and when he said his name, obviously, "This isn't

1    going to help me, Brian," I perceived it as, okay, he's

2    directing all his comments toward Brian.

3         At that time, I believe Sandy was just -- he was

4    new on the job.  I hadn't seen him very often in the

5    courtroom, so I think he may have just been there

6    observing, but I'm not positive about that.

7    Q.   That was Probation Officer Leone?

8    A.   Yes, correct.

9    Q.   So then, with respect to Mr. Santos, did he remain

10   in the courtroom, or did he leave the courtroom?

11   A.   No.  We left with him through the normal avenue to

12   go back to the cell-block holding area.

13   Q.   Do you recall, sir, whether or not anything else --

14   let me step back.

15        With respect to Mr. Santos' comments in the

16   courtroom, first to Judge Arterton, in your experience,

17   how common or uncommon is it for a defendant in those

18   circumstances to speak to a federal judge that way?

19   A.   Extremely uncommon.  In my time on the job, I can't

20   really recall any defendants making comments of that

21   nature to a judge.  I've certainly heard defendants be

22   disappointed or upset, but not to that degree.

23   Q.   How about with respect to his comments directed --

24   or statement to Mr. Topor, that when he gets out he's

25   going to come for him, how common or uncommon is that in

1    your experience?

2    A.    I have never heard that before.

3    Q.    When you left the courtroom with Mr. Santos, do you

4    recall where Judge Arterton was?

5    A.    She would have -- like I said, she's generally

6    pretty quick once the matter ends, that's her normal

7    course of business, is get up and walk out the same door

8    that we're eventually going to leave out of.

9         And her chambers are directly across the hall, so

10   she's usually pretty quick to walk out that same door,

11   walk across the hallway into her chambers.  I imagine

12   she was in her chambers at that point.

13        We generally try to delay a second or two, to give

14   the judge a chance to leave so we don't cross paths.

15   Q.    Where was Mr. Santos taken?

16   A.    I'm sorry, what's that?

17   Q.    After you were outside the courtroom, where was

18   Mr. Santos taken at that point?

19   A.    We would have followed through the hallway, back to

20   the secure elevator which leads us up to the marshals

21   service floor, which is where our holding cell is.

22   Q.    And in that connection let me ask you, do you

23   recall anything else occurring involving Mr. Santos,

24   other than bringing him upstairs?

25   A.    I do.

1         When we got to the elevator, after I had witnessed

2    Mr. Santos become agitated and make the comments to both

3    the judge and the probation officer, I wanted to

4    ascertain what he was feeling and what kind of state he

5    was in.

6         So as we were standing at the elevator, I tried to

7    engage him in conversation to try to get a sense as to

8    his mental state.

9         I said to him, "Come on man, that's not smart."

10        He immediately replied, "I don't care.  I'm tired

11   of this.  Listen, everybody's got to meet their maker,

12   whether it's by me or some other way."

13        So I kind of got my answer through that.

14   Q.   With respect to the comment -- or the statement by

15   Mr. Santos that everybody has to meet their maker, how

16   clear is your recollection today that those words came

17   out of Mr. Santos' mouth?

18   A.   Very clear.

19   Q.   "Whether it's by me or some other way," clear to

20   you that that's what was said, or words to that effect?

21   A.   Yes, very clear.

22   Q.   When that was said, would you tell the ladies and

23   gentlemen of the jury, based on the way he said it, did

24   he appear to be joking about that?

25   A.   No.  There was no joking in his voice or his

1    demeanor.  It was serious.

2    Q.    And did you have any further comments or

3    conversation with Mr. Santos at that point, while you

4    were at the elevator?

5    A.    No.  At that point I got the answer I was looking

6    for.  At this point, I knew he was still very agitated,

7    upset.  He hadn't shown it towards us, "us" being the

8    marshals service, so far.

9        So given the fact that he engaged me in

10   conversation, I certainly took him to be serious, but I

11   didn't perceive any threat towards me at least.  So I

12   didn't think there would be an issue getting him back up

13   into the cell block at least.

14   Q.    Did you proceed to bring him upstairs?

15   A.    We did.

16   Q.    You and your partner?

17   A.    Correct.

18   Q.    Once Mr. Santos was upstairs in the Marshals area,

19   what happened?

20   A.    He was put in the attorney room.  His attorney

21   wanted to come up and see him after that.  We also

22   thought it was a good idea, obviously, to try to cool

23   him off a little bit.

24        After he was done talking to his attorney, he was

25   put back in his cell, and then I didn't have any

1   interaction with him until later on in the day.

2   Q.   And with respect to the interaction later in the

3   day, do you recall what that involved?

4   A.   I do.

5        We have a monitoring system of cameras in each of

6   the cells.  We have six total cells on the cell-block

7   floor.  There's a camera in each cell that's monitored

8   throughout the day.

9        I received a call at my desk from the person

10  monitoring the cameras, CSO Russell See, who told me

11  that Peter Santos was doing something to the camera in

12  his cell.  He could see him up in the picture in the

13  camera.

14       So I went back in the cell block, and I went and I

15  approached Mr. Santos through -- obviously through his

16  cell.

17       And I said, "Hey, what's going on.

18       He said, "Nothing."

19       "Is there something wrong with the camera," I

20  basically asked him, like, "What are you doing."

21       He said, "No, no, nothing."

22       I said, "Okay, well let's not play with the camera

23  at all."

24       He said, "What are you going to do, arrest me?"

25       Well, I informed him, "Well, you're already in

1    custody, but I will put you in restraints for the rest

2    of the day if you cannot behave yourself and not play

3    with the equipment."

4         He then told me, he said, "Well, you know, let's go

5    right now.  You're going to need more than just you to

6    do that."

7         I said, "Well, we have a whole office of people

8    that will help if necessary, but why don't we just don't

9    play with the camera."

10         And he responded something to the effect of, "We'll

11    see.  I'll try."

12         And we left it at that.

13         At that point I left the cell block.  I went back

14    into the monitoring room with the cameras.  I told the

15    CSO, if he plays with the camera again, let me know, and

16    we would have to take appropriate steps at that point.

17         I didn't receive any other news, though, that

18    Defendant Santos had messed with the camera or done

19    anything else.

20    Q.   So with respect to these events that occurred in

21    the courtroom when you were present, and then what was

22    said at the elevator, do you recall, sir, whether or not

23    you ever reported that information, provided that

24    information to other persons in position of authority?

25    A.   I did.  Right after it happened, I reported it to

 1    our chief deputy, Lawrence Bobnick.  I let him know.

 2         And I immediately went back to my desk to

 3    memorialize what had happened, because I understood it

 4    was going to be something that we would want to have a

 5    documentation record of.  So I began to write down what

 6    happened and the statements that Mr. Santos had made.

 7    Q.   And did you have occasion to meet that very day

 8    with any inspector in your office concerning this

 9    matter?

10    A.   I did.  I met with Inspector Matt Parker.

11    Q.   What is Matt Parker's role in the marshals service;

12    or at least in August of 2016, what was Mr. Parker's

13    responsibility?

14    A.   He's our threat investigator.

15    Q.   And did you provide the information to him that you

16    just provided to the jury?

17    A.   I did, yes.

18    Q.   And that was the very day that it occurred?

19    A.   Yes, it was the same day.  Yes.

20              MR. DURHAM:  Thank you, sir.

21              I have no further questions, Your Honor.

22

23                        CROSS-EXAMINATION

24    BY MR. ROGAN:

25    Q.   Good afternoon.

1    A.   Good afternoon, sir.

2    Q.   Again, I always do this in the spirit of full

3    disclosure, you and I know each other professionally.

4    A.   Yes.

5    Q.   Also fair to say, back on August 31, 2016, my

6    client was acting like a real jerk?

7    A.   Yes, fair to say.

8    Q.   Okay.  Let's talk a little bit about that.

9         You testified on direct exam, and you seemed to

10   have a pretty good recollection.  I just want to focus

11   on what happened after the proceeding was ended with

12   Judge Arterton, and then we'll talk about what you

13   observed while the proceeding was going on.

14   A.   Okay.

15   Q.   As you told the jury, Judge Arterton is very quick

16   getting off the bench, and you're very quick to cuff up

17   the detainees at that point, right, it's almost done

18   simultaneously.

19   A.   Correct.

20   Q.   That wasn't anything but standard operating

21   procedure that day, as far as it relates to Mr. Santos.

22   A.   I will say, when the matters conclude, a lot of

23   times the defendants have papers, or they may be talking

24   to their attorney, and we'll gradually make our way over

25   to the defendant to cuff him up.

1           In this particular case, given what had transpired

2      during the proceeding, I was very quick to cuff him up.

3      It was mostly standard operating procedure.  I probably

4      moved a little quicker, though, that day.

5      Q.   That's fair enough.

6           So the first thing you heard him say as he was

7      being led out, and you described Judge Arterton's

8      courtroom, is him looking over towards the jury box and

9      saying, "You know, this isn't going to help me, Brian,"

10     right?

11     A.   Correct.

12     Q.   And no doubt in your mind that you heard that

13     statement by Mr. Santos, right?

14     A.   No, no doubt.  And I believe my recollection is

15     that he said that as I was cuffing him up, so we were

16     still behind the table at that point.  We hadn't started

17     to walk out yet.

18     Q.   So I'll follow up, and then the next thing you

19     heard was the response from Officer Topor is, "I'm doing

20     the best I can, Peter," right?

21     A.   Correct.

22     Q.   Were you still -- we can pull the picture up, but

23     were you still at counsel table, or were you on the move

24     at that point?

25     A.   Not a hundred percent positive.  We were probably

1    just exiting from behind counsel table as he said that.

2    Q.    You typically take them around what would be --

3    A.    -- the right side of the counsel table, past -- in

4    this courtroom it would be in this basic path here, past

5    the witness stand box.

6    Q.    But not past the jury box.

7    A.    No, not past the jury box.

8    Q.    Okay, got you.

9          And then you recall my client saying, "When I get

10   out, I'm coming" -- I want to make sure -- "When I get

11   out, I'm coming for you"; is that true?

12   A.    Correct.

13   Q.    And then you hear Mr. Topor again engage in more

14   conversation, and he says, "Excuse me."

15         And then you hear Mr. Santos, my client, say, "You

16   heard me."

17   A.    Correct.  It was more of an incredulous, like,

18   "Excuse me?"  Like one of those things.

19   Q.    He said, "Excuse me," and then the response from my

20   client is, "You heard me."

21         Is it fair to say that you based your testimony, at

22   least in part, that the comment was directed towards

23   Officer Topor because of the fact that the first thing

24   out of my client's mouth was, he addressed the probation

25   officer by his first name?

1    A.    Correct, yeah.

2    Q.    Because the part about -- and then Mr. Topor

3    actually says -- again, is talking to him in the first

4    person, says, "I'm doing the best I can, Peter," so

5    they're talking to each other using first names.

6    A.    Correct.

7    Q.    And based upon that, when he looks over and then

8    makes this other comment, "When I get out, I'm coming

9    for you," it was based upon that, that you believe it

10   was directed directly at Mr. Topor.

11   A.    That, and also, once he said it the first time,

12   when Brian responded with "Excuse me," he said, "You

13   heard me."

14         So he didn't respond with, "No, I wasn't talking to

15   you."  It seemed pretty clear to me that those two were

16   the ones engaged in the conversation.

17   Q.    At that point they were no longer using first names

18   with each other.

19   A.    No, they didn't repeat their first names again.

20   Q.    And you would agree with me that standing right

21   next to Mr. Topor in the jury box was Dan Leone, the

22   other probation officer?

23   A.    Correct, yes.

24   Q.    But he didn't participate in the conversation.

25   A.    No.

1    Q.   And then you guys are doing what you're trying to

2    do, which is you and your partner -- I wouldn't say what

3    your partner said, but you're trying to calm Mr. Santos

4    down as you're taking him out, right?

