UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          3:17CR00024(AWT)

        vs.

PETER J. SANTOS

                            HARTFORD, CONNECTICUT
              Defendant       JUNE 1, 2017

- - - - - - - - - - - - - - - x

## JURY TRIAL - VOLUME III

BEFORE:

      HON. ALVIN W. THOMPSON, U.S.D.J.

         AND A JURY OF 12

APPEARANCES:

    FOR THE GOVERNMENT:

        OFFICE OF THE UNITED STATES ATTORNEY
        157 Church Street, 23rd Floor
        New Haven, Connecticut 06510
        BY:  JOHN H. DURHAM, AUSA

    FOR THE DEFENDANT:

        LAW OFFICE OF NEAL ROGAN
        315  Post Road West
        Westport, Connecticut  06880
        BY:  NEAL PATRICK ROGAN, ESQ.

                 Corinna F. Thompson, RPR
                 Official Court Reporter

1                           **TABLE OF CONTENTS**

2

3      CLOSING ARGUMENT BY MR. DURHAM:.................... 492

4      CLOSING ARGUMENT BY MR. ROGAN: .................... 507

5      REBUTTAL ARGUMENT BY MR. DURHAM: .................. 538

6      JURY CHARGE ....................................... 559

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              9:37 AM

2              THE COURT:  Looks like we're ready for the

3       jury.

4                    (Whereupon, the jury entered the

5       courtroom.)

6              THE COURT:  Good morning, ladies and

7       gentlemen.

8              THE JURY:  Good morning.

9              THE COURT:  Please be seated everyone.

10             Ladies and gentlemen, one administrative

11      matter I wanted to mention is we have an Exhibit 5A,

12      which is a full exhibit, just so you know.

13             Mr. Rogan.

14             MR. ROGAN:  Good morning, Your Honor.  Good

15      morning, ladies and gentlemen of the jury.  The defense

16      rests, Your Honor.

17             THE COURT:  Thank you.

18             MR. ROGAN:  And I would also like to renew my

19      Rule 29 motion, Your Honor.

20             THE COURT:  And the motion is denied.

21             MR. ROGAN:  Thank you, Your Honor.

22             THE COURT:  Thank you.

23             That means there is no rebuttal case and now

24      we're going to proceed to closing arguments.  First you

25      will hear from counsel for the government, then you'll

1      hear from counsel for the defendant, and I suspect

2      counsel for the government will save some time for

3      rebuttal.

4              Mr. Durham.

5              MR. DURHAM:   Thank you.

6              Good morning, ladies and gentlemen.

7              Let me first thank you for your attentiveness

8      in these proceedings, from the Court and from counsel

9      for the parties.

10             This wasn't a particularly long case, but it's

11     an important case.  All these cases are important for a

12     number of reasons, a variety of reasons.  This one in

13     particular is obviously important to the defendant and

14     it's also important to the system, a system that we need

15     to support and protect the integrity of.

16             So again, we appreciate your attentiveness to

17     the testimony and evidence received in this case.

18             We had indicated in opening statements, and I

19     believe that you'll hear instructions from the Court,

20     relating to the fact -- I think preliminary instructions

21     from the Judge in fact indicated -- that in a trial of a

22     case you as the jurors are the judges of the facts; that

23     is, you decide what the evidence has proven or not

24     proven.  And in connection with that, if I should say

25     anything during the course of this argument or in

1    rebuttal argument that is different from your

2    recollection, you should rely on your own recollection

3    and not what I say.  By the same token, if defense

4    counsel says something that is inconsistent with your

5    recollection, it's your recollection that must control

6    and should be the basis of your fact finding.

7             On the other hand, again as the Judge had

8    indicated in the preliminary instructions, it's the

9    Judge that tells you what the law is and you must follow

10   those instructions from the Judge.  That's your sworn

11   obligation.  You all agreed to do that.  And the Judge

12   will give you very detailed instructions on the law

13   along those lines.

14            But in commenting on the evidence that's been

15   prepped here, obviously I'm not to touch on the legal

16   principles, the elements of the offense and the like.

17   But as with any comment I make about the evidence, if I

18   should say anything that is in any way inconsistent with

19   or different from what Judge Thompson tells you, you

20   must and should follow the Judge's instructions to the

21   T.

22            Now, as you know in this case it's a one-count

23   indictment charging Mr. Santos with threatening a

24   federal official.  That's relatively straightforward.  I

25   believe the Court indicated that you have a copy of the

 1    indictment in the deliberation room with you.  But the

 2    grand jury charges in this case that on or about

 3    August 31, 2016, in the district of Connecticut, the

 4    defendant Peter J. Santos did threaten to assault and

 5    murder a supervisory United States Probation Officer

 6    with the intent to impede, intimidate and interfere with

 7    the supervisory United States Probation Officer while

 8    the officer was engaged in the performance of his

 9    official duties and with the intent to retaliate against

10    the supervisory United States Probation Officer on

11    account of the performance of his official duties.

12            That's a one-count straightforward charge,

13    threatening a federal public official.

14            The offense is in violation of Title 18 United

15    States Code Section 115(a)(1)(B), which the Judge will

16    describe to you in detail.

17            But for purposes of providing some framework

18    to consider the evidence in that charge, let me just

19    indicate to you what the elements of that offense are.

20    Again, if they should vary in some way from what the

21    Judge tells you, follow the Judge's instructions.

22            But there are three elements to this offense;

23    that is, there are three different component parts of

24    the offense charged by the grand jury.

25            The first is that the defendant threatened to

1    assault or murder in this case Supervisory Probation

2    Officer Brian Topor.  That's the first element.

3            And the Judge is going to provide you with

4    written instructions, his instructions to you, you'll

5    get a copy of them with you so you'll his instructions

6    on the law in this regard.

7            The second element, the second thing that must

8    be proven beyond a reasonable doubt for you to return a

9    guilty verdict is that at the time of the alleged

10   threat, Mr. Topor was a federal official, a federal

11   probation officer.

12           And third, that the defendant acted with the

13   intent to impede, intimidate or interfere with the

14   federal official while he was engaged in the performance

15   of his official duties or with the intent to retaliate

16   against that federal official on account of the

17   performance of his federal duties.

18           So those are the three elements.

19           Let me address myself to the evidence that is

20   presented which establishes beyond any reasonable doubt

21   those three elements.

22           I'm going to address the second and third

23   elements first just to sort of set those aside.

24           The second element, as we indicated, is that

25   at the time of the alleged threat Mr. Topor was a

1    federal official.  Well, the uncontroverted evidence in

2    the case is that this all arose on August 31st of 2016

3    when Mr. Topor, who's a United States probation officer,

4    and in fact a supervisory U.S. probation officer, was in

5    Judge Arterton's courtroom.  So he is a United States

6    probation officer.  The Court will instruct you on what

7    a federal official is, but I respectfully submit there's

8    no question but that as to that element, Mr. Topor at

9    the time of the threat, was a federal official.

10            The third element again is that the defendant

11   acted with intent to impede, intimidate or interfere

12   with that federal official while he was engaged in the

13   performance of his official duties or with intent to

14   retaliate against that federal official on account of

15   the performance of his official duties; essentially,

16   looking at what was the intent or what was the purpose

17   for the threat that was made by Mr. Santos to Topor,

18   Mr. Topor, on August 31st.  Well, based on all of the

19   evidence that you've heard, the testimony of the

20   witnesses in the case, the recorded conversations in the

21   defendant's own voice, I respectfully submit to you that

22   there can be no question that the whole purpose of the

23   statement made to Mr. Topor in Judge Arterton's

24   courtroom was to intimidate or interfere with with his

25   performance as a United States probation officer, and

1    even more particularly, to retaliate for the fact that

2    Mr. Topor had taken a position on his release that the

3    defendant didn't like.

4            Respectfully, based on the evidence presented

5    here, there can be no question but that the evidence

6    establishes that beyond a reasonable doubt.

7            Let me just point to some of that evidence.

8            Separate and aside from the transcript of the

9    proceeding that was before Judge Arterton on

10   August 31st, yesterday when Inspector Parker testified

11   you learned that, well, there's evidence beyond just the

12   peoples' recollection as to what was in the courtroom,

13   but the defendant was recorded in telephone

14   conversations both before and after the August 31st

15   hearing.

16           The defendant's mindset then, his purpose or

17   his intent in making the threat to Mr. Topor couldn't be

18   any clearer.

19           You'll recall that one of the pieces of

20   evidence, the audio recording that was played yesterday

21   was marked as 6.1.  The transcript is 6.1T.  You'll have

22   the audio recording.  The Judge made reference today to

23   there's an Exhibit 5A.  So that CD has all of the

24   conversations that you heard yesterday.  That's what's

25   on there.  So it's not all of the conversations.  It's

1    just the portions that the Court admitted into evidence

2    yesterday.

3            But when one looks at and listens to that

4    conversation which occurred on August 27th -- now,

5    remember, in context, the defendant was taken into

6    custody on the 25th.  He thought he was going to get

7    out.  Probation and the person, Mr. Topor, advised Judge

8    Richardson what was going on with the defendant and he

9    was held.

10           So you go back and you pull the conversations

11   or recordings of conversations of Mr. Santos at the

12   Wyatt Correctional Facility and two days later

13   Mr. Santos is talking to his mother.  The conversation,

14   the relevant portion that the Court has admitted into

15   evidence, couldn't make it any clearer what the

16   defendant's mindset is.  He's upset with Brian Topor

17   because of the position Mr. Topor had taken with respect

18   to release.

19           So let's listen to 6.1.  The transcript for

20   your guidance is on the monitor.

21

22               (Audio played.)

23           MR. DURHAM:  That's his starting point.  You

24   know from the testimony that was presented the event

25   occurred on August 25th.  Mr. Santos didn't get his

1    way.  He wasn't released.  And so two days later he's

2    recording, referring to the probation officer, Brian

3    Topor, in context in a particular fashion.  That's what

4    his mindset is at that time.

5          As I go through this argument you'll recall

6    there was a cross-examination of a number of witnesses,

7    well, how do you know it was Mr. Topor?  How do you know

8    it wasn't Mr. Leone?  All you got to do is listen to the

9    conversations.  He clearly, he, Mr. Santos, is clearly

10    directing his ire and his threat to Mr. Topor as

11    evidenced from as early as this recording on

12    August 27th.

13          It becomes also clear, establishes the

14    defendant's mind set, as to whether he was directing his

15    upset at Probation and the people in Probation and

16    whether he was going to resist what they were trying to

17    do to help him or not.  You recall the recording from

18    two days later, August 29th.  Again, two days before

19    the hearing that took place before Judge Arterton.

20    We'll play 7.1.  The transcript is on the screen.

21    Again, two days before the events that occurred on the

22    31st.

23

24          (Audio played.)

25          MR. DURHAM:  I respectfully submit to you

1    there could be little evidence that could be any

2    clearer.  You're going to hear instructions along the

3    lines given in criminal cases -- civil cases as well --

4    as to how you can judge a person's intent.  Typically,

5    you have to look at the facts and circumstances

6    surrounding events because it's hard to get inside, and

7    almost impossible most times, to get inside somebody's

8    head to know what they're really thinking or know what

9    their intent is.  That's not the case here.  Mr. Santos

10   in his own voice is telling you what his intent is.

11   He's going to fight these people all the way.  He's not

12   going to have discussions with them.  He's not going to

13   try to convince them he's right.  He's going to fight

14   these people who he describes in a particularly vulgar

15   way all the way.

16          That's what his thinking is, that's what his

17   purpose is going into the hearing before Judge Arterton

18   on the 31st.

19          And you had the testimony that occurred from

20   all of the people, virtually all the people who were in

21   the courtroom that day, that is August 31st of 2016.

22          Now, there was cross-examination of

23   Ms. Villano and I think Ms. Cashman and the marshals and

24   so forth on, well, what were the exact words that were

25   said and the like.  I would expect that counsel is going

1      to say, well, there are inconsistencies and there are

2      different words, some different word choices and so

3      forth and so on, which is true.  To some extent they

4      weren't the exact same words by all of the witnesses.

5                  But think about that for a minute.

6                  First of all, two people observing the same

7      events aren't always going to remember them in exactly

8      the same way.  Or even two people trying to explain what

9      they both saw aren't going to explain it in exactly the

10     same way or their recollections aren't going to be

11     exactly the same.  But when you look at the collective

12     testimony, every single witness who got on the stand and

13     testified on direct and cross-examination testified to

14     essentially what it is that Santos said to Mr. Topor.

15     So I ask you to keep in mind that every single one of

16     these witnesses said the defendant was serious when he

17     said this.  He wasn't joking around.  He wasn't kidding.

18     He wasn't saying it in a light-hearted fashion.  He was

19     serious when he said it to Topor.  Every one of the

20     witnesses that testified said based on their

21     observations of Mr. Topor, Mr. Topor took it seriously

22     and in fact was concerned about this.

23                 So when you look at the specific language,

24     this is what I would ask you to focus on and suggest

25     that you focus on:  Who were the people in the courtroom

1      who would be most attentive to what it was that was

2      being done and said by Mr. Santos?

3              You saw we put in we introduced into evidence

4      the photographs.  This is the court reporter.  You

5      remember Ms. Cashman was up at the front bench.

6      Ms. Villano, the courtroom deputy, they are with their

7      papers getting ready to leave the courtroom.  Their

8      responsibility is not this man.  That's not what they're

9      focused on.  The people who were focused on Mr. Santos

10     and what Mr. Santos was doing, particularly after his

11     comments to Judge Arterton, are Deputy United States

12     Marshal Moore, Deputy United States Marshal Curra,

13     Mr. Topor, who's responsible as the supervisory

14     probation officer, and Mr. Leone.

15             If you go back and check, again your

16     recollection of this controls, but with respect to the

17     testimony, every one of those individuals said that the

18     defendant said to Mr. Topor, When I come out I'm coming

19     for you.  I think in one instance maybe Mr. Topor said

20     instead of when I come out, I'm coming for you.

21     Mr. Topor said, When I get out, I'm coming for you.  But

22     except for tiny variations of that sort, Mr. Leone,

23     Mr. Topor, Mr. Curra and Mr. Moore were all very

24     consistent in what it is that the defendant had to say.

25             Now, why would that be the case?  What do you

1    know from the evidence and testimony in this case that

2    that's what he said?  Well, you know that because with

3    respect to Mr. Topor he wrote it down immediately after

4    the incident.  You recall counsel asking Mr. Topor on

5    cross-examination about his notes and there was

6    chronological notes and so forth.  He wrote down

7    immediately after the proceeding what it was that the

8    defendant had said.  And what did Topor say the

9    defendant had said to him?  When I get out, I'm coming

10    for you.  What was it that Mr. Leone said?  When I come

11    out, I'm coming for you.

