UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO. 3:17CR24 (AWT) |
| v. | : | November 27, 2017 |
| PETER J. SANTOS | : | |


**GOVERNMENT'S SENTENCING MEMORANDNUM**

The Government respectfully files this Memorandum as an aide to the Court in the above-captioned matter.   In this regard, the defendant is scheduled to be sentenced on December 18, 2017, for the substantive offense of Threatening a Federal Official, in violation of Title 18, United States Code, Section 151(a)(1)(B).


## I.   INTRODUCTION

The defendant Peter Santos was convicted of threatening a federal official in violation of 18 U.S.C. Section 115(a)(1)(B) after a full jury trial. The defendant's conviction flowed from events that took place during a supervised release violation hearing held before the Honorable Janet B. Arterton on August 31, 2016.   As set forth below, the record before the Court sets forth the defendant's complete distain for the court system, including judges, defense counsel, Probation Officers and the judicial process itself.   Indeed, there is nothing in the record to even

suggest that Mr. Santos is prepared to or intends to change his ongoing course of criminal conduct.   As a consequence, the predominant sentencing factors in this case, respectfully, should be punishment and protection of the public.

## II.   STATEMENT OF FACTS AND EVIDENCE

As the record in this case reflects, after a four day jury trial, Peter J. Santos was found guilty in the above-captioned matter of Threatening a Federal Official, in violation of a violation of Title 18, United States Code, Section 115(a)(1)(B). The evidence proving the charge contained in the one-count included the following:

Testimony and evidence presented through Senior United States Probation Officer Jennifer Amato, together with other documentary evidence in the record, established that on January 21, 2014, United States District Judge Kimba Wood (SDNY) sentenced the defendant to a term of 25 months imprisonment to be followed by a 36-month term of Supervised Release. GX1; Tr. 5/30/17 at 43.   The sentence was imposed following his conviction of Conspiracy to Transport Stolen Goods, Conspiracy to Receive Stolen Goods and Conspiracy to Commit Wire Fraud.   On or about December 31, 2015, the defendant Santos began service of that previously imposed term of Supervised Release, and on January 4, 2016, a U.S. Probation Officer met with Santos and discussed with him the Conditions of Supervised Release.   *Id.* at 158-59.

The evidence at trial further established that among the conditions included in the district court's Order was one that required the defendant to refrain from excessive use of alcohol and prohibited the purchase, possession, use, distribution or administering of any controlled substance, or any paraphernalia related to any controlled substance, except as prescribed by a

physician. *Id.* at 43-44; GX1.

The trial testimony and the transcript of a hearing in Santos' Supervised Release

Violation case held before U.S. District Judge Janet Bond Arterton on August 31, 2016,[1]

showed that while on Supervised Release, Santos's urine specimens tested positive for heroin on

at least 12 separate occasions between February 17, 2016 and July 18, 2016. In addition, the

record reflects that Santos had been accepted into a number of substance abuse programs while

on Supervised Release, and almost immediately after entering the respective programs, he left

against medical advice.   Following one final failure to avail himself of the help being offered

through the U.S. Probation Office, and specifically on or about August 16, 2016, the District

Court held a hearing in which the defendant Santos was explicitly told that if he continued to

use drugs and did not make use of the drug rehab programs made available to him, he would be

found in violation and sent back to prison for a period of 6 months.   The period of incarceration

would then be followed by an additional period of supervised release.   Tr. 5/30/17 at 163-65.

After his August 16, 2016 hearing, Santos walked away from another drug rehab

program and continued to test positive for the presence of heroin.   Thereafter, on August 25,

2016, he was arrested on a Supervised Release Violation warrant and ordered detained.   *Id.* at

166.   On August 31, 2016, Santos appeared before Judge Arterton in New Haven, Connecticut

for a hearing on his latest violation of the conditions of his release. During the course of the

hearing, and, more particularly, once it became clear the Court intended to follow through on its

early warning that another failure to participate in another drug rehabilitation program would

---

[1]  The transcript was admitted at trial as GX 2.   Additional documents relating to these facts are included in the full
record of this case.

result in his incarceration, Santos became noticeably agitated and engaged in inappropriate discourse with Judge Arterton. GX 2.1[2] Ultimately, Santos was found to be in violation of his Supervised Release and sentenced to a period of six-months' incarceration to be followed by an additional period of twenty-four months of Supervised Release.