5    A.   Yeah.  At that point, once we get to the elevator,

6    again I'm trying to gauge what his demeanor is going to

7    be.  At this point, what's said is said.  I want to get

8    him -- my job, my primary concern is putting him back in

9    the cell-block holding area without incident.

10   Q.   When you were -- hang on one second.

11        MR. ROGAN:  If I could ask for photograph 3C

12   to be put up, please?

13        Thank you so much.

14   BY MR. ROGAN:

15   Q.   Can you see that on the monitor, Marshal Moore?

16   A.   I do.

17   Q.   And you'd indicated that your primary concern at

18   that point was, you would agree, you're walking behind

19   Mr. Santos at that point?

20   A.   I am.

21   Q.   And you're primarily focused on getting him out of

22   the courtroom, correct?

23   A.   Yeah, getting him back to the cell-block holding

24   area, for sure.

25   Q.   Were you looking at Mr. Santos, or were you looking

1    over at the jury box?

2    A.   I probably took a glance over towards the jury box

3    as well.  I was probably splitting my attention between

4    the two things.

5         Once I heard him say, "I'm coming for you," that's

6    when I started to really focus in on Mr. Santos

7    completely.

8    Q.   But the other stuff -- you know, This isn't going

9    to help me, Brian; I'm doing the best I can, Peter; When

10   I get out, I'm coming; Excuse me; You heard me -- the

11   earlier dialogue between Mr. Santos and Officer Topor,

12   were you looking over at the jury box at that point?

13   A.   I'm sorry, during which part?

14   Q.   The first part where he says, "You know this isn't

15   going to help me, Brian."

16   A.   Yeah, that seemed pretty normal to me.  That could

17   be general discourse.  I didn't take any heightened

18   alert toward that statement in particular.  It wasn't

19   until he made his second statement that put me on alert.

20   Q.   And I think you said, while we don't -- well, we

21   don't have the video.

22        You said you kind of put your head down like, "I

23   can't believe he said something that dumb"; fair to say?

24   A.   I think it was more along the lines of, "Wow, this

25   is a bigger deal than I thought it was.  Here we go

1    now."

2        I'm more concerned once I get up there, am I going

3    to get in a fight today or not, basically.

4    Q.    To be fair, other than him jawing at you guys in

5    the elevator, and we'll talk about that, you didn't have

6    any problem cuffing him up, he didn't resist in any way

7    and --

8    A.    No.

9    Q.    -- he didn't resist in any way on the transport --

10   I keep getting mixed up -- down to the holding cell,

11   right?

12   A.    No, no.  We had no other issues with Mr. Santos.

13   Q.    And you did say something interesting though.

14   Before placing him in the holding cell, he met with his

15   attorney.

16   A.    That's correct.

17   Q.    And obviously I know that you guys aren't privy to

18   that conversation, and I wouldn't ask you even if you

19   were, but do you know how long -- what his attorney's

20   name was?

21   A.    I believe it was the public defender, Terry Ward.

22   Q.    Do you guys keep track of how long an attorney and

23   a client are together in what we call the interview

24   rooms?

25   A.    We do have a log book that we keep at the front

 1    desk, but normally the attorneys sign themselves in and
 2    sign themselves out, so I don't necessarily audit the
 3    sign-in book.
 4    Q.    And you actually thought it was a good idea that he
 5    meet with his attorney, I think you said on direct.
 6    A.    Sure.
 7    Q.    Just to try to calm things down?
 8    A.    My experience, generally speaking, the defendants,
 9    once something happens, their defense attorneys are
10    going to be the ones they confide in.  So they're
11    usually able to calm down their clients.
12    Q.    Fair enough.
13          So this whole issue with my client jerking around
14    with the camera in the holding cell, of no particular
15    import other than that's just him being a jerk; fair to
16    say, it's not helpful?
17    A.    Especially given the demeanor I'd already seen
18    earlier and the full picture, the full context of it, I
19    certainly perceived it to be a continuance of the same
20    behavior.
21          And like I said, I was more concerned with, are we
22    going to have a physical altercation here today or not.
23    Q.    And to be clear, there never was -- at any point
24    before he was transported out to Wyatt that day, there
25    never was any physical altercation?

1    A.   No, there was not.  No.

2    Q.   Okay, great.

3         And again, you indicated that you started to take

4    notes of what had happened pretty soon thereafter.

5    A.   Correct.

6    Q.   Who did you give those notes to, or do you still

7    have them?

8    A.   They were notes that -- what I mean by "notes" is,

9    I started to write up my report, and I just included

10   them in the report that I completed for the incident.

11   Q.   Who did you give that report to?

12   A.   Senior Inspector Matt Parker.

13   Q.   Fair enough.

14        And then you were prepared for your testimony as

15   well, back a couple of weeks ago, correct; do you

16   remember that?

17   A.   In what sense, sir?

18   Q.   Did you meet with anyone, either Matt Parker and/or

19   Attorney Durham, back on May 19th to get ready for

20   your testimony in court today?

21   A.   I did, yes.

22   Q.   And was there anyone else present?

23   A.   Kori was also present, yes.

24   Q.   By the way, I meant to ask you, he also said to

25   you -- and now we're going to get to the "meet your

1    maker" part -- did he preface it by saying, "I don't

2    care, I'm sick of this," or something like that?

3    A.   Yeah, he did.  I believe I testified, I said, "Hey,

4    man, that's not smart"; and he said, "I don't care, I'm

5    sick of this stuff," and that's when he continued with,

6    "Everyone's got to meet their maker."

7    Q.   Did you have an understanding of what he meant by,

8    "I don't care, I'm sick of this stuff"?

9    A.   Probably -- I'm not really sure.  Probably court

10   matters in general, or being in front of a judge in

11   general.

12   Q.   Fair enough.  I think I'm almost done, just one

13   other question.

14        The only thing that was a little bit unusual -- now

15   I'm going to go while the hearing was going on, and we

16   don't have to show the picture again, but at some point

17   when Mr. Santos began to get a little bit agitated, you

18   stood up and were to his --

19   A.   His right.

20   Q.   -- to his right.

21   A.   Yes.

22   Q.   Just in case something would happen, correct?

23   A.   Correct.

24   Q.   And is that standard operating procedure if a

25   defendant starts to maybe get a little bit off of what

1    the norm is for what defendants do in a courtroom?

2    A.   Yes.

3    Q.   But ultimately you didn't have to do anything other

4    than stand up with your arms crossed and be ready in

5    case anything happened.

6    A.   Yeah, correct.

7    Q.   Just a last question:  So at the end, you had

8    resumed your position immediately behind the defendant

9    to, as you said, cuff him up.

10   A.   Yeah, I had to approach him, obviously, to cuff him

11   up, yes.

12   Q.   Last question:  The comments that you heard, are

13   those exact quotes or your best recollection of what you

14   recall being said then?

15   A.   I feel pretty confident in saying they were pretty

16   exact quotes.  For the part leading up to the threats,

17   as far as the paddle thing during the hearing, I'm not

18   100 percent certain, but I know that was my best

19   recollection of the way he put it.

20   Q.   But the comments that you believe were made by

21   both, actually by both Mr. Topor and Mr. Santos, you

22   think are pretty exact quotes.

23   A.   Yeah, I feel pretty confident in that that's what

24   was said.

25             MR. ROGAN:  Great.  Thanks so much.  I

1    appreciate it.

2                    THE WITNESS:  Sure.

3                    MR. DURHAM:  Thank you, Your Honor.  Nothing

4    further.

5                    THE COURT:  Thank you, sir.  You may step

6    down.

7                    (Whereupon, the witness was excused.)

8                    MR. DURHAM:  Mr. Parker, Your Honor.

9                        MATTHEW PARKER,

10                   called as a witness, having been first duly

11                   sworn or affirmed, was examined and testified

12                   as follows:

13

14                   THE CLERK:  Please state your name for the

15    record, spelling your last name.

16                   THE WITNESS:  Matthew Parker, P-A-R-K-E-R.

17                   THE CLERK:  And indicate the town and state in

18    which you live or work.

19                   THE WITNESS:  New Haven, Connecticut.

20                   THE COURT:  Thank you.

21

22                       DIRECT EXAMINATION

23    BY MR. DURHAM:

24    Q.   Sir, the jury has heard your name here, but for

25    purposes of the full record here, would you state how

1    you're employed?

2    A.    I'm employed with the United States Marshals

3    Service.

4    Q.    How long have you worked for the United States

5    Marshals Service?

6    A.    Twenty years.

7    Q.    In that regard, what's your current position with

8    the marshals service?

9    A.    I'm the protective intelligence investigator.

10   Q.    And explain to the jurors what your duties and

11   responsibilities are in that capacity.

12   A.    My duties are to mitigate threats that are received

13   by the federal judiciary, whether it's judges, clerks,

14   U.S. Attorneys, defense counsel, probation officers;

15   whether there's any threats to the buildings themselves,

16   infrastructure, things like that.

17   Q.    For approximately how long have you had those

18   responsibilities?

19   A.    Since August 2011.

20   Q.    So if we move forward then, to August of 2016, you

21   would have been at that work for some five years --

22   A.    Yes.

23   Q.    -- thereabouts?

24        I'm going to ask you whether or not, on

25   August 31st of 2016, you had occasion to engage in any

1    kind of an inquiry relating to events that occurred in

2    Judge Arterton's courtroom.

3    A.    Yes, I have.

4    Q.    Explain, describe to the jurors as best you recall,

5    how did you first learn that something had happened in

6    Judge Arterton's courtroom?

7    A.    I was contacted by Deputy Mike Curra, who was at

8    the courtroom at that time.

9    Q.    I take it you had worked with Deputy United States

10   Marshal Curra prior to that date?

11   A.    Yes.

12   Q.    You can't tell us what he said, that would be

13   hearsay, but as the result of whatever it was that

14   Deputy United States Marshal Curra told you, what if

15   anything did you do?

16   A.    I opened a preliminary protective investigate.

17   Q.    And just explain to the jurors, when you open a

18   preliminary investigation, what does that involve?

19   A.    It involves gathering information, basic

20   investigations into the possible threat and suspects.

21   We open up a case in our database, we review files,

22   things of that nature.

23   Q.    Now, the jury has obviously heard testimony about

24   the events in Judge Arterton's courtroom, but with

25   respect to a preliminary investigation and you opening

1    it up, what do you then go about doing, once you have it

2    open, at least on a preliminary basis?

3    A.   I begin with interviewing individuals who were

4    involved or direct contact with the threat.

5    Q.   Now, this particular incident is charged in the

6    indictment as having occurred on August 31st of 2016.

7         How soon -- when in time to that date did you get

8    involved in opening this up and initiating an

9    investigation?

10   A.   It was immediately after the court proceedings were

11   completed.

12   Q.   Do you recall, sir, whether or not you were able to

13   identify persons who were in the courtroom at the time

14   these various events had occurred?

15   A.   Yes.

16   Q.   Did you have -- tell the jurors what you did, if

17   anything, in connection with trying to interview all of

18   those people.

19   A.   We originally started to set up to interview

20   everyone that was involved in the courtroom, identifying

21   who was there and exactly what they heard.  And we would

22   contact them and see if they were available for us to

23   follow up with an interview.

24   Q.   Now, at least as you understood the situation, the

25   time the threat was made, was Judge Arterton still in

1    the courtroom?

2    A.   No, she was not.

3    Q.   So was she interviewed in connection with that part

4    of things?

5    A.   No.

6    Q.   How about Patti Villano, the courtroom deputy

7    clerk?