12           You will recall the testimony of the two

13    deputy marshals who were standing right there with

14    Mr. Santos in the courtroom when he made the statement.

15    They immediately tried to taunt him, chill him out as

16    he's going to the elevator and so forth.  He makes the

17    statement not just in the courtroom -- I'll get to the

18    other statement at the elevator in a moment -- but he

19    makes that statement.  They go upstairs and they

20    immediately report it to the person within the United

21    States Marshal's Service who's responsible for

22    investigating these matters.  That happens pretty much

23    immediately.  That's what they're trained to do.  That's

24    what they do do as law enforcement officers, to report

25    these things completely and accurately.

1            So the individuals who are most focused on

2    maintaining security in the courtroom, who are most

3    focused on Mr. Santos and what's going on with

4    Mr. Santos are entirely consistent with what it is that

5    Mr. Santos said in that courtroom on August 31, 2016.

6    When I come out or when I get out, I'm coming for you.

7            You'll recall the testimony of Mr. Topor.

8    He's asked about what did he understand that to mean.

9    Mr. Topor testifying that, well, he thought it meant

10   some serious bodily injury or he was going to do me in.

11   Well, you ask yourself:  If this gentleman who you knew

12   was a convicted felon said to you, When I get out, I'm

13   coming for you, what would you think he was telling you?

14   The reasonable inference to be drawn from that is he's

15   going to come and he's going to do you in, as Mr. Topor

16   suggested.

17           But you don't even need to draw that inference

18   because Santos tells the marshals what he meant when he

19   said that when he's at the elevator and they say, hey,

20   come on, that wasn't smart or that was stupid or

21   whatever, and he says, he, Mr. Santos, tells both

22   marshals, both of whom testified under oath before you,

23   the same thing; that is he, Mr. Santos, said to them,

24   Everybody's got to meet their maker, whether it's me or

25   someone else.

1           Could it be any clearer to anybody as to what

2       it is that Mr. Santos said and what he meant?

3       Respectfully, it could not be any clearer and it is that

4       straightforward.

5           He intended to intimidate and interfere with

6       Mr. Topor in the performance of his duty, and more

7       particularly, to retaliate against Mr. Topor for having

8       taken the position he's required to take as a probation

9       officer when he appeared before Judge Richardson on

10      August 25th and for his statements before Judge

11      Arterton on August 31st at the supervised release

12      sentencing hearing.  The defendant's intentions clearly

13      were to threaten Mr. Topor in connection with the

14      performance of his official duties.

15          I say respectfully the evidence could not be

16      any clearer.  But to the extent that the argument might

17      be made that, well, we don't know or it calls for

18      conjecture as to what it was that Mr. Santos intended

19      when he made those statements.  Respectfully, that's

20      complete and utter nonsense, because the day after the

21      hearing, that is on September 1st of 2016, Mr. Santos

22      tells you, he tells anybody who wants to know what he

23      was thinking, what he said, what he intended.  He tells

24      you that and it's memorialized in a recording in his own

25      voice.

1            As you recall, yesterday we played

2      Government's Exhibit 8.1, the conversation of September

3      1st, the morning, the defendant with his mother.  And if

4      you look at the transcript that's the recording -- is

5      the full evidence in the case, but let me just remind

6      you what is on that recording.  Again, you have to

7      listen to it and that's what controls, but Mr. Santos

8      says to his mother the day after, Well, I'm probably

9      getting a new charge for threatening to kill that guy.

10     Not for getting upset.  Not because I was blowing off

11     steam.  Not because I lost my mind or whatever.  He's

12     going to get a new charge for threatening to kill that

13     guy.

14            Now when his mother inquires which one?

15     Mr. Santos says the probation officer.

16            Then when his mom says, I know, but which one?

17     Topor or?  Mr. Santos says what?  Yeah, Topor.

18            So here's a conversation the day after the

19     event that occurs in Judge Arterton's courtroom.  As

20     reflected at least in the recording, no remorse

21     expressed, no sorrow, no regrets, no suggestion that he

22     didn't mean exactly what he said.  And he tells you as

23     jurors exactly what he intended and what he said.  He's

24     going to get new charges for threatening -- his words --

25     to kill -- his words -- the probation officer,

1    Mr. Topor.

2           The three elements of the offense that are

3    charged in this case are wholly and completely

4    satisfied.  The evidence proves the defendant's guilt as

5    to this one-count indictment beyond any reasonable

6    doubt.

7           I have really nothing more to add to that.

8    You heard all the testimony of the witnesses.  It's your

9    obligation to evaluate that testimony and the

10   credibility of the witnesses and to find the facts based

11   on the evidence presented.

12          Respectfully, the evidence does prove beyond

13   any reasonable doubt these three elements and at the

14   conclusion of the rebuttal I'm going to ask you to

15   return a guilty verdict against Mr. Santos in this case.

16          Thank you.

17          THE COURT:  Thank you, Mr. Durham.

18          Mr. Rogan.

19          MR. ROGAN:  Thank you, Your Honor.

20          Good morning, ladies and gentlemen.  Let me

21   start also by thanking you for your jury service.  Every

22   time I do that I often wonder if you think it's just a

23   platitude that we give to jurors in an attempt to curry

24   favor.  I can tell you that it's not, both on behalf of

25   Peter Santos and the government.  Even though this is a

1    short trial, you have gone out of your way to set aside

2    your personal lives, your professional lives, your

3    social lives and things you'd rather be doing and you

4    stepped forward and said, yes, I'll serve, I'll make

5    that decision.  You are the bedrock on which this whole

6    system fails.  If people like you don't come forward,

7    the system collapses.  So on behalf of my client

8    particularly I want to thank you for your service.

9         The second thing I want to do before I get

10   into my argument is to also tell you -- I'm going to

11   walk around a bit and I'm a bit of a pacer and the Judge

12   said that's okay.

13        If at any point during this trial I offended

14   you in any way in the manner in which I cross-examined a

15   witness or approached a witness or my tone of voice, I

16   ask you to hold that against me.  Don't hold that

17   against Peter Santos.  That's my job.  That's my duty.

18   That's my responsibility.  But if I offended you in any

19   way, please hold that against me.

20        I thought a lot about how to begin this case

21   and to begin this closing argument, and I want to tell

22   you if there was ever a case in which you needed to hold

23   the government to its burden of proof, it's this case.

24   Because this is a case about language.  It is a case

25   about intent.  And if it were as easy as the government

1  just described, we wouldn't need you to be here.  And
2  what I want to do in the next 45 minutes or so is I'm
3  going to show you a path by which you can fully and
4  completely discharge your duties as jurors, follow the
5  instructions on the law, follow the facts in this case
6  and find my client not guilty, and it's going to be
7  based upon the elements of the crime as charged and it's
8  going to be based upon the government's burden of proof.
9       But first I need to tell you this:  You
10  probably want to convict my client, if for no other
11  reason -- and I'm going to speak to you in plain and
12  unvarnished terms -- my client's language was
13  unconscionable.
14       Take a look around this room.  We're in
15  hallowed ground.  That's a United States District Court
16  Judge appointed by the President of the United States.
17  That's a U.S. Attorney.  That's a courtroom deputy.
18  That's a law clerk.  These are professionals who should
19  be afforded dignity and respect.  The only people that
20  don't mirror the people that were in this courtroom are
21  there's no one here from Probation.  And I'd also point
22  out there's a United States marshal here.
23       But unfortunately, we don't live in an ideal
24  world.  And I'm going to tell you now what you already
25  know:  There are no circumstances under which it is okay

 1    to speak to a United States District Court Judge in that

 2    manner.  No circumstances.  But that's not a crime.

 3    There are absolutely no circumstances under which it's

 4    okay to call someone -- I'm not going to repeat the

 5    language here because I'm sure you didn't sign up for

 6    that -- there's no circumstances under which it's okay

 7    to call someone a blipping A-hole.  There is absolutely

 8    on the planet, regardless of who they are, they are off

 9    the grid.  There is no way that you can ever use the "C"

10    word to a woman.  It's just offensive and beyond the

11    pale.

12             But here's the point:  That's not a crime.

13    And the reason the government has focused so much on the

14    language I'm going to tell you in as direct a way as I

15    can is they want to inflame you and have you so

16    prejudiced against my client that you'll convict him

17    regardless of the law.  I'm going to tell you, you're

18    not going to do that because I believe when you were

19    selected as jurors you're going to consciously follow

20    your oath, to discharge your duties as jurors and set

21    aside whatever dislike or antipathy you might have for

22    Peter.  And I know that's going to be hard to do, but I

23    know you can do it.

24             I want to tell you now what you also know,

25    okay?  When I referred to him on cross-examination by

1    various terms, that wasn't intended to disparage Peter

2    in any way, but it was actually for a point that I'm

3    going to get to now.

4            Let me take a moment because I want to read

5    this.  This is important.

6            Here's what the law is regarding proof beyond

7    a reasonable doubt.  The government must prove each

8    element of the crime beyond a reasonable doubt.  A

9    reasonable doubt is a doubt based upon reason and common

10   sense, the kind of doubt that would make a reasonable

11   person hesitate to act.  Proof beyond a reasonable doubt

12   must therefore be proof of such a convincing character

13   that a reasonable person would not hesitate to rely and

14   act upon on it in the most important of his or her own

15   affairs.

16           Here's another important part that you didn't

17   know.  He's charged with threatening to assault or

18   murder Mr. Topor.  But here are the elements of the

19   crime and here's the law on that, and I want you to

20   focus on this:

21           The elements of the crime:  The law defines a

22   threat as a serious statement expressing intention to

23   inflict bodily injury or murder as distinguished from

24   idle or careless talk, exaggeration or something said in

25   a joking manner.

```
 1              And we're going to dive into the evidence, but

 2     here's what I want you to keep you in mind as I walk you

 3     through the evidence:  What do you we already know about

 4     Peter Santos?  The only thing his life is focused on is

 5     heroin, heroin, heroin.  Where do I get my next fix

 6     from?  He lives his life in a careless manner.  Why

 7     wouldn't he make a careless comment to an individual?

 8     And that's reasonable doubt, ladies and gentlemen.

 9              And despite what the government tells you,

10     they need to establish with you the predicate fact, What

11     was the threat?  And I will go through the testimony

12     with you of each and every individual and I can tell you

13     now we don't know what the threat was.  It matters in

14     this case, ladies and gentlemen.  I will concede what

15     the government's going to tell you on rebuttal that a

16     threat doesn't need to be explicit, but we at least have

17     to have the starting point of what was said.  So it

18     matters.

19              Start with Mr. Topor, one of the government's

20     last witnesses.  Claimed to have a perfect recall of

21     everything.  Here's the problem with Mr. Topor's

22     testimony.  This is absolutely says what he heard, but

23     the problem is the individual that preceded him, Mr.--

24     sorry.

25              Do you remember Marshal Moore testified?  And
```

1        just so you know, this is a difficult case because I'm

2        actually cross-examining people that I know on a

3        professional level and I identified them to you.  But

4        here's what's important.  You can't just -- as you

5        consider the evidence, you do have to consider it as a

6        whole.  This is not an a la carte menu.

7                So Mr. Topor comes up and says I have perfect

8        recall of what was said.  But he's immediately

9        contradicted by the government's own witness who says

10       specifically, apparently there was an entire dialogue

11       going on between Mr. Topor and Peter.  And it begins

12       with, You know this isn't going to help me, Brian.

13       That's supposedly my client talking.  Mr. Topor:  I'm

14       doing the best I can, Peter.  When I get out I'm coming

15       for you.  Excuse me.  You heard me.  Mr. Topor has no

16       recollection of that because I asked him was anything

17       else happening, did anything else happen.

18               Here's what else you have to understand and

19       why language matters.  Consider this -- and I'm going to

20       do a little demonstration for you -- but consider this:

21       All of the reason you have inconsistencies in this

22       testimony, it's obvious.  If you have inconsistencies in

23       the predicate fact of whether or not you're sure about

24       what the person said such that you wouldn't hesitate to

25       act, you can't convict Peter Santos.  As I said, I'm

1    going to show you the path.  You might end up not liking

2    me as much as you might not like Peter Santos, but

3    you're going to follow the law.

4              Here's what the marshal said.  This whole

5    colloquy or dialogue, whatever happened, took place in

6    seconds.  The testimony was uncontroverted that standard

7    operating procedure as soon as an individual is

8    sentenced -- and we saw the still picture from Judge

9    Arterton -- she gets up, walks out of the courtroom,

10   quote, he's immediately cuffed up and taken out the

11   door.  Watch this.  Assume again that's the exit door.

12              (Demonstrates.)

13              That's the total elapsed time that if took for

14   all of this supposedly to have happened.  You have

15   people doing different jobs.  You've got the marshals

16   doing what they're supposed do.  You've got the

17   courtroom deputy doing what they're supposed to do.

18   That's why there's inconsistencies.  And if they can't

19   get to a common ground on what was said, you can't

20   convict Peter.  Proof beyond a reasonable doubt means

21   there's no other reasonable alternative, and it has to

22   be of such a convincing character that it would cause

23   you to hesitate to act.

24              And I know you might not like that, but that's

25   the law.  That's the law in this case.

1             And despite what Mr. Durham just told you,

2    there are significant inconsistencies in the

3    individuals' testimony.  Significant inconsistencies.

4             Start with the very first witness, Julie

5    Cashman.  Nice woman.  She was occupied in the role as

6    courtroom reporter.  What does she tell us?  That

7    despite what Mr. Durham just told you, that she was

8    present, she heard something along the lines of I'll

9    come see you or I'll look for you.  Are you talking to

10   me or what?  Either/or.

11            And then, more importantly, what she does,

12   despite what the government just told you, even if you

13   think it was a threat, she goes back directly to Judge

14   Arterton -- and she testified on cross-examination to

15   this and you heard it -- that in her mind Peter was

16   just, quote, blowing off steam.  You heard that

17   testimony.

18            And by the way, throughout the course of this

19   trial I'm sure you noticed it, every time I

20   cross-examined the witness and they said, oh, yeah,

21   maybe I'm not so sure about whether it was a threat, it

22   wasn't a threat, the government then got back up and

23   rehabilitated the witness right in front of you and they

24   would change their testimony again.  That's

25   inconsistency, ladies and gentlemen, within the confines

 1     of this trial.  If you find that kind of inconsistency,

 2     despite what you might think about Peter, you can't

 3     convict him beyond a reasonable doubt.

 4          It's also significant and incredibly

 5     important, okay, multiple witnesses, multiple

 6     witnesses -- and I'll identify them for you -- couldn't

 7     tell if the threat was directed to Mr. Topor if there

 8     was a threat, or to Mr. Leone, including Mr. Leone

 9     himself who was seated or standing in the jury box.

10     This indictment doesn't charge Peter with making a

11     threat against Mr. Leone.  It charges him with making a

12     threat against Mr. Topor.

13          In addition, one of the marshals also attests

14     to that, that it was unclear to him to whom the threat

15     was directed.

16          That's not a minor inconsistency, ladies and

17     gentlemen, that you can just kind of pass by and not

18     worry about.  That's a significant inconsistency because

19     that's reasonable doubt.  The indictment says, and it's

20     not proof of anything, but the claim is that he

21     threatened to assault and murder Mr. Topor.