---

[2] Some of the more salient portions of the exchange included the following:

| | |
|---|---|
| THE DEFENDANT: | You can just stop, all right?   You're giving me the time, you give me the time. I'll crawl and scratch.   When I get out, I'm not going to the halfway house.   Do what you want.   Here, put the cuffs on, let's go.   All right? |
| | The exchange with the Court went on as follows: |
| THE COURT: | You're just not going to get your way. |
| THE DEFENDANT: | No, I already know that now, so let's go, let's rock and roll. |
| THE COURT: | When you come out and you go to a program - - |
| THE DEFENDANT: | I ain't going to go to a program, all right?   So let's go, put the cuffs on. |
| | Mr. Santos' Eddie Haskell mask having been completely removed at this point, he addressed the Court as follows: |
| THE DEFENDANT: | All right, so you can row that boat that we were talking about straight up you know where.2 |
| THE COURT: | Do you think your parents are enjoying this conversation?   Are you not ashamed? |
| THE DEFENDANT: | No, I'm not. |
| THE COURT: | I guess not. |

---

- 4 -

A. <u>Evidence of the Threat Made By Defendant</u>

Multiple witnesses testified to the events that transpired between the defendant Santos and Mr. Topor shortly after Judge Arterton had left the bench following imposition of sentence for the defendant's Supervised Release violations. In this regard, Julie Cashman, Judge Arterton's court reporter who was present in the courtroom at the time of the threat, testified that Santos "become agitated as the proceedings progressed."   Tr. 5/30/17 at 77.   Ms. Cashman explained that, ". . . because we were in recess, I cannot give you a verbatim quote, but I do recall Mr. Santos saying something to the effect of, 'When I get out, I'll come see you,' or, 'I'll come look for you,' something along those lines." *Id*. at 93. Ms. Cashman noted that the defendant was speaking in a "serious tone." *Id*. at 95.

The testimony of Ms. Cashman was consistent with the testimony of subsequent witnesses. Among these witnesses was Ms. Patti Villano, the courtroom deputy to Judge Arterton, who was also present in the courtroom at the time of the exchange. Ms. Villano testified, "As they were escorting him out, he looked over at Brian [Topor] and said something to the effect, 'I'll look for you when I get out, I'll come and get you.'" *Id*. at 126. When asked about Mr. Santos' tone of voice when the statement was made, Ms. Villano testified, "It was a threat." *Id*.

In addition, Daniel Leone, a fellow U.S. Probation Officer who was present in the courtroom at the time of the August 31, 2016 hearing, testified.   Mr. Leone's testimony was consistent with the testimonies of Ms. Cashman and Ms. Villano.   Mr. Leone reiterated that through the hearing, Mr. Santos became visibly irritated and noted that, "Upon the judge stating

that she was going to follow through with her six months' imprisonment, followed by the 24 months supervised release, Mr. Santos became agitated, verbally agitated as well as standing up physically." *Id.* at 175.   Mr. Leone then recounted what took place as the defendant was leaving the courtroom: "Following Judge Arterton leaving the bench, Mr. Santos was handcuffed and was being escorted out of the courtroom. As he was exiting, he looked in the direction of myself and my supervisor, Brian Topor, towards the jury box and in the direction of Mr. Topor. Mr. Santos said, 'When I come out, I'm coming for you'." *Id.* at 180.

Brian Topor, one of the U.S. Probation Officers assigned to supervise the defendant while on Supervised Release and the victim of the threat, also testified. His testimony was consistent with the testimony of previous witnesses. Mr. Topor was the supervisory probation officer assigned to Mr. Santos' case. At the August 31, 2016 hearing conducted by Judge Arterton, Mr. Topor recommended against Mr. Santos being allowed to attend yet another treatment program. When asked to testify as to the exchange that took place with Mr. Santos, Mr. Toper stated, "He turned and looked at me and says, 'When I get out, I'm coming for you.'" Tr. 5/31/17 at 281. And when asked to characterize the tone of voice used by Mr. Santos, Officer Toper stated it was, "[f]irm." *Id.*

The trial evidence also included the fact that shortly thereafter, while waiting at the elevator leading to the Marshal's lock-up, Deputy United States Marshal Matthew Moore said to Santos, "Come on, man. That's not smart," in reference to the threat Santos had directed at Officer Toper. In response to Marshal Moore's comment, as the trial testimony of both Deputy Marshals Moore and Michael Curra showed, Santos stated, "[E]veryone has to meet their

maker, whether it is by me or some other way." Tr. 5/31/17 at 370, 399.