8    A.   Yes.

9    Q.   And the court reporter?

10   A.   Correct.

11   Q.   And your fellow marshals, deputy marshals?

12   A.   Yes.

13   Q.   And the probation officers?

14   A.   Correct.

15   Q.   And the prosecutor in the case, Kit Schmeisser?

16   A.   Yes, he was interviewed as well.

17   Q.   How about defense counsel?

18   A.   We did approach defense counsel for an interview.

19   Q.   You're the case agent in this matter, right?

20   A.   Correct.

21   Q.   You heard the testimony that, after Mr. Santos had

22   been brought back up to Marshals' area, he's permitted

23   to meet with his lawyer, correct?

24   A.   Yes.

25   Q.   You attempted to talk to the lawyer, did you?

1    A.    I did.  It was not at that time though.

2    Q.    Now, when you approached counsel -- you certainly

3    had the right to do that, but was he willing to talk to

4    you about the event or not?

5    A.    He was not.  He respectfully declined.

6    Q.    But everybody else, you interviewed?

7    A.    Correct.

8    Q.    Separate and apart from interviewing everyone in

9    the courtroom, do you recall, sir, whether you undertook

10   other investigative steps to fill out the picture of

11   what had happened?

12   A.    Yes.

13   Q.    Describe to the jurors what additional steps you

14   had taken.

15   A.    Well, the first initial step I took was to reach

16   out to Wyatt Detention Facility in Rhode Island.  I

17   contacted their intelligence analyst and requested a

18   copy of the non-privileged, which means phone calls that

19   are not between the client between an attorney and the

20   subject.  And I also asked for visitor's logs, telephone

21   records, and that was the start of the investigation.

22   Q.    I think the jury has heard this, but why was it

23   that it was Wyatt that had you reached out to?

24   A.    That's where Mr. Santos was being held.

25   Q.    And do you recall, sir, whether or not -- what time

1    frame you're looking for -- withdraw that.

2         Was there a period of time that you were seeking

3    telephone calls for?

4    A.   From the time that he was placed in Wyatt after his

5    arrest.

6    Q.   Okay.  So if he was arrested on August 25th of

7    2016, it would be from that point forward?

8    A.   Correct.

9    Q.   Tell the ladies and gentlemen of the jury whether,

10   in fact, you made the request if any such recordings

11   were provided to you.

12   A.   Yes, they were.

13   Q.   And in that connection do you know -- and if you

14   do, would you explain to the jurors -- what the

15   recording system is at Wyatt?

16   A.   It's a monitored recording system where an

17   individual who's an inmate will -- basically they have a

18   list of phone numbers that they would provide to their

19   counselor or to a guard in the facility that they

20   request the name and phone number.

21        Those names and phone numbers are checked in the

22   database, and they are eventually assigned to that

23   individual.  So that individual would be able to make

24   the phone call.  It's not a collect call, but it's a

25   call where there's money put on an account, and those

1    people have to accept the phone call, and they are aware

2    that it's coming from an inmate at Wyatt detention

3    facility.  The name is given of the inmate, and the

4    phone call is stated that it is being monitored.

5    Q.    And when you say, "monitored," monitored includes

6    what?

7    A.    They are recorded.

8    Q.    They're recorded.  Okay.

9          So you did receive recordings from Wyatt relating

10   to Mr. Santos; is that a fair statement?

11   A.    Yes.

12   Q.    In addition to obtaining that information from

13   Wyatt, those materials from Wyatt, the jury has seen --

14   or we've had marked in this case a series of

15   photographs, Photographs 3A through D, and 4A

16   through 4E.

17         Do you know from where those were derived?

18   A.    They were derived from the marshals service

19   closed-circuit TV monitoring that we have in the office.

20   Q.    In that connection, is there audio and visual

21   recording, or just one or the other?

22   A.    Just video.

23   Q.    So with respect to whatever security equipment is

24   in the courtroom, it would be a fair statement that the

25   marshals can watch what's going on, but they can't hear

1    what's going on?

2    A.    Correct.

3    Q.    So again, if the still photographs or the frames

4    that the jurors have seen were taken from video that was

5    made, correct?

6    A.    Yes, correct.

7    Q.    Now, I want to turn your attention --

8              THE COURT:  When you're at a good transition

9    point, it will be time for our 2:50 break.

10             MR. DURHAM:  This would be a good point

11   because I was going to get into some exhibits, Your

12   Honor.

13             THE COURT:  We'll take our afternoon break,

14   ladies and gentlemen.

15                  (Whereupon, the jury left the courtroom.)

16                  (Whereupon, a recess followed.)

17             THE COURT:  Ready for the jury?

18             MR. DURHAM:  Yes, Your Honor.

19                  (Whereupon, the jury entered the

20   courtroom.)

21             THE COURT:  Please be seated, everyone.

22             Whenever you're ready.

23             MR. DURHAM:  Thank you, Your Honor.

24   BY MR. DURHAM:

25   Q.    Sir, when we broke you had indicated or testified

1   to the jurors that you had caused telephone calls from

2   Wyatt to be retrieved, that is telephone calls related

3   to Mr. Santos, correct?

4   A.   Correct.

5   Q.   Now as to those telephone calls --

6             MR. DURHAM:   May I approach, Your Honor?

7             THE COURT:   You may.

8   BY MR. DURHAM:

9   Q.   I want to show you what we marked as

10  Government's Exhibit 5 for identification in this

11  matter.   I would ask you whether you recognize that CD.

12  A.   I do.

13  Q.   With respect to the CD, would you tell the jurors

14  whether or not it contains all of the calls that were

15  provided by Wyatt, whether they were relevant or not

16  relevant to these proceedings?

17  A.   These calls, I believe, are just the ones that are

18  relevant to these proceedings.

19  Q.   Okay.   And with respect to the information that's

20  contained on that disk, they are the full conversations,

21  correct?

22  A.   Correct.

23  Q.   Would you indicate to the ladies and gentlemen of

24  the jury whether or not all portions of all the calls

25  are relevant to these proceedings?

1    A.    They are not.

2    Q.    So in addition to the full conversations, what else

3    is on the disk?

4    A.    There are exact portions that are relevant to the

5    case.

6    Q.    Now, you've been doing this work for how long?

7    A.    Twenty years.

8    Q.    In the course of your 20 years, do you know whether

9    or not all the information is provided -- in this

10   instance, all of the phone calls are provided by way of

11   discovery to the defense?

12   A.    I believe they have.

13   Q.    I want to show you, if I might, what we've marked

14   as Government Exhibits 6T through 11T, all for

15   identification, and ask you if you recognize those

16   items.

17   A.    I do recognize them.

18   Q.    What are 6T through 11T for identification?

19   A.    They are copy of transcripts of the phone calls.

20   Q.    And are those the relevant portions, or are those

21   the complete transcripts for the calls?

22   A.    These are the complete transcripts.

23   Q.    Okay.  So it would include things that are relevant

24   and things that are not relevant.

25   A.    Correct.

1    Q.    And do you know how those were prepared?

2    A.    Yes.  I listened to the phone calls.

3    Q.    And with respect to the full transcripts, what can

4    you tell the jurors concerning the accuracy of the

5    transcript as compared to what's in the recording

6    themselves?

7    A.    I attempted to record these, to the best of my

8    ability, to be as close to the recording as possible.

9    Q.    All right.  But those -- again, those are the full

10   transcripts -- for example, do you recall, in the calls

11   that were provided by Wyatt to you, there were phone

12   conversations with any number of different people --

13   A.    Yes.

14   Q.    -- on any number of different subjects?

15   A.    Correct.

16   Q.    I want to show you what we've marked as

17   Government's Exhibit 6.1T through 11.1T, and I'll ask

18   you if you recognize those items.

19   A.    Yes.

20   Q.    And what are 6.1T through 11.1T?

21   A.    These are the excerpts of the pertinent parts of

22   the conversations.

23   Q.    And again, the conversations, these all come from

24   recordings at Wyatt, correct?

25   A.    Correct.

1    Q.   And the full recording and then the relevant

2    excerpts are all on the disk, Government's Exhibit 5T

3    for identification, correct?

4    A.   That is correct.

5              MR. DURHAM:  Your Honor, with respect to the

6    transcripts and the recordings, I believe that there's

7    agreement amongst the parties that they are authentic

8    recordings, and we were going to intend to move 6.1T,

9    that is relevant excerpts through 11.1T.

10              THE COURT:  Are those the transcripts or the

11    recordings?

12              MR. DURHAM:  The recordings -- the recordings

13    would be 6.1 through 11.1.

14              THE COURT:  So Government's Exhibit 6.1

15    through 11.1 are admitted.

16              MR. DURHAM:  And those are all contained on

17    Exhibit 5, the CD.

18              And with respect then, Your Honor, to the

19    transcripts of the excerpts, that is 6.1T through 11.1T,

20    we would offer those as an aid to the jury but not as

21    full exhibits.

22              THE COURT:  Should I give the limiting

23    instruction?

24              MR. ROGAN:  I would ask at the end, Your

25    Honor.  But also, Attorney Durham's representation

1     regarding our stipulation is correct.

2               THE COURT:  Do you want me to wait to give the

3     instruction?  I think I should give it now, because I'm

4     going to ask them to listen carefully.

5               MR. ROGAN:  It's Your Honor's court, so of

6     course, Your Honor.

7               THE COURT:  Mr. Durham, have you decided how

8     they're going to see the transcriptions?

9               MR. DURHAM:  We'll probably do it the same way

10    the jurors saw the transcript on the monitors.

11              THE COURT:  Okay.

12              MR. DURHAM:  What we're going to do is provide

13    a hard copy as well, that we can mark as an exhibit and

14    provide to the Court so that they have it.

15              Ms. Arsenault, could you just look at 6.1, and

16    go through actually 12.1.  I think I said 11.

17              THE COURT:  You did.

18              MR. DURHAM:  It's just plain 12 -- 12T.

19              THE COURT:  Members of the jury, you will be

20    shown transcriptions the government has prepared that

21    contain its version of the recordings you will hear, and

22    its version of the identity of each of the voices you

23    will hear.

24              I instruct you that no transcript itself is

25    evidence.  In each case, the evidence is the recording

1   itself and what you hear.  Therefore, you should listen

2   very carefully to the recording itself.

3        You are being shown the transcripts solely to

4   assist you in understanding and absorbing what it is

5   that you hear.  If a transcript conflicts with what you

6   hear, then you should disregard the transcript and rely

7   on the recording.

8        MR. DURHAM:  Thank you, Your Honor.

9   BY MR. DURHAM:

10  Q.   Sir, you've told the jurors that you had requested

11  recordings beginning on what date?

12  A.   It was the date that Peter Santos was arrested and

13  brought to Wyatt.

14  Q.   So if evidence in the record says that's

15  August 25th, it would be August 25th coming forward.

16  A.   Correct.

17  Q.   Let me direct your attention first, if I might, to

18  Government's Exhibit 6.1, or more particularly for the

19  jury's aid but not as a full exhibit, the

20  transcript 6.1T.

21        Do you have that in front of you?

22  A.   Yes, I do.

23  Q.   You indicated you prepared the transcript, right?

24  A.   Correct.

25  Q.   With respect to 6.1, that conversation, on what

1   date did that occur?

2   A.   August 27, 2016.

3   Q.   So if he were detained or held as of August 25th,

4   this would have been two days later?

5   A.   Correct.

6   Q.   And with regard to 6.1, who are the people involved

7   in the conversation?

8   A.   It's Peter Santos and Sandy Santos.

9        MR. DURHAM:  I'd ask the Court's permission to

10  play the relevant excerpt.

11       THE COURT:  You may.

12

13            (Audio played.)

14  BY MR. DURHAM:

15  Q.   Now, with respect to the conversation, I'm going to

16  ask you to look at --

17       MR. DURHAM:  If we can look at the second

18  page.  If we could enlarge Mr. Santos, the large

19  paragraph toward the bottom, "They were going to let me

20  go"?