22          These are the government's witnesses.  And

23     remember, the sole burden of proof rests with them, not

24     with Peter, to prove his guilt beyond a reasonable

25     doubt.  Again, you might not like that, but that's the

1      law.   That's the law in this case.

2              And by the way, let me tell you flat out, the

3      purpose of the government playing those phone calls was

4      to do nothing else, as I indicated earlier, other than

5      to inflame you.

6              And here's what I want you to follow.   The

7      timeline of this case is very important.   He called my

8      client a convicted felon.   One of the other things you

9      can consider -- and he is, and we admitted to that --

10     consider this:   He is released after serving 25 months

11     in a federal prison on December 31, 2015.   And what does

12     Peter do within the first five days of being released

13     after 25 months in prison?   He goes right back to using

14     heroin.   And I don't use that, ladies and gentlemen, as

15     an excuse but as an explanation.   And as you consider

16     the evidence in this case, ask yourself whether you know

17     someone, a family member, a friend or someone you know

18     socially or professionally that hasn't been touched by

19     alcoholism, gambling addictions, narcotics addictions.

20             And you know one of the other things that the

21     law requires in this case -- and again, I agree with

22     Mr. Durham that the Judge's instruction on the law

23     provides -- you don't leave your common sense at the

24     door, ladies and gentlemen.   That's what you bring to

25     this process when we interviewed you during the voir

1    dire process.

2            It makes common sense that someone who's

3    addicted to heroin, that's their only focus.  They're

4    going to do anything, say anything, whatever they have

5    to do to get heroin.  That doesn't make Peter a good

6    person or a bad person.

7            One of the other themes that the government

8    developed in this case was, quote, the real Peter

9    Santos.  I have to tell you, if I heard it once I heard

10   it 20 times.  Do you know who the real Peter Santos is?

11   It was exactly who Mr. Topor described, a 20-year heroin

12   addict.  Twenty years.  Over half his adult life using

13   heroin on a daily basis.

14           And what do we know as a matter of common

15   sense?  People who are in the grips of -- Mr. Topor's

16   words -- a demon, don't know what they're doing and they

17   say and do stupid stuff.  Stupid stuff, careless talk.

18           I'm not making any suggestion as to what the

19   government's theme was throughout the trial that

20   Mr. Santos said anything in a joking manner in the

21   courtroom that day, but it clearly falls under the

22   rubric of idle or careless talk, and that's what the law

23   says.  It says again, it's a serious threat as

24   distinguished from idle or careless talk.

25           The government tried to indicate to you that

1    based upon certain of the telephone transcripts that

2    Peter had already formed the intent to commit this crime

3    with which he's charged against Mr. Topor based on

4    transcripts of telephone calls that occurred before he

5    was sentenced on August 31.  Here's the inconsistency,

6    okay?  Mr. Santos didn't know, Peter didn't know until

7    August 31 what the outcome was going to be in front of

8    Judge Arterton and that famous transcript.

9            So he couldn't -- just because he called --

10   and again, it's never good.  It's not okay to call

11   someone an F'ing A-hole.  It's not.  But that's not a

12   crime.  That's not indicative of intent.  It's

13   indicative of someone who engages in careless talk and

14   has lived a careless life.  And we know that from the

15   testimony of these witnesses.  And that's what the law

16   requires and that's what the law provides, the

17   distinction between a serious threat and idle or

18   careless talk.  And that's exactly what Peter was

19   engaged in.

20           I'm going to give you one of the things the

21   government talked that you're allowed to draw reasonable

22   inferences.  Here are some reasonable inferences you can

23   draw from this case:

24           One of the government's themes, and I knew it

25   was going to be, is this famous call that Peter makes

1    between he and his mom the day after, right, about where

2    he says I'm probably going to get new charges for

3    threatening a federal officer.  That sounds pretty bad.

4            I asked a question of one particular witness

5    and I asked it for a specific reason.  I asked the

6    marshal if my client had met with his attorney after the

7    hearing and he said yes.  We put him in what's called an

8    interview room.  A reasonable alternative inference you

9    can draw, ladies and gentlemen, is that that information

10   could have been provided by his attorney about, hey,

11   that could be a problem, okay?

12           So that's where that information could have

13   come from.  That's not a flight of fancy, which the

14   government is going to suggest, but that's a reasonable

15   alternative inference that you can draw in this case.

16   You might not like it, but that's a fact.

17           Proof beyond a reasonable doubt, ladies and

18   gentlemen.  It's an incredibly high standard and the

19   government should be held to it.  And quite frankly,

20   despite what they're going to get up and say to you,

21   they haven't met that burden of proof.  They haven't met

22   that burden of proof.

23           You can't just whitewash inconsistencies

24   between individuals' testimony.  Right in front of you

25   they were contradicting themselves.  Well, I think it

1    was directed to Mr. Topor.  Then no, it wasn't directed

2    to Mr. Topor.  I'm coming for you.  I'm going to see

3    you.  Poor Ms. Villano, again, very nice lady, the

4    courtroom deputy.  She was so confused by the end she

5    said like well, it all means the same thing.  No, it

6    doesn't.  Those inconsistencies matter.

7            And here's a reasonable alternative inference

8    you can draw if you assume that it was something along

9    the lines of I'm going to come find you, I'm going to

10   come get you -- and you're not going to like this but

11   this is a reasonable alternative inference -- remember,

12   he's charged with intent to assault or murder -- a

13   reasonable inference you can draw, I'm going to come

14   find you, I'm going to burn your house down, I'm going

15   to vandalize your house, I'm going to talk some more

16   trash to you, I'm going to steal your car.

17           That language is unclear, "I'm going to come

18   find you," because remember, you have to look at it in

19   the subjective and objective context, okay?

20           And I know the government wants to and all the

21   witnesses were lined up to say no doubt that meant

22   bodily injury or bodily harm.

23           The government spent a lot of time saying how

24   lucid Peter was.  Do you remember that?  He was wasn't

25   under the influence of narcotics.  Well, if Peter Santos

1     wanted to make an explicit threat he could have said,

2     Hey, when I get out I'm coming over your house and I'm

3     going to kill you, I'm going to assault you.  Well, the

4     government can't have it both ways.

5            The problem with their case is that there's so

6     much inconsistency that they're trying to make this fit

7     in a box and they're trying to inflame you that you'll

8     all dislike my client to such an extent that we're going

9     to convict him even though the government hasn't proved

10    this case, and I know you're not going to do that.

11           Let me turn to a couple other significant

12    points if I could.

13           The famous Judge Arterton transcript.  I'm

14    going to tell you now -- and Judge Thompson has already

15    given you a limiting instruction -- that transcript is

16    of no import in this case, because remember during the

17    opening statement, I believe the government said

18    something about that statement, or the Court said

19    something about you could look at that to see if a

20    threat was made.  Every single witness indicated after a

21    review of that transcript there was no threat made by

22    Mr. Santos during the course of that hearing.  The issue

23    is what happened after the hearing.

24           Again, the government kept hammering away at

25    that because they want you to be outraged by how

1    disrespectful and obnoxious my client was to a federal

2    judge.  But again, not a crime, not a crime.

3         Can you really sit there and say to yourself I

4    know exactly what Peter was saying or what he intended

5    to do?  The witnesses don't know, and if the witnesses

6    don't know you have to have reasonable doubt.  And

7    that's a real doubt.  It's not a doubt.  It's a doubt,

8    by the way, ladies and gentlemen, that's rooted in the

9    evidence or the lack of evidence.

10        Here's a question I'd ask you.  The government

11   has the burden of proof.  Remember that demonstration I

12   just did?  They could have shown you the video, because

13   there was testimony that there was a video, no audio

14   from the courtroom.  And it would have had a timer on it

15   and you could have seen how long it did it take for all

16   of this to transpire.  They didn't.  You can draw

17   whatever inference you want from that.

18        Here's another thing that has to come into

19   play:  Mr. Parker stood up on the witness stand and said

20   that everybody knows when they make a phone call from a

21   prison facility, incoming or outgoing, it's monitored

22   and recorded.  You're told at the beginning of the phone

23   call.  The only calls that are not monitored and

24   recorded are between attorney and client.

25        So again, think about what that says about

1        what kind of person Peter is.  Is he a serious person

2        that made a serious threat or is he just someone who's

3        engaged in idle or exaggerated talk?

4               You'll also remember that horrible one where

5        Peter used the "C" word and the "B" word and all these

6        other things.  I finally got Mr. Parker to concede that

7        in fact that was a lie; that that didn't happen.

8        Because remember, that was in the context of that's

9        Peter conveying to another former codefendant of his,

10       Hey, this is what I told the judge, right.  I told her

11       to blah, blah, blah, blah, blah, blah.  He used all

12       kinds of vial, foul language.  Stone cold lie.  Stone

13       cold lie.  You can't put any credence in that.

14               Also, Mr. Topor and Mr. Leone fought tooth and

15       nail with me on the issue of whether or not -- I'm

16       sorry, Mr. Topor -- on whether or not Sandy Santos tried

17       to reach out and apologize to him.  Ask yourself this

18       question:  Would you reasonably think that Mr. Topor was

19       going to take a phone call after August 31, 2016 from

20       Peter Santos?  No.  So Peter did the next best thing and

21       he told his mom, Hey, please call him up and apologize.

22       And why do people apologize, right?  Why do they

23       apologize?  Because they made a mistake or they said

24       something that they didn't mean.  Idle or careless talk.

25       That's what she did.  And she said, and that testimony

1    remains uncontroverted, that Mr. Topor accepted the

2    apology.  And that's important for you to know.

3            And it's important for you to know that the

4    government is also trying to smear my client for the

5    fact that he has a past criminal record.  He does.  We

6    conceded that.  We didn't try to hide it from you.  But

7    here's also what's important:  While the law states that

8    you don't have to actually carry out the threat, one of

9    the things you can consider is who the person is that's

10   alleged to have made the threat, which is why it was so

11   important for me to elicit from the witnesses that

12   Peter, at age 40 some-odd years, despite 20 years of a

13   heroin addiction problem, has no history of violence.

14   None at all.  That's the real Peter Santos.

15           The other thing the government tried to do was

16   to bias you by trying to elicit -- and he couldn't get

17   the testimony straight from two different witnesses --

18   about what were the nature of the financial crimes that

19   my client committed.  What was the purpose behind that?

20   Again, to so smear and prejudice my client as to color

21   your ability to objectively view the evidence in light

22   of beyond a reasonable doubt.  In fact, one guy said

23   several hundred thousand and someone said $1.5 million.

24           Here's the reality:  It doesn't matter.  It

25   doesn't matter.  Peter served his time and he got right

1    back out and started using heroin.

2              And they made a big deal about the fact that

3    he entered into a program seven times and failed.

4    That's what alcoholics do.  That's what people with

5    substance abuse problems do.  Of course it is.  There's

6    no such thing as a functioning heroin addict.

7    Mr. Durham was trying to suggest yesterday that somehow

8    because Peter had money that he didn't fit the

9    stereotype -- whatever that is -- poor people, people of

10   color, people with less financial resources.  Oh,

11   they're street people, they're junkies.  But Peter's

12   different because he doesn't look like that.

13             Use your common sense, ladies and gentlemen.

14   The heroin epidemic in this country is beyond the pale.

15   It's in every walk of life.  I haven't looked around

16   who's in this room, but besides Peter Santos, any one of

17   us could be fighting a substance abuse problem right now

18   and you wouldn't know it.  They look like me, they look

19   like you, they look like all of us.  It crosses every

20   single social and economic line that we know every day.

21   And every day people die from it.  And every day people

22   struggle with it and they do and say stupid things as a

23   result of that.  That's the real Peter Santos.  That's

24   the real Peter Santos.

25             One of the phone calls I suspect that the

1    government is going to play on rebuttal, if they haven't

2    already played it -- and this actually is helpful --

3    Peter Santos says to his mom, I can't shut my F'ing

4    mouth.  Because that's what careless people do.  That's

5    what heroin addicts do.  They just say whatever pops

6    into their mind, okay?  And he says it after the fact

7    and he admits that.  The government somehow wants to

8    again, it's to inflame you with this language that Peter

9    is a bad gay.  Okay, he's got a criminal history.  But

10   he did his time for that.  He was on supervised release.

11   He screwed up repeatedly and he got incarcerated.  And

12   yeah, did his demeanor change during the courtroom --

13   which, by the way, is inconsistent with the government's

14   theory -- did his demeanor change in the courtroom when

15   he didn't get what he wanted?  Sure.  Of course it did.

16   Let's rock and roll.  Again, not what should happen

17   under any circumstances, but that's not a crime.  That's

18   not a crime.

19          And again I'm going to bring you back to the

20   predicate fact:  Can you say beyond a reasonable doubt

21   that you know what the threat was?  Because it's not a

22   multiple choice game.  This is serious business.

23          You have to evaluate the evidence and you

24   can't say beyond a reasonable doubt who the threat was

25   directed to.  Two of the government's witnesses, their

1     own witnesses, Mr. Leone, who the government is going to

2     get up and I'll guarantee you is going to try to say,

3     well, he only had a few years on the job, et cetera.  He

4     said -- and he's one of the people, by the way,

5     intimately involved in this process.  He says I don't

6     know.  He could have been directing it to me.  He could

7     have been directing it to Mr. Topor.  It's possible.  If

8     it's possible, ladies and gentlemen, that's reasonable

9     doubt.  And if you have reasonable doubt, you can't

10    convict Peter, whether you like it or not.

11          The other element you have to consider is the

12    fact that people were doing different things during the

13    course of that proceeding.  Ms. Villano testified that

14    she was gathering up her documents.  The court reporter

15    was gathering what she was doing.  And one of the things

16    in the law that you have to assess is the credibility of

17    the witnesses, their ability to see or hear or observe

18    something accurately.  And given the rapidity with which

19    this whole event happened, they weren't in the position

20    to do that.

21          It's no one's fault that there was no audio in

22    the courtroom, but that's the reality.  We're left with

23    what's basically eyewitness testimony.  And when you

24    have that many versions of the events, that's reasonable

25    doubt and you can't convict Peter for that.  You can

1    convict him for being disrespectful, you can convict him

2    for being foolish and you can convict him for being

3    careless, but you can't convict him for making a serious

4    threat as defined by the law to Mr. Topor as opposed to

5    idle or careless talk.

6              Let me just check my notes.

7              By the way, we're talking about common sense

8    but one of the things -- again, I want to read you that

9    language on the elements, the first element, because I

10   will concede to you, ladies and gentlemen, that there's

11   no argument here, I'm not going to dispute and didn't

12   ask any questions that obviously Mr. Topor was in the

13   course of his employment as a probation officer.

14   There's no question of that.  That's kind of obvious.

15   He was there.

16             But as to that first element, I come back to

17   it.  It's a serious statement expressing an intention to

18   inflict bodily injury or murder as distinguished from

19   idle or careless talk, exaggeration, or something said

20   in a joking manner.