The threatening and serious nature of the statements made to Mr. Topor and the intention behind them were corroborated by the introduction at trial of recorded conversations between Santos and others while Santos was being held at the Wyatt Detention Center.[3]   In particular, on August 27, 2016 – two days after his August 25, 2016 arrest and detention for again violating the terms and conditions of his Supervised Release *and four days before the August 31, 2016 hearing conducted by Judge Arterton* – Santos told his mother he had told his Probation Officers "to go [expletive] themselves."   *See* GX 6.1; GX 6.1T (for id).   This fact was confirmed at trial through the testimony of Mr. Topor.   Two days later, in another recorded call between Santos and his mother, the defendant stated, "I'm going to fight these mother[expletives] till I die if I have to. I'm sick of these [expletive] people [in context his U.S. Probation Officers]."   *See* GX 7.1; GX 7.1T (for id).

On September 1, 2016, the day following the proceedings conducted by Judge Arterton during which he was sentenced to the additional period of 6 months' incarceration and 24 months of Supervised Release after which he threatened Mr. Topor, the defendant was recorded telling his mother that, "Well, I'm probably getting a new charge for threatening to kill that guy [in context Mr. Topor]," GX 8.1; GX 8.1T (for id).

In this same vein, on September 27, 2016, while still incarcerated at Wyatt, Santos had a telephone conversation with a long-time friend and fellow felon, one Clifford Barnes, which was recorded over the Wyatt telephone system.   During the call, Santos asked Barnes to tell

---

[3] In addition to the eyewitness testimony provided by individuals who had seen and heard the defendant's statements, Deputy United States Marshal Matthew Parker testified that he secured copies of a number of non-

U.S. Probation Office Dan Leone, who, again, had been Santos' immediate supervising Probation Officer and who had been in the courtroom with Mr. Topor on August 31, 2016, "… when you see Dan tell him, 'I said [expletive] you, and I am going to kill you when I get out'," adding, "tell him I send my love …." *Id*. at 445.

Based on the overwhelming evidence admitted during the course of the proceeds, the jury appropriately returned a guilty verdict.

## III. GUIDELINES CALCULATION

The PSR prepared by the Probation Office calculates the defendant's adjusted offense level on Count One of the Indictment to be 20, PSR at ¶ 29, and his Criminal History Category ("CHC") to be III, PSR at ¶ 42.   (Pursuant to U.S.S.G. §§ 2A6.1(a)(1), the defendant's base offense level for having threatened a federal official under 18 U.S.C. 115(a)(1)(B) is 12.   PSR ¶ 21.   Under §2A6.1(b)(2)(A), 2-points are added because the defendant made 2 or more threats, PSR ¶22, and 6-points are added under §§ 3A1.2(a)(1) and (2) because of the victim's status as a United States Probation Officer.)

An adjusted base offense level of 20 and CHC of III results in a Guidelines range of 41-51 months' incarceration, PSR ¶ 70, a Supervised Release period of 1-3 years, PSR ¶ 75, a fine of $15,000 to $150,000, PSR ¶ 80, and a mandatory $100 Special Assessment, PSR ¶ 79.*; cf*. Def. Sent. Mem. at 2.

---

privileged phone calls made by the defendant from the Wyatt Detention Facility and attested to the accuracy of the recordings.

## IV.   __Defendant's Request for Downward Departure__

The defendant requests that the Court impose a sentence below his applicable Guidelines range, even the range based on how he argues the range should be calculated,[4] that is, he asks the Court to impose a sentence of time served either by way of a departure or variance.   Def. Mem. at 3.   In making his argument in support of such a substantial (and, in the Government's view, completely unwarranted) departure, he claims that his threat to Mr. Topor was an "unplanned, spontaneous statement," and was "spoke[n] impulsively in a moment of anger." Def. Mem. at 2.   He goes on to assert that the threat "evidenced no deliberation [ ] and was the product of a 'single thoughtless response to a particular event.'" *Id.* at 10.   The record, however, reflects something very different from that suggested by the defense.   Indeed, it reflects that this was not the first time the defendant had acted in an aggressive and inappropriate manner toward Mr. Topor. Even prior to the August 31, 2016 hearing before Judge Arterton, by his own admission, he had told Mr. Topor to go [expletive] himself for essentially just doing his job. GX 6.1; GX 6.1T (for Id) at 2 ("They were going to let me go.   The judge was going to let me go on Wednesday.   I went before the judge in Hartford and he was going to let me go, but that [expletive] Brian [Topor], remember, the head guy there, starts in the judge's ear how I use drugs and this and that.   And then they and he said, well the we'll just hold you until you go to New