21  BY MR. DURHAM:

22  Q.   Do you see that on your monitor?

23  A.   I do.

24  Q.   Now, what was it about this transcript, in

25  particular, that you believe is relevant to the matters

1    that occurred in front of Judge Arterton on

2    August 31st?

3    A.   Well, this happened previously.  This was

4    Mr. Santos' stating of the situation that happened in

5    that courtroom.

6    Q.   And he makes specific reference to an asshole named

7    Brian, correct?

8    A.   Correct.

9    Q.   And in your investigation, other than Brian Topor,

10   was there anybody else who's involved in the proceeding

11   before Judge Richardson?

12   A.   Not that I'm aware.

13   Q.   Do you recall hearing testimony that Mr. Santos had

14   told Mr. Topor that he could go F himself?

15   A.   Correct.

16   Q.   Several lines down from that passage that we just

17   reviewed, if we go down a little bit further, do you

18   recognize the voice of the person who said, "I told him

19   to go," and then used the vulgarity themselves?

20   A.   Yes.

21   Q.   And who was that?

22   A.   That was Peter Santos.

23             MR. DURHAM:  I would ask that

24   Government's Exhibit 7.1 be played, and it's -- well,

25   first let's look at 7.1T, if we might.

```
 1    BY MR. DURHAM:

 2    Q.   This is again for identification; what's the date

 3    of this recording?

 4    A.   This was from August 29, 2016.

 5    Q.   And again, who was speaking in this recording; who

 6    was Mr. Santos talking to?

 7    A.   Sandy Santos.

 8    Q.   And again, for purposes of the record, Sandy Santos

 9    is who; what's the relationship between Sandy Santos and

10    the defendant, Peter Santos?

11    A.   Mother and son.

12              MR. DURHAM:  If we could play 7.1, Your Honor.

13              THE COURT:  You may.

14

15                   (Audio played.)

16    BY MR. DURHAM:

17    Q.   So if we can go up to the -- at the very top,

18    what's on the monitor from the conversation of

19    August 29th, that's now three or four days after he

20    had been detained --

21    A.   Correct.

22    Q.   -- by Judge Richardson, correct?

23    A.   Correct, yes.

24    Q.   You recognize the voice of the person who said, "I

25    mean," something unintelligible, "like trying, like he
```

1    said when I told him to go F himself the other day, he's

2    like, 'Stop trying to fight us.'"

3         Who is it saying that?

4    A.   That's Peter Santos.

5    Q.   To the best of your knowledge, when Mr. Santos was

6    having this conversation that was recorded with his

7    mother, was anybody agitating him?

8    A.   No.

9    Q.   Had anybody liked pushed his buttons to make him

10   say this, as far as your knowledge?

11   A.   As far as my knowledge, I don't believe so.

12   Q.   That's August 29th, so it would still be a couple

13   days before the hearing on August 31st.

14   A.   Correct.

15        MR. DURHAM:  Your Honor, I would ask that

16   Government's Exhibit 8.1T be brought up, again for

17   identification.

18   BY MR. DURHAM:

19   Q.   What's the date of this recording?

20   A.   This is September 1, 2016.

21   Q.   So in context, this is on the day after the hearing

22   before Judge Arterton.

23   A.   Correct.

24        MR. DURHAM:  I ask that 8.1 be played, Your

25   Honor.

1          THE COURT:  Yes.

2

3               (Audio played.)

4          MR. DURHAM:  Can you stop it there.

5     BY MR. DURHAM:

6     Q.   The person who said on tape to his mother, the day

7     after the August 31st hearing before Judge Arterton

8     who says, "Well, I'm probably getting a new charge for

9     threatening to kill that guy," who is that, that makes

10    that statement?

11    A.   Peter Santos.

12    Q.   To the best of your knowledge, was anybody

13    agitating Mr. Santos that day?

14    A.   No.

15    Q.   Based on your review of the entire conversation,

16    was there anybody who seemed to be irritating him at

17    that time?

18    A.   No.

19    Q.   How clear is it in your mind that the person who

20    said, "Well, I'm probably getting a new charge for

21    threatening to kill that guy," how certain are you that

22    that's Peter Santos' voice?

23    A.   I'm very certain.

24          MR. DURHAM:  If we can continue, Your Honor?

25          THE COURT:  You may.

1

2                        (Audio played.)

3              MR. DURHAM:  Stop it there, please.

4    BY MR. DURHAM:

5    Q.   With respect to the person who the defendant wanted

6    his mother to call to apologize and say he was sorry,

7    who was the probation officer?

8    A.   Brian Topor.

9    Q.   And who says it was Brian Topor, in context of who

10   he was talking to?

11   A.   Peter Santos.

12             MR. DURHAM:  Play the rest of that call,

13   please.

14

15                        (Audio played.)

16             MR. DURHAM:  I ask that

17   Government's Exhibit 9.1T be brought up.

18   BY MR. DURHAM:

19   Q.   And the date of the conversation that's marked as

20   Government's Exhibit 9.1 is what?

21   A.   September 1st, 2016.

22   Q.   Same day?

23   A.   Same day.

24   Q.   And do you recall, 9.1, is that before or after the

25   one that the jury just listened to?

1    A.    9.1 is after the last call.

2    Q.    So in the conversation marked 8.1, among other

3    things, the defendant asks his mother to call Mr. Topor,

4    correct?

5    A.    Correct.

6              MR. DURHAM:  I'd ask that 9.1 be played, Your

7    Honor.

8              THE COURT:  Certainly.

9

10             (Audio played.)

11             MR. DURHAM:  Can you stop it there?

12   BY MR. DURHAM:

13   Q.    Who is it that just said, with respect to who was

14   it -- in context, who he's directing this argument and

15   statements to, "Yeah, so that's good, Brian's not going

16   to press charges then, he said that to you," who said

17   that?

18   A.    Peter Santos.

19             MR. DURHAM:  If we can back up it so we can

20   hear that portion again, please.

21             MR. ROGAN:  I'm going to object.  It's

22   repetitive.  It's already been played once.

23             MR. DURHAM:  I'm just trying to get it back in

24   sequence.

25

1                    (Audio played.)

2    BY MR. DURHAM:

3    Q.   And with respect to the recording itself -- that is

4    Government's Exhibit 9.1, the transcript, which is just

5    an aid to the jurors as the judge has instructed them --

6    when Mr. Santos said, "So that's good, Brian's not going

7    to press charges then, he said that to you," the

8    response from Sandy Santos was, "Well, he didn't say

9    that to me."

10        During the course of your investigation, do you

11   recall, sir, first of all, whether or not Mr. Topor ever

12   indicated that he was not pressing charges; did that

13   ever come up?

14   A.   No.

15   Q.   In point of fact, for the benefit of the jurors, is

16   that Mr. Topor's decision as to whether charges would be

17   presented to a grand jury or not?

18   A.   No.

19   Q.   But in any event, according to Mrs. Santos, the

20   mother, he didn't say that; he, Mr. Topor, didn't say

21   that no charges would be brought.

22   A.   Correct.

23   Q.   I'd like to turn your attention to

24   Government's Exhibit 10.1?

25                    MR. DURHAM:   And I would ask that the

1    transcript, 10.1T, be brought up as an aid to the jury.

2    BY MR. DURHAM:

3    Q.   So we look at -- we listen to this conversation.

4         This conversation occurred on what date?

5    A.   September 9, 2016.

6    Q.   So this is a little more, nine days or ten days

7    after the hearing before Judge Arterton?

8    A.   Correct.

9    Q.   Who are the people who participated in this

10   conversation?

11   A.   This is Peter Santos and Timothy McDorman.

12   Q.   With regard to Timothy McDorman, were you ever able

13   to determine in your investigation as to who Timothy

14   McDorman is?

15   A.   He's a codefendant of Mr. Peter Santos when he was

16   charged from the Southern District of New York.

17   Q.   So with respect to Government's Exhibit 1, that

18   talks about the case that was in front of Judge Kimba

19   Wood in New York, Mr. McDorman is one of the

20   codefendants in that case.

21   A.   Correct.

22            MR. DURHAM:  I would ask that 10.1 be played,

23   Your Honor.

24            THE COURT:  Yes, certainly.

25

1                     (Audio played.)

2      BY MR. DURHAM:

3      Q.    So with respect to this conversation -- again, it's

4      marked for identification, the entire transcript, but

5      based on your review of the entire conversation, was

6      there anything that seemed to be pushing Mr. Santos'

7      buttons that day which would provoke him into saying

8      something or irritating him on that particular day?

9      A.    Not that I'm aware of.

10     Q.    So when Mr. Santos says words to the effect, "These

11     piece of" -- expletives, expletives, to your knowledge

12     there wasn't anything in particular that was provoking

13     him that day was occurring at Wyatt.

14     A.    That's correct.

15               MR. DURHAM:  I ask that the rest of the

16     conversation be played, Your Honor.

17               THE COURT:  Yes.

18

19                     (Audio played.)

20     BY MR. DURHAM:

21     Q.    To the best of your recollection, based on your

22     investigation, had Mr. Topor even had any contact with

23     Mr. Santos between the time of the hearing before

24     Judge Arterton and when he's making this particular

25     reference to the head dude, Brian, and what he thinks of

 1    him; had there been any contact?

 2    A.    No.

 3    Q.    Anything that you know of that would have provoked

 4    this -- withdrawn.

 5              MR. DURHAM:  Can we play the rest of the

 6    conversation, Your Honor?

 7              THE COURT:  You may.

 8

 9              (Audio played.)

10    BY MR. DURHAM:

11    Q.    Do you recall, sir, whether or not, in the course

12    of your investigation, anything came to your attention

13    as to whether or not Judge Arterton had referred to a

14    metaphor involving a boat?

15    A.    Yes.

16    Q.    In context of this conversation, who did you

17    understand Mr. Santos to be referring to when he said,

18    "She told me the first time I went, about a boat and" --

19    expletive -- "and rowing it fast and slow.  So I see

20    here my parents in the courtroom, and I see the

21    references" -- another expletive.

22        Who did you understand Mr. Santos to be referring

23    to, at that point in this conversation?

24    A.    It was Judge Arterton.

25    Q.    Anything that you encountered in your

1    investigation, and particularly with this recording,

2    that he was being provoked in some fashion by anybody?

3    A.   No.

4    Q.   Or that he was acting in the heat of the moment?

5    A.   No.

6    Q.   Or that he couldn't control himself or anything of

7    that sort?

8    A.   No.

9    Q.   And the person who's kind of yucking it up on the

10   phone, beside Mr. McDorman, who's kind of yucking it up

11   over this; Mr. Santos?

12   A.   Yes.

13            MR. DURHAM:   I ask the Court for permission to

14   bring up Government's Exhibit 10.2T.

15   BY MR. DURHAM:

16   Q.   What's the date of this recording?

17   A.   This is September 9, 2016.  This is actually the

18   same recording, just another excerpt from that.

19   Q.   A later portion of that?

20   A.   Yes.

21            MR. DURHAM:   I would ask the Court's

22   permission to play 10.2, Your Honor.

23            THE COURT:   You may.

24

25            (Audio played.)

1    BY MR. DURHAM:

2    Q.   Now, with respect to the person who's calling his

3    own lawyer an expletive, who's saying that?

4    A.   Peter Santos.

5         MR. DURHAM:  I would ask permission to pull

6    up 11.1T, Your Honor.

7         THE COURT:  You may.

8

9    BY MR. DURHAM:

10   Q.   As to the conversations marked 11.1, could you tell

11   the ladies and gentlemen of the jury, and state for the

12   written record, when this conversation occurred.

13   A.   September 13, 2016.

14   Q.   So now we're about two weeks out from the hearing,

15   correct?