21             How do we know that Peter was engaged in

22   careless or idle talk?  He did it repeatedly.  He did it

23   repeatedly both before and after the hearing.  He's

24   calling people terrible names.  He's lying to his buddy

25   about what he said to Judge Arterton.  He's conducting

1    his life in a careless way.  He's walking in and out of

2    rehab centers.  That's an indication of the type of

3    person Peter Santos is and why that statement, whatever

4    it was, wasn't a serious threat.  It was just typical

5    Peter Santos BS.  That's all it was.

6             Was it offensive?  Sure.  But again, has the

7    government proven beyond a reasonable doubt that that

8    threat was intended to be directed towards Mr. Topor and

9    intention to inflict bodily injury or murder?  When I

10   come out I'm going to find you.  Have you ever said

11   something where you go, gee, that's not really what I

12   meant to say.

13            It happened in seconds.  It happened in

14   seconds and people can't get the sequence right of who

15   said what.

16            Hey, by the way, you heard the testimony from

17   the marshal.  It appears that maybe Mr. Topor, despite

18   his testimony under oath here, may have initiated the

19   dialogue with Mr. Santos as he's making that walk out

20   the courtroom door.  No one knows.  You know why?  Less

21   than ten seconds, ladies and gentlemen, soup to nuts.

22   Not a good way to try to prove a case beyond a

23   reasonable doubt.

24            And you had multiple witnesses in the room.

25   It's not as though they weren't in the position to see

1       or hear.  When you have that many different versions of

2       the events, that's a problem from the proof beyond a

3       reasonable doubt standard.

4             You know, one of the things I want to talk to

5       you about is not to be dazzled by the technology or take

6       your eye off the shiny object.  The government has all

7       this technology and we have recordings and we have video

8       monitors.  None of it means a whole heck of a lot,

9       ladies and gentlemen, because this is a very narrow

10      issue, very narrow issue:  Was there a threat made,

11      first question.  I suggest to you that the answer is no

12      because they don't know what was said.

13            Number 2, if there was a threat made, was it a

14      serious threat or was it a statement of a 20-year

15      lifetime heroin addict who has a history of engaging in

16      careless talk and idle and exaggerating chatter?  Who

17      gets on the phone and boasts about how disrespectful

18      they are to a United States District Court Judge?  Who

19      does that?  Peter Santos.  That's exaggeration.  That's

20      exactly what it is.

21            So I'm going to see you -- let me go through

22      the different versions.  I'm checking my watch, ladies

23      and gentlemen, because I only have a certain amount of

24      time that I can talk to you.

25            You also heard -- I got this from Mr. Parker

1    on cross-examination.  He made a big deal about on the

2    previous event when Mr. Santos called Mr. Topor a

3    bleeping A-hole.  And even Mr. Parker finally conceded

4    on cross-examination that had nothing to do with

5    anything.  All it did was show his contempt for the

6    office of Probation.  And by the way, again while

7    offensive, having contempt for the Office of Probation

8    is not a crime.  Should Peter have said it?  No.  It's

9    not indicative of anything other than the type of

10   careless exaggeration, I'm half a tough guy approach

11   that Peter was taking when he didn't get his way or

12   things weren't going his way.

13          That guy wasn't going to assault anybody,

14   wasn't going to hurt anybody.  That's just a guy being

15   cuffed and taken out of a courtroom blurting out stupid,

16   you know the vulgarity.

17          And by the way, here's the other thing you've

18   got to consider is the reaction of people in the room.

19   Half the people don't know to whom the threat was

20   directed.  And everybody claims, by the way -- which

21   you've got to assess this credibility and it's tough

22   going up against the very people that would mirror this

23   courtroom -- but everybody says in 30 years, in 23 years

24   I've never seen such a horrid comment by a criminal

25   defendant.  I have to tell you, ladies and gentlemen,

1    I've been doing this a long time.  Every defendant is

2    different.  Let me tell you, defendants use vulgar

3    language.  They are impolite.  They are disrespectful.

4    He called his own lawyer a bleeping.  He's probably

5    going to call me that afterwards.  I don't care.  It

6    doesn't matter in the context of this case and in the

7    context of what the government has to prove beyond a

8    reasonable doubt.

9         And I know that's difficult because I can see

10   you're like he's not a nice guy.  I will absolutely tell

11   you, not the perfect person.  That's obvious.  And

12   that's an understatement, and the government is going to

13   say that's an understatement and it is.

14        But not being a nice guy and being a jerk and

15   being foolish and being careless, if those were all

16   crimes, we're all in serious trouble.  But they're not

17   crimes in this case.

18        I want to focus on a couple of other key

19   points because I don't know how much time I have left.

20        I want to focus particularly on the testimony

21   of Matt Moore who testified yesterday.  For the first

22   time -- this is so interesting.  We had two days of

23   testimony, and for the first time from one of the very

24   last witnesses we hear about this entire dialogue and I

25   wrote it down.

1            Peter from over here, You know this isn't

2     going to help me, Brian.  Supposedly Mr. Topor's

3     response, which he can't remember, I'm doing the best I

4     can, Peter.  When I get out, I'm coming from you.

5     Excuse me?  You heard me.  But the marshal said he

6     didn't look over at Mr. Topor.  He was more focused on

7     the criminal defendant.

8            Let me talk about this comment made -- the

9     government is going to use this -- everybody meets their

10    maker, either by me or someone else.  Again, what does

11    that mean?  First of all, what's really significant is

12    in order to make a threat, if they're going to claim

13    that that was a threat, you got to make it to Topor,

14    right?  He's saying it in the hallway.  Topor's not

15    there.  I asked both the marshals.  He was gone.  The

16    only people present were the two marshals and Peter

17    Santos.  That doesn't demonstrate anything.  That's just

18    more -- I don't want to use vulgarity -- but it's more

19    idle, careless.

20           And what also is interesting is what Peter

21    prefaced this remark with was I'm sick and tired of

22    this.  A reasonable inference that you could draw from

23    that, I'm sick and tired of being in court, I'm sick and

24    tired of being sick and tired, I'm sick and tired of

25    being a heroin addict who can't get his crap together.

1    Those are reasonable inferences you can draw.

2         But whatever he said afterwards in the hallway

3    to the marshals, that's not a threat.  That's not a

4    threat.  You've got to make it to somebody.  He

5    certainly wasn't making it to the marshals.  He wasn't

6    charged with that in the indictment.

7         By the way, the government is also going to

8    close with the big phone call where Peter is on the

9    phone again talking to another one of his, and I will

10   tell you honestly, knucklehead codefendants from his New

11   York case about, oh, yeah.  Tell them I'm going to --

12   I'll paraphrase -- I'm going to kill him when I get out

13   and send him my love and he's laughing.

14        Again, what is that?  The same type of idle

15   careless talk.  How do you say in one part of a

16   sentence, Tell him I send my love.  I'm going to kill

17   him.  Ha, ha.  He's laughing.  Again, not a really cool

18   thing to do but not evidence of a crime against

19   Mr. Topor.  If the government wants to make a

20   prosecution against Mr. Santos for that statement, they

21   can go ahead and do that.  That's for a different

22   courtroom, a different day, a different jury and they

23   didn't do that.  So you can discount that testimony.

24   The indictment is as to Mr. Topor.

25        But all of it is done for the purposes of,

1    boy, this is a bad guy.

2              Ask yourself this question:  Is that a bad guy

3    in the context of what he's claimed to have done here?

4    I'm not talking about the past previous history.  Or is

5    he a knucklehead who, in the throes of an addiction,

6    can't get a grip on what he's saying or what he's doing?

7              I would suggest to you, ladies and gentlemen,

8    that a serious threat to assault or murder Mr. Topor was

9    never, ever made in this case because I provided you the

10   reasonable alternatives to what that statement could

11   mean.  And I believe if you go back and you examine the

12   evidence, that there is inconsistency, and I pointed

13   that out to you, between what was said.  Words matter

14   and words have consequences, but they shouldn't have

15   negative consequences for Peter in this case.

16             If you examine the statements made by every

17   single one of the witnesses -- and by the way, I talked

18   about that back and forth, redirect and recross.  I'm

19   sure you got tired of that pretty fast.  They kept

20   changing their testimony.  One would say absolutely,

21   possible it was directed to so and so, and Mr. Durham

22   would get back up and would go, Are you certain now,

23   sir?  Yep, I did.  They are switching their testimony

24   around.

25             But to come back to my point, what was said,

1    who was it said to and was it a serious statement,

2    whereas I've now just shown you in the law that a

3    serious statement, there's an exception as distinguished

4    by idle or careless talk.  I would suggest to you that

5    based upon the evidence, the very evidence that the

6    government offered to try and convict my client,

7    actually exonerates him because he's all over the place

8    making idle, careless, stupid, moronic comments with no

9    intent to do anything.

10           One of the other comments they brought up was

11   I'm going to "F" with probation.  Again, stupid comment.

12   Indicative of what?  That was made before he was -- I

13   forget whether it was made before or after.

14           And when you have those types of things, while

15   it's offensive, it's all of those things, in this

16   context, in this case when you assess the credibility of

17   the witnesses and you apply it to the law and I come

18   back to what I said to you in the beginning:  You might

19   not like me as a result of it, but if you actually

20   follow Judge Thompson's instructions on the law and the

21   facts in this case, you might end up not liking Peter

22   Santos either, but you would have to find him not guilty

23   because the government hasn't met its burden of proof on

24   each and every one of those elements.  And the most

25   important element is the first one.

1           Thank you, ladies and gentlemen.

2           Oh, one other thing.

3           This is my last opportunity to talk to you.

4  The government is going to get up and do rebuttal.

5  Please do not take my silence as agreeing with anything

6  that the government has to say.  It's just procedurally

7  how this system works.  So I won't have the opportunity

8  to address you again.

9           But I thank you for your patience.

10          THE COURT:  Thank you, Mr. Rogan.

11          MR. DURHAM:  Ladies and gentlemen, let me

12  begin this way:  As the Judge had told you, in closing

13  arguments, the government makes the opening statement

14  and counsel argues and then it's a short rebuttal the

15  government gives and that's for an important reason,

16  because the burden of proof in a criminal case is always

17  on the prosecution.  So we have this opportunity to

18  address some of the issues that were raised or claims

19  that were made by the defense in its closing.  So that's

20  the purpose of these remarks.

21          There's at least one or a couple of things,

22  but at least one thing that the parties agree on, and I

23  believe it's likely the Judge is going to instruct you

24  on this, and that is you are to use your common sense.

25  When you walk into this courthouse and this courtroom,

1    you don't leave your common sense at the door.  You

2    bring it here with you and you use that common sense in

3    evaluating the evidence here.

4            Let me go what that evidence is as relates to

5    what the law is going to be as the Judge instructs you.

6            Some of these things are nuanced, but

7    Mr. Santos' counsel, Mr. Rogan, has gone through and

8    talked about, well, this is what the law is and this is

9    what the law says.  In doing so, he confuses some of the

10   concepts, or he reads only portions of what the law is

11   to you.  So I would urge you to listen very carefully to

12   what the actual instructions are from Judge Thompson

13   concerning the applicable law in this case.  Again, it's

14   the Judge's instructions that control, but for example,

15   counsel says to you in talking to you about the threat

16   and he reads -- he talks about a serious threat and what

17   a serious threat is.  He reads a portion of what the law

18   would say on that.  So for example, he says a threat is

19   a serious statement expressing an intention to inflict

20   bodily injury or murder at once or in the future as

21   distinguished from idle or careless talk, exaggeration,

22   or something said in a joking manner.  What he fails to

23   tell you, with purpose, that the law also says for a

24   statement to be a threat the statement must have been

25   made under such circumstances that a reasonable person

1    who had heard or read the statement would understand it

2    to be a serious expression of intent to inflict bodily

3    injury.  He leaves that part out.

4            He also leaves out instructions, what the law

5    is related to these matters, that it's not necessary,

6    contrary to what I think he suggested in his argument,

7    it is not necessary that the government prove that the

8    defendant intended to carry out the threat or that he

9    had the present ability to carry out a threat.  A threat

10   may be conditional upon the defendant's ability to carry

11   it out.  That is to say that the crime is making the

12   threat.  That's what you're here to decide:  Was there a

13   threat made as the Judge will describe that to you, not

14   whether or not the government has proven that he

15   intended to carry it out.  The purpose of the statute is

16   to prevent people and to make it criminal to threaten

17   the life or the well-being of a federal official.

18   That's what the issue is.

19           So with respect to a good portion of what

20   counsel suggested to you in his repeated reference to

21   idle or careless talk, he's provided you with only a

22   portion of what the law is, and that portion is taken,

23   respectfully, out of context.

24           We would urge you to listen carefully to Judge

25   Thompson on what the law actually is in its totality.

1          Now, counsel makes reference in his closing

2     argument to the fact that well, this evidence, much of

3     the evidence that the government introduced or offered

4     was simply to inflame you as jurors.  Well, use your

5     common sense.  Do you really think that in a federal

6     court proceeding if the evidence is only offered to

7     inflame and it has no substantive value that a federal

8     judge is going to admit that evidence?  The evidence was

9     offered and it was admitted into evidence because it is

10    probative of what the defendant's mindset was.

11         Don't set aside your common sense.  We can

12    stand here as lawyers, well, look at this little shiny

13    object over here.  What do you know from the evidence

14    that was presented in this case?  Don't discard the fact

15    or ignore the fact that the defendant was very unhappy

16    with Mr. Topor as a result of the proceeding before

17    Judge Richardson on August 25th.  No mention of that

18    from defense counsel.  No context.  Provides no context

19    for what happened on August 31st.

20         Use your common sense.  Don't ignore that

21    evidence because this all does happen within a

22    particular context, a context the defendant wants to and

23    does studiously avoid mentioning.

24         Counsel makes a reference to the fact or

25    suggests to you that Mr. Topor, I think he actually said

 1     that Mr. Topor didn't have a clear recollection of what

 2     the threat was.  Now, I'm not exactly sure where that

 3     comes from, but my recollection is -- but it's your

 4     recollection that controls -- Mr. Topor was very clear

 5     that he knew exactly what was said and he wrote it down

 6     immediately after the proceeding.  Maybe that's not the

 7     evidence, but respectfully, I believe that's what

 8     Mr. Topor's testimony was.  He knew exactly what was

 9     said and he wrote it down and it's in his notes and the

10     defendant cross-examined him about.

11          Counsel makes reference to Ms. Cashman.  Well,

12     Ms. Cashman, she didn't know if it was a threat or not.

13     Well, think about what Ms. Cashman's role was.  First of

14     all, Ms. Cashman doesn't know about the recordings, nor

15     should she.  You're not going to share with one witness

16     what other witnesses know because then you taint their

17     knowledge and recollection and so forth.  Nor does

18     Ms. Cashman know about the defendant's statement to the

19     marshals where he expressed his intent, what he was

20     thinking when he threatened Mr. Topor about everybody's

21     got to meet their maker, whether it's through him --

22     talking about himself, Santos -- or someone else.