---

[4] The defendant asserts that his Guideline range should be based on an adjusted base offense level of 14 and Criminal History Category III, resulting in a range of 21-27 months' incarceration.   Def. Mem. at 3.

Haven on Wednesday.   That's when I got a little mad and cursed them out. *** I told them to go [expletive] themselves.")   Similarly, two days later, on August 29, 2016, which was two days *before* the hearing before Judge Arterton, the defendant engaged in another recorded call with his mother.   In that conversation, Santos stated, "I mean (unintelligible) like trying, like he said, when I told him [in context Mr. Topor] to go [expletive] himself the other day.   . . . I am going to fight these mother[expletives] till I die if I have to. I'm done. I'm sick of these [expletive] people." GX 7; GX 7.1T (for id).   At trial, Mr. Topor confirmed that the defendant had in fact told him to go [expletive] himself.   Given the record, the defendant's claim that his threat to Mr. Topor was a "single thoughtless response to a particular event," is without merit.

   For the reasons more fully explained below, the Government respectfully requests that the Court impose a prison sentence that is at least within the defendant's applicable Guidelines range because the defendant (a) has been involved in multiple instances of criminal conduct over a long period of time, (b) has a history that reflects a pattern of engaging in criminal behavior and exhibits a clear distain for the criminal justice system, and (c) has evidenced a clear intent to continue to ignore the lawful orders of the court when he is eventually released from custody.   Finally, the Government respectfully submits that it is imperative that the sentence imposed in this case serve the important purpose of letting the defendant know that the system will not continue to allow him to ignore lawful court orders and continue to engage in criminal conduct without significant penalties being imposed for such conduct.

## V.  Discussion

A.  Determining an Appropriate Sentence Post-Booker

Although imposing sentences within the properly calculated Sentencing Guidelines range are not mandatory, both the Supreme Court and the Second Circuit have stated that they must be considered by the Court along with the other factors listed in 18 U.S.C. § 3553(a).  *United States v. Booker*, 543 U.S. 220, 260-61 (2005); *United States v. Crosby*, 397 F.3d 103, 110 (2d Cir. 2005); *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007)("district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process").  Ultimately, a district court's sentence is reviewed for reasonableness.  *Booker*, 543 U.S. at 260-61; *Crosby*, 397 F.3d at 114-15.   Reasonableness is a flexible concept and district courts are given latitude in their exercise of discretion to fashion an appropriate sentence, even a non-Guidelines sentence.  *See United States v. Jones*, 460 F.3d 191 (2d Cir. 2006).

Importantly, the Second Circuit has instructed district judges to consider the Guidelines "faithfully" when sentencing, *Crosby*, 397 F.3d at 114, and the fact that the Sentencing Guidelines are no longer mandatory does not reduce them to "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *Crosby*, 397 F.3d at 113.   In fact, because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of

individual sentencing decisions," *Gall*, 552 U.S. at 46, district courts must treat the

Guidelines as the "starting point and the initial benchmark" in sentencing

proceedings.    *Id.* at 49; *Kimbrough v. United States*, 552 U.S. 85, 107 (2007).

Moreover, the Second Circuit has "recognize[d] that in the overwhelming majority of

cases, a Guidelines sentence will fall comfortably within the broad range of

sentences that would be reasonable in the particular circumstances."    *United*

*States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough*, 552 U.S. at

89 ("We have accordingly recognized that, in the ordinary case, the Commission's

recommendation of a sentencing range will 'reflect a rough approximation of

sentences that might achieve § 3553(a)'s objectives.'") (quoting R6*ita v. United*

*States*, 551 U.S. 338, 350 (2007).