16   A.   Correct.

17   Q.   And who are the parties to this conversation?

18   A.   Peter Santos and Clifford Barnes.

19   Q.   With respect to Mr. Barnes, he had occasion to talk

20   to Mr. Barnes?

21   A.   Yes.

22   Q.   Do you recognize his voice in this conversation?

23   A.   Yes.

24        MR. DURHAM:  I would ask that 11.1 be played,

25   Your Honor.

```
 1              THE COURT:  It may.

 2

 3                   (Audio played.)

 4   BY MR. DURHAM:

 5   Q.   And the person who said in this recording, "I want

 6   to stir up that whole probation officer, just F them.

 7   If I wasn't around, if I wasn't around they'd have

 8   nothing to do, Cliffy," who says that?

 9   A.   Peter Santos.

10   Q.   Based on your review of the entire conversation,

11   anything that seemed to be provoking those comments from

12   Mr. Santos?

13   A.   No.

14   Q.   And we're now two weeks out, or thereabouts, from

15   the hearing before Judge Arterton, correct?

16   A.   Correct.

17              MR. DURHAM:  I'd ask that

18   Government's Exhibit 12, which is the recording -- this

19   is not a point-1, this is just 12, Your Honor.

20              Let me just make clear,

21   Government's Exhibit 12, we would move as a full

22   exhibit, because this is the whole conversation, this is

23   not an excerpt.

24              And we would ask that 12T be marked just for

25   identification as a guide for the jury.
```

 1              THE COURT:  Government's Exhibit 12 is

 2    admitted.

 3    BY MR. DURHAM:

 4    Q.   With respect, then, to Government's Exhibit 12,

 5    what date -- on a date did this occur?

 6    A.   September 27, 2016.

 7    Q.   And who are the conversants; who's speaking in

 8    conversation?

 9    A.   Peter Santos and Clifford Barnes.

10    Q.   Again, Clifford Barnes from the one that the jurors

11    just heard?

12              MR. DURHAM:  Your Honor, we'd ask permission

13    to play Government's Exhibit 12?

14              THE COURT:  You may.

15

16              (Audio played.)

17    BY MR. DURHAM:

18    Q.   Sir, you indicated to the jury earlier that, with

19    respect to the monitoring system at Wyatt, that there

20    was something of a lead-in to all the calls, right?

21    A.   Correct.  And it re-occurs, too, at a certain time

22    frame in the length of the call.

23    Q.   So in this instance, this is the whole

24    conversation, correct?

25    A.   Correct.

1    Q.   So what the jurors just heard, is that the sort of

2    lead-in to all the recordings up at Wyatt?

3    A.   Yes.

4         MR. DURHAM:   If we could then continue.

5

6              (Audio played.)

7    BY MR. DURHAM:

8    Q.   The person on that call who says, "I'm doing

9    excellent," and then, "When you see Daniel, tell him I

10   said F you, and I'm going to kill him when I get out,"

11   and then chuckles about it, who said that?

12   A.   Peter Santos.

13   Q.   And for the person who says, "Oh, when I --

14   Dan Leone," who said that?

15   A.   Clifford Barnes.

16   Q.   And if you know, who's Clifford Barnes' probation

17   officer?

18   A.   I don't know who Clifford Barnes' probation officer

19   is currently.

20   Q.   And then who was it that said, "Tell him I send my

21   love," and laughs?

22   A.   Peter Santos.

23   Q.   In context, this conversation, again you indicated

24   or told the jurors, occurred on September 27th of

25   2016, correct?

1    A.    Correct.

2    Q.    Mr. Santos says in that call that, "When you see

3    Daniel, tell him I said F you, and I'm going to kill you

4    when I get out."

5          Tell the ladies and gentlemen of the jury whether

6    you were able to determine where Clifford Barnes was

7    when this phone call was made.

8    A.    Clifford Barnes was not in the District of

9    Connecticut at the time.  I believe he was in Minnesota.

10   Q.    So if Mr. Santos is at Wyatt in Rhode Island, and

11   he's talking to Clifford Barnes in Minnesota when he

12   makes this statement, to your knowledge and experience,

13   would Connecticut have any jurisdiction over that call?

14   A.    No.

15         MR. ROGAN:  Objection, Your Honor.  I don't

16   think he -- on relevancy grounds.  What's the

17   jurisdictional issue?

18         THE COURT:  I will let you all argue that to

19   the jury.  How's that?

20   BY MR. DURHAM:

21   Q.    In this conversation, did you come across any

22   information in your investigation which suggested

23   anybody had provoked Mr. Santos into making this

24   statement to Clifford Barnes?

25         By the way.  With respect to Mr. Barnes, who is

1    Mr. Barnes in relation to Mr. Santos, if you know?

2    A.    They are codefendants, as well, in that original

3    case.

4    Q.    So Barnes is another one of the codefendants in the

5    case before Judge Wood, in the Southern District of

6    New York?

7    A.    Correct.

8    Q.    Is there anything in your investigation that would

9    suggest that there was anything that would have provoked

10   Peter Santos in this case to say in this recording or

11   ask Barnes to tell Daniel Leone that he's going to kill

12   him when he gets out?

13   A.    No.

14                MR. DURHAM:   I ask that

15   Government's Exhibit 2, page 25, be brought up.

16                And please highlight the first paragraph on

17   that.

18   BY MR. DURHAM:

19   Q.    Let me read it to you.

20         This is the court, Judge Arterton:   "All right.

21   Now that we see the real Mr. Santos, he is remanded to

22   the Attorney General for a period of six months," and

23   then it goes on, correct?

24   A.    Correct.

25   Q.    With respect to these conversations the jury has

1    just listened to, to the best of your knowledge, was

2    anybody provoking him in any way to make those

3    statements?

4    A.    No.

5              MR. DURHAM:   I have nothing further, Your

6    Honor.

7

8                        CROSS-EXAMINATION

9    BY MR. ROGAN:

10   Q.    Good afternoon, Mr. Parker.

11   A.    Good afternoon.

12   Q.    You and I don't know each other, right?

13   A.    We do not.

14   Q.    These transcripts of the phone calls, no doubt in

15   your mind that Mr. Santos knew, at the time he was being

16   a recipient of a phone call or making a phone call, that

17   the phone calls were being monitored, right?

18   A.    That the phone calls were being monitored and

19   recorded.

20   Q.    And that's for all phone calls, this wasn't done in

21   particular for Mr. Santos, correct?

22   A.    Correct.

23   Q.    So my client has to be an idiot to be making those

24   statements, knowing that he's being recorded.

25             Would you agree with that?

1    A.    Those are your words.

2    Q.    Would you agree with that statement, though, that

3    he'd have to be an idiot, yes or no, to make those

4    statements, knowing the phone calls would be recorded?

5    A.    No.

6    Q.    Let's go through the individual phone calls.  I

7    want to talk about, particularly, the sequencing of the

8    phone calls.  We agree that Mr. Santos was detained on

9    August 25th.

10          As part of your investigation on direct

11   examination, you indicated that you immediately sent a

12   request out to Wyatt to give me those phone calls, which

13   they did, and you provided to my office, right?

14   A.    Correct.

15   Q.    And the first phone call that you excerpted was

16   Government's Exhibit 6.1T; do you see that?

17   A.    Yes.

18   Q.    And that phone call was made on 9/29, September 29,

19   right?

20   A.    No.  August 27th, first phone call.

21   Q.    I'm sorry.  I was looking at the time of day.

22   Right.

23          August 27th, right?

24   A.    Correct.

25   Q.    That's two days after he's been incarcerated, and

1    about three or four days before he's even going to

2    appear in front of Judge Arterton, right?

3    A.   Correct.

4    Q.   So he's offering his opinion at the sentence, if we

5    could highlight on where it says, "They were going to

6    let me go," right?

7              MR. DURHAM:  Second page.

8              MR. ROGAN:  Second page.  Thank you, Counsel.

9    BY MR. ROGAN:

10   Q.   Do you see that?

11   A.   Yes.

12   Q.   That's just Mr. Santos' opinion about what he

13   thought was going to happen, right?

14   A.   Correct.

15   Q.   It's not factually accurate, right?

16   A.   It didn't happen.

17   Q.   Right.  So he's just talking on the phone to his

18   mother about that they were going to let him go, but in

19   point of fact it didn't happen.  And then he uses

20   language about -- I'll repeat it here but, "that

21   asshole, Brian," refers to Mr. Topor, right?

22   A.   Correct.

23   Q.   And that's before any threat was alleged to have

24   been made on August 31, 2016, right?

25   A.   That's correct.

1    Q.    Then if you go to the next phone call I want to

2    talk about, which is the August 29, 2016, call, that's

3    starts at 9:03 p.m., Exhibit 7.1T?

4          Actually, I'm sorry, the one I want to go to is

5    Exhibit 8.1T.  It's dated September 1, 2016, and the

6    time of the start of the call is 9:17.

7          You see where it says in the portion that he says,

8    "I couldn't keep my F'ing mouth shut, F that.  I hate

9    these F'ing people"?

10   A.    Yes.

11   Q.    Do you see that?

12   A.    Yes.

13   Q.    Those are statements that are all made after the

14   fact, right?

15   A.    Correct.

16   Q.    The alleged threat to the extent -- that's for the

17   jury to decide, but this is all done after the fact.

18         Anything that happened, happened on August 31,

19   2016, correct?

20   A.    Correct.

21   Q.    And so again, he's just talking to his mom that he

22   couldn't keep -- couldn't manage to keep his mouth

23   closed during that August 31 hearing, correct?

24   A.    That's correct.

25   Q.    And again, if you turn to the portion that was

1    stopped when you were being examined by counsel, the

2    portion that reads, "Well, I'm probably getting a new

3    charge for threatening to kill that guy, so," do you see

4    that portion?

5    A.   Yes, I do.

6    Q.   So that phone call occurs the day after the

7    hearing, right?

8    A.   Correct.

9    Q.   And how many times in your experience -- and I know

10   you're a very experienced marshal -- how many times have

11   you personally been up to Wyatt Detention Center in

12   Central Falls?

13   A.   A handful of times -- four or five.

14   Q.   Handful.

15   A.   -- four or five.

16   Q.   Do you know whether or not the detainees or the

17   prisoners there have access to computers to do research?

18   A.   I do not.

19   Q.   Have you ever investigated that aspect of it?

20   A.   No.

21   Q.   Are you aware, because you were here in court, that

22   Mr. Santos had a conversation with his then-attorney,

23   Mr. Ward, on the date of the sentencing in front of

24   Judge Arterton?

25   A.   Correct.

1    Q.   You don't doubt that that happened, right; you

2    don't know what the conversation was.

3    A.   I believe that did happen.

4    Q.   And again, he's basically asking after the fact,

5    and he says, Hey, please call and apologize to Topor.  I

6    went temporarily insane, right -- or, I went, quote, a

7    little insane --

8    A.   Correct.

9    Q.   -- and I'm sorry.

10   A.   Correct.

11   Q.   And that occurred after the fact.

12   A.   Yes.

13   Q.   I want to skip ahead to Exhibit -- actually, if we

14   could go to Exhibit 9T -- 9.1T.  I'm sorry.

15        You were asked a question on direct examination,

16   and if we go to the last page of the transcript and

17   highlight the portion that begins, "Yeah, so that's

18   good, Brian's not going to press charges," do you see

19   that?

20   A.   I do.

21   Q.   In point of fact, Mr. Santos was wrong about that.

22   He had no idea; and, as was correctly pointed out by the

23   U.S. Attorney's Office, that's not Mr. Topor's call to

24   make.

25   A.   Correct.

1    Q.   Whose call is that to make?

2    A.   The U.S. Attorney's Office.

3    Q.   Right.  You do the investigation, you hand it over

4    to them, and they decide whether they're going forward.