23          Counsel makes reference to the testimony of

24     Daniel Leone and respectfully, way overstates what he

25     claims it is that Mr. Leone said.  Your recollection

1    controls, but Leone testified to the fact that the

2    threat was directed at Mr. Topor.  It is true that when

3    counsel asked a question on cross-examination, well, he

4    was looking in the direction of the jury box.  Is it

5    possible it could have been to either one of you?  And

6    Leone's testimony was, well, I suppose it's possible.

7    But he was very clear in his testimony that the

8    statement that was made by Mr. Santos was directed at

9    Mr. Topor.  You don't need much more evidence, but if

10   you looked at the other evidence, it was clearly

11   directed at Mr. Topor from the defendant's own mouth,

12   which we'll talk about in a bit.

13        Counsel talks about careless talk and idle

14   chatter and so forth and then makes reference to the

15   defendant's drug addiction.  I think everybody in this

16   courtroom knows some story about some person or some

17   family who has been touched by the addiction of drugs.

18        There was questioning that was asked on direct

19   examination of Mr. Topor in particular relating to

20   Mr. Santos and where he falls in connection with his

21   drug addiction.  Now, counsel alludes to -- I don't know

22   what he suggested -- it has to do with race or whatever,

23   talking about street people.  What's the significance of

24   that testimony as relates to Mr. Santos?  The relevance

25   of that testimony is that unlike many people where the

1    scourge of drugs has them completely losing their homes,

2    their families, they're living in the street, they don't

3    have food to eat and they're going from fix to fix.

4    That's not Mr. Santos' situation.  He's got a house.

5    He's got a job.  He has income.  And he uses heroin.

6    It's not as if his life had totally spun out of control.

7    He has a heroin addiction for sure, a heroin addiction

8    that people like Mr. Topor tries to work with, tries to

9    help.

10           You heard the testimony from Mr. Topor to the

11   effect that, Look, probation officers provide

12   opportunities or attempt to provide opportunities to

13   people in Mr. Santos' situation that nobody else will

14   provide.  That's who Brian Topor is.  Brian Topor isn't

15   someone getting on the stand seeking revenge or making

16   something up because of what Mr. Santos said to him.

17   That's not the case here.

18           But with respect to the defendant, except for

19   his use of heroin, his life is relatively in control and

20   his speech is in control.  And you know that -- counsel

21   talks about the transcript of the proceeding before

22   Judge Arterton.  Well, that has no relevance here.

23   Well, of course it has relevance here.  If you want to

24   understand what it is that the defendant was doing and

25   whether in the defense counsel's language it was idle

1    chatter or careless talk, all you have to do is read

2    that transcript.  So long as Mr. Santos thought he could

3    convince and manipulate Judge Arterton into letting him

4    out once again to go to another program, after having

5    walked away from seven other programs after a day or

6    two, so long as he thought he was in control and so long

7    he thought he could manipulate Judge Arterton into

8    letting him out yet again, he was fine.  It was only

9    when Judge Arterton made it clear or indicated that she

10   was going to follow through on incarcerating him that he

11   then showed what were his true colors.

12          In that regard, I remind you in the

13   transcript, Government's Exhibit 2 in this case, the

14   judge who had firsthand opportunity that day to deal

15   with Mr. Santos said the following after the defendant

16   had made his various comments that defense counsel

17   referred to.

18          The Court said:  All right.  Now that we see

19   the real Mr. Santos, he is remanded to the attorney

20   general for a period of six months.  Following that

21   period of incarceration he will be on supervised release

22   for 24 months, the first six months of which will be

23   spent in a halfway house.

24          And that statement by Judge Arterton is

25   revealing.  The real Peter Santos is exposed in that

1    transcript, and the real Peter Santos is exposed through

2    his own words in the recordings that were offered.  And

3    that transcript and those recordings go specifically to

4    establish evidence of the defendant's intent and motive,

5    the fact that he knew what he was doing and that it was

6    not idle chatter and it was not careless talk when he

7    threatened Mr. Topor.

8         The real Mr. Santos is completely unmasked by

9    the evidence that was presented to you in this case.

10   Now, counsel can suggest, well -- and he clearly is -- a

11   long-time heroin addict.  But with respect to the date

12   on which this occurred, that is on August 31st of

13   2016, let me remind you of what occurred as reflected in

14   the full exhibit in this case, Government's Exhibit 2.

15        First of all, remember the testimony that was

16   elicited I think in the first instance on

17   cross-examination of Mr. Topor about people who are

18   heroin addicts.  The cross-examination I think being to

19   suggest that he, Mr. Santos, did this under the

20   influence of drugs, right?  And Mr. Topor testified to,

21   well, indicia of somebody being under the influence

22   would be sweating, itching, picking at oneself, lack of

23   concentration, inability to focus.  It was only on

24   redirect examination the questions were then asked --

25   not asked on cross -- Well, on this particular day was

1     Santos sweating, itchy, picking at himself?  Did he show
2     a lax of concentration, inability to focus?  And the
3     answer was, No, he was in control.
4              But separate and apart from Mr. Topor's
5     observation and testimony in that regard what do we also
6     know from the evidence?  Well, we know from the
7     defendant's own mouth, not from Mr. Topor or one of the
8     marshals, from the defendant's own mouth.  This is from
9     page 19 of Government's Exhibit 2.  The defendant --
10    he's still trying to convince, manipulate Judge
11    Arterton.  He says, the defendant:  I could have got
12    something in there -- in context -- in prison if I
13    wanted.  They asked me and I said no.  I can give you a
14    urine right now if you'd like.
15             He's not on drugs.  He's not under the
16    influence of drugs.  And that's not an isolated instance
17    on that date where he addresses the Court and his
18    sobriety.
19             On page 18 of Government's Exhibit 2, when you
20    have that in the jury room if you want to take a look at
21    it, page 18 what does the defendant say?  He says, the
22    defendant:  Like I said, every time I've gone into the
23    programs I was always using and high as a kite and today
24    I'm not.  I'm ready to go.  If I leave I'm coming back
25    before you.

1            And in a third spot on page 18 as well of

2     Government's Exhibit 2, the defendant, describing

3     himself to the Judge on the record.  The defendant:  I'm

4     sober today, Your Honor, for the first time in a while.

5            So contrary to what's suggested by counsel in

6     his remarks to you, the defendant was not making

7     careless remarks or idle chatter.  He was stone cold

8     sober.  He was willing to take a urinalysis test that

9     day to show that he was sober and not under the

10    influence of drugs.  That was not controlling his

11    behavior at that time.

12           Counsel then in his remarks turns to another

13    subject matter.  You'll recall in his closing he talked

14    about an explanation for the defendant saying in a

15    recorded conversation, I'm probably going to get charges

16    with threating to kill that guy.  Well, that could have

17    come from the lawyer.  He may have learned that from the

18    lawyer.  I'm not sure what import that is, but let's

19    assume that's right.  Let's assume that the defendant

20    not only knows that he threatened to kill Mr. Topor, but

21    he talked to his lawyer and his lawyer said something to

22    him.  Well, where does that get the defendant?  Even the

23    defendant's own -- in that context, that means even the

24    defendant's own lawyer knew that based on what he had

25    said to Mr. Topor that he was likely to get charged with

1      threatening to kill Mr. Topor.  So where does that go?

2              So even if that suggestion on counsel's part

3      is correct, I think he said it was an alternative theory

4      or inference, his own lawyer knew what it was and the

5      defendant knew that he was likely to be charged as a

6      result of the statements that he had made.  It was a

7      threat, again, to kill Mr. Topor.

8              Counsel then makes reference to

9      inconsistencies and inconsistencies all over the place

10     amongst what the witnesses say and talked about in

11     particular at one point talked about Ms. Villano, Patti

12     Villano, the courtroom deputy, and said, well, she said

13     it's all the same thing.  Well, you recall what it was

14     that Ms. Villano testified to.  She testified to what

15     she recalled was said in the courtroom by the defendant

16     on that date.  And when pushed on cross-examination she

17     was saying, well, it was words like that.  It means the

18     same thing.  He said when he gets out he was going to

19     get him or I'm going to come get him or words to that

20     effect.  Ms. Villano didn't write down what happened

21     that day.  She was doing her job as the deputy clerk.

22     She heard what was said and it was completely consistent

23     with what the other witnesses said, although she may

24     have not have recalled exactly the same words.  But

25     that's hardly what I think the defendant says the

1    government has tried to whitewash the inconsistencies.

2    Whitewash the inconsistencies?  The government put all

3    those witnesses on the stand to testify to what their

4    best recollections were of what happened that day.

5            Counsel then argues and he confuses legal

6    issues here or legal matters.  He argues, he suggests to

7    you that the defendant he did not intend to -- we didn't

8    prove he had an intent to assault or murder Mr. Topor.

9    But that's not what the law is talking about.  Again,

10   the instructions are, the elements of the offense have

11   to do with making the threat.  And it is of no moment,

12   it is not necessary for the government to prove that the

13   defendant -- and listen to this carefully -- it is not

14   necessary for the government to prove, that's not part

15   of the particular charge that the grand jury returned in

16   this case -- it's not necessary to prove that the

17   defendant intended to carry out the threat.  The purpose

18   is that he made the threat.  That's what the offense is

19   in this particular case.

20           Counsel makes reference to the fact that well,

21   the government could have played the video if it wanted

22   to and could have had a time stamp.  Well, that's true.

23   The defendant isn't required to put on any evidence.  He

24   has absolutely no burden at all in the case.  But if

25   that were an issue, it certainly could have been raised

1    on cross-examination or whatever and the videotape could

2    have been played.  But no issue was raised during the

3    course of the trial about that.

4         But the photographs of when the defendant was

5    at counsel table and when he was walking out and when he

6    was looking over at Mr. Topor, those were all admitted.

7         Counsel, as he did in his cross-examination of

8    Supervising Inspector Parker, talks about well, those

9    are stone cold lies.  Well, you know, that's sort of an

10   interesting thing.  If you ask a compound question and

11   then you say those are stone cold lies, was Santos lying

12   in the conversation when he was talking about what he

13   had told the judge?  Maybe the use of some of the

14   particular vulgarities in that instance, he hadn't used

15   those vulgarities, but the complete substance of what he

16   was telling his fellow criminal was in fact what he told

17   Judge Arterton on August 31st of 2016.  And so to say

18   they were stone cold lies I think, respectfully,

19   seriously confuses the picture here.

20        Counsel makes reference to the fact that,

21   well, you know, do you think that Mr. Topor would have

22   taken the defendant's call if he called to apologize?

23   That's why he had his mother do it for him.  I don't

24   know.  You saw Mr. Topor testify.  I ask you the same

25   question:  If the defendant were serious he had some

1    remorse, if he had called Mr. Topor, contrary to the

2    suggestion of counsel who just says, well, he wouldn't

3    have taken the call, you listened to him, you saw his

4    demeanor, you saw his dedication to trying to assist

5    people who need and needed assistance.  Do you think he

6    would have taken the defendant's call?  He would have

7    taken the defendant's call.  This is just another

8    example of the defendant manipulating the system trying

9    to get his own way.  He has his mother do that for him.

10   Despite the fact that he's 40-something years old he has

11   his mother call Mr. Topor and apologize thinking he can

12   get Mr. Topor not to go forward on press charges in this

13   case.

14          The evidence in this case, contrary to the

15   suggestion of defense counsel, shows that Mr. Santos is

16   most able to control his behavior, maybe not to control

17   his use of heroin, but he was able to control his

18   behavior.

19          Counsel then seriously overstates the evidence

20   in this case when he says you can't say -- based on you

21   can't say who the threat was directed at.  Well, I

22   suppose if you take individual responses to individual

23   questions and you totally disregard or throw out the

24   window your own common sense, maybe you can make that

25   argument.  But if you look at the totality of the

1    evidence and the testimony of all the witnesses in this

2    case and apply your common sense, respectfully, it's

3    very clear from the defendant's own mouth who the threat

4    was directed at.  It was directed at Mr. Topor.  And you

5    know that from the statements the defendant made in the

6    courtroom to Mr. Topor, you know that from the

7    statements he made at the elevator and you know that

8    from the recording of September 1, 2016 as to who this

9    is directed at.

10            Counsel says well, you know, what does that

11   mean?  If I say when I get out I'm coming for you, what

12   does that mean?  Well, I ask each and every one of you

13   if you had some kind of altercation or dispute with

14   another person and that person said to you in a serious

15   tone, or as Ms. Cashman testified, sounding like a tough

16   guy, if somebody said to you in your individual capacity

17   who you had a beef with of one sort or another, if they

18   came to you and said, hey, when I get out, I'm coming

19   for you, do you think you would take that seriously?  Do

20   you think you wouldn't know what was being said to you?

21   Of course you would be and you would be concerned about

22   it, as was appropriately in this case Mr. Topor.

23            I doubt that any of you have ever said

24   anything like that, Hey, I'm going to come and get you

25   or I'm coming after you.  But if you did say that you'd

1    know exactly what you meant when you said it.  Just as

2    when Mr. Santos said at the elevator to the marshals,

3    Hey, everybody has to meet his maker, whether it's by me

4    or someone else.  That evidence is not intended, as

5    suggested by counsel, to somehow inflame.  That is

6    evidence that goes specifically on the day of the

7    offense charged by the grand jury, that evidence goes

8    specifically to identifying what the defendant's intent

9    was, what his purpose was and what the threat was in

10   this particular case.

11           Counsel makes reference to, well, if the

12   government wants to prosecute Santos for the

13   conversation that he had with Clifford Barnes in which

14   he made the threat to Mr. Leone, well, that's for

15   another day.

16           Let's put that one in context.  If we can just

17   pull up, if we might, 12T.  The audio recording, as the

18   Judge will tell you, is the evidence, but this is what

19   counsel was referring to, which I hadn't intended to

20   address, but I will since he raised it.

21           Starts with Mr. Santos saying I'm doing

22   excellent.  And then when you see Daniel, tell him I

23   said "F" you and I'm going to kill him when I get out.

24           Oh, when I --

25           Oh, Dan Leone?

1           Peter says:  Tell him I send my love and

2     snickers or laughs.

3           What's the relevance, first of all, with

4     respect to counsel saying well, the government can bring

5     charges.  You remember the examination of Mr. Parker in

6     that regard was Santos was in Rhode Island.  Clifford

7     Barnes was in Minnesota.  There's no jurisdiction over

8     that threat in the state of Connecticut.  So when

9     counsel says oh, they can just bring another charge,

10    understand the context in which that was made.

11          More importantly, with respect to what it is

12    that Santos is saying here, it mirror images in large

13    part what it is that he, Mr. Santos, said and directed

14    at Mr. Topor in the courtroom that day; that is, tell

15    him -- in context, Mr. Leone -- that I'm going to kill

16    him when I get out.

17          Now, in this instance in the courtroom on the

18    31st, he said to Mr. Topor, When I get out, I'm coming

19    for you or I'm going to come for you.  He didn't

20    explicitly use the word "kill" in that instance, but it

21    parallels -- that is the statement by Mr. Santos

22    concerning Mr. Leone -- parallels what he said in the

23    courtroom that day to Mr. Topor.  And that's the reason

24    that it's probative.  That's the reason that it's

25    admissible.  And that's the reason that it came into

1      evidence, because it goes to show and corroborate and

2      present evidence relevant to the fact the defendant did

3      make the threat and what he had in mind when he made the

4      threat to Mr. Topor on that day.