    B.  <u>The Section 3553 Factors Support a Significant Prison Sentence</u>

    Under 18 U.S.C. § 3553(a), the sentencing "court shall impose a sentence

sufficient, but not greater than necessary, to comply with the purposes set forth in

paragraph (2) of this subsection."    The statute then provides that "[t]he court, in

determining the particular sentence to be imposed, shall consider":

        (1)    the nature and circumstances of the offense and the history and
                 characteristics of the defendant;

        (2)    the need for the sentence imposed—

                (A)    to reflect the seriousness of the offense, to promote
                             respect for the law, and to provide just punishment
                             for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

(5)     any pertinent policy statement [issued by the Sentencing Commission];

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Here, the criminal conduct at issue involves the defendant threatening a United States Probation Officer who was engaged in the proper performance of his duties.   This is a serious matter and, respectfully, the defense suggestion that this somehow relates to free speech rights is troublesome.   ("This case . . . represents a delicate balance between the First Amendment rights of a defendant and the need to impose a sentence following a verdict[,]" Def. Mem. at 2, and "This type of statement [that is, the defendant's statement regarding meeting one's maker] is closer to the realm of free speech, and should be treated as such." *Id.* at 9.) As

- 13 -

Section 115(a)(1)(B) makes clear, threatening to come after a federal probation officer for his having done his job is not protected speech and to suggest it is points out the lame nature of the defendant's argument for a downward departure in this case.   It is respectfully submitted that for the reasons set forth below, this criminal conduct, when considered in the context of the factors set forth in § 3553(a) as explained below, supports the imposition of a sentence at the top of the Guidelines range or above.   *See* 18 U.S.C. § 3553(a)(4) (Court shall consider the sentence applicable under the Guidelines).

      1. <u>The Nature and Circumstances of the Offense and the History and Characteristics of the Offender</u>

      The nature and circumstances of the offense in this case has been set forth in detail above and will not be repeated here.   Contrary to the defense position, the threat in this case falls squarely within the heartland of threat offenses.   Because Mr. Topor had the temerity to do his job and make a reasoned, well-supported presentation to Judge Arterton regarding the defendant's conduct while on Supervised Release and the likelihood of his complying with yet another court order regarding rehab, the defendant explicitly and expressly told Mr. Topor that he was coming after him when he got out of jail.   Moreover, the next day, on September 1, 2016, he made explicit in his recorded conversation with his mother that he had threatened to kill his Probation Officer.   GX 8; GX 8.1T (for id) at 2.

- 14 -

    2.    <u>Seriousness of the Offense, Respect for the Law, Just Punishment</u>

The defense asserts that a downward departure to a sentence of time served and probation would be adequate in this case. Def. Mem. at 1, 14.   The government respectfully submits that imposing a sentence of time served and probation in this matter would be to denigrate the seriousness of the criminal conduct at issue.   The defendant tells the Court in his own words what his intentions are regarding the United States Probation Office and Probation Officers: he considers them mother[expletives] and his intends to fight them until he's dead.   He has expressed no remorse for his conduct and that is somewhat understandable in light of the fact that he feels no such remorse.

Respectfully, the sentence imposed by the Court should (a) make clear that the conduct at issue is serious, (b) promote respect for the law (which the defendant himself clearly does not) and (c) provide punish for the criminal conduct at issue. Further, a sentence at the top of or above the properly calculated Guidelines range should be appropriately lengthy sentence to serve the separate goal of isolating the defendant for a period of time so as to insure that for at least the time he is incarcerated, he will not be posing a danger to other members of the community.

## IV.   CONCLUSION

Based on the foregoing, the Government respectfully requests that the Court impose a sentence at the top of the defendant's Guidelines range or above for his

blatant and unprovoked threat to assault his United States Probation Officer for

that Officer having the audacity to provide candid information to the District Court

Respectfully submitted,


*/s/ John H. Durham*
JOHN H. DURHAM
UNITED STATES ATTORNEY
Federal Bar No. ct05087
157 Church Street; 23rd Floor
New Haven, Connecticut   06510
(203) 821-3700

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on November 27, 2017, a copy of foregoing Government's Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.   Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.   Also, a copy of the foregoing was sent via email to United States Probation Officer Richard Rinaldi.

/s/   *John H. Durham*
JOHN H. DURHAM
UNITED STATES ATTORNEY

- 17 -