5    A.   Correct.

6    Q.   So whether or not Mr. Topor did or didn't want to

7    press charges, he doesn't get a vote --

8    A.   Correct.

9    Q.   -- fair to say?

10   A.   True.

11   Q.   And again, this was after the fact.

12        I want to turn to Government's Exhibit 10.1T, and

13   if we could turn to the third page.

14        The two voices are Timothy McDorman, a codefendant,

15   and Mr. Santos, right?

16   A.   Correct.

17   Q.   Without going through the language in detail, I'll

18   read some of it into the record:

19        She goes, Well, the programs will be available when

20   you get out.  And I said, hold up B, hold up, laughs,

21   you can take that boat and row it straight up your the C

22   word, and just put the F'ing cuffs on me and get the F

23   out of here, right?

24        All of those statements made by Mr. Santos in this

25   phone call are a lie, right?

1    A.   They are partially true.

2    Q.   No, they're a lie, because we have the transcript,

3    and I'll bring it back up --

4    A.   Sure.

5    Q.   -- of the actual hearing.  He never used that

6    language --

7    A.   Correct.

8    Q.   -- on that judge in that court.

9    A.   He did not use that language, that's correct.

10   Q.   So all of this colloquy between he and Mr. McDorman

11   is a flat-out lie; he's just either boasting or

12   exaggerating about what a tough guy he is, right?

13   A.   Correct.

14   Q.   And turning to the next exhibit,

15   Government's Exhibit 10.2T, apparently, he doesn't like

16   lawyers either.

17        Would you agree with that statement?

18   A.   That's what he says here.

19   Q.   And he's referring to his previous counsel,

20   Mr. Ward, who represented him at the hearing.

21   A.   Correct.

22   Q.   But I'd like to direct your attention down to the

23   bottom of that, where he says, I can get a hundred

24   thousand dollars, I can get my annuity money, so I ain't

25   even -- so F'ing, I'm all set.

1        That's not true either, right?

2    A.   Which part?

3    Q.   The part about that he's got an annuity, I can get

4    like a hundred thousand dollars, so F'ing I'm all set."

5    A.   I don't know if he has an annuity or not.

6    Q.   So again, this could be just him boasting or

7    exaggerating to another one of his buddies on the phone.

8    A.   Correct.

9    Q.   Did you ever check out whether or not he had an

10   annuity, as he claimed in this, as part of your

11   investigation?

12   A.   I did not.

13   Q.   Okay.  Fair enough.

14        And then turning to 11.1T, this is dated, again,

15   September 13th.

16        By the way, you were asked on every single one of

17   these transcripts if, at any point, on direct

18   examination, Mr. Santos was agitated or whatever, or was

19   being provoked to make these comments.

20        What, if anything, is the significance of whether

21   or not he was agitated as it relates to your

22   investigation?

23   A.   I don't know.

24   Q.   Right.  Because the majority of these phone calls

25   are made long after the allegation is alleged --

1    sorry -- the alleged threat is supposed to have

2    happened.

3              MR. ROGAN:  That was terrible, were you able

4    to get that?

5              THE COURT REPORTER:  Yes.

6    BY MR. ROGAN:

7    Q.   So they're really of no particular import, the

8    phone calls that were made after the fact.

9         Would you agree with me on that?

10   A.   No.

11   Q.   What about these phone calls -- and I'll get to the

12   last one, but prior to the last one, what, if anything,

13   about these phone calls, other than the coarseness and

14   crudity of the language, is significant in your

15   investigation?

16   A.   It shows a pattern of agitation and contempt with

17   probation office.

18   Q.   Okay.  I wouldn't disagree with that.  The language

19   speaks for itself.  It's horrific on its face.

20        So he has contempt for the probation office, and

21   he's unhappy with them, right?

22   A.   Correct.

23   Q.   Before the fact and after the fact, right?

24        And that's why he says, if we look at 11.1T, which

25   happens on September 13, 2016, 0.

1          MR. ROGAN:  And if we could pull that one up?

2          Oh, we already have.

3     BY MR. ROGAN:

4     Q.    "Yeah, I want to stir up that whole probation

5     office.  Just F them."

6          And he's laughing about it, right?

7     A.    Correct.

8     Q.    He thinks it's funny, right, from his point of

9     view.

10    A.    Correct.

11    Q.    And whether he stirred up the probation office or

12    not, you don't know, correct?

13    A.    Correct.

14    Q.    And then if you look at -- sorry, did I cut off

15    your answer?

16    A.    No.

17    Q.    No?

18    A.    No.

19    Q.    Finally, the last exhibit,

20    Government's Exhibit 12T, if we turn to the second page

21    where, again, he's talking to this Clifford Barnes, on

22    the face of it, this language sounds Godawful, right,

23    that he's threatening to supposedly, Tell Daniel when I

24    said F you and I'm going to kill him and send him my

25    love and he's laughing the whole time, right?

1    A.    Right.  Correct.

2    Q.    And this is some -- now almost a month after his

3    incarceration at Wyatt.

4          And you did the transcript, right, and you can

5    clearly hear him laughing on the phone.

6    A.    Correct.

7    Q.    So what, if anything, did you do with this

8    information?

9    A.    With this information I notified the

10   U.S. Attorney's office, I notified Dan Leone, and I

11   notified Brian Topor.

12   Q.    And do you know, based upon your listening and you

13   were able to identify Mr. Santos's voice, can you tell

14   if he was joking or not?

15   A.    I cannot.

16   Q.    You can't.  Okay.

17         Just a couple more questions.

18         These excerpts of these phone calls had some

19   significance in your investigation.  As you said, it

20   pointed out his contempt or disregard for the probation

21   office.

22         The fact that there was video -- you were shown the

23   still photos.  The fact that there was video from the

24   courtroom on that day but no audio, that's routine,

25   right, there was nothing unusual about that --

1    A.    Correct.

2    Q.    -- that there's no audio.

3    A.    Correct.

4    Q.    Fair enough.

5          And just a couple of follow-up questions to what

6    you were asked by Attorney Durham, and I think I'm

7    almost done.

8          As soon as the incident happened, you began your

9    investigation, correct?

10    A.    Yes.

11    Q.    And do you remember -- if you don't, this is not a

12    memory test -- you started interviewing people,

13    witnesses, that very same day?

14    A.    Correct.

15    Q.    Do you remember who the first witness you

16    interviewed was?

17    A.    I probably spoke to Mike Curra first, because he

18    was the one that notified me.  I wouldn't call it a

19    formal interview, but it was telling me the facts and

20    what happened.

21    Q.    So let's call it the first formal interview of the

22    people that were in the courtroom after Judge Arterton

23    had left the bench, do you remember who you first talked

24    to?

25    A.    No, I don't recall.

1    Q.    Do you recall talking to Patricia Villano within

2    about five hours?

3    A.    If that's what my report says, then yes, my report

4    would be accurate.

5              MR. ROGAN:   Thank you.   I have nothing

6    further.

7

8                     REDIRECT EXAMINATION

9    BY MR. DURHAM:

10   Q.    Just briefly, Marshal, with respect to counsel's

11   questions concerning the conversation which is marked as

12   Government's Exhibit 6.1, that is the August 27, 2016,

13   call, this is after the defendant had been detained by

14   Judge Richardson but before the hearing before

15   Judge Arterton, correct?

16   A.    Correct.

17   Q.    And then counsel had asked you a question that made

18   reference to the second page of that, or a portion of

19   that conversation, the transcription of which is on the

20   second page, making reference to Brian; in context,

21   Brian Topor, correct?

22   A.    Correct.

23   Q.    Was it of any relevance to you that before the

24   hearing, that is on August 27th, Mr. Santos was

25   already referring to Mr. Topor in that fashion?

1   A.   I'm sorry.  Could you rephrase?

2   Q.   Sure.

3        Was it of relevance that, prior to the hearing

4   actually having occurred before Judge Arterton, the

5   defendant was already referring to Brian Topor, the

6   probation officer, as an asshole?

7   A.   Yes.

8   Q.   And with respect to that conversation, was it at

9   all relevant to your investigation that he fully

10  expected to get out when he appeared before

11  Judge Arterton?

12  A.   Yes.

13  Q.   Was his expectation met; that is, did he get out on

14  the 31st?

15  A.   No.

16  Q.   Counsel asked you about a conversation that

17  occurred on September 1st of 2016, and, in particular,

18  Government's Exhibit 8.1.

19       And he asked you, that's a conversation that

20  occurred after the hearing before Judge Arterton,

21  correct?

22  A.   Yes.

23  Q.   And with respect to that particular conversation,

24  with respect to the defendant's intent, was it of any

25  relevance to you, on page 2, where, the very day after

1    the hearing, Mr. Santos said, "Well, I'm probably

2    getting a new charge for threatening to kill that guy";

3    was that relevant to you?

4    A.    Absolutely.

5    Q.    In your experience, did that go to the question of

6    what Mr. Santos's intent and motive was relating to the

7    statement he made to Brian Topor?

8    A.    Yes, absolutely.

9    Q.    And then counsel pointed to the -- made reference,

10   but I think it was out of order, the very last page, the

11   third page of that, the same transcript of

12   September 1st, 2016.

13         MR. DURHAM:   If we could go to the third page,

14   please.  And if you'll highlight that.

15   BY MR. DURHAM:

16   Q.    I think counsel said -- let me see.  He asked you a

17   question, saying that, "I went a little insane, tell him

18   I'm sorry."

19         What is it that Santos actually said; what was he

20   asking his mother to tell Mr. Topor?

21   A.    It says that he asked his mother to apologize.

22   Q.    And the last phrase, Mr. Santos says, Does he not,

23   yeah, just tell him I know he was doing his job and I'm

24   sorry about, and just tell him I went a little insane,

25   right?

1    A.    Yes.

2    Q.    Not that I went insane, but just tell him I went

3    insane.

4    A.    Correct.

5    Q.    Counsel asked you a question related to, you do the

6    investigation, and then you refer it to the United

7    States Attorney's Office, who makes the decision as to

8    whether to go forward or not, correct?

9    A.    Correct.

10   Q.    And in the process, that's how it happens, right?

11   A.    Yes.

12   Q.    But before formal charges are actually brought in

13   one of these cases, does the marshals service make that

14   decision, whether charges are going to be brought?

15   A.    No.

16   Q.    Even the U.S. Attorney's Office, do they make the

17   decision on the indictment?

18   A.    No.

19   Q.    Who makes the decision in the federal system as to

20   whether or not charges ought to be brought?

21   A.    The grand jury.

22   Q.    Right.  And with respect, then, to the grand jury,

23   counsel asked you questions, did you testify before the

24   grand jury?

25   A.    I did.

1    Q.    And present this case to the grand jury?

2    A.    I did.

3    Q.    Who was it, then, who ultimately made the decision

4    as to whether this charge ought to be brought?

5    A.    It was the grand jury.

6    Q.    Counsel made reference to the

7    Government's Exhibit 10.1, and with specific reference

8    to the third page, in counsel's words, making reference

9    to Mr. Santos' statement at the top of the page

10   referring to the boat.

11         And he said, That's just a flat-out lie, isn't it?

12         Let me ask you that:  With respect to whether or

13   not Mr. Santos said, on the record, made reference to

14   what Judge Arterton could do with that boat, is that a

15   lie, or did he say that?

16   A.    He did say that.

17   Q.    With respect to the reference at the end of

18   sentence to the vulgarity, that wasn't on the record.

19   A.    Correct.

20   Q.    But with respect to whether it was a lie or not,

21   was it a lie?