5                As we said, the elements of the offense in

6      this case are three in number.  The Judge will instruct

7      you on that.

8                But respectfully, all one needs to do is to

9      look at Mr. Santos' conversation with his mother on

10     September 1st of 2016.  Listen to that conversation.

11     If you need the assistance of transcripts, ask the

12     Judge.  He can provide those to you just as assistance.

13     Again, it's the recording that's the full exhibit.

14                Let's go through that conversation.

15                Remember, this is the day after he has made

16     the threat to Mr. Topor.

17                I'd ask that we play 8.1 for the jurors.

18

19                (Audio played.)

20                MR. DURHAM:  So you have three elements to

21     consider:  Whether there was a threat made.  And with

22     respect to that the defendant says, in his own words,

23     I'm going to get new charges for threatening to kill

24     that guy.

25                Counsel repeatedly in his cross-examination or

1    attempting to cross-examine on this point and in his

2    final argument says we don't know who this threat way

3    made to.  Is that really true?  In the defendant's own

4    words -- and you just heard it -- he clarifies

5    specifically who he threatened to kill or who he

6    intended to threaten to kill.  When his mother says,

7    Which one, referring to the probation officer, Peter

8    Santos says, The probation officer.  But which one?

9    Topor?  And he says, Yeah, Topor.

10           Unless you're going to cast aside your common

11   sense and ignore all the evidence in the case, this

12   conversation of September 1st, the day after he made

13   the threat to Mr. Topor, respectfully conclusively

14   establishes the element of this offense.  He threatened

15   Topor.  Topor was a probation officer.  In the context

16   in which this was made it was in retaliation of

17   Mr. Topor doing his job.

18           He advised Judge Richardson as to the

19   defendant's situation on the 25th, which enraged the

20   defendant.  He did the same thing before Judge Arterton

21   on August 31st.  And for his efforts, largely designed

22   to protect this man, to try to help this man, he gets

23   threatened in a federal courtroom.  And we know that

24   from the testimony and we know it out of his own mouth.

25           Based on all the evidence presented in this

1   case, ladies and gentlemen, and applying your common

2   sense, which the Judge I believe will urge you to do,

3   there is no verdict in this case other than guilty and

4   we would ask you to return a guilty verdict.

5          Thank you, Your Honor.

6          THE COURT:  Thank you, Mr. Durham.

7          Ladies and gentlemen, we'll let you go take a

8   break now and we'll bring you back in 20 minutes and

9   I'll start with the instructions on the law.

10          (Whereupon, the jury left the courtroom.)

11          THE COURT:  Please be seated everyone.

12          So we have a revised verdict form if counsel

13   could look at that.

14          We'll get you both copies too.

15          (Pause.)

16          MR. DURHAM:  Fine with the government, Your

17   Honor.

18          MR. ROGAN:  Fine, Your Honor.

19          THE COURT:  We'll get you copies so you can

20   sit down and look at it carefully, but just let my law

21   clerk know in five minutes or so if you have any

22   concerns.

23          I'm going to try and shoot for starting up

24   around 11:35, if we can.

25          MR. ROGAN:  Yes, Your Honor.

1          THE COURT:  Thank you.

2               (Whereupon, a recess followed.)

3          THE COURT:  Ready for the jury?

4          MR. ROGAN:  Yes, Your Honor.

5          MR. DURHAM:  Yes, Your Honor.

6               (Whereupon, the jury entered the

7     courtroom.)

8          THE COURT:  Please be seated everyone.

9          Ladies and gentlemen, now that you've heard

10    the evidence and the arguments of counsel for each

11    party, it is my duty to give you the instructions of the

12    court as to applicable law in this case.

13          When you came into the courtroom a moment ago

14    you each found in your seat a copy of the verdict form

15    in this case.  In the final part of these instructions I

16    will review the verdict form with you.  When I finish

17    giving you these instructions and you retire to

18    deliberate, please leave your copy of the verdict form

19    on your seat.  When you are deliberating you will have

20    the original verdict form, along with the exhibits

21    admitted in this case with you in the jury room.  You

22    will also have with you a copy of the indictment and a

23    copy of these instructions.  If you decide that you

24    would like additional copies of these instructions,

25    please let the courtroom deputy know.

1          You have faithfully discharged your duty to

2   observe and listen carefully to each witness who

3   testified.  I ask that you give me that same careful

4   attention as I instruct you on the law.

5          My instructions will be delivered in four

6   parts, some of which will be a reminder and some of

7   which will be new.

8          First, I will give you some instructions and

9   general rules that define the role of the Court and the

10  duty of the jury in a criminal case.

11         Second, I will give you instructions that

12  define what are called the elements of the offense

13  charged in the indictment, that is, the elements the

14  government must prove beyond a reasonable doubt to make

15  its case.

16         Third, I will give you some additional rules

17  and guidelines for your deliberations.

18         And fourth, I will instruct you on certain

19  procedures you must follow once the jury retires to

20  deliberate.

21         Now I want to talk with you about the province

22  of the Court and that of the jury.

23         It is your duty as jurors to follow the law as

24  I state it to you and to apply that law to the facts as

25  you find them from the evidence in this case.  You are

1    not to single out one instruction alone as stating the

2    law, but you must consider these instructions as a

3    whole.

4         You will determine the facts from all of the

5    testimony you have heard and from the other evidence

6    that has been submitted.  You are the sole and exclusive

7    weighers of the facts, and in that area neither I nor

8    anyone else may invade your province.  On the other

9    hand, and with equal emphasis, I instruct you that you

10   are bound to accept the rules of law that I give you

11   whether or not you agree with them.

12        Now, counsel have quite properly referred to

13   some of the governing rules of law in their arguments.

14   If, however, any difference appears to you between the

15   law as stated by counsel and that stated by the Court,

16   you are to be governed by the Court's instructions.

17        Similarly, statements as to the facts made by

18   counsel during the course of the trial, including those

19   statements made in the form of a question, do not

20   constitute evidence.  And characterizations of the

21   evidence by counsel should be considered by you only if

22   supported by your recollection of the evidence.

23        Finally, nothing I say in these instructions

24   is to be taken as an indication that I have any opinion

25   about the facts of the case or what that opinion is.  In

1    any event, it is not my function, but yours, to

2    determine the facts in this case.

3         I want to talk with you about the nature and

4    function of the indictment.

5         In this case the indictment alleges that the

6    defendant, Peter J. Santos, threatened a federal

7    official.  The defendant pled not guilty to the charge

8    against him.  Consequently, the prosecution, in order to

9    support a verdict of guilty, must prove each element of

10   that charge beyond a reasonable doubt.  Later in these

11   instructions I will explain to you the elements of the

12   offense with which Mr. Santos is charged.  At this time,

13   however, I instruct you that the indictment is not and

14   may not be considered to be evidence supporting any of

15   these elements.

16        The indictment is merely a formal acquisition

17   by a grand jury and can in no sense be considered proof

18   of Mr. Santos' guilt.  No juror should permit himself or

19   herself to be influenced against Mr. Santos because of

20   or on account of the indictment or because of Mr. Santos

21   having to stand trial here.  That Mr. Santos has been

22   accused and is on trial is not evidence of guilt and you

23   are not permitted to infer or speculate from this that

24   the defendant is more likely to be guilty than innocent.

25   In reaching your determination of whether the government

1    has proven the defendant guilty beyond a reasonable

2    doubt you may consider only the evidence introduced or

3    the lack of evidence.

4              I want to remind you about some basic rules in

5    criminal cases.

6              At the beginning of the trial I gave you some

7    basic rules about criminal trials and I will now restate

8    them for you in more detail.

9              There are three basic rules:

10             The first is that a defendant a presumed

11    innocent of a crime unless and until proven guilty.

12    Thus, a defendant, although accused of a crime in an

13    indictment, begins a trial with a clean slate, that is,

14    with no evidence against him.  This presumption was with

15    the defendant when the trial began.  It remains with him

16    now as I speak to you.  And it will continue with the

17    defendant into your deliberations unless and until every

18    one of you is convinced that the government has proven

19    his guilt beyond a reasonable doubt.

20             As I have instructed you, the indictment is

21    merely an accusation and only that.  It is not evidence

22    of any kind that the defendant committed the offense.

23    The law permits nothing but legal evidence presented

24    before the jury in court to be considered in support of

25    the charge against the defendant.  The presumption of

1      innocence alone, therefore, is sufficient to acquit the

2      defendant if the government fails to prove the charge

3      against him beyond a reasonable doubt.

4               That brings us to the second rule.

5               In a criminal case the burden is always on the

6      government to prove guilt beyond a reasonable doubt.  It

7      has that burden throughout the entire trial.  This

8      burden never shifts to the defendant, for the law never

9      imposes upon a defendant in a criminal case the burden

10     or duty of calling any witnesses or producing any

11     evidence.  The defendant is not even obligated to

12     produce any evidence by cross-examining the witnesses

13     for the government.

14               The third rule is that the government must

15     prove each element of the crime beyond a reasonable

16     doubt.  It is not required that the government prove

17     guilt beyond all possible doubt.  The test is one of

18     reasonable doubt.  A reasonable doubt is a doubt based

19     upon reason and common sense, the kind of doubt that

20     would make a reasonable person hesitate to act.  Proof

21     beyond a reasonable doubt must therefore be proof of

22     such a convincing character that a reasonable person

23     would not hesitate to rely and act upon it in the most

24     important of his or her own affairs.

25               I want to talk with you about a couple of

1     terms I'll be using in these instructions, the word

2     "prove" and the word "find."

3              Throughout the remainder of my instructions to

4     you I will use the word "prove" from time to time with

5     reference to the government's burden.  I shall also

6     speak of your "finding" various facts as to the element

7     of the crime charged in this case.  Throughout my

8     instructions you should understand that whenever I say

9     that the government has to "prove" a fact to you, I mean

10    that it has to prove that fact to you beyond a

11    reasonable doubt as I just explained that term to you.

12    You are to understand my use of the word "prove" to mean

13    prove beyond a reasonable doubt even if I do not always

14    repeat those exact words.  Similarly, when I say that

15    you must "find" a fact in order to return a guilty

16    verdict, you must find that fact to have been proven by

17    the government beyond a reasonable doubt, even if I

18    simply use the word "find."

19              I want to talk with you about certain matters

20    that a jury cannot consider.

21              Your verdict must be based solely upon the

22    evidence developed at this trial or the lack of

23    evidence.  You must perform your duty as jurors without

24    bias or prejudice as to either party.  It is improper

25    for a juror to consider any personal feelings he or she

1    may have about the gender, age, race, religion, national

2    origin, wealth, life-style or other characteristics of

3    the parties.  It would also be improper for you to allow

4    any feelings you might have about the nature of the

5    crime charged or the conduct you have heard described to

6    interfere with what must be your fair and impartial

7    decision-making process.  All persons who come before

8    the court charged with a criminal offense are entitled

9    to the presumption of innocence and the government

10   always has the burden of proof as I just described to

11   you.

12              I want to talk also about sympathy and bias.

13              You have been chosen as jurors to try the

14   issues of fact and reach a verdict on the basis of the

15   evidence or lack of evidence presented here.  Under the

16   terms of your oath as jurors you are not to be swayed by

17   sympathy or bias that you may have towards either party.

18   You are to be guided solely by the evidence in this

19   case, and the crucial central question that you must ask

20   your set of as you a sift through the evidence is:  Has

21   the government proven the guilt of the defendant beyond

22   a reasonable doubt?

23              It is for you alone to decide whether the

24   government has proven that the defendant is guilty of

25   the offense charged solely on the basis of the evidence

1    and subject to the law as I charge you.  If you let fear

2    or prejudice or bias or sympathy interfere with your

3    thinking, there is a risk that you will not arrive at a

4    true and just verdict.

5          I also want to talk with you about the fact

6    that the government is a party in this case.

7          As I just mentioned, you are to perform your

8    duties as jurors of finding facts without bias or

9    prejudice as to either party.  You are to perform your

10   duty in an attitude of complete fairness and

11   impartiality.  This case is important to the government

12   for the enforcement of criminal laws is a matter of

13   prime concern to the community.  Equally, it is

14   important to the defendant who's charged with a serious

15   crime.  The fact that the prosecution is brought in the

16   name of the United States of America entitles the

17   government to no greater consideration than that

18   accorded any other party to litigation.  By the same

19   token, it is entitled to no less consideration.  All

20   parties, whether the government, individuals,

21   corporations or other entities stand as equals at the

22   bar of justice.

23         Lastly in this section I want to talk with you

24   about the possibility of punishment.

25         You are instructed about the possible

1    punishment of the defendant is of no concern of the jury

2    and should not in any sense enter into or influence your

3    deliberations.  In the event of a conviction, the duty

4    of imposing sentence rests exclusively with the Court,

5    that is, the Judge.  The function of the jury is to

6    weigh the evidence in the case and determine whether the

7    defendant is guilty or not guilty solely upon the basis

8    of such evidence.  Under your oath as jurors you cannot

9    allow consideration of the punishment which maybe be

10   imposed upon the defendant, if convicted, to influence

11   your verdict in any way.

12          That brings us to the second section where I'm

13   going to talk with you about the elements of the charged

14   offense.

15          The indictment charges the defendant with

16   threatening a federal official in violation of Title 18

17   United States Code Section 115(a)(1)(B).  The indictment

18   reads as follows:

19          The grand jury charges.

20          Count 1, threat to a federal official.

21          Paragraph 1:

22          On or about August 31, 2016, in the district

23   of Connecticut, the defendant, Peter J. Santos, did

24   threaten to assault and murder a Supervisory United

25   States Probation Officer with the intent to impede,

1    intimidate and interfere with the Supervisory United

2    States Probation Officer while the officer was engaged

3    in the performance of his official duties and with the

4    intent to retaliate against the Supervisory United

5    States Probation Officer on account of the performance

6    of his official duties.

7              In violation of Title 18 United States Code

8    Section 115(a)(1)(B).

9              A true bill and signed by the foreperson.

10             The statute relevant to the indictment is

11   Title 18 United States Code Section 115(a)(1)(B).

12   Section 115(a)(1)(B) of Title 18 of the United States

13   Code provides, in pertinent part, that:

14             Whoever threatens to assault or murder an

15   official whose killing would be a crime under Title 18

16   United States Code Section 1114, with intent to impede,

17   intimidate or interfere with such official while engaged

18   in the performance of official duties, or with intent to

19   retaliate against such official on account of the

20   performance of official duties shall be guilty of a

21   crime.

22             I'm going to talk with you about the elements

23   of the offense.