22   A.    No, it was not a lie.

23   Q.    Similarly, when Mr. Santos said, "Just F'ing put

24   these cuffs on me and get me out of here," was it a lie

25   that Santos, in that court proceeding, said before

1    Judge Arterton, "Just cuff me, put the cuffs on me"?

2    A.   That's what he said.

3    Q.   He didn't happen to use the F word at that point.

4    A.   Correct.

5    Q.   But it certainly wasn't a flat-out lie that he said

6    that, was it?

7    A.   It was not.

8         MR. DURHAM:   I have nothing further.

9         Thank you, Your Honor.

10

11                    RECROSS-EXAMINATION

12   BY MR. ROGAN:

13   Q.   You would agree with me, sir, that in investigating

14   a charge of threatening, words matter, right?

15   A.   Correct.

16   Q.   So what Mr. Durham was just asking you, again, is

17   parsing words.  I'm going to ask you the question again:

18        There's nothing in the record to suggest that any

19   of the language that Mr. Santos was using in that phone

20   call, where he used the C word, that is not the language

21   that he used in that courtroom on that day with

22   Judge Arterton, yes or no.

23        MR. DURHAM:   The government objects to that

24   because it's a compound question.

25        MR. ROGAN:   No, it's not.

1            Sorry, Your Honor.

2            MR. DURHAM:  All of those words, that there

3    are multiple words.  If he's talking about the C word,

4    that's one thing.

5            THE COURT:  It is compound.  Why don't you

6    break it down.

7    BY MR. ROGAN:

8    Q.   I'll break it down vulgarity by vulgarity.

9            Is there anything in the transcript where

10   Mr. Santos uses that word in that courtroom on that day,

11   yes or no?

12   A.   No.

13   Q.   Is there anything in the transcript on August 31,

14   2016, that he uses the bitch word, okay, to Judge

15   Arterton?

16   A.   No.

17   Q.   So those are lies that Mr. Santos is telling

18   another buddy for purposes of exaggerating, correct?

19   A.   Those -- he did not use those words, correct.

20   Q.   So as part of your investigation, did you ever --

21   question withdrawn.

22           You also were asked a question about, and

23   highlighted in the one where Mr. Santos states -- and

24   I'll find it --

25           MR. ROGAN:  And this is important, so if we

1    could go back to Government's Exhibit 8.1T.

2    BY MR. ROGAN:

3    Q.    You were asked about this.  This is a call between

4    Peter and his mother, made on September 1, about 9:17.

5          Do you know if that's p.m. or a.m?

6    A.    A.m.

7    Q.    A.m.

8          But it goes to military time when it's p.m.?

9    A.    Right.

10   Q.    On the second page where he says, "Well, I'm

11   probably getting a new charge for threatening to kill

12   that guy," here's a very direct question:  Did your

13   investigation, which started the day of the hearing,

14   ever uncover information that Mr. Santos knew that he

15   was getting a new charge for, quote, threatening to kill

16   that guy?

17   A.    Can you say that again, please?

18   Q.    Sure.

19         This call is made at 9:17 the morning.  He's been

20   detained.  The proceeding ended around 9:45 the

21   preceding day.

22         During the course of your investigation, did you

23   ever learn where Mr. Santos would have known that he was

24   going to be getting a new charge for threatening to kill

25   that guy?

1    A.   Yes.

2    Q.   Where did he get that information from?

3    A.   Where did he get the information from?  I don't

4    know.

5    Q.   That was my question to you.

6         So you don't know how he got that information, that

7    he was going to be charged with threatening to kill a

8    guy.

9    A.   Correct.

10   Q.   So it's significant to you -- did you ever uncover

11   if -- between the time that the proceeding ended and

12   your investigation began, did anyone ever tell you that

13   they had told Mr. Santos that he was going to be charged

14   with threatening to kill a guy?

15   A.   No.

16   Q.   So again, that goes to my point, you don't know

17   where that information came from.

18   A.   Correct.

19   Q.   And again, all of this vulgarity and all of that

20   has nothing to do with your investigation, other than it

21   shows a complete contempt, in your words, by Mr. Santos

22   to the office -- to the United States Probation Office,

23   correct?

24   A.   Specifically which call?

25   Q.   All of them as it relates to language he used -- in

1    fact, you were asked -- let me withdraw that question.

2    It was badly framed.

3         The fact that he calls Brian -- and I'll use the

4    word that Mr. Durham used -- an asshole two days before,

5    what significance did that have; have you not heard that

6    type of language used before?

7    A.   I have used that language.

8    Q.   You've been in charged of handling really bad guys,

9    everybody from murderers to whatever you can think of in

10   the criminal spectrum, right?

11   A.   Correct.

12   Q.   And this type of vulgarity being used by inmates or

13   detainees or defendants is not uncommon, is it?

14   A.   It is not.

15   Q.   So what's the significance of calling his probation

16   officer an asshole?

17   A.   The significance is that it shows a repeated

18   pattern of him having a problem with Brian Topor.

19             MR. DURHAM:  Your Honor, I'm just going to

20   object.  It's counsel's testimony is what he thinks the

21   significance is.  That's for the jury to decide.

22             MR. ROGAN:  Actually, Your Honor, I just want

23   to note something for the record.

24             THE COURT:  You can rephrase it, but not the

25   way you were saying it.  You're making a statement.

1    BY MR. ROGAN:

2    Q.    What, if any, implication did the use of the word

3    "asshole" have on your investigation?

4    A.    Nothing.

5    Q.    Right.  So your earlier comment about his disdain

6    for Brian Topor had nothing to do with his use of the

7    word two days before his hearing.

8    A.    He does have disdain for Brian Topor, yes, he does.

9    And using that word was part of it as well.

10   Q.    Okay.  I thought you just told me, it had no import

11   on your investigation.

12   A.    It didn't make a decision one way or another about

13   bringing charges.

14   Q.    Okay.  And not your decision to make.

15   A.    Correct.

16   Q.    And you would agree with me that you've heard all

17   the testimony because you've been able to be here in the

18   courtroom, right?

19   A.    Yes, I have.

20   Q.    And that's appropriate in your role as the

21   investigator.

22         You heard Mr. Topor say that, through most of his

23   relationship with Mr. Santos, it was, quote, cordial,

24   right?

25   A.    Correct.

1    Q.   And that at some point in time it changed.

2    A.   Correct.

3    Q.   So this contempt or disdain was not an ongoing

4    issue for Mr. Topor and Mr. Santos, correct?

5    A.   Correct.

6    Q.   It only started, in fact, when he was detained.

7    A.   That's when we found out about it, correct.

8                 MR. ROGAN:  Thank you.  I have nothing else.

9                 MR. DURHAM:  I have one question, Your Honor.

10

11                 FURTHER REDIRECT EXAMINATION

12   BY MR. DURHAM:

13   Q.   This is from Government's Exhibit 8.1, a

14   conversation on September 1, 2016, counsel asked you on

15   recross and brought your attention to Santos saying,

16   "Well, I'm probably getting a new charge from

17   threatening to kill that guy."

18        Do you remember him asking you that?

19   A.   Yes.

20   Q.   And then he asked you a question about, do you know

21   who told him that.  That assumes that somebody had to

22   tell him that; that he just didn't know, when he

23   threatened somebody, that he's going to get new charges

24   or he'll probably get new charges, right?

25   A.   Correct.

1          MR. DURHAM:  Thank you, Your Honor.  Nothing

2     further.

3          MR. ROGAN:  Just one.

4

5               FURTHER CROSS-EXAMINATION

6     BY MR. ROGAN:

7     Q.   As part of your investigation, you ran a criminal

8     history on my client, Peter Santos, yes or no?

9          MR. DURHAM:  Objection, Your Honor.  It's

10    beyond the scope of recross.

11         THE COURT:  I think he's laying a foundation.

12         MR. ROGAN:  Thank you, Your Honor, I am.

13    BY MR. ROGAN:

14    Q.   Did Mr. Santos, was he ever arrested or convicted

15    for threatening any federal official at any point in

16    time, from the date he was born up until the date of

17    this incident?

18    A.   No.

19         MR. ROGAN:  Thank you.

20         MR. DURHAM:  Nothing further.

21         THE COURT:  Thank you sir.  You may step down.

22              (Whereupon, the witness was excused.)

23         THE COURT:  Let me confirm with counsel where

24    we are, and I'll get back to the jury in just 30

25    seconds.

1

2                    (Discussion at sidebar off the record.)

3            THE COURT:  Ladies and gentlemen, we've had a

4    lot of testimony concerning the recordings, so I am

5    going to repeat the limiting instruction.

6            You were shown transcriptions the government

7    had prepared that contain its version of recordings that

8    you heard, and its version of the identity of each of

9    the voices you heard.

10           I instructed you that no transcript itself was

11   evidence, so I instructed you to listen very carefully

12   to the recordings themselves.  You were shown the

13   transcripts solely to assist you in understanding and

14   absorbing what it is you were hearing.

15           If a transcript conflicted with what you

16   heard, then you should disregard the transcript and rely

17   on the recording; i.e., what you heard.

18           Mr. Durham.

19           MR. DURHAM:  Thank you, Your Honor.

20           Government rests at this point.

21           THE COURT:  Thank you.

22           Ladies and gentlemen, I expect that sometime

23   tomorrow morning we will get to closing arguments and

24   charge.  So that we can have a lot of flexibility in

25   terms of the schedule, the courtroom deputy will take

1    lunch orders from you before you leave today, and we'll

2    provide lunch for you, since you may not have time to go

3    out and pick up something.

4         Other than that, I'd simply like to thank you

5    for your hard work today, and ask you to remember the

6    instructions that I gave you yesterday, about keeping an

7    open mind throughout the trial; not discussing the case

8    amongst yourselves or with anyone else; not permitting

9    anyone to discuss it in your presence; and not having

10   any contact with the parties, attorneys, witnesses or

11   anyone associated with them; and also not being exposed

12   in the media or anywhere else to any information about

13   this case or any similar matter.

14        Once again, thank you for your hard work

15   today.  We'll see you tomorrow morning at 9:30.

16        (Whereupon, the jury left the courtroom.)

17        THE COURT:  Please be seated, everyone.

18        Let's just go off the record for a second and

19   talk about the schedule with respect to the charge, and

20   then I'll come back to a couple of other things.

21        (Off the record.)

22        THE COURT:  So I guess first, the government

23   has rested.

24        I understand Mr. Santos currently intends not

25   to testify; is that correct, Mr. Rogan?

1           MR. ROGAN:  That is correct, Your Honor.

2           THE COURT:  So I need to confirm, Mr. Santos,

3    that you understand that you do have the right to

4    testify.

5           THE DEFENDANT:  Yes, Your Honor.

6           THE COURT:  Do you understand that the

7    decision as to whether to testify is ultimately your

8    decision?

9           THE DEFENDANT:  Yes, Your Honor.

10           THE COURT:  Do you understand that, although

11    it is ultimately your decision, it's a decision that

12    should be made by you only after full consultation with

13    your attorney?

14           THE DEFENDANT:  Yes, Your Honor.

15           THE COURT:  But that it is a decision that you

16    must make?

17           THE DEFENDANT:  Yes, Your Honor.

18           THE COURT:  Do you believe that you've had the

19    opportunity to have a full consultation with your

20    attorney as to what is in your best interests in terms

21    of testifying or not testifying?

22           THE DEFENDANT:  Yes, Your Honor.

23           THE COURT:  And have you concluded that it is

24    in your best interests not to testify?

25           THE DEFENDANT:  Yes, Your Honor.

 1            THE COURT:  Do you understand that if, at any

 2     time before the defense rests -- that is, Mr. Rogan

 3     stands up and says in front of the jury, "The defense

 4     rests" -- if you decide you want to testify, you have

 5     the right to change your mind and do so; you just tell

 6     me or tell Mr. Rogan, "I want to testify."