24             In order to prove the defendant guilty of

25   threatening a federal official, the government must

1     prove each of the following elements beyond a reasonable

2     doubt:

3                 First, that the defendant threatened to

4     assault or murder Supervisory Probation Officer Brian

5     Topor;

6                 Second, that at the time of the alleged threat

7     Mr. Topor was a federal official;

8                 And third, that the defendant acted with the

9     intent to impede, intimidate or interfere with that

10    federal official while he was engaged in the performance

11    of his official duties, or with the intent to retaliate

12    against that federal official on account of the

13    performance of his official duties.

14                I'm going to talk about the first element now.

15                The first element the government must prove

16    beyond a reasonable doubt is that the defendant

17    threatened to assault or murder Supervisory United

18    States Probation Officer Brian Topor.  A threat is a

19    serious statement expressing an intention to inflict

20    bodily injury or murder, at once or in the future, as

21    distinguished from idle or careless talk, exaggeration

22    or something said in a joking manner.  For a statement

23    to be a threat the statement must have been made under

24    such circumstances that a reasonable person who heard or

25    read the statement would understand it as a serious

1    expression of an intent to inflict bodily injury.  In

2    addition, the defendant must have made the statement

3    intending it to be a threat or with the knowledge that

4    the statement will be viewed as a threat.

5         To determine whether or not the defendant

6    threatened Mr. Topor, you should consider the

7    circumstances under which the statement was made,

8    including its context with respect to surrounding

9    conversation, the language the defendant used and the

10   reaction of those who heard or read the statement.

11        It is not necessary that the government prove

12   that the defendant intended to carry out the threat or

13   that he had the present ability to carry out the threat.

14   A threat may be conditional upon the defendant's ability

15   to carry it out.

16        That brings us to the second element.

17        The second element that the government must

18   prove beyond a reasonable doubt is that at the time of

19   the alleged threat Supervisory United States Probation

20   Officer Brian Topor was a federal official.  I instruct

21   you that a federal official under Title 18 United States

22   Code Section 1114 includes any officer or employee of

23   the United States or of any agency in any branch of the

24   United States government while such officer or employee

25   is engaged in or on account of the performance of

1    official duties.  However, it is for you to determine if

2    Mr. Topor held such a position and was engaged in such

3    duties at the time in question.

4              The defendant does not have to prove that

5    the -- the government does not have to prove that the

6    defendant knew that Mr. Topor was a federal official.

7    The crime of threatening a federal official is designed

8    to protect federal officials acting in pursuit of their

9    official functions.  Therefore, it is sufficient to

10   satisfy this element for the government to prove that

11   the victim was a federal official at the time of the

12   alleged threat.

13             That brings us to the third element.

14             The third element that the government must

15   prove beyond a reasonable doubt is that the defendant

16   acted with the intent to impede, intimidate or interfere

17   with that federal official while he was engaged in the

18   performance of his official duties, or with the intent

19   to retaliate against that federal official on account of

20   the performance of his official duties.

21             The word "impede" means to stop the progress,

22   obstruct or hinder.

23             "To intimidate" means to make timid or

24   fearful, to inspire or affect with fear, to frighten or

25   to deter or overawe.

1          "To interfere with" means to come into

2     collision with or to intermeddle, to hinder, to

3     interpose or to intervene.

4          "To retaliate" means to return like for like,

5     to act in reprisal for some past act.

6          Direct proof of a defendant's intent is almost

7     never available.  It would be a rare case where it could

8     be shown that a person wrote or stated that as of a

9     given time he committed an act with a particular intent.

10    Such direct proof is not required.  The ultimate fact of

11    intent, though subjective, may be established by

12    circumstantial evidence based upon the defendant's

13    outward manifestation, his words, his conduct, his acts

14    and all the surrounding circumstances disclosed by the

15    evidence and the rational or logical inferences that may

16    be drawn from them.

17         I'm going to explain a couple of things about

18    language that appears in the indictment.

19         First, the indictment charges that the offense

20    alleged was committed on or about a certain date.

21    Although it is necessary for the government to prove

22    beyond a reasonable doubt that the offense was committed

23    on a date reasonably near the date alleged in the

24    indictment, it is not necessary for the government to

25    prove that the offense was committed precisely on the

1    date charged.

2              And second, I want to talk with you about the

3    use of the conjunctive in the indictment.

4              As I read the indictment you may have noticed

5    that the conjunctive word "and" is used to connect other

6    charging words.  Thus, for example, the indictment

7    charges that the defendant acted with, quote, "The

8    intent to impede, intimidate and interfere."  However,

9    when you consider the third element of the offense, you

10   will notice that it requires the government to prove

11   beyond a reasonable doubt that the defendant acted with

12   the intent to impede, intimidate or interfere.  I

13   instruct you that in determining whether the government

14   has met its burden of proof you are to follow the

15   Court's instructions which are set forth in the

16   essential elements of the offense.

17             That brings us to Section III of the

18   instructions.

19             We're just about halfway through.

20             First I want to talk with you about evidence.

21             You must consider only the evidence or lack of

22   evidence in deciding this case.  You may, however, draw

23   reasonable inferences from the testimony and other

24   evidence as you feel are justified in the light of

25   common experience.  You may make deductions and reach

1    conclusions that principles of reason and common sense

2    lead you to make from all of the evidence presented.

3            There are two kinds of evidence you may

4    consider.  You may recall that one is direct evidence.

5    Direct evidence is where a witness testifies to what he

6    or she saw, heard or observed.  In other words, when a

7    witness testifies about what the witness asserts is

8    known to the witness of his or her own knowledge by

9    virtue of his or her own senses what the witness claims

10   he or she saw, touched or heard, that is called direct

11   evidence.

12           You may recall that the other kind of evidence

13   is indirect or circumstantial evidence.  Circumstantial

14   evidence is proof of certain circumstances that tends to

15   prove or disprove the presence or lack of certain other

16   facts.  To remind you of the example I gave you in the

17   preliminary charge, if you see water on the street

18   outside your window, you can infer that it has rained.

19   On the other hand, there might be other plausible

20   reasons for water being on the street.  The point being

21   made here is that you may infer on the basis of reason

22   and experience and common sense from an established fact

23   the existence or the nonexistence of some other relevant

24   fact.  It is a general rule that the law makes no

25   distinction between direct and circumstantial evidence.

1    The law, rather, requires that the jury find the facts

2    from the evidence, including direct and circumstantial

3    evidence, and leaves it to the discretion of the jury to

4    make such findings.

5              I've been talking with you about the kinds of

6    evidence and now I want to explain to you that the

7    evidence from which you are to decide what the facts are

8    comes in two forms:

9              First, there is the sworn testimony of

10   witnesses, both on direct and cross-examination.

11             And second, there are the exhibits that have

12   been received into the trial record.

13             Now, certain things are not evidence and are

14   not to be considered as such:

15             First, arguments or statements by lawyers are

16   not evidence.  They are designed and permitted to give

17   the lawyers the opportunity to tell you how they think

18   you should evaluate the evidence.

19             Second, the questions to the witnesses are not

20   evidence.  Any questions or comments by me are not

21   evidence.  Let me also emphasize that a lawyer's

22   question is not evidence.  While you must at times

23   consider a lawyer's question to give content and meaning

24   to the witness's answer, it is the witness's answer that

25   is evidence.  In short, questions are not evidence,

1    answers are.

2          Third, objections and arguments are not

3    evidence.

4          Fourth, testimony that has been excluded,

5    stricken or that you have been instructed to disregard

6    is not evidence and must be disregarded.

7          In addition, some testimony and exhibits have

8    been received only for a limited purpose.  Where I have

9    given you any limiting instruction about evidence that

10   you heard or saw, you must follow that limiting

11   instruction.

12         Also, exhibits marked for identification but

13   not admitted as evidence may not be considered as

14   evidence.

15         Fifth, anything you may have seen or heard

16   outside the courtroom is not evidence and must be

17   disregarded entirely.  You are to decide the case solely

18   on the evidence offered and received in the trial.  Of

19   course you should consider the evidence presented in

20   light of your own common sense and experience, and you

21   may draw reasonable inferences from evidence.  However,

22   your verdict must be based solely on the evidence

23   presented in this courtroom.

24         I remind you that you must completely

25   disregard any media or other reports on this matter or

1     any similar matter.  Indeed, it would be unfair to

2     consider such reports since they are not evidence and

3     the parties have no opportunity of challenging their

4     accuracy or otherwise explaining them away.  In short,

5     it would be a violation of your oath as jurors to allow

6     yourselves to be influenced in any manner by such

7     publicity.

8              I also want to talk with you about the fact

9     that I've made rulings as to evidence during the trail.

10             From time to time in the course of this trial

11    I have ruled on the admissibility of certain evidence.

12    It is imperative that you understand that any evidence

13    as to which an objection was sustained by the Court and

14    any evidence stricken by the Court must be entirely

15    disregarded.  You should have no concern with the

16    reasons for any rulings I have made and you are not to

17    draw any inferences from my rulings.  Issues concerning

18    the admissibility of evidence are questions of law for

19    the Court to decide.

20             In admitting evidence as to which an objection

21    has been made, the Court does not determine what weight

22    should be given to the evidence in question or pass on

23    the credibility of the evidence.  These are matters for

24    you to decide.

25             You must disregard any evidence that has been

1    ruled out of the case by the Court, and you must refrain

2    from speculation about any communications between the

3    lawyers and the Court that were held out of your

4    presence and hearing.

5            Now, it is the duty of the attorney on each

6    side of a case to object when the other side offers

7    testimony or other evidence that the attorney believes

8    is not properly admissible.  Counsel also have the right

9    and the duty to ask the Court to make rulings of law and

10   to request conferences at the bench out of the hearing

11   of the jury.  All those questions of law must be decided

12   by the Court.  You must not show any bias against an

13   attorney or his client because the attorney objected to

14   the admissibility of evidence or asked for a conference

15   out of the hearing of the jury or asked the Court for a

16   ruling on the law.

17           I want to talk with you about a couple of

18   particular items of evidence.

19           First I want to talk with you about the

20   hearing transcript and the telephone calls.

21           The government introduced evidence in the form

22   of the transcript of the August 31, 2016 hearing.  This

23   evidence was admitted for limited purposes only.  It was

24   offered by the government as evidence of the defendant's

25   intent, the defendant's motive and as to whether a

1    threat was made, and it was admitted only for those

2    limited purposes.  If you choose to credit this

3    evidence, you must consider it only for those limited

4    purposes.

5         The government also introduced evidence in the

6    form of recorded telephone calls.  This evidence was

7    also admitted for a limited purpose only.  It was

8    offered by the government as evidence of the defendant's

9    intent and motive and it was admitted only for that

10   limited purpose.  If you choose to credit this evidence,

11   you must consider it only for that limited purpose.

12        I also want to talk with you about the

13   transcripts of the calls.

14        You were shown transcripts the government

15   prepared that contained its version of recordings of

16   calls made to or from Wyatt Detention Facility and its

17   version of the identity of each of the voices you heard.

18   I instruct you that no transcript itself is evidence.

19   In each case the evidence is the recording itself and

20   what you heard.  Therefore, I instructed you to listen

21   very carefully to the recording itself.  You were shown

22   the transcripts solely to assist you in understanding

23   and absorbing what you heard.  If a transcript conflicts

24   with what you heard, you should ignore the transcript

25   and rely on the recording.

1            Next I want to talk with you about the use of

2      particular witnesses or investigative techniques.

3            You are instructed that there is no legal

4      requirement that the government use any specific

5      investigative techniques to prove its case.  Law

6      enforcement techniques are not your concern.  Your

7      concern is to determine whether or not, based upon all

8      the evidence in the case, the defendant has been proven

9      guilty beyond a reasonable doubt.  In this regard I also

10     charge you that all persons who may have been present at

11     any time or place mentioned in the case, or who may

12     appear to have some knowledge of the issues in this case

13     need not be called as witnesses, nor does the law

14     require that all things mentioned during the course of

15     the trial be produced as exhibits.

16            And now I want to talk with you about

17     credibility of witnesses.

18            In deciding the facts of this case you will

19     have to evaluate the credibility of the witnesses.  You,

20     as jurors, are the sole judges as to the credibility of

21     the witnesses and the weight that their testimony

22     deserves.  You may accept as true everything a witness

23     says, only part of it, or none of it.  In deciding what

24     part of a witness's testimony to believe you may

25     consider a number of factors, including the following:

1            One, the witness's ability to see or hear or

2    know the things to which the witness testified;

3            Two, the quality of the witness's memory;

4            Three, any bias the witness may have;

5            Four, the witness's manner while testifying;

6            Five, whether the witness was contradicted by

7    anything the witness said or wrote before trial or by

8    other evidence;

9            And six, how reasonable was the witness's

10   testimony when considered in light of other evidence

11   which you believe?

12           Inconsistencies or discrepancies in the

13   testimony of a witness or between the testimony of

14   different witnesses may or may not cause you to

15   discredit such testimony.  Two or more persons

16   witnessing an incident or a transaction may see or hear

17   it differently.  Innocent misrecollection, like failure

18   of recollection, is not an uncommon experience.  In

19   weighing the effect of a discrepancy, however, you may

20   wish to consider whether it pertains to a matter of

21   importance or an unimportant detail, and whether the

22   discrepancy results from innocent error or intentional

23   falsehood.

24           In evaluating the credibility of the witnesses

25   you should take into account any evidence that the

1    witness who testified may benefit in some way from the

2    outcome of this case.  Such an interest may sway the

3    witness to testify in a way that advances his or her own

4    interest.  Therefore, if you find that any witness whose

5    testimony you are considering may have an interest in

6    the outcome of this trial, then you should bear that

7    factor in mind when evaluating the credibility of his or

8    her testimony.  This is not to suggest that a witness

9    who has an interest in the outcome of this case will

10   testify falsely.  It is for you to decide to what

11   extent, if at all, the witness's interest has affected

12   or colored his or her testimony.

13           Now I'm going to talk with you about the

14   concept of impeachment of a witness.

15           A witness may be discredited or impeached by

16   contradictory evidence by showing that he or she

17   testified falsely concerning a material matter or by

18   evidence that at some other time the witness had said or

19   done something or has failed to say or do something

20   which is inconsistent with the witness's present

21   testimony.  If you believe that any witness has been so

22   impeached, then it is your exclusive decision to give

23   the testimony of that witness such credibility or

24   weight, if any, as you think it deserves.

25           In determining the weight to give to the

1    testimony of a witness you should ask yourself whether

2    there was evidence tending to prove that the witness

3    testified falsely about some important fact, or whether

4    there was evidence that at some other time the witness

5    said or did something or failed to day or do something

6    that was different from the testimony he or she gave at

7    the trial.

8           Where a witness testified inaccurately and you

9    do not think that the inaccuracy was consciously

10   dishonest, you should bear this inaccuracy in mind and

11   scrutinize the whole testimony of the witness.  If,

12   however, you conclude that a witness has not only

13   testified inaccurately, but that he or she has done so

14   intentionally or willfully, this casts a very serious

15   doubt on all of his or her testimony and you are

16   entitled to conclude that you cannot accept any of the

17   witness's testimony.  Whether you should disregard all

18   of the witness's testimony or believe some parts of it

19   is for you to decide.