 7            THE DEFENDANT:  Yes, Your Honor.

 8            THE COURT:  Okay.  And thank you.

 9            Any questions at all about that, sir?

10            THE DEFENDANT:  No, Your Honor.

11            THE COURT:  And, Mr. Rogan, at this point it's

12     likely that there will be no witnesses for the defense?

13            MR. ROGAN:  Yes, Your Honor.  At this point, I

14     don't need to play hide the ball.  I appreciate the

15     sidebar, but I will think about it overnight.  But I

16     will, in candor, inform the Court, and in fairness to

17     the other side, we do not intend to present.

18            THE COURT:  If you change your mind, you have

19     Mr. Durham's number or contact information?

20            MR. ROGAN:  I don't anticipate that to change,

21     but I'll certainly do that.  And I will need to make, at

22     some point, I will need to make a Rule 29.

23            THE COURT:  That's the next thing on our list.

24     So this is the point here, if you're ready.

25            Then we'll talk about the charge conference,

1    because I do have a few things to mention.

2            MR. ROGAN:  So, Your Honor, I recognize in

3    making a Rule 29 motion that the burden is extremely

4    heavy on the part of the defendant.  I recognize the law

5    is well established that the Court has to view all the

6    evidence in the light most favorable to the government

7    and deferring to jury's assessment of witnesses'

8    credibility.

9            However, if you start with the very first

10   witness in this case, Your Honor, and the essential

11   elements of what's required to be proven by the

12   government beyond a reasonable doubt, there has been so

13   much conflicting testimony about what was said, and by

14   whom, that I don't even think the government gets to the

15   predicate -- the fact which needs to be established,

16   that there was a threat made.

17           And while I know that that assessment of the

18   credibility of the witness is usually left to the jury,

19   given the disparity, the wide disparity in all of the

20   different versions of the events from eyewitnesses, Your

21   Honor, I don't see how a jury, if you let this go to a

22   jury, could find beyond a reasonable doubt what exactly

23   was said, and did it constitute a threat.

24           We can start with Ms. Cashman -- by the way,

25   Your Honor, in addition, there's been at least two --

1    and I'll have to recheck my notes -- three witnesses

2    that indicated that they're uncertain, even as they

3    testify here today, to whom that threat was allegedly

4    directed, which is another element, an essential element

5    of the crime.

6              And there is conflicting testimony -- and you

7    heard all the different fact witnesses, Your Honor --

8    and there's significant conflicting testimony from all

9    of the witnesses about whether or not it was Mr. Santos

10   blowing off steam, what were people's reaction.

11             And even, Your Honor, the most recent

12   witness -- sorry, the witness before, Marshal Moore,

13   indicated for the first time that there appeared to be a

14   dialogue in the courtroom between Mr. Topor and my

15   client, Mr. Santos.

16             For the first time we heard that today.  Even

17   Mr. Topor, on his own direct examination, said he didn't

18   initiate any conversation with Mr. Santos.  But in point

19   of fact we find out, before any alleged threat is made,

20   there's a conversation going on between the two of them,

21   where they're referring to each other by their first

22   name.

23             And I look at this case, understanding how

24   high the burden is, but when you look at the three

25   essential elements of the threat:  Was there a threat

1      made; was it a serious statement; was it directed to a

2      federal official.  About the only element that's been

3      met in this case -- because I don't think there's any

4      dispute that Mr. Topor was in the performance of his

5      duties, but as your preliminary charge points out, it

6      has to be a serious expression of an intent to inflict

7      bodily harm or worse.

8              And I don't see, given the various versions of

9      the events -- and I will talk about, it's not an

10     objective standard, it's a combination of an objective

11     and a subjective standard that this jury has to consider

12     under the current state of the law.

13             And if they do that, at best there is a

14     comment made that said, "I'm going to come find you."

15     There is no explicit threat.  And I recognize that's not

16     necessarily required, but any reasonable jury, based

17     upon the testimony they've heard, they're going to have

18     reasonable doubt as to what the intent was, and was

19     Mr. Santos serious, or was he, in fact, idle talk or

20     exaggeration or -- I forget the third one.  And there

21     are other elements in making that comment to Mr. Topor.

22             I keep coming back to whatever that comment

23     was; and that is, there is so much conflict in the

24     testimony from the people that matter that were in the

25     room, and that's Mr. Leone, Mr. Topor, Ms. Villano,

1    Ms. Cashman, and the two marshals.  Those are really the

2    eyewitnesses that we heard in this testimony.

3              And they all have varying significantly, and

4    it's not minor differences, significant differences as

5    to the essential elements of the crime.  And without

6    recapitulating all of their testimony, if you apply that

7    Rule 29 standard, despite that high burden, I don't

8    think the government's got there.  And I don't think

9    they have enough to get this to a jury, and I would move

10   for a motion for judgment of acquittal, Your Honor.

11             THE COURT:  Thank you.

12             Mr. Durham.

13             MR. DURHAM:  May it please the Court.  The

14   standard is to view the evidence in the light most

15   favorable to the government.  The government

16   respectfully submits that a reasonable juror could take

17   the testimony of any one of these witnesses, apply it,

18   and find the defendant guilty; that is to say, the

19   defendant's statement to Mr. Topor, and the evidence,

20   and the totality clearly shows that it was Mr. Topor who

21   the comment was directed at, including the defendant's

22   own statement that was recorded in the context of

23   Mr. Topor, he was threatening to kill.  That alone would

24   satisfy -- any one of those witness's testimony would

25   satisfy the first element of the three elements in the

1    offense.

2              I don't think that the defense seriously

3    contends that the evidence is lacking as to the fact

4    that Mr. Topor was a federal official, which is the

5    second element.

6              I don't think they seriously contend, as to

7    the third element, this had anything to do with anything

8    other than the defendant's performance of his official

9    duties.

10             The only thing one would have to do was look

11   at the testimony of Deputy Marshal Moore, Deputy Marshal

12   Curra, from Mr. Topor, from Mr. Leone, and so forth, to

13   easily conclude that it was intended to be a threat

14   directed at Mr. Topor and to a person.

15             Everybody testified that Mr. Santos did not

16   appear to anybody to be joking, that this wasn't said

17   lightly.  They said that he was serious when he said it.

18             And so looking at the totality of the

19   evidence, the government respectfully submits that it's

20   evidence sufficient to bring this to the jury.

21             THE COURT:  Thank you.  The motion is denied.

22             As we discussed off the record, we'll get

23   together for our charge conference off the record at

24   7:30 or after that tonight, and then we'll put our

25   comments on the record, to the extent we want to put

1    something on the record, tomorrow morning at 9:00.

2              You all got a draft which has certain language

3    in brackets.  I think the brackets have -- they are in

4    bold.  Those are either -- well, they're flagged for us

5    to discuss.

6              Some of the language that's in brackets, I

7    thought it may be appropriate in a typical case but not

8    needed in this case.  Some, I had a question as to

9    whether it would actually come into play in this case,

10   since I was distributing this before we got through all

11   the evidence.  Don't let me go past one of those on our

12   call today.

13             I think -- I pretty much followed your

14   requests, which were very similar in terms of the

15   elements of the offense.  I did put in a reference under

16   the second element to 18 U.S.C. Section 1114 talking

17   about a federal official, because I thought that when I

18   cited the statute, I assumed we were dealing with the

19   last clause, an official whose killing would be a crime

20   under 18 U.S.C. Section 1114.  That's on page 11 of the

21   charge.  I assumed that's the part of the statute we

22   were dealing with.

23             If that's correct, then I thought I should

24   explain where that language was coming from, in case I

25   had somebody who was looking at it and sort of tracking

1    through where things flowed from.  So that reference was

2    not in your submissions.

3         I think the defense submission actually

4    mentioned that Mr. Topor is a federal official.  If you

5    all want to stipulate to that, that's fine, we'll just

6    modify the language.  If not, we'll go with the version

7    that's here, which is basically a slight variation on

8    what was in the government's submission.

9         I have a couple of requests with respect to

10   your closings.  First, I guess, do you all have a sense

11   as to how long would you like for closings?

12        What you can do is, you can discuss it.  If

13   you come to an agreement as to what you like, I usually

14   accommodate counsel if they have a joint request.  So

15   I'll let you confer, and let me know.

16             (Pause.)

17        MR. DURHAM:  Could we talk about that at 7:30,

18   and I'll talk to counsel?

19        THE COURT:  Certainly.

20        My other requests are, you should feel free to

21   refer to the law.  You can literally read from the

22   charge if you want.  You can put it up and show it to

23   the jurors if you like.  I just ask you that you not say

24   it's the charge, and that you not say that, "The judge

25   is going to instruct you that," because I feel

1    uncomfortable -- well, nobody ever says, "The judge is

2    going to instruct you that," and then cites to the part

3    of the charge that helps the other side.

4            So I just don't like the suggestion that I'm

5    going to be making a charge that favors your side when

6    I'm giving you a balanced charge, I believe.

7            So just leave me out of your closing, leave

8    the charge out of your closing.  You don't have to leave

9    the law out of your closing.  Don't make any reference

10   to what I'm going to say or what the charge says.  You

11   can feel free to say, "The law is, and, "I believe the

12   law is."  You all --

13           MR. DURHAM:  Your Honor, so we don't violate

14   the spirit of what Your Honor is saying, typically I

15   know that I would say, but if I say something different

16   than, "The judge tells you, you must follow the

17   instructions of the judge" --

18           THE COURT:  That's fine.

19           MR. DURHAM:  -- that's okay?

20           THE COURT:  That's fine.

21           I had a -- quite a while ago now, where

22   somebody said, "The judge is going to charge you," and

23   they said what I wasn't going to say.  And that was a

24   very uncomfortable moment, and I couldn't remain silent.

25           Then the other thing I ask counsel not to do,

1    which isn't so much an issue in a criminal case, but I

2    ask counsel not to use the verdict form in their

3    arguments.

4            Did you hear what I said?

5            MR. DURHAM:  No, Your Honor.

6            THE COURT:  Not to use the verdict form in the

7    arguments.  Some lawyers would say, "We would like you

8    to fill in here $20 million," or something like that.

9            MR. DURHAM:  No.

10           THE COURT:  Okay.

11           And then you should all review with Linda what

12   exhibits will go to the jury early in the morning, if

13   you haven't done it now.  I'm sure that the government

14   has somebody to handle that.

15           And then you'll see that, in the charge, I

16   make reference to the fact that the jury will get the

17   charge in the jury room; if they want more copies, they

18   can ask for it.

19           And then, I guess, before you do your --

20   before I do the charge, I'll have you all meet with my

21   courtroom deputy and my law clerk to make sure that you

22   all have the same information as to who will be

23   alternates.  I like to not remember who they are as I'm

24   doing the charge.  It distracts me.  But you all should

25   do that before I start the charge.

1                    If anybody comes, in terms of family, for

2          that, Mr. Rogan, they should be aware that the courtroom

3          will be sealed, so they'll have to make sure that they

4          go out after closings and get back before the courtroom

5          is sealed, for Mr. Santos' family.

6                    I think that's all I wanted to cover.

7                    Any questions about anything?

8                    MR. ROGAN:  No, Your Honor.

9                    THE COURT:  Great.  So I'll talk to you all

10         later this evening.  You'll get the call-in information

11         before you leave.

12                    (Proceedings adjourned at 4:55 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3            UNITED STATES VS. PETER J. SANTOS

4                    3:17CR00024(AWT)

5

6

7            I, Corinna F. Thompson, RPR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages, pages 239 - 487, are a true and

11   accurate transcription of my shorthand notes taken in

12   the aforementioned matter on May 31, 2017, to the best

13   of my skill and ability.

14

15

16

17

18                /s/_____

19                    CORINNA F. THOMPSON, RPR
                    Official Court Reporter
                    450 Main Street, Room #225
20                  Hartford, Connecticut 06103
                    (860) 547-0580

21

22

23

24

25