20          You should remember that a simple mistake by a

21   witness does not necessarily mean that the witness was

22   not telling the truth.  People may tend to forget some

23   things or remember other things inaccurately.  If a

24   witness has made a misstatement, you must consider

25   whether it was simply and innocent lapse of memory or an

 1    intentional falsehood, and that may depend upon whether

 2    it concerns an important fact or an unimportant detail.

 3            I'm going to talk with you about the concept

 4    of prior inconsistent statements.

 5            The testimony of a witness may be discredited

 6    or impeached by showing that the witness previously made

 7    statements that are inconsistent with his or her

 8    testimony in court.  It is up to you to determine what

 9    credibility, if any, you will give the testimony of a

10    witness who has been impeached by an earlier

11    inconsistent statement.

12            I also want to talk with you about

13    uncontradicted testimony.

14            You are not required to accept testimony even

15    though the testimony is uncontradicted and the witness

16    is not impeached.  You may decide because of the

17    witness's bearing and demeanor, or because of the

18    inherent improbability of his or her testimony, or for

19    other proper reasons sufficient to you, that such

20    testimony is not worthy of belief.

21            I also want to talk with you about testimony

22    of law enforcement officers.

23            You have heard the testimony of law

24    enforcement witnesses.  The mere fact that a witness is

25    employed by the state or federal government as a law

1    enforcement officer does not in and of itself mean that

2    his testimony is deserving of more or less consideration

3    or greater or lesser weight.  At the same time, it is

4    quite legitimate for defense counsel to try to attack

5    the credibility of a law enforcement witness on the

6    grounds that his testimony may be colored by a personal

7    or professional interest in the outcome of the case.  It

8    is your decision, after reviewing all of the evidence,

9    whether to accept the testimony of a law enforcement

10   witness and to give that testimony whatever weight, if

11   any, you find it deserves.

12          Lastly in this section I want to talk with you

13   about the defendant's right not to testify.

14          The defendant did not testify in this case.

15   Under our Constitution a defendant has no obligation to

16   testify or to present any other evidence because it is

17   the prosecution's burden to prove his guilt beyond a

18   reasonable doubt.  A defendant is never required to

19   prove that he is innocent.  You may attach no

20   significance to the fact that the defendant did not

21   testify.  No adverse inference maybe drawn by you

22   because the defendant did not take the witness stand.

23   You may not consider this against the defendant in any

24   way in your deliberations in the jury room.

25          And now in the last section of these

1    instructions I want to talk with you about certain

2    procedures that you must follow.

3            First, I want to give you a reminder about the

4    burden of proof.

5            As I described to you earlier, in order for

6    the government to prove that the defendant is guilty of

7    the charged offense, it must prove the elements of that

8    offense.  Unless the government proves beyond a

9    reasonable doubt each and every element of the charged

10   offense you must find the defendant not guilty.

11           Next I want to talk with you about your duty

12   to deliberate and your use of notes.

13           The verdict must represent the considered

14   judgment of each juror.  Also, to return a verdict, it

15   is necessary that each juror agree.  Your verdict must

16   be unanimous.  It is your duty as jurors to consult with

17   one another and to deliberate with a view toward

18   reaching an agreement if you can do so without

19   compromising individual judgment.  You must each decide

20   the case for yourself, but only after an impartial

21   consideration of the evidence in the case with your

22   fellow jurors.  In the course of your deliberations do

23   not hesitate to reexamine your own views and change your

24   opinion if convinced it is erroneous, but do not

25   surrender your honest position as to the weight or

1    effect of evidence solely because of the opinion of your

2    fellow jurors or for the purpose of merely returning a

3    verdict.  Your final vote must reflect your

4    conscientious belief as to how the issue here should be

5    decided.  And again, your verdict, whether guilty or not

6    guilty, must be unanimous.

7          Please remember at all times that you are not

8    partisans.  That is because you are judges.  In this

9    case you are the judges of the facts and your sole

10   interest is to determine whether the government has

11   proven the defendant's guilt beyond a reasonable doubt.

12   Please remember my instructions about notes given at the

13   beginning of the case.  When you retire to deliberate,

14   if a fellow juror claims that a certain fact exists

15   because he or she has had it written down on his or her

16   note pad, remember that it is your own recollection that

17   must control.

18         Similarly, none of you must use the mere fact

19   that you took notes to try and influence any other

20   juror.  Notes can be used to refresh one's own

21   recollection, but it is what each of you remembers that

22   counts, not anyone's notes.

23         Consistent with the principle that the jury

24   may not deliberate unless all the jurors are present and

25   participating, jurors may not use cell phones during

1    deliberations.  Use of a cell phone by a juror during

2    deliberations requires that deliberations be suspended

3    until the cell phone is no longer in use.  A juror may

4    request permission from the Court to leave his or her

5    cell phone on during deliberations in unusual

6    circumstances when the juror needs to be able to receive

7    a call.

8            I also want to talk with you about the

9    integrity of the deliberative process.

10            During your deliberations you must not

11   communicate with or provide any information to anyone by

12   any means about this case.  You may not use any

13   electronic device or media, such as the telephone, any

14   text or instant messaging service, or any other internet

15   service to communicate to anyone information about this

16   case or to conduct any research about this case until I

17   accept your verdict.  In other words, you cannot talk to

18   anyone on the phone, correspond with anyone or

19   electronically communicate with jurors during

20   deliberations.  I expect you to notify me if you become

21   aware of another juror's violation of these

22   instructions.

23            You may not use these electronic means to

24   investigate or communicate about this case because it is

25   important that you decide this case based solely on the

1    evidence presented in this courtroom.  Information on

2    the internet or available through social media might be

3    wrong, incomplete or inaccurate.  You are only permitted

4    to discuss the case with your fellow jurors during

5    deliberations because they have seen and heard the same

6    evidence you have.  In our justice system it is

7    important that you are not influenced by anything or

8    anyone outside this courtroom.  Otherwise, your decision

9    may be based on information known only by you and not by

10   your fellow jurors or the parties in the case.  This

11   would unfairly and adversely impact the fairness of our

12   process.

13        Let me talk about a couple of other procedural

14   matters.

15        Upon retiring to the jury room you will select

16   one person to act as your foreperson.  The foreperson

17   will preside over your deliberations and will speak for

18   you here in the courtroom.  Any communications with the

19   Court during deliberations must be in writing and signed

20   by the foreperson.  No member of the jury should ever

21   attempt to communicate with me except by a writing

22   signed and dated by the foreperson, and I will never

23   communicate with any member of the jury on any subject

24   touching the merits of the case other than orally here

25   in open court in the presence of counsel and the

1    parties.

2           If you have any questions, you should

3    communicate such questions to the Court in a writing

4    signed by the foreperson.  If you do send a note to me,

5    please do not disclose in your note or otherwise

6    anything about your deliberations.  Specifically, do not

7    disclose to anyone, not even to me, how the jury stands,

8    numerically or otherwise, on the questions you must

9    decide until after you have reached a unanimous verdict.

10          You will have the evidence presented during

11    the trial with you in the jury room.  You will not,

12    however, have a written transcript of the witness's

13    testimony.  If you want any of the testimony read, that

14    can be done, but please remember that it is not always

15    easy to locate what you might want.  So be as specific

16    as you possibly can if you request any portion of the

17    testimony.

18          You will also have a copy of the indictment

19    with you in the jury room during your deliberations.

20    You may use it to read the offense with which the

21    defendant is charged.  You are reminded, however, that

22    an indictment is merely an accusation and is not to be

23    used by you as proof of the conduct charged.

24          Now, as you know, a verdict form has been

25    prepared for your convenience and you will have the

1      original verdict form with you in the jury room.  The

2      answers to the questions on the verdict form must be the

3      unanimous answer of the jury.  The foreperson will write

4      the unanimous answer of the jury in the space provided.

5      The foreperson will date and sign the verdict form when

6      completed and then return to the courtroom with the

7      verdict form.  The foreperson should keep the verdict

8      form until directed by me to hand it to the courtroom

9      deputy.

10             I'm just going to point out a couple of things

11      for you with respect to the verdict form.

12             You'll see that Section I has subsections A

13      and B.  You of course will start with A where you are

14      asked to respond to this question:  As to the charge set

15      forth in Count 1 of the indictment, we, the jury,

16      unanimously find that the defendant, Peter Santos, is --

17      and then you will check off one of those two answers,

18      not guilty or guilty.

19             If you check off not guilty, you will proceed

20      to Section II of the verdict form.

21             If you check off guilty, you will proceed to

22      Section I B of the verdict form where you have to answer

23      an additional question; namely, has the government

24      proven beyond a reasonable doubt that Mr. Santos

25      threatened to kill Supervisory United States Probation

1     Officer Topor, and you'll answer that no or yes.  And

2     then you'll proceed to Section II.  And you will see in

3     Section II there's a reminder the foreperson should sign

4     and date the verdict form.  There's also a place to fill

5     in the time.

6              I hope that is straightforward.

7              Now, before you proceed with your

8     deliberations I have to inform you that three of you

9     must be identified as alternate jurors.  If your number

10    is announced as an alternate juror, you will be asked to

11    wait here in the courthouse until deliberations are

12    concluded.  We have a room just off the hallway that you

13    came down where alternate jurors wait.

14             I'm going to ask the courtroom deputy to give

15    us the names of three alternate jurors -- the numbers

16    rather.

17             THE CLERK:  Alternate Juror 1 is Juror 10.

18             Alternate Juror Number 2 is Juror Number 2.

19             And Alternate Juror Number 3 is Juror

20    Number 7.

21             THE COURT:  For those of you who are going to

22    serve as alternate jurors, I know you must be

23    disappointed, to some degree at least, but I do want to

24    make sure that you understand a couple of things.  If we

25    proceed to trial with no alternate jurors and we have a

1    juror who gets sick or has a family emergency or for any

2    other reason is unable to come in, we cannot continue.

3    So it serves the process to have alternate jurors.

4            Even now, as we have a jury of 12

5    deliberating, if someone becomes unable to continue for

6    any reason we would have to replace that deliberating

7    juror with an alternate juror and the deliberations

8    would start over again.  That is highly preferable to

9    having the trial start over again.  So that is a very

10   good and workable system.  And I have had cases where

11   that has happened.

12           So I do want the alternate jurors to take

13   seriously my instructions that until deliberations are

14   done, the alternates cannot come to any conclusions

15   about the case, they cannot discuss the case in any

16   manner when they're sitting back in the room and they

17   cannot be exposed to anything about this case or any

18   similar matter, and they also cannot have any contact

19   with the parties, attorneys or witnesses in the case.

20   You need to be in the same position as the people who

21   are deliberating because we never know when we have to

22   have somebody replace a deliberating juror.

23           I think we will keep you posted as to what

24   things are going on and we'll bring you back into the

25   courtroom before we end for the day and for any events

1     that occur.

2               So we've now reached the time for the jury to

3     retire to the jury room.  When you go to the jury room

4     please do not begin to deliberate until you receive from

5     the courtroom deputy the exhibits you are to have with

6     you any jury room and she formally directs you to begin

7     your deliberations.  She'll bring those exhibits in

8     shortly.

9               I remind you that at the completion of your

10    deliberations the foreperson should communicate with the

11    Court through a signed writing to be handed to the

12    courtroom deputy in the courtroom indicating that a

13    verdict has been reached.  Again, please do not deliver

14    the verdict form to the courtroom deputy until you are

15    directed to do so by me after you have returned to the

16    courtroom.

17              Thank you all very much for your attention to

18    these instructions.

19              Everyone's lunch is back in the jury room.

20              Thank you.

21              (Whereupon, the jury left the courtroom.)

22              THE COURT:  Please be seated everyone.

23              I did catch three little nits in the charge

24    and I'll have my law clerk show them to you and make

25    those changes before we send it in.

1           Any objection to the charge as delivered?

2           MR. ROGAN:  Your Honor, yes.  Just the

3    previous objections that I had noted on the record.  So

4    I do object to the charge as given, Your Honor.

5           THE COURT:  Yes.  I'm preserving the ones that

6    have already been made.  I meant to ask any additional

7    ones.

8           MR. ROGAN:  Correct, Your Honor.

9           THE COURT:  Thank you.

10           MR. DURHAM:  The government has no objections,

11    Your Honor.

12           THE COURT:  Okay.

13           We're all set in terms of taking the exhibits

14    in.  I'll show you all these changes and then we'll get

15    the charge in and I'll ask that you all have your phone

16    numbers with the courtroom deputy in case she needs to

17    reach you.  Try to be within 15 minutes in case we get a

18    question from the jury.

19           We're all set with the recording device for

20    the jurors to use.

21           Any questions?

22           MR. ROGAN:  One procedural question, Your

23    Honor.  Because they are deliberating, are the alternate

24    jurors having lunch back there with them?

25           THE COURT:  They typically go down the hall as

1    soon as Linda goes in and they go in and get their

2    things a go off to the side.  Linda will escort them

3    down there.

4              Okay, thank you.

5

6              (Whereupon, a recess followed.)

7

8              MR. DURHAM:  Your Honor, I think your

9    colleague, Judge Hall, would be very comfortable with

10   the temperature in here now.

11             THE COURT:  She's the only one.

12             The jury says they want to reconvene at

13   9:00 tomorrow.  So I think if counsel are here at 9:30,

14   that should be plenty of time.  I'll tell the alternates

15   that.

16             (Whereupon, the jury entered the

17   courtroom.)

18             THE COURT:  Please be seated everyone.

19             I'll try and do this quickly because,

20   according to your note, you wanted to be gone by now.

21             I've shared your note.  That's fine.  Come

22   back at 9:00 tomorrow.  When you're all here you start

23   deliberating.

24             For counsel and the alternates, if you're here

25   at 9:30, that's plenty of time.  The jury wants to start

1    at 9:00.

2              I want to thank you for your hard work and

3    remind you about the instructions I gave you about not

4    discussing the case.  I think you remember them?  Good.

5    Other than that, thank you, and we'll let you get on

6    your way.  See you tomorrow.

7                   (Whereupon, the jury left the courtroom.)

8              THE COURT:  I'll let counsel stay in the

9    courtroom until the jurors have time to clear the

10   courthouse.

11             We'll recess.

12                  (Whereupon, a recess followed at

13   4:00 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3          UNITED STATES VS. PETER J. SANTOS

4                  3:17CR00024(AWT)

5

6

7          I, Corinna F. Thompson, RPR, Official Court

8     Reporter for the United States District Court for the

9     District of Connecticut, do hereby certify that the

10    foregoing pages, pages 1 - 237, are a true and accurate

11    transcription of my shorthand notes taken in the

12    aforementioned matter on May 30, 2017, to the best of my

13    skill and ability.

14

15

16

17

18              /s/_____

          CORINNA F. THOMPSON, RPR
19            Official Court Reporter
            450 Main Street, Room #225
20          Hartford, Connecticut 06103
                 (860) 547-0580
21

22

23

24

25